# EXHIBIT A

Case 1:19-cv-14758-RMB-JBC    Document 1-1    Filed 07/05/19    Page 1 of 68 PageID: 12

Gurbir S. Grewal
ATTORNEY GENERAL OF NEW JERSEY
Richard J. Hughes Justice Complex
25 Market Street; PO Box 093
Trenton, NJ 08625-0093
Tel.: (609) 376-2761
By: Gwen Farley, Deputy Attorney General
Bar No. 000081999
*Attorneys for Plaintiffs*

Leonard Z. Kaufmann
g  Atty. ID #045731994
  lzk@njlawfirm.com
COHN LIFLAND PEARLMAN
  HERRMANN & KNOPF LLP
Park 80 West – Plaza One
250 Pehle Avenue, Suite 401
Saddle Brook, New Jersey 07663
Tel.: (201) 845-9600
*Special Counsel to the Attorney General*

| | |
|---|---|
| NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION; THE COMMISSIONER OF THE NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION; and THE ADMINISTRATOR OF THE NEW JERSEY SPILL COMPENSATION FUND,<br><br>　　　　Plaintiffs,<br><br>v.<br><br>E.I. DUPONT DE NEMOURS & COMPANY; THE CHEMOURS COMPANY; THE CHEMOURS COMPANY FC, LLC; AND "ABC CORPORATIONS" 1-10 (Names Fictitious),<br><br>　　　　Defendants. | SUPERIOR COURT OF NEW JERSEY LAW DIVISION<br><br>PASSAIC COUNTY<br><br>DOCKET NO. L-000936-19<br><br><br>CIVIL ACTION<br><br>**FIRST AMENDED COMPLAINT AND JURY TRIAL DEMAND** |

Plaintiffs, the New Jersey Department of Environmental

Protection ("Department" or "NJDEP"), the Commissioner of the

Department of Environmental Protection ("Commissioner"), and the Administrator of the New Jersey Spill Compensation Fund ("Administrator") (collectively the "Plaintiffs" or "the State"), file this Complaint against the above-named defendants (the "Defendants"), and allege as follows:

## STATEMENT OF THE CASE

1. Plaintiffs bring this civil action against E.I. du Pont de Nemours & Company ("DuPont"), as well as The Chemours Company ("Chemours Co."), and The Chemours Company FC, LLC (together "Chemours"), pursuant to the Spill Compensation and Control Act, N.J.S.A. 58:10-23.11 to -23.24 ("Spill Act"); the Water Pollution Control Act, N.J.S.A. 58:10A-1 to -20 ("WPCA"); the Solid Waste Management Act, N.J.S.A. 13:1E-1, et seq. ("SWMA"); the Department's enabling statute, N.J.S.A. 13:1D-1, et seq.; the Uniform Fraudulent Transfer Act, Del. Code. tit. 6, §§ 1301 to 1312, N.J.S.A. 25:2-20 to 25:2-34; and the common law of New Jersey for cleanup and removal costs, damages, and other relief as a result of the discharge of hazardous substances and pollutants at and from the Pompton Lakes Works facility (the "PLW Facility" or "Facility").

2. DuPont owned and operated the PLW Facility as a manufacturing facility for almost a century, producing lead azide, aluminum and bronze shelled blasting caps, metal wires, and aluminum and copper shells at the site. Pompton Lake, the Ramapo

2

River, the Wanaque River and Acid Brook are all on or adjacent to the property, which is also adjacent to the Ramapo Mountain State Forest, as well as residential communities.

3.     DuPont used a number of areas of the Facility for the disposal of various wastes generated by its manufacturing operations.  DuPont's historic operations and waste management practices have resulted in the discharge and release of scores of hazardous substances and pollutants, including volatile organic compounds ("VOCs"), such as trichloroethylene ("TCE"), perchloroethylene ("PCE"), and metals, such as lead and mercury, into the streams, rivers and lakes in the area of the Facility, as well as the groundwater, soils, sediments, wetlands, and other natural resources at and around the Facility.  Specific natural resources harmed by such contamination include, but are not limited to: water, sediments and soils in Acid Brook and the surrounding flood plain leading to Pompton Lake, the Acid Brook Delta, Pompton Lake, soils at residential properties located along Acid Brook, water and sediments in and floodplain soils adjacent to the Wanaque, Ramapo, and Pompton Rivers, groundwater, air, and biota (i.e., non-human living resources).

4.     A plume of contaminated groundwater has migrated off-site under a residential area, where private wells were widely used for drinking water.  This contamination has caused extensive vapor intrusion issues, affecting hundreds of homes.

3

5.    Although  Defendants  have  addressed  some  historic contamination,  extensive  contamination  remains  throughout  the site,  and  that  contamination  continues  to  harm  the  natural resources of the State.  The Facility and areas to which hazardous substances and pollutants have migrated are collectively referred to as the "Contaminated Site."

6.    The Plaintiffs seek costs and damages including, but not limited to: the costs of restoring natural resources of the State to their pre-discharge condition; the costs of replacing natural resources;  damages  for  the  loss  of  use  and  value  (including existence value) of natural resources; the costs of assessing natural resource injuries and damages; the unreimbursed costs of investigation, oversight, and remediation; the costs of restoring, repairing, or replacing natural resources destroyed or damaged by a discharge; any income lost from the time the natural resource was damaged to the time it is restored, repaired, or replaced; any reduction in value of the natural resource caused by the discharge by comparison to its value prior thereto; loss of State tax revenue due  to  damage  to  real  or  personal  property  resulting  from  a discharge; the economic benefits DuPont and Chemours accrued, including any savings realized from avoided capital or noncapital costs  for  their  unpermitted  discharges;  punitive  damages; litigation fees and costs; and pre-judgment interest.

4

## THE PARTIES

7.   The Department is a principal department within the Executive Branch of the State government.  Under the leadership of the Commissioner, it is vested with the authority to conserve natural resources, protect the environment, prevent pollution, and protect the public health and safety.  N.J.S.A. 13:1D-9; N.J.S.A. 58:10-23.11b; N.J.S.A. 58:10A-3.

8.   The State is the trustee, for the benefit of its citizens, of all natural resources within its jurisdiction.  The Department is vested with the authority to protect this public trust and to seek compensation for any injury to the natural resources of this State.  N.J.S.A. 58:10-23.11a.  In addition, the State may act in its parens patriae capacity to protect the State's "quasi-sovereign" interests, including its interest in the health and well-being of its residents and the integrity of its natural resources.  The Department brings this case in its trustee, parens patriae, and regulatory (police power) capacities, as well as in its capacity as an owner of real property directly impacted by contamination originating from the Facility.

9.   Plaintiff Commissioner is the Commissioner of Plaintiff NJDEP.  N.J.S.A. 58:10-23.11b; N.J.S.A. 58:10A-3; and N.J.S.A. 13:1B-2.  In this capacity, the Commissioner is vested by law with various powers and authority, including those conferred by the

5

Department's enabling legislation, N.J.S.A. 13:1D-1 through -19; N.J.S.A. 13:1B-3.

10.  Plaintiff Administrator is the chief executive officer of the New Jersey Spill Compensation Fund ("the Spill Fund"). N.J.S.A. 58:10-23.11j.  In that capacity, plaintiff Administrator is authorized to approve and pay any cleanup and removal costs the Department incurs, N.J.S.A. 58:10-23.11f.c & d, and to certify the amount of any claim to be paid from the Spill Fund, N.J.S.A. 58:10-23.11j.d.

11.  Defendant DuPont is a corporation duly organized under the laws of the State of Delaware, with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805.

12.  Defendant The Chemours Company is a corporation organized and existing under the laws of the State of Delaware, with its main place of business located at 1007 Market Street, Wilmington, DE 19899.  In 2015, DuPont spun off its performance chemicals business to The Chemours Company, along with certain environmental liabilities.

13.  Defendant The Chemours Company FC, LLC is a limited liability company duly organized under the laws of the State of Delaware, with its principal place of business located at 1007 Market Street, PO Box 2047, Wilmington, Delaware 19899.  The Chemours Company FC, LLC is a subsidiary of The Chemours Company

6

that was formed in April 2014.  On July 1, 2015, DuPont transferred ownership of the PLW Facility to The Chemours Company FC, LLC.

14.  Together, The Chemours Company and The Chemours Company FC, LLC are hereinafter referred to as "Chemours."

15.  Defendants "ABC Corporations" 1-10, these names being fictitious, are entities with identities that cannot be ascertained as of the filing of this Complaint, certain of which are corporate successors to, predecessors of, or are otherwise related to, the identified defendants in this matter, or which are otherwise liable for the causes of action set forth herein.

## AFFECTED NATURAL RESOURCES

16.  The "natural resources" of this State are all land, fish, shellfish, wildlife, biota, air, water, and other such resources owned, managed, held in trust, or otherwise controlled by the State.  N.J.S.A. 58:10-23.11b.

17.  The natural resources of this State include the "waters of the State," which include the ocean and its estuaries, all springs, streams and bodies of surface water or groundwater, whether natural or artificial, within the boundaries of this State or subject to its jurisdiction.  N.J.S.A. 58:10A-3(t).

18.  New Jersey's habitats and ecosystems—forests, lakes, rivers, wetlands, agricultural lands, coastal estuaries, pinelands, and grasslands—are some of the most threatened in the nation.  They are vulnerable to pollution, degradation, and

7

destruction from the discharge of hazardous substances and pollutants.

19. Hazardous substances and pollutants have been found in the surface water, groundwater, soils, sediments, wetlands, air, and other natural resources at the Contaminated Site.

20. These natural resources have intrinsic (i.e., inherent existence) values. The current and future residents of New Jersey have a substantial interest in a clean environment.

## Surface Water

21. Surface waters are a critical ecological resource of New Jersey. New Jersey's surface water—which includes all water in the State's lakes, streams, and wetlands—is a primary source of drinking water in the State. Nearly half of New Jersey's population obtains its drinking water from surface-water sources, and approximately 850 million gallons of surface water per day is used for that purpose.

22. Surface water in New Jersey is also used for other commercial and industrial purposes, such as cooling water and electrical generation, boating, fishing, and transportation of goods and services.

23. The tourism and recreation industries, which are vital to the State's economy, are dependent on clean water and beaches.

8

24.  Surface waters also provide commercial, recreational, aesthetic, and ecological value, including by supporting aquatic ecosystems, nearby communities, and the citizens of the State.

25.  Surface water bodies located within, directly adjacent to, or downstream of the PLW Facility include Acid Brook and Acid Brook Delta, the Ramapo River, Pompton Lake, and the Wanaque River. All of these water bodies have been contaminated by discharges of hazardous substances and pollutants at the PLW Facility.

26.  Approximately 1.5 miles downstream of the Facility, the Ramapo River converges with the Pompton River.  The Pompton River then flows into the Passaic River and into Newark Bay.  A study performed by Chemours' consultant found mercury contamination in the Pompton River.

27.  Water and sediments contained within each of these water bodies (including those bodies that are downriver and downwind of the Facility) provide other natural resource values, including biological and human uses.

28.  Hazardous substances and pollutants from the Facility have adversely impacted surface waters both on and off the Facility.

### Groundwater

29.  Groundwater—that is, water that exists beneath the Earth's surface—is an extremely important natural resource for the people of New Jersey.  More than half of New Jersey's population

obtains drinking water from groundwater sources, and more than 900 million gallons of water per day are used for that purpose.

30.  Private wells, which provide access to groundwater, were widely used in the residential communities around the Facility. Wells were used for drinking water, watering lawns, and filling swimming pools, among other things.

31.  Not only does groundwater serve as a source of potable water, it also serves as an integral part of the State's ecosystem. Groundwater provides base flow to streams.  It influences surface-water quality, wetland ecological conditions, and the health of the aquatic ecosystem.

32.  Groundwater also provides cycling and nutrient movement within and among the State's bodies of water and wetlands, prevents saltwater intrusion, provides ground stabilization, prevents sinkholes, and helps to maintain critical water levels in freshwater wetlands.

33.  Groundwater and the other natural resources of the State are unique resources that help sustain the State's economy.

34.  Groundwater depths in the eastern part of the Facility range from approximately three to 26 feet below ground surface. Groundwater within the eastern area generally flows toward the south.  Groundwater flows through the Acid Brook valley and then southeast from the southern area of the Facility, running beneath residential areas, before discharging into Pompton Lake.

10

35.   In the western part of the Facility, groundwater depths range from approximately six to 19 feet below ground surface. Groundwater in the western area generally flows toward the south and the Wanaque River.

36.   Hazardous substances and pollutants from the Facility have adversely impacted groundwater both on and off the Facility.

### Air

37.   Air resources are vital to life.  Pollution of air resources can injure human health and welfare, flora and fauna, and property and can unreasonably interfere with the enjoyment of life and property in areas affected by such pollution.  Air deposition (i.e., deposits of air contaminants on the earth's surface) can also be a source of contamination to other types of natural resources, including surface water, groundwater, sediments and soils, wetlands, forests, and biota.

38.   Upon information and belief, air pollution from activities at the PLW have contaminated downwind natural resources, including but not limited to the Ramapo Mountain State Forest.

39.   When subsurface air is contaminated with volatile organic compounds ("VOCs"), the subsurface air (i.e., soil gas) can become a source of contaminated air to the structures above, causing vapor intrusion.

11

40. VOC contamination emanating from the PLW Facility has contaminated the subsurface air underlying hundreds of homes to the south-southeast of the PLW Facility, causing vapor intrusion in these homes. These homes have required the installation of vapor mitigation systems to address the indoor air pollution caused by the volatilization of VOCs from subsurface air into the homes.

### Sediments and Soils

41. New Jersey's land and aquatic resources are comprised of unique and complex ecosystems.

42. Sediments and soils are critical components of New Jersey's ecological resources.

43. Sediments and soils can sustain a wide diversity of plants and animals that are essential in a healthy ecosystem. They provide a living substrate for submerged and emergent flora and support diverse invertebrate species, wading birds, and fish and shellfish populations.

44. Sediments in the Acid Brook Delta and Pompton Lake have been contaminated with at least mercury, copper, and lead from discharges of hazardous substances and pollutants at the PLW Facility.

45. Hazardous substances and pollutants discharged at the PLW Facility have contaminated sediment and soils within the Facility and adjacent areas with barium, copper, lead, mercury, selenium, zinc, and organic contaminants such as perchloroethylene

12

("PCE") and polycyclic aromatic hydrocarbons ("PAHs"), among other contaminants.

46.   Upon information and belief, sediments and soils that were downwind of the Facility's operations have also been contaminated through air deposition of hazardous substances and pollutants released from the PFW Facility.

47.   Hazardous substances and pollutants discharged at or released from the Facility have adversely impacted sediments and soils both on and off the Facility.

### Wetlands

48.   Wetlands are a critical component of New Jersey's ecological resources, which include land and aquatic resources comprised of unique and complex ecosystems.

49.   New Jersey has approximately 730,000 acres of freshwater wetlands and 250,000 acres of coastal wetlands.

50.   Wetlands can sustain a wide diversity of plants and animals that are essential in a healthy ecosystem.

51.   Wetlands perform many additional functions, which include the improvement of water quality, sediment trapping, groundwater recharge, shoreline protections, and protecting land from flooding and erosion.

52.   Ramapo State Forest, which borders the northeast and eastern portions of the Facility, contains deciduous wooded wetlands.

53.   Hazardous substances and pollutants discharged at or released from the PLW Facility have adversely impacted wetlands both on and off the Facility, including wetlands associated with the Acid Brook, Acid Brook Delta, Pompton Lake, Ramapo River, Wanaque River, and Pompton River.

## Forests

54.   Forests are a critical component of New Jersey's ecological resources.

55.   New Jersey's forests produce clean water and air, absorb runoff, provide recreation, and are home to thousands of species of wildlife.

56.   The Ramapo Mountain State Forest contains deciduous forest and some deciduous wooded wetlands.

57.   Upon information and belief, hazardous substances and pollutants discharged at, or released from, the PLW Facility have adversely impacted forests both on and off the Facility, including the Ramapo Mountain State Forest.

## Biota

58.   Biota, including the flora and fauna of the State, are critical ecological resources.  New Jersey is home to more than 2,000 plant species, which include entire communities of rare flora that cannot be found anywhere else in the world.  Approximately 15 percent of the native plant species in New Jersey, however, are now at risk of extinction, with a total of 331 vascular plant

14

species listed as endangered and an additional 32 that have already been extirpated.

59.  New Jersey wildlife includes approximately 900 species, including 90 mammal species, 79 reptile and amphibian species, more than 400 fish species, and approximately 325 species of birds. Approximately 1.5 million shorebirds and as many as 80,000 raptors make migratory stopovers in New Jersey each year.

60.  At least 17 percent of New Jersey's native vertebrate species and 24 percent of its native invertebrate species are at risk of extinction.  Several threatened and endangered raptor species have difficulty breeding because of the bioaccumulation of toxic compounds.

61. New Jersey's biodiversity provides a wealth of ecological, social, and economic goods and services that are an integral part of the ecological infrastructure for all cultural and economic activity in the State.

62.  Contamination from the discharge of hazardous substances and pollutants is one of the major causes of biodiversity loss.

63. Natural resource injuries to biota in New Jersey negatively impact not only the individual species directly involved, but the capacity of the injured ecosystems to regenerate and sustain such life into the future.

64. Hazardous substances and pollutants discharged at or released from the PLW Facility have adversely impacted biota both on and off the Facility.

**GENERAL ALLEGATIONS**

65. DuPont owned and operated the PLW Facility as an explosives manufacturing facility for 92 years, from 1902 to 1994. The Facility is still commonly referred to as "DuPont Pompton Lakes Works" or "Chemours Pompton Lakes Works" site.

66. The Facility's address is 2000 Cannonball Road in Pompton Lakes.  The Facility is located in Pompton Lakes Borough and Wanaque Borough, both in Passaic County.

67. The PLW Facility encompasses approximately 600 acres and is also designated and known as Block 100, Lots 3, 6, 7, and 9 in Pompton Lakes Borough and Block 479, Lots 4, 4.1, and 5 in Wanaque Borough.

68. Interstate 287 ("I-287") crosses the northern and western portions of the Facility, and the Ramapo State Forest borders the northeast and eastern portions.  Areas known as Pompton Lakes, Twin Lake Valley, and Haskell surround the Facility on the southern and western edges, and support residential, industrial, and commercial uses.

69. DuPont manufactured explosives and explosive products at the PLW Facility for nearly a century.  Manufactured products included mercury fulminate and lead azide blasting caps, aluminum

and bronze shelled blasting caps, copper shells, metal wires, fuses, smokeless powder, and other explosives. During World War I, the Facility produced up to 1,500,000 blasting caps per day. DuPont also operated a wire plating and drawing process, an aluminum and copper shell drawing process, and a metal cladding operation.

70. Waste management practices at the Facility resulted in significant contamination of surface water, groundwater, soils, and sediments both on and off the Facility.

71. DuPont used a number of areas of the Facility for the disposal of various wastes generated by its explosives manufacturing operations, including lead salts, mercury compounds, explosive powders, chlorinated solvents, waste wire drawing solution, and detonated off-specification blasting caps.

72. DuPont made decisions regarding disposal practices, equipment selection, and equipment maintenance (or lack thereof) at the Facility.

73. Based upon information and belief, DuPont knew, or should have known, that its practices and operations at the Facility would likely contaminate the State's natural resources. Upon information and belief, these practices occurred with the knowledge of senior level corporate officers and managers within and throughout DuPont's corporate structure, such as environmental

17

coordinators, department heads, vice presidents, presidents, and members of corporate boards of directors.

## Contamination by Area

74.   DuPont's operations at the Facility were historically divided into three areas: the Eastern Manufacturing Area, the Western Manufacturing Area, and the Northern Manufacturing Area.

*Western Manufacturing Area*

75.   The Western Manufacturing Area ("WMA") is located in the Wanaque River Valley.  The WMA is located south of I-287 along the Wanaque River.

76.   The Wanaque River Valley was formerly known as the Lake Inez Valley (the removal of the Lake Inez Dam in 1984 drained the lake), and it was alongside Lake Inez that DuPont's explosives manufacturing began in the area that would become part of the PLW Facility.

77.   DuPont began explosive manufacturing at the WMA in 1902.

78.   In 1926, DuPont consolidated its operations in the Eastern Manufacturing Area and ended its operations in the WMA.

79.   Operational facilities in the WMA consisted of buildings for manufacturing; storage areas, where magazines for explosive materials and products were stored; and engineered tunnels for conducting cladding operations.  In the WMA, these structures were located mainly along the banks and ridge slopes of the Wanaque River.

18

80. Manufacturing and waste disposal practices at the Facility led to spills and releases of hazardous substances and pollutants into WMA soils and groundwater, as well as to surface water and sediments in the Wanaque River and its floodplain.

81. Examples of waste areas in the WMA include the shooting ground (known as Area of Concern ("AOC") 107), the old fuze works wire dump (AOC 192), old fuze works dump (AOC 194), old fuze miscellaneous waste site (AOC 193), tar deposits area (AOC 198), and the burning area (AOC 199).

82. The following contaminants have been identified in natural resources in the WMA: antimony, arsenic, cadmium, chromium, copper, lead, mercury, nickel, selenium, silver, thallium, zinc, and PAHs.

*Eastern Manufacturing Area*

83. The Eastern Manufacturing Area ("EMA") was formerly referred to as the Acid Brook Valley.  The EMA is located east of the Wanaque River, south of I-287, west of Ringwood State Park, and north of residential portions of Pompton Lakes Borough.

84. Operational facilities in the EMA were located in the low-lying lands of the valley, consisting of manufacturing and experimental laboratory buildings; storage areas, where magazines for explosive materials and products were stored; and an engineered tunnel for conducting cladding operations.

19

85.   Waste management practices during the Facility's operation resulted in contamination of soil, groundwater, surface water, and sediment both on and off the Facility, including but not limited to the EMA, Acid Brook, Acid Brook Delta, Pompton Lake, and the Pompton Lake floodplain.

86.   The following contaminants have been identified in natural resources in the EMA: arsenic, antimony, barium, cadmium, chromium, cobalt, copper, lead, manganese, mercury, nickel, selenium, silver, thallium, cyanide, PCE, PAHs, and bis(2-ethylhexyl)phthalate.

87.   The following manufacturing and chemical storage areas in the EMA were sources of hazardous substances and pollutants:

   a.   Mercury fulminate plant, storage building and fume lines;

   b.   Experimental lead azide laboratory;

   c.   Black powder mill;

   d.   Cap test area;

   e.   Storage tanks for materials such as mercury fulminate, lead azide, and other chemicals used in manufacturing processes;

   f.   Gasoline underground storage tanks;

   g.   Powder dry-house impoundment;

   h.   Platforms for various manufacturing processes such as mercury fulminate killing; and

20

i.   Engineered tunnels for cladding operations.

88.   These locations were sources of contamination to surrounding and underlying sediments and soils, groundwater, and surface water resources.

89.   Detection of materials known to have been used as constituents in the historic manufacturing operations at EMA (for example, mercury and lead used to manufacture mercury fulminate and lead azide) confirm that these materials were released as a result of the Facility's operations.   These detected materials include metals—such as lead, mercury, and copper, as well as chlorinated organic compounds-which have been detected in EMA soil and in groundwater in the immediate vicinity of the Facility's historic operations.

90.   In general, a multitude of waste products were disposed on-site.   Wastes disposed of on-site included, but were not limited to, lead salts, mercury compounds, explosive powders, chlorinated solvents, waste wire drawing solutions, metal scrap, and detonated blasting caps.   These wastes were handled in a variety of ways. Powder-contaminated material was burned on-site.   Chemical wastes were disposed of in unlined waste lagoons, ponds, and waste storage tanks.   Sludge was piled on unlined surfaces, next to lagoons and ponds.   Scrap metal and other solid wastes were disposed of in dumps.   Off-specification blasting caps were disposed of by detonation underwater in a lagoon known as the "Shooting Pond."

21

91. Examples of former waste management areas at the Facility that are sources of hazardous substances and pollutants include: the lead recycling area, burning grounds and pits, unlined lagoons, burned wire and scrap metal dumps, the canister disposal area, and the Shooting Pond.

92. The Shooting Pond was created by excavating into bedrock. Bedrock in this area is fractured and is a recharge area for aquifers in the valley, and repeated underwater explosions may have further fractured the bedrock. For decades, DuPont detonated about 100 defective blasting caps in the pond every 10 minutes, five days a week.

93. Groundwater in the vicinity of the Shooting Pond is contaminated with various metals and VOCs, including lead, copper, selenium, 1,1,1-trichloroethane ("TCA"), trichloroethylene ("TCE"), and PCE. Contaminants most likely entered the groundwater as a result of percolation from the Shooting Pond and splash water generated during detonation.

94. Samples of the Shooting Pond water in 1979 and 1981 detected aniline (500 parts per billion ("ppb")), chlorinated hydrocarbons (149 ppb), arsenic (95 ppb), selenium (600 ppb), chromium (4,000 ppb), lead (8,000 ppb), and methylene chloride (127 ppb).

95. Similarly, waters of the State were contaminated when waste solvents, including TCE and PCE, were dumped with wastewater

into four unlined lagoons on the edge of the Facility. Contaminants migrated from the unlined lagoons into the underlying groundwater.

96. In addition, wastewater containing lead nitrate was dumped into one of two unlined salt ponds prior to 1972; the other received wastewater containing sodium hydroxide, lead nitrate, and dinitro-o-cresol prior to 1976. The entire area was filled and paved over in 1978. Elevated levels of lead have been detected in groundwater in this area.

97. The scrap metal dump was another source of contamination. The dump received construction debris, burned iron wire, scrap metal, and old equipment prior to 1950. As a result, groundwater in the area became contaminated with lead and PCE.

98. The outdoor storage area also has been a source of contamination to the site soils. The storage area consisted of an asphalt pad with maximum capacity of 204 drums and five 20-cubic yard containers of solid waste—primarily lead-contaminated sand, gravel, and debris from the Shooting Pond area. There was no containment system, and stormwater runoff from the outdoor storage area flowed over land to local surface depressions during operations, where it seeped into the soil.

*Northern Manufacturing Area*

99. The Northern Manufacturing Area ("NMA") is located north of I-287 along the Wanaque River.

23

100. Hazardous substances and pollutants discharged at or released from the Facility, including arsenic, lead, and mercury, have adversely impacted natural resources in the NMA.

*Incomplete Cleanup Efforts to Date*

101. The State has attempted for decades to get DuPont and, in recent years, Chemours to delineate the extent of contamination and remediate the contamination. To date, those efforts have not yielded adequate results.

102. On April 29, 1983, the Department issued a letter requiring DuPont to assess the impact of waste disposal areas on the groundwater at the Facility.

103. DuPont submitted a "Ground Water Assessment Report" to the Department on July 19, 1984. That report revealed extensive contamination of the groundwater at the Facility by hazardous substances and pollutants including lead, selenium, and VOCs, including PCE. The most severe contamination was found in the southern portion of the Facility near the four unlined waste lagoons.

104. After reviewing the 1984 report, NJDEP required DuPont to further investigate the extent of groundwater contamination in this part of the Facility.

105. Further investigation revealed that groundwater was contaminated with TCE, PCE, 1,1,1-TCA, 1,1-dichloroethylene, trans-1,2-dichloroethylene, lead, selenium, and mercury.

24

106. The investigation also found that a plume of contaminated groundwater had migrated off the Facility boundaries to the southeast, contaminating private and municipal wells.

107. In September 1988, DuPont and the State entered an Administrative Consent Order ("ACO") requiring DuPont to conduct a remedial investigation and feasibility study of remedial action alternatives addressing "all contamination at/or emanating from the Site."

108. The 1988 State ACO required site-wide corrective action and off-site corrective action, addressing solid wastes and contaminated groundwater.

109. On July 5, 1990, the Department issued to DuPont a portion of a permit for the operation of a Resource Conservation and Recovery Act ("RCRA") Treatment, Storage, and Disposal Facility. Under federal law, the State lacked authority to issue the provisions of the permit that pertained to the Hazardous and Solid Waste Amendments of 1984 ("HSWA"), because only the federal U.S. Environmental Protection Agency ("EPA") may issue such permit provisions. The permit would not become operational until both the RCRA and HSWA portions were issued. On August 24, 1992, the EPA (Region II) issued the HSWA portion of the RCRA permit. On that date, therefore, the RCRA permit became operational.

110. In 2005, the Department, the Administrator, and DuPont entered into a Compensatory Restoration Administrative Consent

25

Order ("CRACO").  The CRACO is not a bar to the claims asserted in this Complaint for reasons including, but not limited to, the following: DuPont has failed to comply with the CRACO, concealed the nature and extent of contamination at its facilities, has attempted to provide contaminated property to fulfill its obligations, and additional injuries have been incurred since the CRACO became effective (e.g., new discharges, injuries caused by the remedy).

111. Then in 2015, when DuPont transferred the PLW Facility to Chemours, the Department, DuPont, and Chemours entered into an Administrative Consent Order Amendment pursuant to the Industrial Site Recovery Act, N.J.S.A. 13:1K-6, et seq., and Spill Act, setting forth various funding, remedial, and permitting requirements.

112. Over the course of decades of investigations, over 200 solid waste management units and areas of concern have been identified at or in the vicinity of the PLW Facility.

113. Today, 31 years after the original 1988 State ACO was signed, the Facility and surrounding natural resources remain heavily contaminated.  The full nature and extent of the contamination, and the injuries caused by that contamination, remain unknown.

114. Although Defendants have addressed some historic contamination, extensive contamination remains throughout the

26

Contaminated Site, and that contamination continues to harm the natural resources of the State.

*The Fraudulent Spinoff of DuPont's Specialty Chemicals Business*

115. DuPont and Chemours have very substantial liabilities due to their polluting activities. Although perfluorooctanoic acid ("PFOA") and other per- and polyfluoroalkyl substances ("PFAS") contamination are not an issue at the PLW Facility, DuPont's and Chemours' liabilities for PFOA and other PFAS contamination account for a very substantial portion of their environmental liabilities nationwide, and therefore affect their overall ability to satisfy their environmental liabilities for the PLW Facility.

116. DuPont sought to insulate itself from billions of dollars of legacy pollution liabilities, especially those arising from PFOA and other PFAS contamination at chemical plants that it owned and operated throughout the country. Upon information and belief, DuPont's potential cumulative liability related to PFOA and other PFAS is likely billions of dollars due to the persistence, mobility, bio-accumulative properties, and toxicity of these "forever" compounds, as well as DuPont's decades-long attempt to hide the dangers of PFAS from the public.

117. For more than five decades, DuPont manufactured, produced, or utilized PFOA and other PFAS at plants in New Jersey, West Virginia, and North Carolina. Throughout this time, DuPont

27

was aware that PFOA was toxic, harmful to animals and humans, bio-accumulative, and bio-persistent in the environment. DuPont also knew that it had emitted and discharged PFOA in large quantities into the environment, and that tens of thousands of people had been exposed to PFOA, including through public and private drinking water supplies, which DuPont had contaminated. Thus, DuPont knew, or reasonably should have known, that it faced billions of dollars in liabilities arising from its use of PFOA.

118. For example, in 1999, members of the Tennant family, who owned property impacted by PFOA-contamination adjacent to DuPont's Washington Works plant in Parkersburg, West Virginia, sued DuPont in West Virginia federal court.

119. DuPont's in-house counsel was very concerned about DuPont's exposure related to PFOA. In November 2000, one of DuPont's in-house counsel handling PFOA issues wrote to his co-counsel: "We are going to spend millions to defend these lawsuits and have the additional threat of punitive damages hanging over our head. Getting out in front and acting responsibly can undercut and reduce the potential for punitives . . . Our story is not a good one, we continued to increase our emissions into the river in spite of internal commitments to reduce or eliminate the release of this chemical into the community and the environment because of our concern about the biopersistence of this chemical."

28

120. In 2005, after confidentially settling the Tennant case, DuPont agreed to pay $10.25 million to resolve eight counts brought by EPA alleging violations of the Toxic Substances Control Act and the Resource Conservation and Recovery Act. That was the largest civil administrative penalty that EPA had ever obtained under a federal environmental statute. DuPont also was required to commit an additional $6.25 million to supplemental environmental projects. See https://www.epa.gov/enforcement/reference-news-release-epa-settles-pfoa-case-against-dupont-largest-environmental.

121. Also, in 2005, DuPont agreed to settle a class action lawsuit, which had been filed on behalf of 70,000 residents of Ohio and West Virginia who had been exposed to PFOA that DuPont had discharged from Washington Works for $343 million. Under the terms of the settlement, DuPont agreed to fund a panel of scientists (the "Science Panel") to determine if any diseases were linked to PFOA exposure, to filter local water for as long as PFOA concentrations exceeded regulatory thresholds, and to set aside $235 million for ongoing medical monitoring of the affected community. The settlement also provided that any class members who developed the linked diseases would be entitled to sue for personal injury, and DuPont agreed not to contest the fact that exposure to PFOA could cause those diseases.

29

122. After eight years, the Science Panel found several human diseases with "probable links" to PFOA exposure, including: high cholesterol; ulcerative colitis; pregnancy-induced hypertension; thyroid disease; testicular cancer; and kidney cancer.

123. More than 3,500 personal injury claims were filed against DuPont in Ohio and West Virginia as part of the 2005 settlement. These claims were consolidated in the federal multidistrict litigation styled In Re: E.I. du Pont de Nemours and Company C-8 Personal Injury Litigation (MDL No. 2433) in the United States District Court for the Southern District of Ohio. Forty "bellwether" trials were scheduled to take place in 2015 and 2016.

124. DuPont knew that it faced substantial exposure at these trials, as well as liability related to PFOA and other PFAS contamination at other sites throughout the country and that its liability was likely billions of dollars.

125. In addition to its PFOA and other PFAS liabilities, DuPont was facing very substantial environmental liabilities for its historic manufacturing and research operations throughout the country, including liability for discharges at the PLW Facility.

126. DuPont sought to limit its environmental liability and protect its assets by engaging in a series of restructuring transactions, including a "spinoff" of its performance chemical business which included Teflon, i.e., one of the primary products

30

that DuPont manufactured using PFOA and which led to widespread contamination throughout the country.

127. Chemours Co. was incorporated on February 18, 2014 under the name "Performance Operations, LLC." On April 10, 2014, the company was renamed "The Chemours Company, LLC." On April 30, 2015, the company was converted from a limited liability company to a corporation with the name "The Chemours Company." Prior to July 1, 2015, Chemours Co. was a wholly-owned subsidiary of DuPont.

128. On July 1, 2015, DuPont completed the spinoff of its performance chemicals business (the "Spinoff") through the creation of Chemours Co., which became a separate, publicly-traded entity.

129. DuPont and Chemours Co. entered into a June 26, 2015 Separation Agreement to effectuate the Spinoff (the "Separation Agreement"). At the time of the Spinoff, the performance chemicals business consisted of DuPont's Titanium Technologies Chemical Solutions and Flourochemicals segment (collectively, the "Performance Chemicals Business").

130. Pursuant to the Separation Agreement, DuPont agreed to transfer to Chemours Co. all businesses and assets related to the Performance Chemicals Business, including 37 active chemical plants. Upon information and belief, the PLW Facility was transferred to Chemours Co. via the Separation Agreement and one or more schedules to that Agreement.

131. Prior to the Spinoff, DuPont completed a significant internal reorganization so that all the assets and liabilities (held by DuPont or its subsidiaries) that DuPont deemed to be part of the Performance Chemicals Business would be held by Chemours Co., as a wholly owned subsidiary of DuPont.

132. In addition to the assets transferred to Chemours Co., DuPont caused Chemours Co. to assume DuPont's historical liabilities relating to DuPont's Performance Chemicals business, including those arising from its discharge of contaminants, such as PFOA and other PFAS, into the environment.  While specific details about the liabilities are set forth in non-public schedules that are not available to Plaintiffs, the Separation Agreement required Chemours Co. to assume what the agreement defines as "Chemours Liabilities," which include DuPont's historic liabilities regardless of (i) when or where such liabilities arose, (ii) whether the facts upon which they are based occurred prior to, on, or subsequent to the effective date of the Spinoff, (iii) where or against whom such liabilities are asserted or determined, (iv) whether arising from or alleged to arise from negligence, gross negligence, recklessness, violation of law, fraud, misrepresentation by DuPont or Chemours Co., and (v) which entity is named in any action associated with any liability.

133. The Separation Agreement defines Chemours Liabilities broadly, to include "any and all Liabilities relating . . .

32

primarily to, arising primarily out of or resulting primarily from, the operation or conduct of the Chemours Business, as conducted at any time prior to, at or after the Effective Date . . . including . . . any and all Chemours Assumed Environmental Liabilities. . . .," which include DuPont's historic liabilities relating to and arising from its decades of operations at the PLW Facility and emitting PFOA and PFAS into the environment in New Jersey and elsewhere.

134. Chemours Co. also agreed to indemnify DuPont in connection with those liabilities that it assumed. The indemnification has no cap or temporal limitation.

135. Chemours Co. also agreed to use its best efforts to be fully substituted for DuPont with respect to "any order, decree, judgment, agreement or Action with respect to Chemours Assumed Environmental Liabilities . . . ."

136. Upon information and belief, there was no meaningful negotiation of the Separation Agreement, and DuPont largely dictated its terms. Indeed, when the Separation Agreement was signed, Chemours Co. was a wholly-owned subsidiary of DuPont, and a majority of the Chemours Co. board consisted of DuPont employees.

137. In connection with the Spinoff, Chemours Co. paid DuPont approximately $3.9 billion, consisting of approximately $3.4 billion in cash, plus approximately $507 million in promissory

notes. Chemours Co. also transferred all of its stock to DuPont, which was ultimately delivered to DuPont's shareholders.

138. Chemours Co. was thinly capitalized following the Spinoff. Indeed, shortly after the Spinoff, market analysts described Chemours Co. as "a bankruptcy waiting to happen" and a company "purposely designed for bankruptcy."

139. In order to fund the $3.9 billion payment to DuPont, Chemours Co. issued unsecured senior notes and entered into a credit agreement with a syndicate of banks to provide two senior secured credit facilities, incurring a total of $4 billion in indebtedness. Upon information and belief, the terms of the financing were dictated by DuPont, in its sole discretion, and not Chemours Co.

140. According to Chemours Co.'s unaudited pro forma financial statements, as of March 31, 2015 (but giving effect to all of the transactions contemplated in the Spinoff), Chemours Co. had total assets of $6.4 billion and total liabilities of $6.3 billion. Following the Spinoff, Chemours Co. issued a 10-K stating that, as of December 31, 2015, Chemours Co. had assets totaling $6.3 billion and total liabilities of $6.2 billion.

141. The 10-K stated that these liabilities included $454 million in "other accrued liabilities," which in turn included $11 million for accrued litigation and $68 million for environmental remediation. The 10-K also stated Chemours Co. had $553 million

34

in "other liabilities," which included $223 million for environmental remediation and $58 million for accrued litigation.

142. However, Chemours Co. significantly underestimated its liabilities, especially the liabilities that it had assumed from DuPont with respect to PFOA and other PFAS contamination, which DuPont and Chemours Co. should have known would be billions of dollars in addition to other environmental liabilities for other contaminants discharged at DuPont and Chemours facilities.

143. For example, in 2017, Chemours Co. and DuPont amended the Separation Agreement in connection with the settlement of the personal injury multi-district litigation brought by thousands of residents who had been exposed to PFOA from DuPont's Washington Works plant.  Per the amendment, Chemours Co. paid $320.35 million to the plaintiffs in the settlement on August 21, 2017, and DuPont paid an additional $320.35 million on September 1, 2017.  For all future PFOA costs incurred from July 6, 2017 through July 6, 2022, Chemours Co. agreed to cover the first $25 million per 12-month period, DuPont agreed to cover the next $25 million per 12-month period, and Chemours Co. agreed to cover any additional amounts. Chemours Co. is a named defendant in numerous lawsuits relating to DuPont's historical use of PFAS.

144.  Had DuPont and Chemours Co. taken the full extent of these liabilities into account, as they should have, Chemours Co. would have negative equity (that is, liabilities that are greater

35

than assets), and would be balance sheet insolvent. Thus, even though PFOA and other PFAS did not contribute to the specific contamination at the PLW Facility, Chemours Co.'s liability for PFOA and other PFAS contamination nationwide (if not world-wide), directly impacts the company's solvency.

## **First Count**

### **Spill Act**
### **(As Against All Defendants)**

145. Plaintiffs repeat each allegation of Paragraphs 1 through 144 above as though fully set forth in its entirety herein.

146. Each Defendant is a "person" within the meaning of N.J.S.A. 58:10-23.11b.

147. The discharge of hazardous substances is prohibited. N.J.S.A. 58:10-23.11c.

148. Except as otherwise provided in N.J.S.A. 58:10-23.11g.12, which is not applicable here, any person who discharges a hazardous substance, or is in any way responsible for any hazardous substance, shall be liable, jointly and severally, without regard to fault, for all cleanup and removal costs no matter by whom incurred.  N.J.S.A. 58:10-23.11g(c).

149. The Department and Administrator have incurred, and will continue to incur, costs and damages, including lost use and value, costs of restoration and replacement for natural resources of this

State that have been, or may be, injured as a result of discharges at the PLW Facility, and assessment costs.

150. The costs and damages the Department and Administrator have incurred, and will incur, associated with discharges at the PLW Facility, are "cleanup and removal costs" within the meaning of N.J.S.A. 58:10-23.11b.

151. The Defendants, as dischargers of hazardous substances at the PLW Facility, are liable, jointly and severally, without regard to fault, for all cleanup and removal costs and direct and indirect damages, including lost use and value, costs of restoration and replacement, and assessment costs, the Department and Administrator have incurred, and will incur, to assess, mitigate, restore, or replace any natural resource of this State that has been, or may be, injured as a result of the discharge of hazardous substances at the PLW Facility.  N.J.S.A. 58:10-23.11g(c)(1).

152. The Defendants, as owners of the PLW Facility at the time hazardous substances were discharged there, also are persons in any way responsible, and are liable, jointly and severally, without regard to fault, for all cleanup and removal costs and direct and indirect damages, including lost use and value, costs of restoration and replacement, and assessment costs the Department and Administrator have incurred, and will incur, to assess, mitigate, restore, or replace any natural resource of this

37

State that has been, or may be, injured as a result of the discharge of hazardous substances at the PLW Facility.   N.J.S.A. 58:10-23.11g(c)(1).

153. Chemours, as the knowing purchaser of contaminated property, the PLW Facility, at which hazardous substances were previously discharged, is also a person in any way responsible, and is liable, without regard to fault, for all cleanup and removal costs and direct and indirect damages, including lost use and value, costs of restoration and replacement, and assessment costs, that the Department and Administrator have incurred, and will incur, to assess, mitigate, restore or replace, any natural resource of this State that has been, or may be, injured as a result of the discharge of hazardous substances at the PLW Facility.   N.J.S.A. 58:10-23.11g(c)(3).

154. Pursuant to N.J.S.A. 58:10-23.11u(a)(1)(a) and N.J.S.A. 58:10-23.11u(b), the Department may bring an action in the Superior Court for, inter alia, injunctive relief, N.J.S.A. 58:10-23.11u(b)(1); for its unreimbursed investigation, cleanup and removal costs, including the reasonable costs of preparing and successfully litigating the action, N.J.S.A. 58:10-23.11u(b)(2); for natural resource restoration and replacement costs, N.J.S.A. 58:10-23.11u(b)(4); and for any other unreimbursed costs or damages the Department incurs under the Spill Act, N.J.S.A. 58:10-23.11u(b)(5).

38

155. Pursuant to N.J.S.A. 58:10-23.11g(a) and (b), the Defendants are also liable for lost income due to damage to natural resources destroyed or damaged by a discharge, and loss of State tax revenue due to damage to real or personal property proximately resulting from a discharge.

156. As a direct or indirect result of such violations, Plaintiffs NJDEP and Administrator have incurred, are incurring, and will continue to incur substantial costs including costs relating to:

a. the investigation, cleanup, and removal of discharged hazardous substances;

b. the restoration of natural resources contaminated by discharges of hazardous substances at the Site; and

c. the compensation of the citizens of New Jersey for the lost interim value and benefits of natural resources contaminated by discharges of hazardous substances at the Site.

157. The costs Plaintiffs NJDEP and the Administrator have incurred, and will incur, are "cleanup and removal costs" within the meaning of N.J.S.A. 58:10-23.11b.

158. Pursuant to N.J.S.A. 58:10-23.11q, the Administrator is authorized to bring an action in the Superior Court for any unreimbursed costs or damages paid from the Spill Fund.

39

### **Prayer for Relief**

**WHEREFORE,** the Department and Administrator request that this Court enter judgment against Defendants as follows:

a. Ordering each Defendant to reimburse the Department and Administrator, jointly and severally, without regard to fault, for all cleanup and removal costs and direct and indirect damages they have incurred, including lost use and value, costs of restoration and replacement for any natural resource of this State injured as a result of the discharge of hazardous substances at the PLW Facility, with applicable interest, and assessment costs;

b. Finding each Defendant liable, jointly and severally, without regard to fault, for all future cleanup and removal costs and direct and indirect damages, including lost use and value, costs of restoration and replacement for any natural resource of this State injured as a result of the discharge of hazardous substances at the PLW Facility, with applicable interest, and assessment costs;

c. Compelling each Defendant, jointly and severally, without regard to fault, to perform any further cleanup of the Contaminated Site in conformance with the Site

40

Remediation Reform Act, N.J.S.A. 58:10C-1, et. seq., and all other applicable laws and regulations;

d.  Compelling each Defendant, jointly and severally, without regard to fault, to fund the Department's performance of an assessment of any natural resource that has been, or may be, injured as a result of the discharge of hazardous substances at the PLW Facility, and compelling each Defendant to compensate the citizens of New Jersey for the costs of restoration and replacement, including lost use and value of any injured natural resource;

e.  Ordering the Defendants to pay for all compensatory damages for the lost interim value of the natural resources at and around the Facility as a result of the contamination of such natural resources by hazardous substances;

f.  Finding each Defendant liable, jointly and severally, without regard to fault, for lost income due to damage to natural resources destroyed or damaged by a discharge, and loss of State tax revenue due to damage to real or personal property proximately resulting from a discharge;

41

g.     Awarding the Department and Administrator their costs and fees in this action pursuant to N.J.S.A. 58:10-23.11u(b)(2); and

h.     Awarding the Department and Administrator interest and such other relief as this Court deems appropriate.

## Second Count

### Water Pollution Control Act
### (As Against All Defendants)

159. Plaintiffs repeat each allegation of Paragraphs 1 through 158 above as though fully set forth in its entirety herein.

160. Defendants are each a "person" within the meaning of N.J.S.A. 58:10A-3.

161. Except as otherwise exempted pursuant to N.J.S.A. 58:10A-6(d) and (p), which are not applicable here, it is unlawful for any person to discharge any pollutant except to the extent the discharge conforms with a valid New Jersey Pollutant Discharge Elimination System permit issued by the Commissioner pursuant to the WPCA, or pursuant to a valid National Pollutant Discharge Elimination System permit issued pursuant to the federal Water Pollution Control Act, 33 U.S.C. §§ 1251 - 1387.  N.J.S.A. 58:10A-6(a).

162. The unauthorized discharge of pollutants is a violation of the WPCA for which any person who is the discharger is strictly liable, without regard to fault.  N.J.S.A. 58:10A-6(a).

42

163. The Department has incurred, and will continue to incur, costs as a result of the discharge of pollutants at the PLW Facility.

164. The Department also has incurred, and will continue to incur, costs and damages, including the costs of investigation to establish a violation at the PLW Facility, costs in removing, correcting or terminating the adverse effects upon water quality or public health due to violations at the PLW Facility, and compensatory damages and any other actual damages for any natural resource of this State that has been, or may be, lost or destroyed as a result of the discharge of pollutants at the PLW Facility.

165. The costs and damages the Department has incurred, and will incur, for the PLW Facility are recoverable by the Commissioner within the meaning of N.J.S.A. 58:10A-10(c)(2)-(4).

166. DuPont discharged pollutants at the PLW Facility, which discharges were neither permitted pursuant to N.J.S.A. 58:10A-6(a), nor exempted pursuant to N.J.S.A. 58:10A-6(d) or N.J.S.A. 58:10A-6(p), and is liable, without regard to fault, for all costs and damages, including compensatory damages and any other actual damages for any natural resource of this State that has been, or may be, lost or destroyed as a result of the discharge of pollutants at the PLW Facility.

167. Chemours discharged pollutants at the PLW Facility, which discharges were neither permitted pursuant to N.J.S.A.

58:10A-6(a), nor exempted pursuant to N.J.S.A. 58:10A-6(d) or N.J.S.A. 58:10A-6(p), and is liable, without regard to fault, for all costs and damages, including compensatory damages and any other actual damages for any natural resource of this State that has been, or may be, lost or destroyed as a result of the discharge of pollutants at the PLW Facility.

168. Pursuant to N.J.S.A. 58:10A-10(c), the Commissioner may bring an action in the Superior Court for injunctive relief, N.J.S.A. 58:10A-10(c)(1); for the costs of any investigation, inspection, or monitoring survey which led to establishment of the violation, including the costs of preparing and litigating the case, N.J.S.A. 58:10A-10(c)(2); any cost incurred by the State in removing, correcting, or terminating the adverse effects upon water quality resulting from any unauthorized discharge of pollutants for which action under this subsection may have been brought, N.J.S.A. 58:10A-10(c)(3); compensatory damages and any other actual damages for any natural resource of this State that has been, or may be, lost or destroyed as a result of the unauthorized discharge of pollutants, N.J.S.A. 58:10A-10(c)(4); and the actual amount of any economic benefits accruing to the violator from any violation, including savings realized from avoided capital or noncapital costs resulting from the violation, the return earned or that may be earned on the amount of avoided costs, any benefits accruing as a result of a competitive market

44

advantage enjoyed by reason of the violation, or any other benefit resulting from the violation, N.J.S.A. 58:10A-10(c)(5).

### **Prayer for Relief**

**WHEREFORE,** the Commissioner requests that this Court enter judgment against Defendants as follows:

a. Permanently enjoining Defendants, requiring them to remove, correct, or terminate the adverse effects on water quality resulting from any unauthorized discharge of pollutants at or from the PLW Facility;

b. Ordering Defendants, without regard to fault, to pay for the costs for any investigation, inspection, or monitoring survey, leading to establishment of the violation, including the costs of preparing and litigating the case;

d. Finding Defendants liable, without regard to fault, for all costs for removing, correcting, or terminating the adverse effects upon water quality resulting from any unauthorized discharge of pollutants at the PLW Facility;

e. Finding Defendants liable, without regard to fault, for all compensatory damages and other actual damages for any natural resource of the State that has been, or may be, injured, lost, or destroyed as a result of the

unauthorized discharge of pollutants at the PLW Facility;

f.  Finding Defendants liable, without regard to fault, for the amount of any economic benefits they have accrued, including any savings realized from avoided capital or noncapital costs, the return they have earned of the amount of avoided costs, and benefits each Defendant has enjoyed as a result of a competitive market advantage, or any other benefit they have received as a result of having violated the WPCA;

g.  Awarding the Commissioner her costs and fees in this action pursuant to N.J.S.A. 58:10A-49.1(c)(2); and

h.  Awarding the Commissioner interest and such other relief as the Court deems appropriate.

## Third Count

### Solid Waste Management Act
### (As Against DuPont & Chemours)

169. Plaintiffs repeat each allegation of Paragraphs 1 through 168 above as though fully set forth in its entirety herein.

170. DuPont and Chemours are each a "person" within the meaning of N.J.S.A. 13:1E-3.

171. The Solid Waste Management Act ("SWMA" or the "Act") defines "[s]olid waste" as, inter alia, "discarded materials resulting from industrial, commercial and agricultural operations" and "all other waste materials." N.J.S.A. 13:1E-3.  N.J.A.C. 7:26-

46

1.6(b) defines "other waste material," in pertinent part, as "any solid, liquid, semi-solid or contained gaseous material, including, but not limited to spent material, sludge, by-product, discarded commercial chemical products, or scrap metal resulting from industrial, commercial, mining or agricultural operations, from community activities, or any other material which has served or can no longer serve its original intended use, which . . . [i]s discarded or intended to be discarded . . . [i]s applied to the land or placed on the land or contained in a product that is applied to or placed on the land in a manner constituting disposal." N.J.A.C. 7:26-1.6(b) provides that "a material is also a solid waste if it is 'disposed of' by being discharged, deposited, injected, dumped, spilled, leaked or placed into or on any land or water so that such material or any constituent thereof may enter the environment or be emitted into the air or discharged into ground or surface waters."

172. N.J.S.A. 13:1E-3 of the SWMA and N.J.A.C. 7:26-1.4 define "disposal" as "the storage, treatment, utilization, processing, resource recovery of, or the discharge, deposit, injection, dumping, spilling, leaking or placing of any solid or hazardous waste into or on any land or water, so that the solid or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including groundwaters."

173. Various constituents present in soils, groundwater and surface water in and around the Site are discarded materials and are "solid waste" as defined under N.J.S.A. 13:1E-3 and N.J.A.C. 7:26-1.6.

174. Upon information and belief, DuPont and Chemours have engaged in the past disposal of solid waste in and around the Site in the form of various constituents without first having filed a completed application for and received approval of a solid waste facility ("SWF") permit for such activities, resulting in the widespread presence of such solid wastes in soils, groundwater, and surface water in and around the Site, all in violation of N.J.A.C. 7:26-2.8(e).

175. Upon information and belief, DuPont and Chemours have engaged in the past disposal of solid waste in and/or around the Site in the form of hazardous constituents in excess of 0.148 cubic yards of solids and/or 30 gallons of liquids, at locations other than a permitted SWF, resulting in the widespread presence of such solid wastes in soils, groundwater and surface water in and around the Site, in violation of N.J.S.A. 13:1E-9.3.

176. Pursuant to N.J.S.A. 13:1E-9(b) and (d), when the Commissioner finds that a person has violated any provision of the SWMA or any regulations adopted pursuant to the SWMA, the Commissioner is authorized to bring a civil action in Superior Court seeking temporary or permanent injunctive and other relief,

as well as assessment of the violator for the costs of any investigation leading to the establishment of the violation, costs incurred by the State in removing, correcting or terminating the adverse effects to water and air quality resulting from the violation, and assessment against the violator of compensatory damages for any loss or destruction of wildlife, fish or aquatic life, and for any other actual damages, all of which relief may be awarded in a summary manner.

## Prayer for Relief

WHEREFORE, the Commissioner requests that this Court enter judgment against DuPont and Chemours as follows:

a. Ordering DuPont and Chemours to, jointly and severally, fully comply with the SWMA by, inter alia, removing all unlawfully disposed of solid waste from all locations in and around the Site at which the same have come to be located and for which DuPont and Chemours did not obtain a SWF permit;

b. Ordering DuPont and Chemours, jointly and severally, to reimburse the Commissioner for the reasonable costs of preparing and litigating its claim seeking the enforcement of DuPont's and Chemours' obligations pursuant to the SWMA; and

c. Ordering DuPont and Chemours, jointly and severally, to reimburse the Commissioner for the cost incurred by the

49

Department in assessing, removing, correcting, or terminating the adverse effects upon water and air quality resulting from their violations of the SWMA;

d.   Ordering DuPont and Chemours, jointly and severally, to compensate the State of New Jersey for the loss or destruction of wildlife, fish or aquatic life, and other actual damages caused by their violations of the SWMA; and

e.   Awarding the Commissioner such other relief as this Court deems appropriate.

## Fourth Count

### Public Nuisance
### (As Against DuPont & Chemours)

177. Plaintiffs repeat each allegation of Paragraphs 1 through 176 above as though fully set forth in its entirety herein.

178. Groundwater, surface water, sediments, wetlands, soils, and biota are natural resources of the State held in trust by the State.

179. The use, enjoyment, and existence of uncontaminated natural resources is a right common to the general public.

180. The contamination of the groundwater, surface water, sediment, wetlands, soils, and biota at and around the PLW Facility constitutes a physical invasion of the State's natural resources,

50

and upon information and belief, the State's real property in the vicinity of the Facility, and an unreasonable and substantial interference, both actual and potential, with (1) the exercise of the public's common right to these natural resources; (2) the State's special property and statutory status and obligations regarding the natural resources of the State; (3) the State's ability, through the Department, to protect, conserve and manage the natural resources of the State, which are by law precious and invaluable public resources held by the State in trust for the benefit of the public; and (4) the rights of the people of the State to enjoy their natural resources free from interference by pollution and contamination.

181. As the owner of the Ramapo Mountain State Forest in the vicinity of the PLW Facility, which, upon information and belief, has become contaminated by the PLW Facility, Plaintiff Department has suffered a special injury different from that common to the general public.

182. As long as these natural resources at and around the PLW Facility remain contaminated due to DuPont and Chemours' conduct, the public nuisance continues.

183. Until these natural resources are restored to their pre-injury quality, DuPont and Chemours are liable for the creation, and continued maintenance, of a public nuisance in contravention of the public's common right to clean natural resources.

51

184. The acts of Defendants as set forth above were willful and wanton.

### Prayer for Relief

**WHEREFORE,** Plaintiffs request that this Court enter judgment against Defendants as follows:

a. Ordering DuPont and Chemours to reimburse the Department and Administrator for their costs of abatement, without regard to fault, including but not limited to all costs to investigate, clean up, restore, treat, monitor, and otherwise respond to contamination of the State's natural resources so that such natural resources are restored to their original condition;

b. Compelling DuPont and Chemours to abate the nuisance by investigating, cleaning up, restoring, treating, monitoring, and otherwise responding to contamination in the State's natural resources so that such natural resources are restored to their original condition;

c. Compelling DuPont and Chemours to pay special damages to the Plaintiffs, funding the Department's performance of any further assessment and compensatory restoration of any natural resource that has been, or may be, injured as a result of the discharge of hazardous substances and pollutants at the PLW Facility, and compelling each Defendant to compensate the citizens of New Jersey for

the costs of restoration and replacement, including lost use and value of any injured natural resource;

d.   Awarding Plaintiffs punitive damages in an amount to be determined by the Court;

e.   Awarding Plaintiffs costs and fees in this action, including attorneys' fees, incurred in prosecuting this action, together with prejudgment interest, to the full extent permitted by law;

f.   Awarding Plaintiffs such other relief as this Court deems proper.

## Fifth Count

### Trespass
### (As Against DuPont & Chemours)

185. Plaintiffs repeat each allegation of Paragraphs 1 through 184 above as though fully set forth in its entirety herein.

186. Groundwater, surface water, sediment, wetlands, soils, and biota are natural resources of the State held in trust by the State for the benefit of the public.  Water resources are owned by the State for the benefit of its citizens.

187. The State brings this claim in both its public trustee and parens patriae capacities.

188. As the trustee over the State's natural resources, the State has a duty to protect and restore all natural resources of the State and protect the health and comfort of its inhabitants.

53

189. In its parens patriae capacity, the State may protect its "quasi-sovereign" interests, including the State's interest in the well-being of its populace, as well as the populace's interest in the integrity of the State's natural resources. Accordingly, the State is bringing this action for the invasion of a substantial number of its residents' possessory interests in the State's natural resources. Waters, sediments, and biota that have been affected by Defendants' contamination are mobile, moving to and inhabiting areas far from the immediate area of the initial contamination.

190. Additionally, the State is the owner of lands, including the Ramapo Mountain State Forest, in the vicinity of the PLW Facility.

191. The hazardous substances and pollutants in the groundwater, surface water, sediment, wetlands, soils, and biota at and around the PLW Facility, including, upon information and belief, on State-owned lands, constitute a physical invasion of property without permission or license.

192. DuPont and Chemours are liable for trespass, and continued trespass, because the hazardous substances and pollutants in the groundwater, surface water, sediment, wetlands, soils, and biota at and around the PLW Facility, as well as contamination previously removed from the PLW Facility, resulted

54

from discharges of hazardous substances and pollutants at the Facility.

193. As long as the natural resources remain contaminated due to DuPont's and Chemours's conduct, the trespass continues.

194. The acts of Defendants as set forth above were willful and wanton.

### **Prayer for Relief**

**WHEREFORE,** Plaintiffs request that this Court enter judgment against DuPont and Chemours as follows:

a. Finding DuPont and Chemours liable, jointly and severally, for all costs to investigate, clean up, restore, treat, monitor, and otherwise respond to contamination of the State's natural resources so that such natural resources are restored to their original condition, and for all damages to compensate the citizens of New Jersey for the lost use and value of their natural resources during all times of injury caused by hazardous substances and pollutants, and for such orders as may be necessary to provide full relief to address risks to the State, including the costs of:

    i. Past and future testing of natural resources likely to have been contaminated by hazardous substances or pollutants;

55

ii.    Past and future treatment of all natural resources containing detectable levels of hazardous substances or pollutants restored to non-detectable levels; and

iii.    Past and future monitoring of the State's natural resources to detect the presence of hazardous substances or pollutants, and restoration of such natural resources to their pre-discharge condition;

b.    Ordering DuPont and Chemours to pay all costs related to the investigation, cleanup, restoration, treatment, and monitoring of contamination of the State's natural resources;

c.    Ordering Defendants to pay all damages in an amount at least equal to the full cost of restoring the State's natural resources to their original condition prior to the contamination;

d.    Ordering Defendants to pay all compensatory damages for the lost value (including lost use) of the State's natural resources as a result of the contamination of such natural resources;

e.    Ordering Defendants to pay all other damages sustained by Plaintiffs in their public trustee, parens patriae, and regulatory capacities as a direct and proximate

56

result of the Defendants' acts and omissions alleged herein;

f.   Entering an order against the Defendants for all appropriate injunctive relief to abate or mitigate the contamination that Defendants caused;

g.   Awarding Plaintiffs punitive damages in an amount to be determined by the Court;

h.   Awarding Plaintiffs costs and fees in this action, including attorneys' fees, incurred in prosecuting this action, together with prejudgment interest, to the full extent permitted by law; and

i.   Awarding Plaintiffs such other relief as this Court deems appropriate.

## Sixth Count

### Negligence
### (As Against DuPont & Chemours)

195. Plaintiffs repeat each allegation of Paragraphs 1 through 194 above as though fully set forth in its entirety herein.

196. DuPont and Chemours had a duty to Plaintiffs to ensure that hazardous substances and pollutants were not discharged at the PLW Facility and did not injure groundwater, surface water, sediment, wetlands, soils, and biota at and around the site.

197. DuPont and Chemours breached these duties.

198. As a direct and proximate result of DuPont's and Chemours' discharges of hazardous substances and pollutants at the PLW Facility, groundwater, surface water, sediment, wetlands, soils, and biota at and around the site have been injured.  DuPont and Chemours are jointly and severally liable for such injuries and the consequential damages.

199. As a further direct and proximate result of DuPont's and Chemours' discharge of hazardous substances and pollutants at the PLW Facility, the Department and Administrator have incurred, are incurring, and will continue to incur investigation, cleanup and removal, treatment, monitoring and restoration costs, and expenses for which DuPont and Chemours are jointly and severally liable.

200. The acts of Defendants as set forth above were willful and wanton.

### **Prayer for Relief**

**WHEREFORE**, Plaintiffs request that this Court enter judgment against DuPont and Chemours as follows:

a.  Finding DuPont and Chemours liable, jointly and severally, for all costs to investigate, clean up, restore, treat, monitor, and otherwise respond to contamination of the State's natural resources so that such natural resources are restored to their original condition, and for all damages to compensate the citizens of New Jersey for the lost use and value of

their natural resources during all times of injury caused by hazardous substances and pollutants, and for such orders as may be necessary to provide full relief to address risks to the State, including the costs of:

   i. Past and future testing of natural resources likely to have been contaminated by hazardous substances or pollutants;

   ii. Past and future treatment of all natural resources containing detectable levels of hazardous substances or pollutants restored to non-detectable levels; and

   iii. Past and future monitoring of the State's natural resources to detect the presence of hazardous substances or pollutants, and restoration of such natural resources to their pre-discharge condition;

b. Ordering DuPont and Chemours to pay all costs related to the investigation, cleanup, restoration, treatment, and monitoring of contamination of the State's natural resources;

c. Ordering Defendants to pay all damages in an amount at least equal to the full cost of restoring the State's natural resources to their original condition prior to the contamination;

d.   Ordering Defendants to pay all compensatory damages for the lost value (including lost use) of the State's natural resources as a result of the contamination of such natural resources;

e.   Ordering Defendants to pay all other damages sustained by Plaintiffs in their public trustee, parens patriae, and regulatory capacities as a direct and proximate result of the Defendants' acts and omissions alleged herein;

f.   Entering an order against the Defendants for all appropriate injunctive relief to abate or mitigate the contamination that Defendants caused;

g.   Awarding Plaintiffs punitive damages in an amount to be determined by the Court;

h.   Awarding Plaintiffs costs and fees in this action, including attorneys' fees, incurred in prosecuting this action, together with prejudgment interest, to the full extent permitted by law; and

i.   Awarding Plaintiffs such other relief as this Court deems appropriate.

### Seventh Count

### Actual Fraudulent Transfer
### (As Against DuPont and Chemours Co.)

201. Plaintiffs repeat each allegation of Paragraphs 1 through 199 above as though fully set forth in its entirety herein.

202. Plaintiffs are and were creditors of Chemours Co. at all relevant times.

203. Through its participation in the Spinoff, as detailed above, Chemours Co. transferred valuable assets to DuPont, including the $3.9 billion dividend (the "Transfers"), while simultaneously assuming significant liabilities pursuant to the Separation Agreement (the "Assumed Liabilities").

204. The Transfers and Assumed Liabilities were made for the benefit of DuPont.

205. At the time that the Transfers were made and the Assumed Liabilities were assumed, and until the Spinoff was complete, DuPont was in a position to, and in fact did, control and dominate Chemours Co.

206. Chemours Co. made the Transfers and incurred the Assumed Liabilities with the actual intent to hinder, delay and defraud the creditors or future creditors of Chemours Co.

207. Plaintiffs have been harmed as a result of the Transfers. Under Del. Code. Tit. 6 Sec. 1301 to 1312 and N.J.S.A. 25:2-20 to

25:2-34, Plaintiffs are entitled to avoid the Transfers and to recover property or value transferred to DuPont.

### Prayer for Relief

**WHEREFORE,** Plaintiffs request that this Court enter judgment against DuPont and Chemours Co. as follows:

a. Voiding the Transfers to the extent necessary to satisfy the Plaintiffs' claims;

b. Awarding Plaintiffs prejudgment interest and attorneys' fees and costs; and

c. Awarding Plaintiffs such other relief as this Court deems appropriate.

### Eighth Count
### Constructive Fraudulent Transfer
### (As Against DuPont and Chemours Co.)

208. Plaintiffs repeat each allegation of Paragraphs 1 through 207 above as though fully set forth in its entirety herein.

209. Plaintiffs are and were creditors of Chemours Co. at all relevant times.

210. Chemours Co. did not receive reasonably equivalent value from DuPont in exchange for the Transfers and Assumed Liabilities.

211. Each of the Transfers and Chemours Co.'s assumption of the Assumed Liabilities was made to or for the benefit of DuPont.

212. At the time that the Transfers were made and the Assumed Liabilities were assumed, and until the Spinoff was complete,

DuPont was in a position to, and in fact did, control and dominate Chemours Co.

213. Chemours Co. made the Transfers and assumed the Assumed Liabilities when it was engaged or about to be engaged in a business for which its remaining assets were unreasonably small in relation to its business.

214. Chemours Co. was insolvent at the time or became insolvent as a result of the Transfers and its assumption of the Assumed Liabilities.

215. At the time that the Transfers were made and Chemours Co. assumed the Assumed Liabilities, DuPont and Chemours Co. intended Chemours Co. to incur, or believed, or reasonably should have believed that Chemours Co. would incur debts beyond its ability to pay as they became due.

216. Plaintiffs have been harmed as a result of the Transfers.

217. Under Del. Code. Tit. 6 Sec. 1301 to 1312 and N.J.S.A. 25:2-20 to 25:2-34, Plaintiffs are entitled to avoid the Transfers and to recover property or value transferred to DuPont.

### Prayer for Relief

**WHEREFORE,** Plaintiffs request that this Court enter judgment against DuPont and Chemours Co. as follows:

    a.    Voiding the Transfers to the extent necessary to satisfy the Plaintiffs' claims;

b.   Awarding Plaintiffs prejudgment interest and attorneys' fees and costs; and

c.   Awarding Plaintiffs such other relief as this Court deems appropriate.

## JURY DEMAND

Plaintiffs are entitled to a jury trial and hereby demand a trial by jury.

## RULE 4:5-1 CERTIFICATION

I hereby certify that, to the best of my knowledge and belief, the matter in controversy is not the subject of any action pending in any other court or of a pending arbitration proceeding, nor is any other action or arbitration proceeding contemplated, except the following pending actions:  NJDEP, et al. v. E.I. du Pont de Nemours & Company, et al., MID-L-002448-19 (relating to the DuPont/Chemours "Parlin site"); NJDEP, et al. v. E.I. du Pont de Nemours & Company, et al., SLM-L-00057-19 (relating to the DuPont/Chemours "Chambers Works site"); and NJDEP, et al. v. E.I. du Pont de Nemours & Company, et al., GLO-L-000388-19 (relating to the DuPont/Chemours "Repauno site").  I know of no other parties other than the parties set forth in this pleading who should be joined in the above action.  I recognize the continuing obligation of each party to file with the Court and serve on all parties an amended Certification if there is a change in the facts stated in the original Certification.

## DESIGNATION OF TRIAL COUNSEL

Pursuant to Rule 4:25-4, Plaintiffs designate Leonard Z. Kaufmann, Esq., as trial counsel in this matter.

Dated:  May 31, 2019

**Gurbir S. Grewal**
**ATTORNEY GENERAL OF NEW JERSEY**
*Attorneys for Plaintiffs*

By: */s/ Gwen Farley*
Gwen Farley
Deputy Attorney General
  (Atty. ID #000081999)
Richard J. Hughes Justice Complex
25 Market Street; PO Box 093
Trenton, New Jersey 08625-0093
Tel.: (609) 376-2761

**COHN LIFLAND PEARLMAN**
  **HERRMANN & KNOPF LLP**
Special Counsel to the Attorney General

By: */s/ Leonard Z. Kaufmann*
Leonard Z. Kaufmann
  (Atty. ID #045731994)
A Member of the Firm
Also by:  Joseph A. Maurice
          Christina N. Stripp
Park 80 West – Plaza One
250 Pehle Avenue, Suite 401
Saddle Brook, New Jersey 07663
Tel.: (201) 845-9600

**KELLEY DRYE & WARREN LLP**
Special Counsel to the Attorney General
By:     William J. Jackson
        John Gilmour
        David Reap
        Melissa E. Byroade
515 Post Oak Blvd. Suite 900
Houston, Texas 77027
Tel.: (713) 355-5000

**LAW OFFICES OF JOHN K. DEMA, P.C.**
Special Counsel to the Attorney General
By:     John K. Dema
        Scott E. Kauff
        John T. Dema
        James Crooks
1236 Strand Street, Suite 103
Christiansted, St. Croix
U.S. Virgin Islands 00820-5034

66

Tel.: (340) 773-6142