Exhibit 6

Control No. 19110216



# State of New Jersey

PHILIP D. MURPHY
Governor

SHEILA Y. OLIVER
Lt. Governor

DEPARTMENT OF ENVIRONMENTAL PROTECTION
SITE REMEDIATION AND WASTE MANAGEMENT PROGRAM
BUREAU OF CASE ASSIGNMENT &INITIAL NOTICE
ISRA INITIAL NOTICE
Mail Code 401-05H
P.O. Box 420
Trenton, NJ 08625-0420

CATHERINE R. MCCABE
Commissioner

June 10, 2019

Glenn Harris
210 Lake Drive East
Cherry Hill, NJ    08002
harrisg@ballardspahr.com


Kristine Wellman
The Chemours Company FC, LLC
67 Canal Rd.
Deepwater, NJ   08023
Phone: (856) 540-2600
Email: kristine.wellman@chemours.com


Glenn Harris
Counsel
Ballard Spahr LLP
210 Lake Drive East
Suite 200
Cherry Hill, NJ   08002
Phone: (856) 761-3440
Email: harrisg@ballardspahr.com


Michael Lukas
DuPont Specialty Products USA, LLC
974 Centre Road
Chestnut Run Plaza 721
Wilmington, DE   19805
Phone: (302) 999-3567
Email: michael.j.lukas@dupont.com


Michael Lukas
Remediation Team Manager
DUPONT SPECIALTY PRODUCTS USA, LLC

DSP_CW00000991

974 Centre Road
Chestnut Run Plaza 721
Wilmington, DE  19805
Phone: (302) 999-3567
Email: michael.j.lukas@dupont.com

Re:     Case Name:      *DuPont Chambers Works Tenant Space*
        Address:        67 Canal Rd
                        Pennsville Twp, Salem
        Case Tracking #: 176036
        SRP PI#:        008221
        Activity Number Reference:    GIN190001
        ISRA Case #:                  E2019176036 DuPont Chambers Wo
        Case Activity Number:         LSR190001

Dear Sir/Madam:

This letter serves to advise that the New Jersey Department of Environmental Protection
(Department) has received a complete Industrial Site Recovery Act (ISRA) General Information
Notice (GIN) for DuPont Chambers Works Tenant Space.  Please reference the above assigned
ISRA case number and SRP PI number on all correspondence sent to the Department.

The remediation of an ISRA site is subject to the provisions of the Site Remediation Reform Act
(SRRA), which was amended on May 7, 2012 (http://www.nj.gov/dep/srp/regs/statutes/srra.pdf).
The SRRA establishes criteria for the licensing of site remediation professionals who will assure
that contaminated sites are remediated in accordance with the Technical Requirements for Site
Remediation, N.J.A.C. 7:26E (http://www.nj.gov/dep/rules/rules/njac7_26e.pdf). The SRRA
authorizes the Department of Environmental Protection to establish mandatory timeframes for
the completion of each phase of remediation. These timeframes, as well as other requirements of
the act, have been codified in regulations that became effective on May 7, 2012.
(http://www.nj.gov/dep/rules/rules/njac7_26c.pdf)

As the person responsible for conducting the remediation for the referenced ISRA case, the
SRRA requires you to do the following:

- Within 45 days after the date the GIN was required to be submitted (NJAC7:26B-3.2(a)),
  retain the services of a Licensed Site Remediation Professional (LSRP) to perform the
  remediation in accordance with the requirements set forth at NJAC 7:26E and NJAC
  7:26C. **(The retained LSRP shall submit a LSRP Notification of Retention or
  Dismissal form via the Department's online service, to demonstrate retention within
  the 45 day timeframe)**.  A list of LSRPs can be found at http://www.nj.gov/dep/srp/;
- Conduct the remediation without the prior approval of the Department in accordance with
  the requirements set forth at N.J.A.C. 7:26E, the Technical Requirements for Site

Remediation and N.J.A.C. 7:26C, Administrative Requirements for the Remediation of Contaminated Sites (see regulatory timeframes listed below);

- Establish a remediation funding source, if required (http://www.nj.gov/dep/srp/guidance/rfsguide/);
- Pay all applicable fees and oversight costs;
- Provide the Department with access to the contaminated site and documents concerning the remediation; and
- Obtain all necessary permits.

Failure to comply with the obligations above may result in the Department taking direct oversight of the remediation.  Once a site or a portion of a site is under direct Department oversight, the responsible party forfeits all rights in the decision-making process regarding the remedial investigation and remedial action to be performed at the site, including remedy selection.  Additionally, the responsible party will be required to post a remediation funding source and the Department will control the disbursements from the remediation funding source (http://www.nj.gov/dep/srp/guidance/srra/direct_oversight.pdf).

Preliminary Assessment Report, Regulatory Timeframe:

If no potentially contaminated areas of concern are identified during the Preliminary Assessment, a complete Preliminary Assessment Report with a Preliminary Assessment/Site Investigation Form, a Case Inventory Document, and a Response Action Outcome form with a Response Action Outcome document issued by a Licensed Site Remediation Professional shall be submitted to the Department no later than 90 days after the date the GIN was required to be submitted (NJAC7:26E-3.1(e)1).

If potentially contaminated areas of concern are identified during the Preliminary Assessment, a Site Investigation must be conducted.  The Preliminary Assessment Report shall be submitted with the Site Investigation Report (see section below).

Site Investigation Report, Regulatory Timeframe:

If no contaminants are detected above the unrestricted use standards during the Site Investigation, a complete Preliminary Assessment/Site Investigation Report with a Preliminary Assessment/Site Investigation Form, a Case Inventory Document, and a Response Action Outcome form with a Response Action Outcome document prepared by a Licensed Site Remediation Professional shall be submitted no later than 1 year after the date the GIN was required to be submitted (NJAC7:26E-3.14(a)1).

If levels of contaminants are detected above the unrestricted use standards during the Site Investigation, a complete Preliminary Assessment/Site Investigation Report with a Preliminary Assessment/Site Investigation Form, a Case Inventory Document, and a Receptor Evaluation shall be submitted to the Department no later than 1 year after the date the GIN was required to be submitted. Additionally, a Remedial Investigation must be conducted (refer to NJAC7:26E-4).

Receptor Evaluation

Receptor Evaluation is not required when an Unrestricted Use Response Action Outcome is issued and is filed with the Department within 1 year after the date the GIN was required to be submitted (NJAC7:26E-1.12(b)).

Remedial Investigation Report, Remedial Action Report:

A complete Remedial Investigation Report with a Remedial Investigation Report form, and a Case Inventory Document, prepared by a Licensed Site Remediation Professional shall be submitted in accordance with the timeframes at N.J.A.C. 7:26E-4.10, and implemented in accordance with the schedule contained therein. Upon completion of the remedial action a Remedial Action Report with a Remedial Action Report form shall be prepared by a Licensed Site Remediation Professional and submitted to the Department.

Annual Remediation Fees

The first Annual Remediation Fee Form demonstrating the applicable fee calculated in accordance with N.J.A.C. 7:26C-4 shall be submitted to the Department by the retained LSRP utilizing the Department's on-line service, upon the earliest of the following:
- The submittal of a preliminary assessment report;
- The submittal of a preliminary assessment and site investigation report;
- The submittal of the first remedial phase document; or
- 90 days after the ISRA triggering event.

Please note: if the Department does not receive an Annual Remediation Reporting Form and applicable fee within the timeframes noted above, a Category 2 fee will be assigned. Fees are non-refundable.

Sale or Transfer of a Business, Assets or Property

Prior to the sale or transfer of a business, assets or property, ISRA requires that the owner or operator must:
- Obtain and submit to the Department a Response Action Outcome issued by a Licensed Site Remediation Professional, or
- Obtain and submit to the Department a Remedial Action Work Plan certified by a Licensed Site Remediation Professional, and post a remediation funding source pursuant to N.J.A.C. 7:26C-5, or
- Obtain an Authorization Letter issued by the Department, or
- Submit to the Department a Remediation Certification pursuant to N.J.A.C. 7:26B-3.3, and post a remediation funding source pursuant to N.J.A.C. 7:26C-5.

Sales completed in violation of the law will be referred for enforcement action.

If you need any special guidance contact the ISRA Initial Notice section at (609)-292-2943.

Sincerely

*Kirstin Hahn*

Kirstin Hahn, Bureau Chief
Bureau of Case Assignment & Initial Notice

C:     DEP File Copy

Exhibit 7



Area G
Area A
Area B
E3
E4
Area D
Area E
Area I
Area C
Area J
C1
E2
C2
E5
E1
Area H
Area F

| Area | Sub-Area | Current Operations | Historical Operations |
|------|----------|-------------------|----------------------|
| A | - | Main office building for the Aramids Division. The building was shared by Chemours and DuPont | Freon office and lab |
| B | - | Storage building used to store insulation material. An out of service railroad track runs through this area. | Engineering area construction shop |
| C | 1 | Secondary Office Building | Engineering plate, tin and lead shops; engineering change houses |
| | 2 | Men's Change Room Building | |
| D | - | Parking lot with equipment/roll-off storage | "Storage area" with access roads running through |
| E | | Main process area which included the production of aramids, phosgene, diamines; packaging, scaffolding storage, tanker truck storage | Main process area which included the production of phosgene, diamines, nomex, and hylene |
| | 1 | Phosgene production | |
| | 2 | Diamines production | |
| | 3 | PCL process area | |
| | 4 | Dinitrobenzene bunker | |
| | 5 | Packaging area | |
| F | - | Nitrators production area - production of dinitrobenzene as part of diamines production | Manufacturing of fluoroelastomers and DNT (2,4 dinitrotoluene) |
| G | - | Reactive Chemicals Testing Lab area - performance testing of small quantities of chemicals used in production of aramids. | Land undeveloped in 1969 site diagram. Based on review of the historical aerials for this area, the area was developed around 1974. Current operations began in 1974 and continued until cessation of operations in 2018 |
| H | - | Praxair Area - production of gaseous compounds used in aramid production | Land undeveloped in 1969 site diagram; Praxair plant built between 1981 and 1987 - production of gaseous compounds used in aramid production |
| I | - | FMDL Building (Fluoroelastomer Market Development Lab) | FMDL Building (Fluoroelastomer Market Development Lab) |
| J | - | Benzene Loading/Unloading Area | No operations depicted in 1969 site diagram - aerial photo indicates area was undeveloped in 1965, with possible storage operations identified in 1981 aerial photo |

*Historical operations are based off a 1969 site diagram provided by the Site contact

Current and Historical Operations for Indicated Par cels

Notes:
1. 2015 Aerial Imagery Source: NJGIN
2. GIN - General Information Notice
3. This submission is related to the GINs for
ISRA Case Nos E2018168681, E2018172783, and E2019176036
4.  Parcels not included in ISRA GIN submissions ar
continuing operations

**Legend**
Chemours Property Boundary
**Dupont Chambers Works Parcels**
Leasehold Included in Case No. E2018168681
Leasehold Included in Case No. E2018172783
Leasehold Included in Case No. E2019176036

**DuPont Leasehold Areas**
**DuPont Chambers Works**
67 Canal Road
Deepwater, NJ

**3**

Geosyntec▷
consultants

**Figure**
**1**

0    500
Feet

Ewing, NJ    July 2019

R:\GIS\GISprojects\JR0217_Dupont\Projects\DuPont Leaseholds Per NJDEP Request_Rev 6.mxd 7/17/2019 8:42:52 AM

Exhibit 8

Control No. 19110216

**SHERRIER, MICHAEL P**

| | |
|---|---|
| **From:** | Tom Geiger <TGeiger@Geosyntec.com> |
| **Sent:** | Thursday, February 18, 2021 4:41 PM |
| **To:** | SHERRIER, MICHAEL P; Danielle Thorson |
| **Cc:** | Julia Ryan |
| **Subject:** | [EXTERNAL] FW: RFS PI#920221 / SRP PI#008221 / ISRA Case#E2019176036 E.I. duPont de Nemours and Company AKA DuPont Chambers Works Site Self-Guarantee Deficient |

Good afternoon Mike and Danielle,

I just received this from Jennifer Macleod, approving the 30 extension request to submit the new RFS for the Chambers Works FMDL ISRA case.

Regards,
Tom

---

**From:** MacLeod, Jennifer <Jennifer.MacLeod@dep.nj.gov>
**Sent:** Thursday, February 18, 2021 4:29 PM
**To:** Tom Geiger <TGeiger@Geosyntec.com>
**Cc:** Haymes, David <David.Haymes@dep.nj.gov>; Kratina, Kevin <Kevin.Kratina@dep.nj.gov>; Maybury, Steve <Steve.Maybury@dep.nj.gov>; Dudar, Helen <Helen.Dudar@dep.nj.gov>
**Subject:** Re: RFS PI#920397 / SRP PI#008221 / ISRA Case#E2019176036 E.I. duPont de Nemours and Company AKA DuPont Chambers Works Site Self-Guarantee Deficient

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe. If you have any suspicion, please confirm with the sender verbally that this email is authentic.

**E.I. duPont de Nemours and Company**
**AKA DuPont Chambers Works**
**67 Canal Road & Route 130**
**Deepwater, Salem County**
**RFS PI#:  920397**
**SRP PI#:  008221**
**ISRA Case#: E2019176036**
**RFS Type:  Alternate RFS Mechanism Due**

Hello Mr. Geiger,

We are in receipt of your February 3, 2021 request for thirty (30) additional days to respond to the Department's January 27, 2021 email and provide an alternate Remediation Funding Source (RFS) package for ISRA Case #E2019176036.  This is acceptable to the Department and the Remediation Cost Review and RFS/FA Form, detailed cost estimate, original RFS Mechanism, and 1% surcharge check should be provided by **Monday, March 29, 2021.**\* Please ensure the detailed cost estimate includes all costs to complete the remediation for all areas of concern and contaminants in all media, in accordance with N.J.A.C. 7:26C-5.3 and N.J.A.C. 7:26C-5.10.

Sincerely,

1

DSP_CW00001001

Jennifer


*/Please note that the additional 30-day timeframe to respond does not represent an extension of the original due date to submit an acceptable RFS mechanism and the Department reserves all rights and remedies available pursuant to ISRA, including, without limitation, all claims pending in *New Jersey Dept. of Envt'l Prot. v. E.I. du Pont de Nemours & Co.*, No. 2:19-cv-14758 (D.N.J. June 8, 2020.)

Jennifer MacLeod

Remediation Funding Source Coordinator

NJ Department of Environmental Protection

Site Remediation Program – Remediation Funding Source Unit

401 East State Street-6th Floor

Mail Code 401-06X

P.O. Box 420

Trenton, NJ 08625

(609) 984-3651

jennifer.macleod@dep.nj.gov


*NOTE: This E-mail is protected by the Electronic Communications Privacy Act, 18 U.S.C. Sections 2510-2521. This E-Mail and its contents, may be Privileged & Confidential due to the Attorney-Client Privilege, Attorney Work Product, and Deliberative Process or under the New Jersey Open Public Records Act. If you are not the intended recipient of this e-mail, please notify the sender, delete it and do not read, act upon, print, disclose, copy, retain or redistribute it.*

*Nothing in this correspondence affects your potential liability and obligations to the State Trustee, the Department or its Commissioner regarding natural resource injuries, restoration or damages.*

---

**From:** Tom Geiger <TGeiger@Geosyntec.com>
**Sent:** Wednesday, February 3, 2021 5:21 PM
**To:** MacLeod, Jennifer <Jennifer.MacLeod@dep.nj.gov>; SHERRIER, MICHAEL P <Michael.P.Sherrier@dupont.com>
**Cc:** Haymes, David <David.Haymes@dep.nj.gov>
**Subject:** [EXTERNAL] RE: RFS PI#920397 / SRP PI#008221 / ISRA Case#E2019176036 E.I. duPont de Nemours and Company AKA DuPont Chambers Works Site Self-Guarantee Deficient


Hello Ms. MacLeod,


Thank you for the information supplied in your email of 27 January 2021 regarding the Remediation Funding Source for ISRA Case #2019176036.

DSP_CW00001002

We are transmitting this response to your email to provide clarification, additional information, and a proposed scheduled regarding the Remediation Funding Source.

Clarification:

There are currently three ISRA Cases identified with the name of DuPont Chambers Works Tenant Space per the General Information Notices that were submitted.

The following information is provided to clarify the parcels associated with each Case and the Remediation Funding Source (RFS) requirements for each. Please refer to the attached figure, which has also been provided to Ms. Helen Dudar, NJDEP Traditional Oversight Case Manager, for these ISRA cases:

- ISRA Cases E2018168681 (Aramids, 8 leasehold parcels) and E2018172783 (Reactive Chemicals Testing Laboratory, 1 leasehold parcel). These two cases were combined into one case in the NJDEP system.
  - Per NJDEP, since this was a cessation of operations, no remediation certification was required. Therefore, per NJAC 7:26-5,2(l)1.i, a RFS is NOT required until the NJDEP approves/LSRP certifies a Remedial Action Workplan (RAWP). This has not yet happened, so no RFS is required for these two cases at this time
- ISRA Case E2019176036 (FMDL, 1 leasehold parcel): Due to transfer of operations, this case required a Remediation Certification that was submitted to the NJDEP. The remediation certification was dated 8/29/2019.
  - Per NJAC 7:26-5,2(l)1.ii, a Remediation Cost Review and RFS/FA Form was submitted along with the Self Guarantee Application concurrently with the Remediation Certification for the surrogate amount of $250,000. This surrogate amount is specified by the NJDEP for sites with soil and groundwater contamination. Although we did not have data indicating groundwater contamination, the NJDEP required an RFS of $250,000 due to the history of the entire property, even those portions that are not part of the subject leaseholds.
  - A PA/SI has not yet been submitted for Case E2019176036 (FMDL). Therefore, an RFS utilizing the surrogate amount is still appropriate. Once the PA/SI report is submitted, the regulations require a Remediation Cost Estimate to be prepared and submitted with a Remediation Cost-RFS/FA form along with an RFS mechanism in a value at least equal to the cost estimate.

Additional Information:

DuPont has reviewed your comments related to the Self Guarantee Application and the net tangible worth value supplied in the Self Guarantee Application. As you indicated, the net tangible worth value is less than three times the cost to complete remediation and DuPont is not currently eligible to utilize a self-guarantee as a RFS funding mechanism.

The SI sampling work and data evaluation for Case E2019176036 (FMDL) have been completed and the PA/SI report is in preparation. To address the above issue, a remediation cost estimate for ISRA Case E2019176036 is being prepared based on the information from the work completed as part of the PA/SI. It is anticipated that the remediation cost for ISRA Case E2019176036 will be approximately $60,000. The cost estimate, a Remediation Cost Review and RFS-FA Form, RFS funding mechanism, and 1% surcharge fee check are being prepared and will be submitted shortly.

3

Schedule:

As indicated above, DuPont is currently preparing the NJDEP required submittal for the RFS.  However, it is anticipated that the submittal, particularly developing the remediation cost estimate and procurement of the funding mechanism, will require greater than 30 days to complete.  Therefore, DuPont respectfully requests 60 days to submit the above listed RFS documents to the NJDEP.

After you have had an opportunity to review the above information, please do not hesitate to contact me or Michael Sherrier with any questions.

Also, please advise if you concur with the requested schedule extension to provide the RFS mechanism and associated documents.

Regards,

**Thomas Geiger, P.E. (NJ), L.S.R.P.**

**Senior Engineer**

**Geosyntec Consultants, Inc.**

1750 American Boulevard, Suite 200

Pennington, New Jersey 08534

Phone:  609.493.9017  Mobile:  267.895.5042

GEOSYNTEC | SIREM | SAVRON

Follow Us – LinkedIn | Twitter | Facebook | YouTube

INFORMATION CONTAINED IN THIS E-MAIL TRANSMISSION IS PRIVILEGED AND CONFIDENTIAL. IF YOU ARE NOT THE INTENDED RECIPIENT OF THIS EMAIL, DO NOT READ, DISTRIBUTE OR REPRODUCE THIS TRANSMISSION (INCLUDING ANY ATTACHMENTS). IF YOU HAVE RECEIVED THIS E-MAIL IN ERROR, PLEASE IMMEDIATELY NOTIFY THE SENDER BY TELEPHONE OR EMAIL REPLY.

DSP_CW00001004

**From:** MacLeod, Jennifer <Jennifer.MacLeod@dep.nj.gov>
**Sent:** Wednesday, January 27, 2021 4:48 PM
**To:** SHERRIER, MICHAEL P <Michael.P.Sherrier@dupont.com>; Tom Geiger <TGeiger@Geosyntec.com>
**Cc:** Haymes, David <David.Haymes@dep.nj.gov>
**Subject:** RFS PI#920397 / SRP PI#008221 / ISRA Case#E2019176036 E.I. duPont de Nemours and Company AKA DuPont
Chambers Works Site Self-Guarantee Deficient

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe. If you have any suspicion, please confirm with the sender verbally that this email is authentic.

**E.I. duPont de Nemours and Company**
**AKA DuPont Chambers Works**
**67 Canal Road & Route 130**
**Deepwater, Salem County**
**RFS PI#:  920397**
**SRP PI#:  008221**
**ISRA Case#: E2019176036**
**RFS Type:  Self-Guarantee**

Hello Mr. Sherrier and Mr. Geiger,

On September 21, 2020, the Department received the annual cost review on the Remediation Cost Review and RFS/FA Form and the Self-Guarantee Application for the above-referenced site.  Upon review of the Self-Guarantee Application, DuPont de Nemours, Inc. is noted as the Parent Company providing a Self-Guarantee on behalf of DuPont Specialty Products USA, LLC.  As shown in the application form, DuPont de Nemours, Inc. had a negative tangible net worth at the time of the application's filing.  Pursuant to N.J.A.C. 7:26C-5.8(a)2, in order to provide a Self-Guarantee as a Remediation Funding Source (RFS), the estimated cost to complete remediation must not exceed one-third of guarantor's tangible net worth.  N.J.S.A. 58:10B-3(a) requires that the guarantor maintain at all times a tangible net worth that exceeds three times the cost to complete remediation.  DuPont de Nemours, Inc. therefore was not eligible as of September 21, 2020 to employ a self-guarantee because its reported tangible net worth was negative, and therefore insufficient.

It has further come to the Department's attention that the Parent Self-Guarantee Application that DuPont de Nemours, Inc. submitted on behalf of DuPont Specialty Products USA, LLC on August 29, 2019 also did not comply with N.J.A.C. 7:26C-5.8(a)2 and N.J.S.A. 58:10B-3(a).  Although DuPont de Nemours, Inc. reported a tangible net worth of $1,524,666,667.00, that amount was based on its fiscal year end 2018 financial statements.  We understand that DuPont de Nemours Inc., however, engaged in transactions after the 2018 financial statements issued, but before it submitted its August 29, 2019 Parent Self-Guarantee Application, that resulted in it having a negative tangible net worth.  DuPont de Nemours Inc. therefore did not have, and did not maintain, the required amount of tangible net worth to support the application.  Due to the negative net worth of DuPont de Nemours, Inc., DuPont Specialty Products USA, LLC and DuPont de Nemours, Inc. could not rely on the Self-Guarantee and have not been in compliance with their obligations to establish an RFS pursuant to the Industrial Site Recovery Act, N.J.S.A. 13:K-6 et seq.

In addition, please note that DuPont Specialty Products USA, LLC's September 21, 2020 RFS Cost Estimate for the leasehold that is the subject of the RFS (referred to by DuPont de Nemours, Inc. as the "DuPont Chambers Works Tenant

DSP_CW00001005

Space" consisting of 10 defined leased areas) was based on a surrogate value of $250,000 because DuPont Specialty Products USA, LLC claimed that a Preliminary Assessment/Site Investigation (PA/SI) has not yet been completed for this ISRA Case.  However, a PA/SI for ISRA Cases E2018168861 and E2018172783 that includes the exact same "DuPont Chambers Works Tenant Space" was submitted to the Department as recently as September 1, 2020.   Within thirty (30) days* of receipt of this letter, DuPont Specialty Products USA, LLC shall submit to the Department an actual RFS Cost Estimate using the information contained in the September 1, 2020 PA/SI and all additional information available concerning the contamination at and from the DuPont Chambers Works Tenant Space.


To establish compliance with the RFS requirements, DuPont Specialty Products USA, LLC shall provide the following within thirty (30) days* of this email:

1. An alternative RFS mechanism in an amount equal to or greater than the detailed cost estimate;
2. A revised Page 2 and Page 3 of the Remediation Cost Review and RFS/FA Form indicating the appropriate mechanism under Section D, any appropriate amount change, and the cost estimate amount updated in Sections E and F; and
3. A 1% surcharge check made payable to the Treasurer, State of New Jersey.  Please reference "RFS PI#920397 1% surcharge" on the check, if possible.

Please feel free to contact me with any questions or concerns you may have.

Sincerely,
Jennifer


*/Please note that the 30-day timeframe to respond to this letter does not represent an extension of the original due date to submit an acceptable RFS mechanism and the Department reserves all rights and remedies available pursuant to ISRA, including, without limitation, all claims pending in *New Jersey Dept. of Envt'l Prot. v. E.I. du Pont de Nemours & Co*., No. 2:19-cv-14758 (D.N.J. June 8, 2020.)



Jennifer MacLeod

Remediation Funding Source Coordinator

NJ Department of Environmental Protection

Site Remediation Program – Remediation Funding Source Unit

401 East State Street-6th Floor

Mail Code 401-06X

P.O. Box 420

Trenton, NJ 08625

(609) 984-3651

jennifer.macleod@dep.nj.gov

DSP_CW00001006

NOTE: This E-mail is protected by the Electronic Communications Privacy Act, 18 U.S.C. Sections 2510-2521. This E-Mail and its contents, may be Privileged & Confidential due to the Attorney-Client Privilege, Attorney Work Product, and Deliberative Process or under the New Jersey Open Public Records Act. If you are not the intended recipient of this e-mail, please notify the sender, delete it and do not read, act upon, print, disclose, copy, retain or redistribute it.

Nothing in this correspondence affects your potential liability and obligations to the State Trustee, the Department or its Commissioner regarding natural resource injuries, restoration or damages.

DSP_CW00001007

Exhibit 9

Control No. 19110216

Message
_____

**From**: Tom Geiger [TGeiger@Geosyntec.com]
**Sent**: 3/15/2021 7:14:19 PM
**To**: MacLeod, Jennifer [Jennifer.MacLeod@dep.nj.gov]
**CC**: SHERRIER, MICHAEL P [Michael.P.Sherrier@dupont.com]; Danielle Thorson [DThorson@Geosyntec.com]
**Subject**: [EXTERNAL] RE: RFS PI#920397 / SRP PI#008221 / ISRA Case#E2019176036 E.I. duPont de Nemours and Company AKA DuPont Chambers Works


Hi Jennifer,

Thank you for confirming receipt of the surety bond.

If you have any questions, please do not hesitate to contact me.
Regards,
Tom

---

**From:** MacLeod, Jennifer <Jennifer.MacLeod@dep.nj.gov>
**Sent:** Monday, March 15, 2021 2:06 PM
**To:** Tom Geiger <TGeiger@Geosyntec.com>
**Cc:** SHERRIER, MICHAEL P <Michael.P.Sherrier@dupont.com>; Danielle Thorson <DThorson@Geosyntec.com>
**Subject:** RE: RFS PI#920397 / SRP PI#008221 / ISRA Case#E2019176036 E.I. duPont de Nemours and Company AKA DuPont Chambers Works

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe. If you have any suspicion, please confirm with the sender verbally that this email is authentic.

Hi Tom,

The original Surety Bond is here as well, date stamped received by the Bureau of Case Assignment and Initial Notice March 4, 2021.  These documents will be forwarded to the Case Manager for review.

Thanks again,
Jennifer

Jennifer MacLeod
Remediation Funding Source Coordinator
NJ Department of Environmental Protection
Site Remediation Program – Remediation Funding Source Unit
401 East State Street-6th Floor
Mail Code 401-06X
P.O. Box 420
Trenton, NJ  08625
(609) 984-3651
jennifer.macleod@dep.nj.gov

*NOTE: This E-mail is protected by the Electronic Communications Privacy Act, 18 U.S.C. Sections 2510-2521. This E-Mail and its contents, may be Privileged & Confidential due to the Attorney-Client Privilege, Attorney Work Product, and Deliberative Process or under the New Jersey Open Public Records Act. If you are not the intended recipient of this e-mail, please notify the sender, delete it and do not read, act upon, print, disclose, copy, retain or redistribute it.*

*Nothing in this correspondence affects your potential liability and obligations to the State Trustee, the Department or its Commissioner regarding natural resource injuries, restoration or damages.*

---

**From:** Tom Geiger <TGeiger@Geosyntec.com>
**Sent:** Monday, March 15, 2021 12:11 PM
**To:** MacLeod, Jennifer <Jennifer.MacLeod@dep.nj.gov>
**Cc:** SHERRIER, MICHAEL P <Michael.P.Sherrier@dupont.com>; Danielle Thorson <DThorson@Geosyntec.com>
**Subject:** [EXTERNAL] RE: RFS PI#920397 / SRP PI#008221 / ISRA Case#E2019176036 E.I. duPont de Nemours and Company AKA DuPont Chambers Works

Thank you Jennifer.

Regards,

**Thomas Geiger, P.E. (NJ), L.S.R.P.**
**Senior Engineer**
**Geosyntec Consultants, Inc.**
1750 American Boulevard, Suite 200
Pennington, New Jersey 08534
Phone:  609.493.9017  Mobile: 267.895.5042

GEOSYNTEC | SIREM | SAVRON

Follow Us – LinkedIn | Twitter | Facebook | YouTube

INFORMATION CONTAINED IN THIS E-MAIL TRANSMISSION IS PRIVILEGED AND CONFIDENTIAL. IF YOU ARE NOT THE INTENDED RECIPIENT OF THIS EMAIL, DO NOT READ, DISTRIBUTE OR REPRODUCE THIS TRANSMISSION (INCLUDING ANY ATTACHMENTS). IF YOU HAVE RECEIVED THIS E-MAIL IN ERROR, PLEASE IMMEDIATELY NOTIFY THE SENDER BY TELEPHONE OR EMAIL REPLY.

---

**From:** MacLeod, Jennifer <Jennifer.MacLeod@dep.nj.gov>
**Sent:** Monday, March 15, 2021 12:05 PM
**To:** Tom Geiger <TGeiger@Geosyntec.com>
**Cc:** SHERRIER, MICHAEL P <Michael.P.Sherrier@dupont.com>; Danielle Thorson <DThorson@Geosyntec.com>
**Subject:** RE: RFS PI#920397 / SRP PI#008221 / ISRA Case#E2019176036 E.I. duPont de Nemours and Company AKA DuPont Chambers Works

> CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe. If you have any suspicion, please confirm with the sender verbally that this email is authentic.

Hello Tom,
This will confirm receipt of the original check and Remediation Cost Review and RFS/FA Form.  I will also confirm when we receive the original Surety Bond.
Thank you,
Jennifer

Jennifer MacLeod
Remediation Funding Source Coordinator

DSP_CW00001009

NJ Department of Environmental Protection
Site Remediation Program – Remediation Funding Source Unit
401 East State Street-6th Floor
Mail Code 401-06X
P.O. Box 420
Trenton, NJ  08625
(609) 984-3651
jennifer.macleod@dep.nj.gov



*NOTE: This E-mail is protected by the Electronic Communications Privacy Act, 18 U.S.C. Sections 2510-2521. This E-Mail and its contents, may be Privileged & Confidential due to the Attorney-Client Privilege, Attorney Work Product, and Deliberative Process or under the New Jersey Open Public Records Act. If you are not the intended recipient of this e-mail, please notify the sender, delete it and do not read, act upon, print, disclose, copy, retain or redistribute it.*

*Nothing in this correspondence affects your potential liability and obligations to the State Trustee, the Department or its Commissioner regarding natural resource injuries, restoration or damages.*

---

**From:** Tom Geiger <TGeiger@Geosyntec.com>
**Sent:** Friday, March 5, 2021 4:18 PM
**To:** MacLeod, Jennifer <Jennifer.MacLeod@dep.nj.gov>
**Cc:** SHERRIER, MICHAEL P <Michael.P.Sherrier@dupont.com>; Danielle Thorson <DThorson@Geosyntec.com>
**Subject:** [EXTERNAL] RFS PI#920397 / SRP PI#008221 / ISRA Case#E2019176036 E.I. duPont de Nemours and Company AKA DuPont Chambers Works

Good afternoon Jennifer,

Attached is a copy of the Remediation Cost Estimate-RFS/RA form (with attachments) and a check as payment for the 1% RFS surcharge.
The original was sent in today's mail.  Also the original RFS mechanism (surety bond) is being been sent to the NJDEP under separate cover.

If you have any questions or require any additional information, please do not hesitate to contact me.

Best regards,

**Thomas Geiger, P.E. (NJ), L.S.R.P.**
**Senior Engineer**
**Geosyntec Consultants, Inc.**
1750 American Boulevard, Suite 200
Pennington, New Jersey 08534
Phone:  609.493.9017  Mobile:  267.895.5042

GEOSYNTEC | SIREM | SAVRON

Follow Us – LinkedIn | Twitter | Facebook | YouTube

INFORMATION CONTAINED IN THIS E-MAIL TRANSMISSION IS PRIVILEGED AND CONFIDENTIAL. IF YOU ARE NOT THE INTENDED RECIPIENT OF THIS EMAIL, DO NOT READ, DISTRIBUTE OR REPRODUCE THIS TRANSMISSION (INCLUDING ANY ATTACHMENTS). IF YOU HAVE RECEIVED THIS E-MAIL IN ERROR, PLEASE IMMEDIATELY NOTIFY THE SENDER BY TELEPHONE OR EMAIL REPLY.

DSP_CW00001011

Exhibit :

Governor Phil Murphy ● Lt.Governor Sheila Oliver

| NJ Home | Services A to Z | Departments/Agencies | FAQs |    Search

newjersey
department of environmental protection

# Site Remediation Program

SRP Home | DEP Home

Industrial Site Recovery Act (ISRA)    How to Determine if ISRA Applies to You

## Site Remediation Following the Industrial Site Recovery Act (ISRA)

The Industrial Site Recovery Act (ISRA) is a unique environmental law[1] which requires the remediation of certain business operations (site) prior to their sale or transfer or upon its cessation of on site business operations. Industrial Establishment is the defined term in the ISRA rule that describes those businesses regulated under ISRA. The remediation of "industrial establishments" has been law in New Jersey since 12/31/83 [2]. Compliance with ISRA begins at the time of specified triggering events. Read further to learn more about who must comply with ISRA and when compliance begins.

## Who Must Comply with ISRA?

Any person who owns the industrial establishment, owns the real property of an industrial establishment or is the operator of the industrial establishment must comply with ISRA.

## How to Determine if ISRA Applies to You

This portion of the guide is designed to help both business and property owners, as well as their legal and technical representatives, determine if the Industrial Site Recovery Act (ISRA) (N.J.S.A. 13:1K and N.J.A.C. 7:26B), applies to their property or business. It is strongly recommended that this guide be used as a supplement to the ISRA regulations which can be found by following the above link. Hopefully, through the use of this guide and the regulations in tandem, you will have a better understanding of how ISRA applies to you or your client.

## What is an industrial establishment?

The term industrial establishment cannot be defined without first discussing the North American Industry Classification System (NAICS)[3]. NAICS is a classification system created by the federal government to facilitate the collection of statistical information. All businesses have NAICS numbers based on the nature of their business. The ISRA rule at Appendix C sets forth those NAICS numbers which are regulated.

**Useful Links regarding NAICS**

- Appendix C https://www.nj.gov/dep/rules/rules/njac7_26b.pdf

- What is NAICS http://www.census.gov/epcd/www/drnaics.htm#g1

- NAICS search engine http://www.census.gov/eos/www/naics/

An industrial establishment is a business whose NAICS number is listed in Appendix C of the ISRA rule. In addition to having a listed NAICS number the business must have operated in New Jersey on or after December 31, 1983 and business operations must involve the storage or handling of hazardous substances as defined at N.J.A.C. 7:1E, the New Jersey Spill Compensation and Control Act. Hazardous substances include petroleum products and those substances listed at Appendix A of N.J.A.C. 7:1E. To view the list of hazardous substance, see the following https://www.nj.gov/dep/rpp/brp/dp/downloads/NJAC_7_1E_App_A_and_B.pdf [pdf]

In summary, to be an industrial establishment, a business must:

- have a NAICS number listed in Appendix C *and*;

- have operated in New Jersey on or after December 31, 1983 *and*;

- use or store hazardous substances as defined at N.J.A.C. 7:1E.

For the complete definition of Industrial Establishment, see N.J.A.C.7:26B-1.4.

## What events require an ISRA filing for an Industrial Establishment?

The need to comply with ISRA occurs after a triggering event. The event usually indicates that a significant change in the ownership or operations of the business or property is about to take place (for example, the signing of an agreement to sell the property of an industrial establishment). Compliance with ISRA is required at the time of the triggering event (the signing of the agreement in this example) and prior to the closing of the property sale.

A reminder before we delve further into the complexities of ISRA triggering events; ISRA only applies to an Industrial Establishment as defined above. If the place of business does not meet the above criteria defining an industrial establishment, ISRA does not apply. That said, an inclusive list of ISRA triggering events can be found in the ISRA rule at N.J.A.C. 7:26B-3.2. https://www.nj.gov/dep/srp/regs/isra/

Common transactions which trigger the requirement of an industrial establishment to comply with ISRA include; the sale of property, sale of business or the cessation of operations. It's easy to determine if ISRA has been triggered as the result of these types of transactions.

But ISRA also applies to more complex business transactions. How does the owner or operator of an industrial establishment know if their planned "Corporate Reorganization" or stock transfer will require ISRA compliance?

The following guidance is provided to assist you in making these types of determinations. Please note, this guidance is largely based on the Departments regulations formerly codified at N.J.A.C. 7:26B-2.2 Applicability determinations. Though the Department no longer offers the service of determining ISRA applicability, the determinative criteria embodied in this former section remain valid.

The guidance offered herein can be categorized on a transactional basis as follows; Transactions relative to;

1. a transfer of ownership or operations involving an evaluation of whether the indirect owner's assets would have been available for remediation. (Indirect owner transactions)

2. a transfer of ownership or operations involving an evaluation of whether the subject transaction is a corporate reorganization not substantially affecting the ownership. (Corporate reorganization transactions)

3. a transfer of ownership or operations involving an evaluation of whether the subject transaction is a transfer of a controlling interest. (Controlling interest transactions)

### Indirect Owner Transactions

The key to ISRA applicability relative to indirect owner transactions is to determine whether the indirect owner has exercised control over the industrial establishment or the direct owner or operator thereof. An affirmative finding that the indirect owner has exercised control over the industrial establishment or the direct owner or operator thereof, would result in a determination that the indirect owner's assets would have been available for remediation thus triggering the requirements of ISRA. The following six criteria have been developed to determine if the indirect owner's assets would have been available for remediation. The owner or operator of the industrial establishment should:

1. Identify each direct owner and each indirect owner of the industrial establishment;

2. Identify whether the indirect owner has exerted fiscal control over the direct owner or industrial establishment including, but not limited to, imposing any restriction upon the financing, borrowing, budgeting, dividends and cash management of the direct owner or industrial establishment;

3. List all persons that are officers and directors for both the direct owner and the indirect owner of the industrial establishment to establish whether the officers, directors and employees of the indirect owner constitute a majority of the directors of the direct owner or the industrial establishment or such smaller number of directors as is sufficient to effectively direct the management and policies of the direct owner or the industrial establishment;

4. Identify whether the officers, directors and employees of the indirect owner are involved in the day-to-day operations of the direct owner or the industrial establishment and whether the day-to-day operations of the direct owner or the industrial establishment are relevant to the generation, manufacture, handling, storage or disposal of hazardous substances or hazardous wastes;

5. Identify whether the indirect owner has the ability to control the activities, policies or decisions of the direct owner or the industrial establishment and whether these activities, policies or decisions are relevant to the generation, handling, storage or disposal of hazardous substances or hazardous wastes; and

6. Evaluate any additional information which may be relevant to this determination.
   Please note, when performing this type of analysis, no one factor is determinative. All factors in their totality must be must considered.

### Corporate Reorganization Transactions

Corporate reorganizations are excepted from ISRA applicability if they meet two basic concepts based on the four factors listed below. Firstly the transaction must be between "Persons" as defined at N.J.A.C. 7:26B-1.4, under common ownership. Secondly, the financial ability of the owner or operator of the industrial establishment to remediate the site cannot be significantly diminished as a result of the transaction. The owner or operator of the industrial establishment should:

1. Identify each direct owner of the industrial establishment, indirect owner of the industrial establishment and the organizational structure of the person, prior to, and after the proposed transaction;

2. Identify whether the transaction involves the transfer of stock and/or assets, solely among persons under common ownership or control and/or shareholders or owners of such persons. A transaction between related corporations that prepare financial statements or tax returns on a consolidated basis will be presumed to be among corporations under common ownership or control;

3. Identify:
   i. Whether the transaction will result in an aggregate diminution of more than 10 percent in the net worth of the industrial establishment or of the person directly owning or operating the industrial establishment. The applicant must include all transactions occurring within the five-year period preceding the date of the proposed transaction in the calculation of "aggregate diminution"; or

   ii. Whether there is an equal or greater amount in assets that is available for the remediation of the industrial establishment before and after the transaction(s);

4. Consider any additional information which may be relevant to this determination.

### Controlling Interest Transactions

Controlling interest transactions deal with the transfer of an interest in a company and how the transfer affects the control of that company. A finding that the subject transaction results in a change in the person holding the controlling interest in the direct owner or operator or indirect owner of an industrial establishment would result in a determination that the transaction is a change in ownership as defined by N.J.A.C. 7:26B-1.4, thus triggering the requirements of ISRA. Normally speaking, this type of analysis pertains to the transfer of stock in a corporation. The following three factors are used to determine if a contemplated transaction will result in a transfer of a controlling interest in an industrial establishment. The owner or operator of the industrial establishment should:

1. Identify whether the transferor is transferring more than 50 percent of the voting or ownership interest in the direct owner or operator or indirect owner of an industrial establishment. There is a rebuttable presumption that any person who has more than

50 percent of the voting or ownership interest holds a controlling interest in that direct owner or operator or indirect owner; or

2. Identify whether the transferor is transferring 50 percent or less of a voting or ownership interest in the direct owner or operator or indirect owner of an industrial establishment and:
    i. Identify whether the transferor possess(es), directly or indirectly, the power to direct or cause the direction of the management and policies of the entity; and
    ii. Identify whether a voting trust, shareholder's agreement, proxy or similar agreement exists which would enable the transferor to elect a majority of the board of directors or a smaller number of directors sufficient to effectively direct or cause the direction of the management and policies of the entity; and

3. Consider any additional information which may be relevant to this determination.

## Financial Information

When performing an analysis requiring information concerning the net worth of any person, the following information listed in 1 and 2 below should be consulted:

1. Income and expenses or similar statements of each direct owner or operator or indirect owner of the industrial establishment, as applicable; and
2. Audited balance sheets or similar statements of assets and liabilities of each direct owner or operator or indirect owner of the industrial establishment, as applicable, as used by that person for the preceding fiscal year that ended closest in time to the date of the applicability determination application.

#### What if my facility is subject to ISRA?

If you determine that your facility is subject to ISRA and your facility does not qualify for any of the waivers, exemptions or alternate compliance processes described below, then you are required to perform all necessary remediation at your facility. The process begins with the filing of a General Information Notice (GIN). The owner or operator of an industrial establishment must notify the NJDEP within five days of any triggering event by filing the GIN. Once this notification is made, the owner or operator must conduct a remediation in accordance with the Technical Requirements for Site Remediation N.J.A.C. 7:26E. With the enactment of the Site Remediation Reform Act on November 4, 2009 this remediation must be conducted by a Licensed Site Remediation Professional (LSRP). This includes at a minimum a **Preliminary Assessment** (PA) to identify potential Areas of Concern (AOCs) and if necessary a **Site Investigation** (SI) to determine if any contaminants are present above any applicable remediation standards. If there is contamination documented in the SI Report, the owner or operator must conduct a **Remedial Investigation** (RI) to determine the nature and extent of contamination. The next step is the proposal of a **Remedial Action Workplan** (RAW) detailing the measures necessary to remediate contaminated property to the applicable remediation standard. The Licensed Site Remediation Professional shall submit a Response Action Outcome when there have been no discharges of hazardous substances or wastes on the property or at the time any such discharges were cleaned up to the remediation standards in effect at the time.

In the case of a proposed transfer of ownership, the owner or operator must obtain a Response Action Outcome from a LSRP or a LSRP must certify a RAW prior to the actual transfer. When closing operations, the owner or operator must notify the NJDEP subsequent to closing of or its public release of its decision to close and submit to the NJDEP a Response Action Outcome or a LSRP certified RAW. This is all initiated through the filing of the ISRA application forms and/or reports in accordance with the Technical Requirements For Site Remediation, N.J.A.C. 7:26E (General Information Notice, Preliminary Assessment Report forms etc.). The execution of a Remediation Certification between the owner or operator and prospective purchaser is a third option to allow the transaction to be consummated prior to full ISRA compliance.

#### Alternate Compliance Options, Exemptions and Waivers

This section describes the various applications for alternate compliance options including exemptions and waivers that are provided by ISRA regulations. It is emphasized that whenever an application requires a certification, evaluation or investigation of a facility, these must be performed pursuant to the Technical Requirements for Site Remediation (TRSR), N.J.A.C. 7:26E.

A Certificate of Limited Conveyance, **N.J.S.A. 13:1K-11.8, N.J.A.C. 7:26B-5.7**, allows the owner of the real property to transfer up to one third of the appraised value of the real property where an industrial establishment exists without having to remediate the entire industrial establishment. This certificate is valid for three years after the issuance date. Before completing the transfer, the owner or operator must file a GIN, remediate the portion to be conveyed, and obtain a Response Action Outcome for that portion of the industrial establishment subject to the transfer.

A De Minimis Quantity Exemption, **N.J.S.A. 13:1K-9.7, N.J.A.C. 7:26B-5.9**, the owner or operator to close operations or transfer ownership or operations without conducting a remediation pursuant to ISRA under specific conditions. The owner or operator must submit a De Minimis Quantity Exemption application and a fee and obtain approval by the NJDEP prior to the transfer or closure. The required de minimis quantity conditions exist if the total quantity of hazardous substances and hazardous wastes generated, manufactured, refined, transported, treated, stored, handled or disposed of at the industrial establishment at any one time during the owner's or operator's period of ownership or operations:

- does not exceed 500 pounds or 55 gallons; or
- if a hazardous substance or hazardous waste is mixed with non-hazardous substances, the total quantity in the mixture does not exceed 500 pounds or 55 gallons; or
- if, in the aggregate, hydraulic or lubricating oil, does not exceed 220 gallons.

A **Remediation in Progress Waiver**, N.J.S.A. 13:1K-11.5, N.J.A.C. 7:26B-5.4, allows an owner or operator of an industrial establishment to close operations or transfer ownership or operations if the site is already undergoing remediation with NJDEP oversight or oversight by a LSRP. The owner or operator must submit an ISRA Alternate Compliance Option form and a LSRP certified preliminary assessment report or a preliminary assessment/site investigation report. The certified report must confirm the applicant has had no discharges of a hazardous substance during its period of ownership or operations or any discharges by the applicant have been remediated as documented by providing a copy of a NJDEP No Further Action approval or a Response Action Outcome issued by a LSRP and that a remediation-funding source is in place. If the NJDEP approves the waiver, the remediation proceeds under the existing case until the LSRP issues a Response Action Outcome.

A **Regulated Underground Storage Tank Only Waiver**, N.J.A.C. 13:9A-11.6, N.J.A.C. 7:26B-5.3, allows an owner or operator of an industrial establishment to close operations or transfer ownership or operations without conducting remediation pursuant to ISRA if the only AOC is a regulated Underground Storage Tank (UST) or the only discharges at the site are from regulated UST's. The owner or operator must submit an ISRA Alternate Compliance Option form and a LSRP certified preliminary assessment report or a preliminary assessment/site investigation report that supports a regulated UST is the only area of concern at the industrial establishment. If the NJDEP approves the waiver, the remediation continues with the existing underground storage tank case until the LSRP issues a Response Action Outcome.

**For general questions regarding the ISRA process call the Office of Community Relations at (609) 984-3081.**

[1] New Jersey's Spill Compensation and Control Act (N.J.S.A. 58:10-23.11) establishes that any person who has discharged a hazardous substance, or is in any way responsible for any hazardous substance, shall be strictly liable, jointly and severally, without regard to fault, for all cleanup and removal costs. ISRA, however, is unique in that it imposes, as a precondition of the sale or transfer of an industrial establishment or upon cessation of its operations, the requirement to conduct a preliminary assessment and other remediation requirements on the owner or operator of the industrial establishment.

[2] In 1983, the Legislature found that discharges of toxic chemicals dating back to early industrialization had left a legacy of contaminated industrial property in this State. In response to the growing public awareness and concern of the risks to the public health and the environment and the potential costs to the State to clean up abandoned contaminated sites, the Legislature enacted the "Environmental Cleanup and Responsibility Act" (ECRA). The Legislature also found that the act's imposition of a cleanup plan approval before the transfer or upon the closing of an industrial establishment and the requirement to establish a funding source for the cleanup are in the general public interest by ensuring the discovery of contamination, by ensuring that funding for cleanup is set aside at the time it is available from a transfer or closing, and by ensuring that contaminated property is not abandoned to the State for cleanup. Through the implementation of ECRA, many contaminated sites were discovered and remediated, but it became clear that changes to the original legislation were needed.

On July 16, 1993, Senate Bill No. 1070 was signed into law as P.L. 1993, c.139. Senate Bill No. 1070 represented the Legislature's efforts to reform the process by which contaminated sites are remediated. Sections 1 through 22 of P.L. 1993, c.139, supplement and amend ECRA, including renaming the law to ISRA.

ISRA furthers the policy of this State to protect the public health and safety, and the environment by promoting efficient and timely cleanups and by eliminating any unnecessary financial burden on the persons responsible for remediating contaminated sites. This has been achieved by streamlining the regulatory process, by establishing summary administrative procedures for industrial establishments that have previously undergone an environmental review. The procedures in ISRA guard against redundancy from the regulatory process and minimize governmental involvement in certain business transactions

[3] Please note, the ECRA/ISRA regulated universe of businesses was formally defined using the Standard Industrial Classification (SIC) system. That system was abandoned by the Federal Government in 1997 with the creation of NAICS. State legislation was enacted effective August 15, 2003, directing the Department to adopt rules identifying within NAICS "the generally equivalent universe of employers and facilities that have been to date covered by the SIC codes." Appendix C is the result of that mandate.

---

To report an environmental incident impacting NJ, call the Toll-Free 24-Hour Hotline
**1-877-WARNDEP / 1-877-927-6337**

---

**Contact DEP | Privacy Notice | Legal Statement & Disclaimers | Accessibility Statement** 

Site Remediation Program: SRP Home | About SRP | Search | Help
Department: NJDEP Home | About DEP | Index by Topic | Programs/Units | DEP Online
Statewide: NJ Home | services A to Z | Departments/Agencies | FAQs

Copyright © State of New Jersey, 1996-2021

Last Updated: December 20, 2012

Exhibit ;

Control No. 19110216

# New Jersey Administrative Code - 1996 to 2005

N.J.A.C. 7:26B-1.5

N.J. Admin. Code tit. 7, § 26B-1.5

NEW JERSEY ADMINISTRATIVE CODE

TITLE 7. DEPARTMENT OF ENVIRONMENTAL PROTECTION

CHAPTER 26B. ENVIRONMENTAL CLEANUP RESPONSIBILITY ACT RULES

SUBCHAPTER 1. GENERAL PROVISIONS

Current through January 6, 1997; 29 N.J. Reg. No. 1

+++ HISTORICAL DOCUMENT +++

**7:26B-1.5** Applicability

 (a) Owners or operators who plan to close, terminate or transfer operations of an industrial establishment shall submit an Initial Notice in accordance with the time requirements set forth at N.J.A.C. 7:26B-1.6.

 (b) Unless otherwise provided in this chapter, closing, terminating, or transferring operations includes, but is not limited to, the following events:

1. Sale or transfer of stock in a corporation which directly owns or operates, or indirectly through any of its subsidiaries, owns or operates, an industrial establishment that results in any form of a merger or consolidation, unless the Department determines otherwise pursuant to N.J.A.C. 7:26B-1.9;

2. Sale or transfer of stock in a corporation which results in a change in the person or persons holding the controlling interest of a corporation which directly owns or operates, or indirectly through any of its subsidiaries, owns or operates an industrial establishment, unless the Department determines otherwise pursuant to N.J.A.C. 7:26B-1.9;

3. Sale or transfer of the controlling share of the assets of an industrial establishment, whether in one or several independent transactions, at the same or different times within a five year period, to one person or to different persons, unless the Department determines otherwise pursuant to N.J.A.C. 7:26B-1.9;

4. Sale or transfer of title to an industrial establishment unless otherwise provided at N.J.A.C. 7:26B-13;

5. Sale or transfer of title to any real property of an industrial establishment unless otherwise provided at N.J.A.C. 7:26B-13;

6. Dissolution of a corporation which directly owns or operates, or indirectly through any of its subsidiaries, owns or operates an industrial establishment, unless the Department determines otherwise pursuant to N.J.A.C. 7:26B-1.9;

7. Certain proceedings or events in connection with a receivership action under statutory or common law or bankruptcy proceedings under chapters 7, 11, or 13 of the Federal Bankruptcy Act, 11 U.S.C., §§ 101 et seq., by or against the owner or operator of an industrial establishment, as specified below at N.J.A.C. 7:26B-1.6(a) 13 and 14;

8. Condemnation proceedings directed at an industrial establishment unless the transfer is a limited conveyance as provided at N.J.A.C. 7:26B-13;

9. Sale of an industrial establishment or sale or transfer of the controlling share of the assets of the industrial establishment pursuant to a foreclosure;

10. Sale or transfer (other than a sale or transfer satisfying the standards set forth in N.J.A.C. 7:26B-1.9(b) 5) of the entire interest of any partner in a general partnership, the entire interest of a general partner in a limited partnership, or the entire interest of a limited partner in a limited partnership liable for the obligations of a limited partnership as provided at N.J.S.A. 42:2-9, 42:2-11, and 42:2A-27, such partnership or limited partnership owning or operating an industrial establishment. Notwithstanding the reference to N.J.A.C. 7:26B-1.9(b) 5, this definition does not require that a person submit an application for an applicability determination in order for a transaction or occurrence to satisfy the standards set forth in N.J.A.C. 7:26B-1.9(b) 5.

11. Sale or transfer of title to an industrial establishment by exercising an option to purchase;

12. Sale or transfer of title to any real property of an industrial establishment by exercising an option to purchase;

13. Sale, transfer, or termination of a lease which results in the cessation of operations of an industrial establishment;

14. Any judicial proceeding or final agency action through which an industrial establishment becomes non-operational for health or safety reasons;

15. Cessations of all or substantially all the operations at an industrial establishment that is for a period of two years or longer (see N.J.A.C. 7:26B-1.8(a) 7);

16. Transfer of an industrial establishment to a trust, except where grantor and beneficiary are identical or members of the same family. As used in this paragraph, "family" means an individual's siblings, spouse, children, grandchildren, parents, and grandparents;

17. Execution of a lease for a period of 99 years or longer; and

18. Any changes in operations sufficient to change the primary SIC number of an industrial establishment from an SIC number that is subject to the Act or this chapter to one that is not subject to the Act or this chapter.

 (c) Any industrial establishment which remains under the same ownership as prior to December 31, 1983, and upon or at which remain containers, tanks, surface impoundments, or other types of storage facilities containing hazardous substances and wastes after December 31, 1983 shall be subject to the Act and this chapter upon the closing, terminating, or transferring of operations of the industrial establishment.


Amended by R.1989 d.403, effective August 7, 1989.

See: 21 N.J.R. 402(a), 21 N.J.R. 2367(a).

 Reference to N.J.A.C. 7:26B-1.9 added to several paragraphs and at (b)15. Cessation of all or substantially all operations clarified by adding time of two years or more and at (b)14 an incident or event was clarified by examples.

INVALIDITY ANNOTATION: See 23 N.J.R. 1797(a).

 Validity of N.J.A.C. 7:26B-1.5(b) 10 and 14 affected by decision in In re Adoption of N.J.A.C. 7:26B, Dkt. Nos. A-2403-78T1, A-2521-87T1, A-2522-87T1, A-2523-87T1, A-2524-87T1 and A-364-89T3 (App. Div. May 6, 1991).

Amended by R.1993 d.137, effective April 5, 1993 (operative July 19, 1993).

See: 24 N.J.R. 720(a), 25 N.J.R. 1557(a), 25 N.J.R. 3155(b).

 Changes made pursuant to In Re Adoption of N.J.A.C. 7:26B, 250 N.J. Super. 189 (App.Div.1991).

CASE NOTES

Notice and reporting requirements applied to transaction by which parent corporation was liquidated and there was distribution of interest in subsidiary, which owned contaminated facility, to shareholders.

"Owner" included subsidiary corporation owning contaminated real property.

Regulation applying Environmental Cleanup Responsibility Act to partial and full condemnation was valid.

Regulation exempting intrafamily transfers of industrial establishments from Environmental Act was valid.

Regulation defining phrase "any other transaction or proceeding through which an industrial establishment becomes nonoperational" was invalid.

Regulation requiring compliance with Environmental Act upon partial condemnation was not invalid.

Regulation triggering Environmental Act upon sale and transfer when partnership owned or operated industrial establishment was invalid.

Environmental regulations did not violate Commerce Clause.

Regulations triggering Environmental Act upon occurrences involving parent corporation were valid.

Regulation providing bright-line test for applicability of Environmental Act was valid.

Regulation defining "cessation of operations" to include "substantially all" operations was valid.

Leaving materials in unguarded drums did not constituted "storage" under the Environmental Act.

"Cessation of all operations" under Environmental Act means substantially all activities.

---

**End of Document**                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 32

Control No. 19110216

( oo⁰  Pedcfi



,State Llf Nefti Arretg
DEPARTMENT OF ENVIRONMENTAL PROTECTION
SITE REMEDIATION PROGRAM
Mail Code 401-06
P. O. Box 420
Trenton, New Jersey 08625-0420
Tel. #:  609-292-1250
Fax. #:  609-777-1914

CHRIS CHRISTIE
*Governor*

KIM GUADAGNO
*Lt. Governor*

BOB MARTIN
*Commissioner*

March 30, 2012

Linda Gordon Hester, Esq.
Senior Council
Downstream Legal Group
McLean 2112
600 North Dairy Ashford
Houston, TX 77079- 1175

RECEIVED

APR  - 2012

Linda G, Hester

Re: Non-applicability. of ISRA to the Restructuring of ConocoPhillips

Dear Ms. Hester:

Thank you for your letter dated March 19, 2012 seeking the agreement of the New Jersey Department of Environmental Protection that ISRA does not apply to the proposed restructuring of ConocoPhillips. My staff and I have read your letter and agree with your interpretation of the exemptions the ISRA rules allow in subchapter 2 to the proposed restructuring of ConocoPhillips.  My agreement is based on what was presented to the Depaitment in your letter and ultimately the determination of ISRA applicability resides with ConocoPhillips.

I must point out that footnote #4 on page 6 of your letter incorrectly interprets petroleum pipelines as not meeting the definition of Industrial Establishment as defined in the ISRA rules. You have correctly interpreted the guidance the NAICS manual provides regarding un-manned operations, however, the ISRA law supersedes the guidance provided in the NAICS manual in certain circumstances, pipelines being one such circumstance.  In 2003 the New Jersey Legislature directed the Department to develop a list of ISRA subject NAICS numbers that were "generally equivalent" to the universe of SIC numbers subject to the original law.  This mandate to convert from SIC to NAICS was established in PL 2003 c.157.  PL 2003 c.157 states "The department shall ensure that the categories of employers, entities, establishments, or facilities regulated pursuant to the rules and regulations adopted pursuant to section 1 of this act are consistent with those regulated prior to the effective date of this act."  In short, the Department was not allowed to regulate more or less of a universe than it had before the order to convert from SIC to NAICS coding. Under the rules of the SIC manual, a petroleum pipeline is an ISRA subject Industrial Establishment with a SIC number of 4613.  SIC number 4613 converts to a NAICS number of 486910 which is correctly listed as an ISRA subject number in Appendix C of the ISRA rule.   Therefore after the restructuring, should the new entity that will control the

pipelines trigger any of the events in the ISRA rule that requires a notice to the Depai ment, ISRA will apply to the pipelines and to any other facilities that also meet the definition of Industrial Establishment such as the refineries and tank farms mentioned in your letter.

Thank you for your cooperation in this matter.   Should you have any questions, feel free to contact Joshua Gradwohl of the Bureau of Case Assignment and Initial Notice at (609) 292-0408.

Sincerely,

David Sweeney
Assistant Commis  oner



Linda G. Hester
Senior Counsel
Downstream Legal Group

McLean 2112
600 North Dairy Ashford
Houston, TX 77079-1175
phone 281.293.2851
fax 281.293.6998
linda.g.hester@conocophillips.com

March 19, 2012                                    *__Via Electronic Mail & UPS Next Day Air__*

David Sweeney, Assistant Commissioner
Site Remediation Program
NJ Department of Environmental Protection
401 E. State Street, 6th floor
Mail Code 401-06
Trenton, NJ 08625-0420

Re:    Nonapplicability of ISRA to the Restructuring of ConocoPhillips

Dear Assistant Commissioner Sweeney:

Thank you for meeting with us on March 14th to discuss the restructuring of ConocoPhillips. As we discussed at the meeting, we are writing to describe the basis for our conclusion that the Industrial Site Recovery Act, N.J.S.A. 13:1K-6 et seq. ("ISRA") does not apply to any aspect of the restructuring of ConocoPhillips as described in this letter. We request that you concur in writing.

In brief, ISRA should not apply to the restructuring of ConocoPhillips because the transactions will not materially impact the ability to remediate the sites in New Jersey. Following the restructuring, the company owning and operating the facilities in New Jersey will have assets worth over $45.6 billion, which far outstrips any potential liabilities, and the New Jersey facilities will be run by the same business that operates those facilities under ConocoPhillips.

I.    **Description of the Restructuring**

ConocoPhillips ("COP"), a publicly traded corporation (NYSE: COP), has announced its intention to separate its Upstream Business and Downstream Business into two stand-alone, publicly traded corporations. Currently, all of the assets of COP's Downstream Business are held, directly or indirectly, by ConocoPhillips Company ("COPCo"), COP's wholly-owned corporate subsidiary. The "Downstream Business" generally consists of (a) a refining and marketing segment, which purchases, refines, markets and transports crude oil and petroleum products, and also includes power generation activities; (b) a chemicals segment, which manufactures and markets petrochemicals and plastics; (c) a midstream segment, which

PSXCPT00000018

David Sweeney, Assistant Commissioner
March 19, 2012
Page 2

purchases, gathers, processes, transports and markets natural gas and fractionates and markets natural gas liquids; and (d) an emerging business segment that primarily relates to the refining and marketing segment, chemicals segment or midstream segment.

The Restructuring will result in Downstream assets currently owned either directly or indirectly by COPCo being owned by Phillips 66 Company either directly or indirectly in a similar arrangement to their current ownership. Phillips 66 Company will be wholly owned by Phillips 66 in a relationship parallel to the current relationship between COPCo and COP.

Once this separation is completed, Phillips 66, Phillips 66 Company and their subsidiaries will collectively be a large, independent, publicly traded company directly or indirectly operating the Downstream Business across the globe. This Restructuring is expected to be completed on or about May 1, 2012.

In furtherance of the separation, COPCo will transfer, through a series of steps, those assets and subsidiaries relating to the Downstream Business to Phillips 66 Company, a Delaware corporation and a newly created, wholly-owned subsidiary of COPCo. Included within the Downstream Business is ConocoPhillips Pipe Line Company ("CPPL"), which is a wholly-owned subsidiary of COPCo that owns and operates certain pipeline assets. CPPL will be converted to a limited liability company, and distribute two Upstream pipeline interests located outside New Jersey to COPCo to be retained with the Upstream Business. These two pipeline interests represent $28 million out of CPPL's total assets of $1,140 million, or about 2.5% of the asset value of CPPL.

COPCo will then distribute Phillips 66 Company to COP. COP, in turn, will then distribute Phillips 66 Company to Phillips 66, a newly created, wholly-owned corporate subsidiary of COP ("P66"). Promptly thereafter, COP shall distribute to the holders of COP's common stock all of the outstanding shares of P66 common stock through a spin-off. Immediately following the spin-off, P66 will be an independent publicly traded corporation (NYSE: PSX), Phillips 66 Company will be a wholly-owned subsidiary of P66, and collectively P66, Phillips 66 Company and their subsidiaries will own and operate the Downstream Business that COPCo formerly owned and operated. Collectively, this multi-step process will be referred to in this letter as the "Restructuring."

## II.    Description of Phillips 66

At the date of its spin-off, P66 will be one of the largest petroleum refiners in the United States and globally, with a net crude oil processing capacity of 1.8 million barrels per day in the United States and 2.2 million barrels per day worldwide. P66 will also have extensive natural gas gathering and processing operations and petrochemical manufacturing operations, primarily conducted through equity affiliates. See Preliminary Information Statement of Phillips 66, Exhibit 99.1 to SEC Form 10, p. 1 (March 1, 2012) ("Form 10"). At December 31, 2011, P66's accrued liabilities for asset retirement obligations and environmental costs were $920 million (Form 10, F-20), representing less than 5 percent of P66's total liabilities of $19.9 billion (Form 10, F-5). At that same date, P66's total assets of $43.2 billion exceeded total liabilities by $23.3

David Sweeney, Assistant Commissioner
March 19, 2012
Page 3

billion (Form 10, F-5). P66's operating activities generated positive cash flows of $5.0 billion in 2011, and have averaged $2.8 billion per year in the three years ending December 31, 2011 (Form 10, F-6). P66 has received investment grade credit ratings from Moody's and Standard & Poor's, and has access to $4.0 billion in additional liquidity under its revolving credit agreement with a syndicate of financial institutions (Form 10, p. 140). Based on the above, P66 will have substantial financial capabilities to deal not only with any environmental liabilities in respect of its New Jersey operations, but also its entire worldwide asset base.

The assets of the Downstream Business being transferred to Phillips 66 Company include the following facilities in New Jersey: Bayway Refinery, Woodbury Tank Farm, Tremley Point Terminal, and CPPL. CPPL owns and operates, among other pipeline assets, the East Line pipeline, a portion of which is in New Jersey, and the 560 Line in New Jersey. Each of these assets is described in greater detail below.

A.    **Bayway Refinery**

The Bayway Refinery is a 1,300-acre industrial facility in Linden, Union County. The refinery commenced operations in 1909 and was operated continuously by ExxonMobil (or its predecessor companies) until Tosco Refining Company purchased the facility in 1993. Phillips Petroleum Company acquired Tosco in 2001 and then merged with Conoco, Inc. in 2002 to form ConocoPhillips.[1]

Bayway has a crude oil processing capacity of 238 MBD and processes mainly light, low-sulfur crude oil, which is supplied to the refinery by tanker, primarily from the North Sea, Canada and West Africa. The refinery produces transportation fuels, such as gasoline, diesel fuel and jet fuel, as well as petrochemical feedstocks, residual fuel oil and home heating oil. The facility consists of a petroleum refining facility, a petrochemical manufacturing facility, several tank fields, a fuel distribution terminal, process areas, offices, chemical plants, mechanical shops, wastewater treatment units, pipelines, railroad sidings, and tanker docks. The facility distributes refined products to East Coast customers via barges, trucks, pipelines and railcars.

Six tenants also conduct operations at the Bayway Refinery. ExxonMobil leases office space and also occupies space for loading and unloading petroleum products. Cogen Technologies Linden Venture, L.P. owns and operates a fossil fuel-fired electric generating station that supplies electricity to New York and to the PJM Interconnection, as well as steam to the refinery. Linden VFT, LLC owns and operates an electric switchyard facility that is used to transmit electricity between the Linden Cogeneration facility, the Pennsylvania-New Jersey-Maryland transmission system and the New York Independent System Operator (NYISO) system. Infineum USA LP manufactures petroleum additives for lubricants and fuels. The BP Turbo Air facility manufactures lubricating oil for aircraft turbine engines. Finally, the E.I. DuPont Morses Mill Sulfuric Acid Regeneration Plant regenerates used sulfuric acid and recovers sulfur gas generated at the Bayway Refinery. COP's Restructuring will not impact the

---

[1] Letters of nonapplicability ("LNAs") were issued for the transaction between Tosco and Phillips Petroleum (N20012573) and for the merger of Phillips Petroleum and Conoco (N20022095).

David Sweeney, Assistant Commissioner
March 19, 2012
Page 4

operations of the tenants at Bayway. Over the years, the tenants' ISRA compliance with respect to transactions by the owners of Bayway or the tenants themselves has been satisfied through Remediation in Progress Waivers and LNAs.[2]

Bayway Refinery is undergoing a comprehensive environmental investigation and remediation pursuant to an Administrative Consent Order dated November 27, 1991, ("ACO") between Exxon Corporation (now ExxonMobil) and the New Jersey Department of Environmental Protection ("NJDEP"). The ACO was amended in 1993 and 1994 to specifically address Tosco's acquisition of Bayway and the transfer of a portion of the property to the City of Linden.[3] ExxonMobil is implementing the investigation and cleanup of the site pursuant to the ACO as amended and in accordance with its *Remedial Strategy Road Map for the Bayway Refinery, Linden, New Jersey* prepared by TRC Environmental Corporation and dated November 2011 (the "RSRM"), which is currently under consideration by NJDEP. The ACO requires ExxonMobil to post $25 million in financial assurances to guarantee the availability of funds to conduct the work required under the ACO. See ACO, ¶ 53. Although the ACO specifies that the $25 million financial assurance is not a limit on investigation and remediation costs, it certainly can serve as a rough estimation of such liabilities at the site.

The cleanup of spills at Bayway during COPCo's operations have been subject to the site's comprehensive and NJDEP-approved Discharge Prevention, Containment and Countermeasures / Discharge Cleanup and Removal ("DPCC/DCR") plan. COPCo has made the financial responsibility demonstration required under the DPCC/DCR regulations to establish that it has the financial resources to complete cleanup and removal activities at the site.

As such, Bayway is subject to an on-going cleanup by the financially robust prior owner, the ongoing cleanup is secured by financial assurances, any subsequent spills have been addressed in a manner approved by NJDEP, and COPCo has established its financial ability to address any future cleanup and removal activities.

**B.    Tremley Point Terminal**

The Tremley Point Terminal is located on approximately 117 acres in Linden, Union County. Tremley Point serves as a petroleum product terminal for the shipment of finished petroleum products by pipeline or ship. The site contains 24 aboveground storage tanks for petroleum products, and a marine dock facility with two active berths for loading and unloading tank barges. Operations commenced at the site in 1918. Tosco acquired Tremley Point from BP in 1996, triggering ISRA. BP is conducting an environmental investigation and remediation of Tremley Point pursuant to ISRA (ISRA Case No. 95445).

---

[2] See E98512 (Remediation in Progress Waiver – Cogen); E20030164 (Remediation in Progress Waiver – Cogen); E20060082 (Remediation in Progress Waiver – Cogen); E20110225 (Remediation in Progress Waiver pending – Linden VFT); N20012573 (LNA for Tosco-Phillips merger); N20022095 (LNA for Phillips - Conoco merger); N20031847 (LNA for merger of Bayway Refining Co subsidiary into COPCo).

[3] See Administrative Consent Order, In the Matter of Exxon Bayway Refinery and Esso, Exxon Corporation Standard Oil of New Jersey and amendments dated April 9, 1993, and December 22, 1994. A copy of the ACO and amendments can be made available upon request.

David Sweeney, Assistant Commissioner
March 19, 2012
Page 5

As discussed above with respect to Bayway, COPCo's operations at Tremley Point are subject to the site's comprehensive and NJDEP-approved DPCC/DCR plan. As such, COPCo personnel at Tremley Point identify and address spills immediately pursuant to its NJDEP-approved DPCC/DCR plan before the hazardous substances can have a detrimental impact on the environment, and identify all spills to NJDEP in the DPCC/DCR plan. COPCo has provided a financial responsibility demonstration for Tremley Point.

As such, Tremley Point is subject to an on-going cleanup by the financially robust prior owner, any subsequent spills have been addressed in a manner approved by NJDEP, and COPCo has established its financial ability to address any future cleanup and removal activities.

## C.    Woodbury Tank Farm

The Woodbury Tank Farm occupies an area of approximately 26 acres in Woodbury Heights (West Deptford Township) in Gloucester County. The site is bordered to the east and south by a petroleum pipeline manifold and pump station, to the north by Kings Highway and a petroleum bulk storage and distribution facility owned by another company, and to the west by undeveloped land. The Woodbury Tank Farm was constructed in 1953 and, since its construction, has been used for breakout storage of refined petroleum products being shipped through the pipeline system. There are no truck loading or unloading facilities at the site. The tank farm consists of six above-ground storage tanks with a total capacity of approximately 460,000 barrels plus two ancillary aboveground tanks with a total capacity of approximately 7,500 barrels. The tanks are located within bermed areas and are equipped with a cathodic protection system.

Tosco acquired the site from BP in 1996, triggering ISRA (ISRA Case No. 95443). BP has conducted the required investigation activities under ISRA and has developed a remedial action strategy to implement at the site. Interviews with COPCo personnel responsible for environmental compliance at the tank farm and their review of records for the facility indicate no discharges of hazardous substances at the site during COPCo's ownership.

As such, the site is subject to a nearly-complete remediation program by a fiscally responsible prior owner and there are no indications of discharges at the site other than those subject to the on-going cleanup.

## D.    ConocoPhillips Pipe Line Company (560 Line & East Line in NJ)

The assets in New Jersey that CPPL owns before and after Restructuring are the East Line pipeline, an undivided 1/3 interest in the Harbor Line pipeline, the 560 Line pipeline, and the inactive Inter Refinery Pipeline. The East Line, which CPPL owns and operates, originates at the Trainer Refinery in Pennsylvania, crosses the Delaware River into New Jersey and proceeds across Gloucester County to the Woodbury Tank Farm in West Deptford. A branch of the East Line runs to a BP-owned terminal facility in Paulsboro. Harbor Line runs from the Woodbury Tank Farm to a manifold on property owned by Buckeye Pipeline in Union County. Sunoco owns the other 2/3 of Harbor Line and is the operator of that asset. Sunoco will continue to be the operator and majority owner of Harbor Line, so the Restructuring of COP will not result

David Sweeney, Assistant Commissioner
March 19, 2012
Page 6

in a change in the ownership or operation of that pipeline. The 560 Line, which CPPL owns and operates, runs from the Rahway Tank Farm located within the Bayway Refinery to the Tremley Point Terminal, both of which are in the City of Linden, Union County. Interviews with COPCo and CPPL personnel responsible for environmental compliance and the pipeline integrity program, and their review of operational records, indicate no significant discharges of hazardous substances from the East Line or 560 pipelines during CPPL's ownership. The Inter Refinery Pipeline is an inactive and capped pipeline that connected Bayway Refinery to Exxon's facility in Bayonne when Exxon owned and operated both facilities. Exxon capped the pipeline in 1990, thereby ceasing its operation, and included it in the sale of Bayway to Tosco in 1993. The Inter Refinery Pipeline was added to ExxonMobil's ACO for Bayway through the 1993 amendment to the ACO. The Inter Refinery Pipeline is no longer an industrial establishment because it has not been operated by ConocoPhillips, nor anyone, since 1990.

**III.    ISRA Overview**

The legislature enacted ISRA (and its predecessor statute the Environmental Cleanup Responsibility Act ("ECRA")) because the act was in the public interest to ensure "the discovery of contamination, by assuring that funding for cleanup is set aside at the time it is available from a transfer or closing, and by assuring that contaminated property is not abandoned to the State for cleanup." N.J.S.A. 13:1K-7. Its core purpose, as recognized by the Legislature, the NJDEP and the courts, was preventing the abandonment of hazardous wastes. In re Adoption of N.J.A.C. 7:26B, 250 N.J. Super. 189, 217 (App. Div. 1991), aff'd in part, rev'd in part on other grounds, 128 N.J. 442 (1992). The Legislature enacted ISRA in 1993 as a reform of ECRA with the express purpose of eliminating "unnecessary financial burden" while continuing to "protect the public health, safety, and the environment." N.J.S.A.13:1K-7. Among the means by which the Legislature intended to achieve these purposes was by "minimize[ing] governmental involvement in certain business transactions." Id. (emphasis added).

As such, ISRA requires an owner and operator of an industrial establishment to investigate, and if necessary, remediate a site when operations cease or upon transfer of ownership or operations, including corporate transactions through which an industrial establishment undergoes a change in ownership. Petroleum refineries, tank farms, and terminals are "industrial establishments" under ISRA.[4]

---

[4] We have included in this letter the discussion of CPPL for purposes of completely describing the Restructuring. Nevertheless, we reserve the ability to assert that the pipelines are not industrial establishments under ISRA because they are not "establishments" within the meaning of the North American Industry Classification System, United States 2002, issued by the Office of Management and Budget (the "NAICS Manual"). The NAICS Manual provides that an establishment is "a single physical location, where business is conducted or where services or industrial operations are performed." NAICS Manual, "Frequently Asked Questions". Not every place where business operations are performed, however, constitutes an establishment. Traditionally, the individual sites, projects, fields, networks, lines, or systems of dispersed activities were not considered to be establishments, with the establishment for the business being those relatively permanent main or branch offices, terminals, stations that are either (1) directly responsible for supervising such activities, or (2) the base from which personnel operate to carry out these activities. CPPL's pipelines are part of the company's petroleum products distribution network and are unmanned, "physically dispersed operations" and thereby not establishments under the NAICS Manual and not "industrial establishments" under ISRA.

David Sweeney, Assistant Commissioner
March 19, 2012
Page 7

ISRA does not apply, however, to (i) a corporate reorganization not substantially affecting the ownership of the industrial establishment; (ii) a transaction or series of transactions involving the transfer of stock and/or assets among corporations under common ownership if the transaction (a) will not result in the diminution of the net worth of the corporation that directly owns or operates the industrial establishment by more than 10%; or (b) a greater or equal amount of assets are available for the remediation of the industrial establishment before and after the transaction; and (iii) a transaction or series of transactions involving the transfer of stock and/or assets resulting in a change in the person holding the controlling interest of an indirect owner of an industrial establishment when the indirect owner's assets would have been unavailable for remediation. N.J.A.C. 7:26B-2.1(a)1, 2 & 4.

### A.    Corporate Reorganization and Common Ownership Exceptions

Although ISRA provides that a "corporate reorganization not substantially affecting the ownership of the industrial establishment" is not a change in ownership subject to ISRA, the Legislature did not define the term "corporate reorganization," and NJDEP's regulations interpreting this term have been withdrawn. Accordingly, we must look to the withdrawn regulations, guidance posted on NJDEP's website, and NJDEP's prior nonapplicability determinations for guidance on the appropriate interpretation of this term and implementation of the exception for ISRA applicability. NJDEP had defined the "corporate reorganization" exemption in a manner designed to prevent corporations from purposefully insulating potential environmental liabilities from the profitable areas of their enterprise and otherwise impeding NJDEP's access to those assets. See 21 N.J.R. at 2371 (Response to Comment 39). Consistent with this approach, if a transaction is a corporate reorganization that does not entail "significant changes in the financial ability of a person to comply [with ISRA]," then the transaction is a corporate reorganization not substantially affecting the ownership of the industrial establishment and exempt from ISRA. N.J.A.C. 7:26B-2.2(c) (withdrawn).

Guidance on NJDEP's website asserts that to meet the corporate reorganization exception, a transaction must satisfy two conditions: (1) the transaction must be between "persons" under common ownership; and (2) the financial ability of the owner or operator of the industrial establishment to remediate the site "cannot be significantly diminished as a result of the transaction." www.state.nj.us/dep/srp/isra/isra_applicability.htm. Stated this way, the two conditions of the Corporate Reorganization exception are the same factors applied in the Common Ownership exception under N.J.A.C. 7:26B-2.1(a) 2. Accordingly, applicability of the two exceptions can be examined together.

NJDEP's guidance identifies the following four factors that should be considered in this analysis: (1) the identity of each direct and indirect owner of the industrial establishment and the organizational structure before and after the transaction; (2) whether the transaction involves the transfer of stock and/or assets solely among persons under common ownership or control and/or shareholders or owners of such persons; (3) whether the transaction will result in an aggregate diminution of more than 10 percent in the net worth of the industrial establishment or of the person directly owning or operating the industrial establishment, or whether there is an equal or greater amount in assets that is "available for the remediation of the industrial establishment" before and after the transaction; and (4) any additional information which may be relevant to the

David Sweeney, Assistant Commissioner
March 19, 2012
Page 8

determination. Id.  The regulations, the statute, and NJDEP's guidance do not define "assets available for remediation."

    Consistent with these exceptions and the purposes behind ISRA, NJDEP's ISRA nonapplicability determinations with respect to certain transfers have focused on the financial status of the company owning the industrial establishments after the transaction and the expected value of the cleanup liabilities associated with the industrial establishments.  For example, NJDEP determined in 1998 that ISRA did not apply to General Motor's spin-off of its Delphi Energy and Engineering Management Systems business as a separate, publicly traded company where the assets and net worth of the new company far exceeded the estimated cleanup liabilities at its facility in New Jersey.  See ISRA Case No. N19984148.  Similarly, NJDEP determined that ISRA did not apply to the transfer by Public Service Electric and Gas Company ("PSE&G") of its entire fleet of electric generating stations to newly created limited liability companies where the anticipated net worth of the newly formed companies would exceed the expected value of remediation liabilities at the generating stations.  See ISRA Case Nos.N19993416 & N19993419 through N19993434.  Significantly, PSE&G's electric generating stations, many of which had been in operation since the early 1900s, had never been subject to a comprehensive environmental investigation and remediation program and were not subject to any remedial activities at the time of the transfer.[5]  Additionally, NJDEP also found that ISRA did not apply to the spin-off of the Fort James subsidiary of James River (ISRA case No. N199951934), or to the spin-off of General Dynamics' electrodynamics division (ISRA Case No. N19972432) because in both cases the value of the newly-formed company was expected to far exceed the value of the remediation obligations associated with the industrial establishments.

## B.    Indirect Owner Exception

    The Indirect Owner Control Exception examines whether the indirect owner's assets would have been available for remediation if the transaction did not occur.  According to NJDEP's guidance, "the key to ISRA applicability relative to indirect owner transactions is to determine whether the indirect owner has exercised control over the industrial establishment or its direct owner or operator."  See www.state.nj.us/dep/srp/isra/isra_applicability.htm.  An affirmative finding that the indirect owner exercised control over the industrial establishment or the direct owner or operator thereof, would result in a determination that the indirect owner's assets would have been available for remediation and ISRA applies.

    The regulations formerly required, and NJDEP's guidance currently specifies, the following information to make this determination: (i) the identity of each direct owner and each indirect owner of the industrial establishment; (ii) whether the indirect owner has exerted fiscal

---

[5] Although illustrative of the nonapplicability of ISRA to corporate spin-offs where the resulting company holding the industrial establishments is financially robust, the PSE&G application faced more significant challenges than the determination that ISRA does not apply to the Restructuring of COP and P66.  Unlike the P66 assets that are undergoing comprehensive environmental investigations and remedial programs, the environmental conditions at the PSE&G generating stations were largely unknown and unaddressed at the time of the utility's restructuring.  As a result, PSE&G submitted a probabilistic study of the expected value of the environmental liabilities at the generating stations.  That type of study is not necessary here because the liabilities associated with the P66 assets are being addressed by fiscally responsible companies who formerly owned the sites (i.e., ExxonMobil and BP), in addition to COPCo's and P66's responsibilities for remediating any spills resulting from their operations.

David Sweeney, Assistant Commissioner
March 19, 2012
Page 9

control over the direct owner or industrial establishment including, but not limited to, imposing any restriction upon the financing, borrowing, budgeting, dividends and cash management of the direct owner or industrial establishment; (iii) whether the officers, directors and employees of the indirect owner constitute a majority of the directors of the direct owner or the industrial establishment or such smaller number of directors as is sufficient to effectively direct the management and policies of the direct owner or the industrial establishment; (iv) whether the officers, directors and employees of the indirect owner are involved in the day-to-day operations of the direct owner or the industrial establishment and particularly those relevant to the generation, manufacture, handling, storage or disposal of hazardous substances or hazardous wastes; and (v) whether the indirect owner has the ability to control the activities, policies or decisions of the direct owner or the industrial establishment particularly those activities, policies or decisions relevant to the generation, handling, storage or disposal of hazardous substances or hazardous wastes. No one of these factors is determinative.

Examination of the history of the application of ISRA and ECRA to indirect owner transactions reveals a clear recognition by the courts and NJDEP that – although NJDEP has developed broad regulatory criteria as general guides to the exercise of its authority over transactions involving indirect owners – NJDEP may not apply these criteria in a woodenly literal or mechanistic manner to reach transactions that need not be subject to ISRA to satisfy the statute's purposes and governing principles. See, e.g., In re Adoption of N.J.A.C. 7:26B, 250 N.J. Super. at 216; NJDEP, Adoption of Industrial Site Recovery Act Rules, 29 N.J.R. 4913, 4924 (Nov. 17, 1997). In developing the regulations relating to the applicability of ISRA to transactions by indirect owners, NJDEP dismissed the suggestion of one commenter that the broad criteria of N.J.A.C. 7:26B-2.2(b) would allow NJDEP to subject an indirect owner to ISRA for exercising the ordinary oversight that every parent corporation must exercise over a subsidiary to fulfill its fiduciary obligations, thereby resulting in "every parent being held responsible for the actions of its wholly-owned subsidiary." There was no basis, NJDEP stated, "to support this conclusion." 29 N.J.R. at 4925. NJDEP thus acknowledged that it would not consider customary oversight by a parent over the affairs of a subsidiary to be an indicia of "control" warranting a determination that the parent's assets were available for remediation.

Consistent with ISRA's indirect owner exception, the U.S. Supreme Court recognized that there is a certain level of oversight and management that a parent exercises over its subsidiary, such as monitoring the subsidiary's performance, supervising the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures, that cannot give rise to parental liability. See U.S. v. Best Foods, 524 U.S. 51, 72 (1998). Similarly, the New Jersey Supreme Court's seminal case on the topic only held a parent corporation directly liable for contamination where its personnel, officers and directors were constantly involved in the day-to-day operations of the subsidiary including allowing the dumping of waste material. See NJ Dept. of Environmental Protection v. Ventron, 94 N.J. 473, 502 (1983).

## IV.     ISRA does not apply to the Restructuring of ConocoPhillips

The Restructuring of COP should not be subject to ISRA because the transactions that implement the Restructuring are among corporations under common ownership or the shareholders of those corporations and the assets available for remediation will not be materially

David Sweeney, Assistant Commissioner
March 19, 2012
Page 10

diminished relevant to the possible liabilities. The industrial establishments and the new direct owner of those industrial establishments will be transferred among companies who all are under the common ownership, directly or indirectly, of COP. The final step in the reorganization – the spin-off of P66 – takes place under the common ownership of the shareholders of COP because COP is transferring to its shareholders all of the shares of P66. The Restructuring also satisfies the financial test because the assets available to the Downstream Business for remediation after the Restructuring are the same assets available for remediation before the Restructuring because the entire Downstream Business is being moved to P66. These assets, estimated at over $45.6 billion, are more than adequate to address any liabilities at its facilities in New Jersey.

    **A.    COP's Restructuring is a Corporate Reorganization and Transactions among Parties under Common Ownership in Accordance with the ISRA Exceptions**

    The following subsections provide the information required under the factors for application of the corporate reorganization and the common ownership exceptions to ISRA applicability.

    **1.    Identity of Direct and Indirect Owners**

    The direct owner of the industrial establishments before the Restructuring is COPCo. The direct owner of the industrial establishments for all steps in the Restructuring after the first step will be Phillip 66 Company.[6] Phillips 66 Company is the Downstream Business of COPCo, incorporated and under a new name.

    The indirect owners of the industrial establishments before the Restructuring are COP and COP's shareholders. At all times, both before and immediately after the Restructuring, COP's shareholders are the indirect owners of the industrial establishments. At different steps in the Restructuring, COPCo, COP and P66 (initially a subsidiary of COP then held by COP's shareholders) are all indirect owners of the industrial establishments.

    Accordingly, there is identity among the direct and indirect owners of the industrial establishments throughout the Restructuring.

    **2.    Transfers of Stock and Assets Solely Among Persons under Common Ownership and Their Shareholders**

    Step 1 -- Each of the transfers in the Restructuring is among companies under the common ownership of COP or its shareholders. The only transfer of assets is COPCo's transfer of the entire Downstream Business into Phillips 66 Company. At the time of this transfer, Phillips 66 Company will be a wholly owned subsidiary of COPCo. COP will be both COPCo's direct owner as well as the indirect owner of Phillips 66 Company.

    Step 2 -- COPCo's transfer of Phillips 66 Company to COP -- and step 3 -- COP's transfer of Phillips 66 Company to P66 -- are both transfers of stock among companies under

---

[6] CPPL is the direct owner of the pipeline assets in New Jersey, to the extent they are industrial establishments, both before and after the Restructuring.

David Sweeney, Assistant Commissioner
March 19, 2012
Page 11

common ownership. COPCo will be a wholly owned subsidiary of COP when it transfers Phillips 66 Company to COP. COP's shareholders will be the direct owner of COP and the indirect owner of COPCo. P66 will be a wholly-owned subsidiary of COP when it receives Phillips 66 Company from COP. COP's shareholders will be the direct owner of COP and the indirect owner of P66 at the time of the transfer of Phillips 66 Company to P66.

Step 4 of the Restructuring, the spinoff of P66, is a transfer of stock among companies under common ownership or their shareholders because COP is transferring all of the shares it holds in P66 to COP's shareholders. Following this fourth and final step in the Restructuring, the ultimate indirect owner of the industrial establishments will be COP's shareholders because they also will own P66, which will be the owner of Phillips 66 Company, which will own the industrial establishments. COP's shareholders also were the ultimate indirect owner of the industrial establishments before the Restructuring.

### 3. The Restructuring will not Significantly Diminish the Financial Ability of the Owner to Remediate the Industrial Establishments

An equal amount of assets will be available for remediation before and after the Restructuring because the assets of the Downstream Business are the relevant assets and they are all moving to the new companies. P66's assets are estimated to exceed $45.6 billion with an annual net income greater than $4.57 billion. These assets are more than sufficient to address any remediation costs. These figures also are the assets and income of the Downstream Business of COPCo because that entire business, including its assets, are being transferred to Phillips 66 Company and P66, so the Restructuring does not result in a diminution of available assets.

Not only are the assets available for remediation of the industrial establishments not significantly changed as a result of the Restructuring, but they also are more than sufficient to address the remediation liabilities at the industrial establishments. The industrial establishments represent only a small proportion of the company's total downstream operations. Total environmental costs for the entire Downstream Business are reported in the pro forma financial statements as $542 million. The liabilities associated with the industrial establishments would be only a small fraction of this number, which in itself is insignificant compared to the total assets ($45.6 billion), total revenue ($200.614 billion), and annual net income ($4.57 billion) for P66.

As further reference, Bayway Refinery, which is the largest of the industrial establishments being transferred, is subject to financial assurances of $25 million to guarantee the investigation and remediation. The likelihood of any additional costs attributable to COPCo's ownership is small in light of the scope of ExxonMobil's remediation program under the ACO and the site's response to discharges under its NJDEP-approved DPCC/DCR plan. The costs associated with Woodbury Tank Farm and Tremley Point Terminal are expected to be significantly less than the costs associated with Bayway. Woodbury Tank farm is significantly smaller than Bayway, has less activity, is near the end of a remediation program, and there are no indications of any discharges during COPCo's ownership. Tremley Point also is significantly smaller than Bayway, has few operations, and is undergoing a remediation program. Any discharges at Tremley Point since COPCo's ownership have been subject to cleanup under the

David Sweeney, Assistant Commissioner
March 19, 2012
Page 12

facility's NJDEP-approved DPCC/DCR plan. Any remediation obligations at Tremley Point not satisfied by the on-going remediation, therefore, would be limited in scope and cost.

The nonapplicability of ISRA to the Restructuring following an analysis of the financials of the company owning the industrial establishments after the transaction and the expected value of the remediation obligation is consistent with NJDEP's nonapplicability determinations issued for General Motors (N19984148), PSE&G (N19993416 & N19993419 – N19993434), James River (N19951934), and General Dynamics (N19972432).

Reviewing these factors together leads to the conclusion that ISRA should not apply to the Restructuring because the transactions satisfy the ISRA exemptions for corporate reorganizations and transfers among companies under common ownership that do not significantly diminish the assets available for remediation of the industrial establishments.

**B.     COP's Restructuring Satisfies the ISRA Exception for Transfers Involving Indirect Owners**

COP's transfer of the stock of P66 to COP's shareholders in the final step of the Restructuring is a transaction involving indirect owners of industrial establishments, but is not subject to ISRA both because, as previously described, the transaction does not result in a material change in the assets available for remediation and because neither indirect owner exercised control over the day-to-day decision making of the industrial establishments or their direct owners.

Like any corporation that is fulfilling its fiduciary duty to its shareholders, COP exercises some degree of oversight over its direct and indirect subsidiaries. However, this does not extend beyond the customary oversight exercised by any corporate parent.

As noted above, NJDEP has acknowledged it cannot treat such customary oversight as the basis for concluding that the parent's assets are available for cleanup because this would result in "every parent being held responsible for the actions of its wholly-owned subsidiary." 29 N.J.R. at 4925.[7]      As such, the Restructuring's transactions among the indirect owners of the industrial establishments are not subject to ISRA because the indirect owners did not exercise a level of control over the industrial establishments sufficient to cause the transactions to be considered a change in ownership or control of the industrial establishments.

---

[7] The level of oversight and management that a parent company exercises over its subsidiary that the Supreme Court recognized as not giving rise to parental liability includes: 1) monitoring of a subsidiary's performance; 2) supervision of the subsidiary's finance and capital budget decisions; and 3) articulation of general policies and procedures. See Bestfoods, 524 U.S. at 72. Such actions by a parent do not result in the parent assuming the environmental liabilities of its subsidiary. Id.

David Sweeney, Assistant Commissioner
March 19, 2012
Page 13

## V.     Conclusion

ISRA does not apply to the Restructuring because the transactions are corporate reorganizations, transactions among entities under common ownership, or transactions among indirect owners that do not impact the ownership of the industrial establishments or the assets available for remediation.  A determination that ISRA does not apply to the Restructuring also is consistent with LNAs that NJDEP has issued to other corporate spin-offs where the financial strength of the new owner of the industrial establishments far exceeded the environmental liabilities.  Not applying ISRA to the Restructuring also is sound policy given the environmental cleanups already being conducted at the industrial establishments and the fiscal strength of the responsible parties at those sites.

As we had discussed, please confirm for us in writing that you concur with our view that ISRA does not apply to the Restructuring of ConocoPhillips.

Thank you for your consideration of this matter.

Very truly yours,

Linda Gordon Hester

Attachments

PSXCPT00000030

David Sweeney, Assistant Commissioner
March 19, 2012
Page 14

bcc:   Steve Belin
       Ray Wuertz

PSXCPT00000031

**ATTACHMENT A**

PSXCPT00000032

Preliminary Information Statement of Phillips 66                    Page 1 of 207

EX-99.1 23 d250454dex991.htm PRELIMINARY INFORMATION STATEMENT OF PHILLIPS 66

**Table of Contents**

Exhibit 99.1
(Subject to Completion, Dated March 1, 2012)



[•], 2012

Dear ConocoPhillips Stockholder:

I am pleased to report that the previously announced repositioning of ConocoPhillips through the separation of ConocoPhillips' Phillips 66 subsidiary from our remaining businesses is expected to become effective on [•], 2012, on which date Phillips 66, a Delaware corporation, will become an independent public company and will hold, through its subsidiaries, the assets and liabilities associated with ConocoPhillips' Downstream business.

The separation will be completed by way of a pro rata distribution of all of the outstanding shares of Phillips 66 common stock to our stockholders of record as of 5:00 p.m. Eastern Time, on [•], 2012, the distribution record date. Each ConocoPhillips stockholder of record will receive one share of Phillips 66 common stock for every two shares of ConocoPhillips common stock held by such stockholder on the record date. The distribution of these shares will be made in book-entry form, which means that no physical share certificates will be issued. Following the distribution, stockholders may request that their shares of Phillips 66 common stock be transferred to a brokerage or other account at any time. No fractional shares of Phillips 66 common stock will be issued. The distribution agent will aggregate fractional shares into whole shares, sell the whole shares in the open market at prevailing prices and distribute the net cash from proceeds from the sales pro rata to each holder who would otherwise have been entitled to receive a fractional share in the distribution.

ConocoPhillips has sought a private letter ruling from the Internal Revenue Service to the effect that, among other things, the distribution of Phillips 66's common stock to ConocoPhillips stockholders, together with certain related transactions, will qualify as a transaction that is generally tax-free for U.S. federal income tax purposes. However, any cash that you receive in lieu of fractional shares generally will be taxable to you. It is a condition to completing the separation that ConocoPhillips receive the private letter ruling from the Internal Revenue Service, in form and substance satisfactory to ConocoPhillips, to the effect that the distribution of Phillips 66's common stock to ConocoPhillips stockholders, together with certain related transactions, will qualify as a transaction that is generally tax-free for U.S. federal income tax purposes, which condition may be waived by ConocoPhillips in its discretion. You should consult your own tax advisor as to the particular tax consequences of the distribution to you, including potential tax consequences under state, local and non-U.S. tax laws. The separation is also subject to other conditions, including necessary regulatory approvals.

The distribution does not require stockholder approval, nor do you need to take any action to receive your shares of Phillips 66 common stock. ConocoPhillips' common stock will continue to trade on the New York Stock Exchange under the ticker symbol "COP." Phillips 66 has applied to have its common stock authorized for listing on the New York Stock Exchange under the ticker symbol "PSX."

The enclosed information statement, which we are mailing to all ConocoPhillips stockholders, describes the separation in detail and contains important information about Phillips 66, including its historical combined financial statements. We urge you to read this information statement carefully.

We want to thank you for your continued support of ConocoPhillips.

Sincerely,

J. J. Mulva
*Chairman of the Board, President and
Chief Executive Officer*

Table of Contents



[•], 2012

Dear Future Phillips 66 Stockholder:

It is our pleasure to welcome you as a future stockholder of Phillips 66. While we will be a new company upon our separation from ConocoPhillips, our businesses have a strong history of financial and operating performance. Following the separation, we will be a uniquely integrated downstream company, with operations encompassing natural gas gathering and processing, crude oil refining, petroleum products marketing, transportation, power generation, and petrochemicals manufacturing and marketing.

Given our leading position in these industries, we will have the opportunity to expand the use of our financial, technical and commercial capabilities to create value. Cash flows from operating activities are expected to be more than adequate to fund capital spending and dividend payments, allowing us to strengthen our balance sheet and build financial flexibility. We will continue to use our disciplined approach to capital spending, with the goal of having the highest returns in each of the industries in which we compete. Growth in earnings and free cash flow is expected through future investment in high-return projects. Our goal is to share our growth in cash flow with our stockholders through annual increases in dividends.

Our business strategy focuses on generating value through: (1) delivering profitable growth; (2) enhancing returns on capital; (3) maintaining financial strength; and (4) providing strong shareholder distributions. We are confident that we have the quality of assets and management to execute these strategic objectives.

We have applied to have our common stock authorized for listing on the New York Stock Exchange under the ticker symbol "PSX."

Our management team is excited about the opportunities ahead of us, and is committed to unlocking the potential of Phillips 66. We invite you to learn more about our company and our plans by reading the enclosed material and look forward to updating you on our progress.

Sincerely,

Greg C. Garland
*President*
Phillips 66

PSXCPT00000034

Preliminary Information Statement of Phillips 66                                        Page 3 of 207

Table of Contents

Information contained herein is subject to completion or amendment. A Registration Statement on Form 10 relating to these securities has been filed with the Securities and Exchange Commission under the Securities Exchange Act of 1934, as amended.

**Preliminary Information Statement**
**(Subject to Completion, Dated March 1, 2012)**



**Information Statement**

**Phillips 66**

**Common Stock**

ConocoPhillips is furnishing this Information Statement in connection with the distribution to ConocoPhillips stockholders of all of the common stock of Phillips 66 owned by ConocoPhillips, which will be 100 percent of such common stock outstanding immediately prior to the distribution. Phillips 66 currently is a wholly owned subsidiary of ConocoPhillips that at the time of the distribution will hold, through its subsidiaries, the assets and liabilities associated with ConocoPhillips' Downstream business.

To implement the distribution, ConocoPhillips will distribute the shares of Phillips 66 common stock on a pro rata basis to the holders of ConocoPhillips common stock. Each holder of ConocoPhillips common stock will receive one share of common stock of Phillips 66 for every two shares of ConocoPhillips common stock held at 5:00 p.m. Eastern Time on [•], 2012, the record date for the distribution.

The distribution is expected to occur after the New York Stock Exchange (NYSE) market closing on [•], 2012. Immediately after ConocoPhillips completes the distribution, Phillips 66 will be an independent, publicly traded company. We expect that, for U.S. federal income tax purposes, no gain or loss will be recognized by you, and no amount will be included in your income, upon your receipt of shares of Phillips 66 common stock in the distribution, except with respect to any cash received in lieu of fractional shares.

No vote of ConocoPhillips stockholders is required in connection with this distribution. ConocoPhillips stockholders will not be required to pay any consideration for the shares of Phillips 66 common stock they receive in the distribution, and they will not be required to surrender or exchange shares of their ConocoPhillips common stock or take any other action in connection with the distribution.

As ConocoPhillips owns all of the outstanding shares of Phillips 66's common stock, there currently is no public trading market for Phillips 66 common stock. We have applied to have Phillips 66's common stock authorized for listing on the NYSE under the ticker symbol "PSX." Assuming the NYSE authorizes Phillips 66's common stock for listing, we anticipate that a limited market, commonly known as a "when-issued" trading market, for Phillips 66's common stock will develop on or shortly before the record date for the distribution and will continue up to and including the distribution date. We expect the "regular-way" trading of Phillips 66's common stock will begin on the first trading day following the distribution date.

**In reviewing this Information Statement, you should carefully consider the matters described in "Risk Factors" beginning on page 19 of this Information Statement.**

**Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or determined whether this Information Statement is truthful or complete. Any representation to the contrary is a criminal offense.**

**This Information Statement does not constitute an offer to sell or the solicitation of an offer to buy any securities.**

The date of this Information Statement is [•], 2012.

ConocoPhillips first mailed this Information Statement to ConocoPhillips stockholders on or about [•], 2012.

PSXCPT00000035

**Table of Contents**

## TABLE OF CONTENTS

| | Page |
|---|---|
| Summary | 1 |
|     Our Business | 1 |
|     Our Business Strategies | 2 |
|     Our Competitive Strengths | 3 |
|     The Separation | 5 |
|     Questions and Answers about the Separation and Distribution | 7 |
|     Summary of the Separation and Distribution | 13 |
|     Summary Risk Factors | 16 |
| Selected Combined Financial Data of Phillips 66 | 18 |
| Risk Factors | 19 |
|     Risks Relating to the Separation | 19 |
|     Risks Relating to Our Industry and Our Business | 24 |
|     Risks Relating to Ownership of Our Common Stock | 29 |
| Cautionary Statement Regarding Forward-Looking Statements | 32 |
| The Separation | 34 |
|     General | 34 |
|     Reasons for the Separation | 34 |
|     The Number of Shares You Will Receive | 35 |
|     Treatment of Fractional Shares | 35 |
|     When and How You Will Receive the Distribution of Phillips 66 Shares | 35 |
|     Treatment of Equity-Based Compensation | 36 |
|     Treatment of 401(k) Shares | 36 |
|     Results of the Distribution | 37 |
|     Incurrence of Debt | 37 |
|     Material U.S. Federal Income Tax Consequences of the Distribution | 37 |
|     Market for Common Stock | 40 |
|     Trading Between Record Date and Distribution Date | 40 |
|     Conditions to the Distribution | 41 |
|     Reason for Furnishing this Information Statement | 42 |
| Dividend Policy | 43 |
| Capitalization | 44 |
| Business and Properties | 45 |
|     Overview | 45 |
|     Our Business Strategies | 45 |
|     Our Competitive Strengths | 47 |
|     Segment and Geographic Information | 48 |
|     Technology Development | 62 |
|     Competition | 62 |
|     General | 63 |
|     Legal Proceedings | 63 |
| Management | 65 |
|     Executive Officers Following the Distribution | 65 |
| Directors | 66 |
|     Composition of the Board of Directors | 66 |
|     Qualification of Directors | 66 |
|     Board of Directors Following the Distribution | 66 |

i

PSXCPT00000036

Preliminary Information Statement of Phillips 66                    Page 5 of 207

**Table of Contents**

| | Page |
|---|---|
| Additional Directors | 67 |
| Committees of the Board of Directors | 68 |
| Nominating Process of the Committee on Directors' Affairs | 69 |
| Decision-Making Process to Determine Director Compensation | 70 |
| Board Risk Oversight | 70 |
| Communications with the Board of Directors | 70 |
| Compensation Discussion and Analysis | 71 |
| Executive Compensation | 86 |
| Non-Employee Director Compensation | 109 |
| Stock Ownership | 111 |
| Certain Relationships and Related Transactions | 113 |
| The Separation from ConocoPhillips | 113 |
| Related Party Transactions | 113 |
| Agreements with ConocoPhillips | 113 |
| Description of Capital Stock | 117 |
| Where You Can Find More Information | 122 |
| Unaudited Pro Forma Condensed Combined Financial Statements | 123 |
| Management's Discussion and Analysis of Financial Condition and Results of Operations | 129 |
| Executive Overview | 129 |
| Results of Operations | 132 |
| Capital Resources and Liquidity | 139 |
| Critical Accounting Estimates | 148 |
| Quantitative and Qualitative Disclosures About Market Risk | 152 |
| Index to Financial Statements | F-1 |

ii

Table of Contents

### NOTE REGARDING THE USE OF CERTAIN TERMS

We use the following terms to refer to the items indicated:

- "We," "us," "our" and "company," unless the context requires otherwise, refer to Phillips 66, the entity that at the time of the distribution will hold, through its subsidiaries, the assets and liabilities associated with ConocoPhillips' Downstream business, and whose shares ConocoPhillips will distribute in the separation. ConocoPhillips' Downstream business includes its refining, marketing and transportation operations, including power generation, its natural gas gathering, processing, transmission and marketing operations (primarily conducted through its equity investment in DCP Midstream, LLC), and its petrochemical operations (conducted through its equity investment in Chevron Phillips Chemical Company LLC). Where appropriate in context, the foregoing terms also include the subsidiaries of this entity.

- The term "distribution" refers to the distribution of all of the shares of Phillips 66 common stock owned by ConocoPhillips to stockholders of ConocoPhillips as of the record date.

- The term "separation" refers to the separation of the Downstream business from ConocoPhillips and the creation of an independent, publicly traded company, Phillips 66, holding the Downstream business through the distribution.

- The term "distribution date" means the date on which the distribution occurs.

iii

PSXCPT00000038

Preliminary Information Statement of Phillips 66                                      Page 7 of 207

Table of Contents

## SUMMARY

*This summary highlights selected information from this Information Statement relating to Phillips 66, Phillips 66's separation from ConocoPhillips and the distribution of Phillips 66 common stock by ConocoPhillips to its stockholders. For a more complete understanding of our businesses and the separation and distribution, you should read the entire Information Statement carefully, particularly the discussion set forth under "Risk Factors" beginning on page 19 of this Information Statement, and our audited historical combined financial statements, our unaudited pro forma condensed combined financial statements and the respective notes to those statements appearing elsewhere in this Information Statement.*

*Except as otherwise indicated or unless the context otherwise requires, the information included in this Information Statement, including the combined financial statements of Phillips 66, assumes the completion of all the transactions referred to in this Information Statement in connection with the separation and distribution.*

### Our Business

Following our separation from ConocoPhillips, we believe we will have a unique approach to downstream integration through our combination as a leading refiner with significant marketing and transportation assets, one of the largest domestic producers of natural gas liquids (NGL), and one of the world's top producers of petrochemicals. Including our equity affiliates, our operations encompass 15 refineries with a gross crude oil capacity of 2.8 million barrels per day, 10,000 branded marketing outlets, nearly 80,000 miles of pipeline, 7.2 billion cubic feet per day of gross natural gas processing capacity, and over 40 billion pounds of gross annual chemicals processing capacity. We believe this positions Phillips 66 to compete with the best in the industries across the value chain.

Phillips 66 has the following businesses, which we refer to collectively as the Downstream business:

- The Refining and Marketing (R&M) segment purchases, refines, markets and transports crude oil and petroleum products, mainly in the United States, Europe and Asia, and also engages in power generation activities.

- The Midstream segment gathers, processes, transports and markets natural gas, and fractionates and markets NGL, predominantly in the United States. The Midstream segment primarily consists of our 50 percent equity investment in DCP Midstream, LLC (DCP Midstream), a joint venture with Spectra Energy Corp.

- The Chemicals segment manufactures and markets petrochemicals and plastics on a worldwide basis. The Chemicals segment consists of our 50 percent equity investment in Chevron Phillips Chemical Company LLC (CPChem), a joint venture with Chevron Corporation.

Phillips 66 was formed in 2011 and will, at the time of the distribution, hold the assets and liabilities of ConocoPhillips' Downstream business. Phillips 66's headquarters will be located in Houston, Texas and its general telephone number is 281-293-6600. Our Internet website is http://www.Phillips66.com. Our website and the information contained on that site, or connected to that site, are not incorporated by reference into this Information Statement.

Elsewhere in this Information Statement we provide a more detailed description of the Downstream business that will be separated from ConocoPhillips' other businesses. Following the separation, Phillips 66 will be an independent, publicly traded company. ConocoPhillips will not retain any ownership interest in

1

PSXCPT00000039

**Table of Contents**

Phillips 66. In connection with the separation, ConocoPhillips and Phillips 66 will enter into a number of agreements that will govern the relationship between ConocoPhillips and Phillips 66 following the distribution.

Our business is subject to various risks. For a description of these risks, see "Risk Factors" and "Management's Discussion and Analysis of Financial Condition and Results of Operations" included elsewhere in this Information Statement.

### Our Business Strategies

*Deliver Profitable Growth*
We believe all three of our business segments have profitable growth opportunities. The use of free cash flow for investments to improve R&M margins and expand Chemicals and Midstream capacity has the potential to deliver significant growth in earnings and returns.

In R&M, we have identified projects designed to reduce feedstock costs and improve clean product yield, which should expand gross profit margins and return on capital employed (ROCE). An example is the coker and refinery expansion (CORE) project at the Wood River Refinery. This project increased heavy crude oil processing capacity, while delivering a 5 percent improvement in clean product yield. Additionally, on an ongoing basis, we evaluate and execute R&M projects designed to improve operating efficiency.

We expect to have significant growth opportunities related to expanding North American natural gas and NGL production. For example, as unconventional natural gas production grows, opportunities are created for DCP Midstream to invest in new pipelines, natural gas processing plants and gathering systems. In our chemicals business, we see ways to exploit low NGL feedstock costs. In March 2011, CPChem announced plans to evaluate the construction of a world-scale ethane cracker and derivatives facility on the U.S. Gulf Coast. Internationally, CPChem is seeking to identify new petrochemical facility investment opportunities in the Middle East and Asia.

*Enhance Returns on Capital*
We believe ROCE is an important metric for evaluating the quality of capital allocation decisions, and it provides a good measure of portfolio value. ROCE is a measure of a company's efficiency and profitability of its capital investments. ROCE is a ratio, the numerator of which is net income plus after-tax interest expense, and the denominator is average total equity plus total debt. We will seek to increase ROCE through a combination of portfolio optimization, investing in higher-return projects, and continuing cost discipline. Absolute ROCE improvement, as well as improvement relative to our peers, is expected to be a key performance metric as we move forward.

Of the three business segments within Phillips 66, R&M has the highest capital employed and lowest ROCE, and thus requires further rationalization to improve returns. We continue to evaluate opportunities to reduce refining exposure in markets where we expect to generate below-average returns over the medium-to-longer term because of low market crack spreads. For example, we recently sold the Wilhelmshaven Refinery in Germany and have idled and intend to sell or permanently close the Trainer Refinery in Pennsylvania. In addition to portfolio rationalization of low-returning refining assets, we plan to improve R&M ROCE through a disciplined capital allocation process.

Conversely, we expect to increase capital investments and capital employed in more profitable and higher-returning projects in our Chemicals and Midstream segments.

2

PSXCPT00000040

Table of Contents

An important aspect to increasing ROCE is continued discipline in cost management. We plan to remain focused on costs, through internal efficiency efforts, coupled with ongoing procurement initiatives with providers of goods and services. Cost control is a key aspect of our performance evaluation and tracking.

*Maintain Financial Strength*
A strong balance sheet and financial flexibility are important attributes in our industry. At the time of our separation, we expect to hold an investment-grade credit rating on our long-term debt and maintain sufficient cash and liquidity to allow us to invest in high-return projects. Available cash flow in excess of capital spending and dividends can be directed toward the retirement of debt in order to achieve and maintain a targeted debt-to-capital ratio of 20 percent to 30 percent.

*Strong Stockholder Distributions*
We believe a significant portion of value creation can be generated through consistent growth in regular dividends and share repurchases. Distributions to shareholders also reinforce the focus on capital discipline by Phillips 66 management. We currently plan to pay quarterly cash dividends at an initial rate of $0.20 per share and, subject to market conditions and other factors, increase these dividends annually at the discretion of our Board of Directors. In addition, share repurchases will be considered after capital, dividend and debt reduction objectives are met.

Our Competitive Strengths

*A Strong Safety and Environmental Stewardship Culture*
We believe a workforce committed to continuous improvement in safety and environmental stewardship is a fundamental requirement for our employees, our company, and the communities in which we operate. We employ rigorous training and audit programs to drive ongoing improvement in both personal and process safety as we strive for zero incidents. We are committed to protecting the environment and continually seek to reduce our environmental footprint throughout our operations. For example, we reduced the sulfur dioxide emission from our refineries by 58 percent during the three-year period ended December 31, 2010, while our nitrogen oxides emissions were reduced 27 percent over the same period.

*A Unique Approach to Downstream Integration*
Our combination as a leading refiner with significant marketing and transportation assets, one of the largest domestic producers of NGL, and one of the world's top producers of petrochemicals creates a unique approach to downstream integration through earnings diversification. Our businesses have the efficiency of scale and technical capability to compete in the most attractive markets globally. Including our equity affiliates, our operations encompass 15 refineries with a gross crude oil capacity of 2.8 million barrels per day, 10,000 branded marketing outlets, nearly 80,000 miles of pipeline, 7.2 billion cubic feet per day of gross natural gas processing capacity, and over 40 billion pounds of gross annual chemicals processing capacity. We believe this positions Phillips 66 to compete with the best in the industries across the value chain.

*Geographically Diverse Refining Assets*
Our 11 operated U.S. refineries are located across all five Petroleum Administration for Defense Districts (PADDs). This regional diversity enables us to participate in market opportunities as they occur in every U.S. geographic region. The level of transportation, marketing and commercial integration varies in each PADD, depending on need, and provides our refineries with dependable supply of crude oil from domestic, Canadian and other international sources. We have nearly 500,000 barrels per day of net refining capacity in four refineries in the Midcontinent region, where we currently benefit from strong margins because of low feedstock costs due to increasing onshore crude oil production. Internationally, we own or hold interests in three refineries in Europe and one in Asia. These include our 100 percent-owned Humber Refinery in the

3

Table of Contents

United Kingdom, one of the most sophisticated refining assets in Europe. Humber is a fully integrated facility that produces a high portion of transportation fuels, such as gasoline and diesel fuel. Our Immingham Combined Heat and Power Plant in the United Kingdom provides steam and electricity to the Humber Refinery, as well as merchant power into the U.K. market.

*Ability to Process a Variety of Crude Oil Types While Maintaining High Yields*

Extensive transportation and logistics assets and commercial capabilities support our refineries, allowing the delivery of crude oil feedstock from multiple domestic, Canadian and international sources of supply. Our refineries can process a wide range of crude oils, including lower-priced heavy and sour crudes. Clean product yield is the percentage of higher-margin products (such as gasoline, distillate, aromatics, lubricants and chemical feedstocks) produced from processed crude oil and other purchased raw materials. In 2011, our refineries delivered clean product yields of 84 percent, a 1 percent improvement over 2010. Our commercial capabilities include supply and trading operations experienced in sourcing crude and marketing refined products globally.

*Low-Cost Marketing Operations*

Our global marketing strategy is to provide sustainable, low-cost and ratable demand for our refining network's products. In the United States, we supply gasoline, diesel fuel and aviation fuel to approximately 8,250 marketer-owned or -supplied outlets in 49 states under three domestic brands—*Phillips 66*, *Conoco* and *76*. This strong branded wholesale business is supported by long-term supply agreements with marketers. In Europe, we hold a niche marketing position through our ability to leverage our *JET* brand and provide a low-cost, well-established infrastructure. This network allows us to deliver a very competitive gasoline and diesel fuel brand with a premier retail offering.

*Extensive Transportation Assets*

Our domestic transportation business includes 15,000 miles of pipelines under management, including crude oil, petroleum product and NGL pipelines; 42 finished product terminals, 8 liquefied petroleum gas terminals, 5 crude oil terminals, and 1 coke exporting facility; an extensive fleet of marine and inland vessels under charter; and truck and rail assets. This transportation business supports our refining system and efforts to optimize refined product distribution, resulting in economies of scale that contribute to profitability.

*DCP—A High-Growth Midstream Business*

We conduct our midstream business primarily through a 50 percent equity investment in DCP Midstream. DCP Midstream is a leader in its sector as one of the largest natural gas gatherers and processors, NGL producers, and NGL marketers in the United States. DCP Midstream's extensive asset base is located in many of the legacy natural gas producing regions of the United States, including the Rocky Mountains, Midcontinent, Permian, East Texas/North Louisiana, South Texas, Central Texas and the Gulf Coast. In addition, DCP Midstream is entering high-growth regions of the United States, including the Niobrara, Eagle Ford shale, Barnett shale, and Granite Wash regions, allowing for substantial growth opportunities. DCP Midstream's assets include 62,000 miles of pipelines, 61 gas processing plants and 12 NGL fractionators. In 2010, DCP Midstream signed agreements that will enable it to become the anchor shipper of growing Eagle Ford shale gas production on a portion of the Trunkline Gas pipeline system. DCP Midstream is also planning construction of the Sand Hills Pipeline to provide NGL transportation capacity for producers in the Permian and Eagle Ford basins to gain access to market centers along the Gulf Coast.

*CPChem—A High-Returning Petrochemicals Company*

We conduct our chemicals business through a 50 percent equity investment in CPChem. CPChem has a number of large petrochemical facilities in the U.S. Gulf Coast region, and has significant international operations through its investments in feedstock-advantaged areas in the Middle East, with access to large,

4

PSXCPT00000042

Table of Contents

growing markets for its products, such as Asia. CPChem is one of the world's top producers of olefins and polyolefins and a leading supplier of aromatics and styrenics. Our investment in CPChem has generated high returns in recent years, with a 2010 ROCE of 21 percent and a 2011 ROCE of 28 percent. CPChem is analyzing a number of additional growth projects globally, including proposed construction of a world-scale ethane cracker and two polyethylene facilities at or near one or more of CPChem's Texas Gulf Coast sites. With an expected annual capacity of 3.3 billion pounds, the ethane cracker would, if progressed, increase CPChem's U.S. ethylene capacity by over 40 percent and allow CPChem to leverage the development of significant shale gas resources in the United States.

### The Separation

*Overview*

On [•], 2012, the Board of Directors of ConocoPhillips approved the distribution to ConocoPhillips stockholders of all the shares of common stock of Phillips 66. Phillips 66 is a wholly owned subsidiary of ConocoPhillips that at the time of the distribution will hold, through its subsidiaries, the assets and liabilities associated with ConocoPhillips' Downstream business. Immediately following the distribution, ConocoPhillips stockholders as of the record date will own 100 percent of the outstanding shares of common stock of Phillips 66.

Before Phillips 66's separation from ConocoPhillips, Phillips 66 and ConocoPhillips will enter into a Separation and Distribution Agreement and several other agreements to effect the separation and distribution. These agreements will provide for the allocation between Phillips 66 and ConocoPhillips of ConocoPhillips' assets, liabilities and obligations and will govern the relationship between Phillips 66 and ConocoPhillips after the separation (including with respect to employee matters, tax matters and intellectual property matters). Phillips 66 and ConocoPhillips will also enter into a Transition Services Agreement and several commercial agreements which will provide for, among other things, the provision of transitional services, utility cost allocation, delivery system maintenance for certain premises, and ongoing commodity supply arrangements.

The ConocoPhillips Board of Directors believes that separating the Downstream business from ConocoPhillips' other businesses through the distribution is in the best interests of ConocoPhillips and its stockholders and has concluded the separation will provide each company with a number of material opportunities and benefits, including the following:

- *Strategic Focus.* Position each company to pursue a more focused strategy, with ConocoPhillips well-positioned for organic growth through ongoing strategic initiatives in the upstream sector, and Phillips 66 well-positioned to pursue value creation strategies in the downstream sector with greater flexibility as a result of being an independent and dedicated downstream company.

- *Management Focus.* Allow management of each company to concentrate that company's resources wholly on its particular market segments, customers and core businesses, with greater ability to anticipate and respond faster to changing markets and new opportunities. Operationally, both companies will be positioned as leaders in their segments, with sufficient size to manage risks and anticipate and respond to opportunities. Each company will be able to focus on its core operations, with greater management focus on customized strategies that can deliver long-term shareholder value.

- *Recruiting and Retaining Employees.* Allow each company to recruit and retain employees with expertise directly applicable to its needs and under compensation policies that are appropriate for

5

PSXCPT00000043

Preliminary Information Statement of Phillips 66                                    Page 12 of 207

Table of Contents

its specific lines of business. In particular, following the distribution, the value of equity-based incentive compensation arrangements offered by each company should be more closely aligned with the performance of its businesses. Such equity-based compensation arrangements should provide enhanced incentives for employee performance and improve the ability of each company to attract, retain and motivate qualified personnel at all levels of the organization, including those key employees considered essential to that company's future success.

- *Access to Capital and Capital Structure.*  Eliminate competition for capital between the two business lines. Instead, both companies will have direct access to the debt and equity capital markets to fund their respective growth strategies and to establish a capital structure and dividend policy appropriate for their business needs. In addition, the separation will result in separately traded stocks reflecting a pure-play upstream company and an integrated downstream company that will facilitate each company's growth strategy.

- *Investor Choice.*  Provide investors with a more targeted investment opportunity in each company that offers different investment and business characteristics, including different opportunities for growth, capital structure, business models and financial returns. This will allow investors to evaluate the separate and distinct merits, performance and future prospects of each company.

The distribution of our common stock as described in this Information Statement is subject to the satisfaction or waiver of certain conditions. For more information, see "The Separation—Conditions to the Distribution" and "Risk Factors—Risks Relating to the Separation" included elsewhere in this Information Statement.

6

Preliminary Information Statement of Phillips 66                    Page 161 of 207

FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

PHILLIPS 66

INDEX TO FINANCIAL STATEMENTS

|  | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm | F-2 |
| Audited Combined Financial Statements of Phillips 66: |  |
|     Combined Statement of Income for the years ended December 31, 2011, 2010 and 2009 | F-3 |
|     Combined Statement of Comprehensive Income for the years ended December 31, 2011, 2010 and 2009 | F-4 |
|     Combined Balance Sheet at December 31, 2011 and 2010 | F-5 |
|     Combined Statement of Cash Flows for the years ended December 31, 2011, 2010 and 2009 | F-6 |
|     Combined Statement of Changes in Net Investment for the years ended December 31, 2011, 2010 and 2009 | F-7 |
|     Notes to Combined Financial Statements | F-8 |
| Schedule II—Valuation and Qualifying Accounts (Combined) | F-47 |

F-1

PSXCPT00000045

Table of Contents

Report of Independent Registered Public Accounting Firm

The Board of Directors and Stockholders
ConocoPhillips

We have audited the accompanying combined balance sheets of Phillips 66 as of December 31, 2011 and 2010, and the related combined statements of income, comprehensive income, changes in net investment, and cash flows for each of the three years in the period ended December 31, 2011. Our audits also included the financial statement schedule listed in the Index to Financial Statements. These financial statements and schedule are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements and schedule based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. We were not engaged to perform an audit of the Company's internal control over financial reporting. Our audits included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the combined financial position of Phillips 66 at December 31, 2011 and 2010, and the combined results of its operations and its cash flows for each of the three years in the period ended December 31, 2011, in conformity with U.S. generally accepted accounting principles. Also, in our opinion, the related financial statement schedule, when considered in relation to the basic financial statements taken as a whole, presents fairly in all material respects the information set forth therein.

/s/ Ernst & Young LLP

Houston, Texas
March 1, 2012

F-2

PSXCPT00000046

Preliminary Information Statement of Phillips 66                                   Page 163 of 207

Table of Contents

| Combined Statement of Income | | | Phillips 66 |
|---|---|---|---|
| Years Ended December 31 | | Millions of Dollars | |
| | 2011 | 2010 | 2009 |
| Revenues and Other Income | | | |
| Sales and other operating revenues* | $ 196,088 | 146,561 | 112,692 |
| Equity in earnings of affiliates | 2,843 | 1,765 | 1,092 |
| Net gain on dispositions | 1,638 | 241 | 79 |
| Other income | 45 | 89 | 88 |
| Total Revenues and Other Income | 200,614 | 148,656 | 113,951 |
| Costs and Expenses | | | |
| Purchased crude oil and products | 172,837 | 125,092 | 93,156 |
| Operating expenses | 4,072 | 4,189 | 4,097 |
| Selling, general and administrative expenses | 1,409 | 1,384 | 1,314 |
| Depreciation and amortization | 908 | 880 | 879 |
| Impairments | 472 | 1,699 | 66 |
| Taxes other than income taxes* | 14,288 | 13,985 | 13,620 |
| Accretion on discounted liabilities | 21 | 22 | 24 |
| Interest and debt expense | 17 | 1 | 1 |
| Foreign currency transaction (gains) losses | (34) | 85 | (53) |
| Total Costs and Expenses | 193,990 | 147,337 | 113,104 |
| Income before income taxes | 6,624 | 1,319 | 847 |
| Provision for income taxes | 1,844 | 579 | 368 |
| Net income | 4,780 | 740 | 479 |
| Less: net income attributable to noncontrolling interests | (5) | (5) | (3) |
| Net Income Attributable to Phillips 66 | $ 4,775 | 735 | 476 |
| *Includes excise taxes on petroleum product sales: | $ 13,955 | 13,689 | 13,325 |

*Includes excise taxes on petroleum product sales:
See Notes to Combined Financial Statements.

F-3

PSXCPT00000047

Preliminary Information Statement of Phillips 66                    Page 164 of 207

Table of Contents

| Combined Statement of Comprehensive Income | | | Phillips 66 |
|---|---|---|---|
| Years Ended December 31 | | Millions of Dollars | |
| | 2011 | 2010 | 2009 |
| Net Income | $4,780 | 740 | 479 |
| Other comprehensive income (loss) | | | |
| Defined benefit plans | | | |
| Net gain (loss) arising during the period | (8) | (8) | 2 |
| Reclassification adjustment for amortization of prior net losses included in net income | 3 | 2 | 3 |
| Net change | (5) | (6) | 5 |
| Other plans* | (41) | (23) | 46 |
| Income taxes on defined benefit plans | 17 | 12 | (16) |
| Defined benefit plans, net of tax | (29) | (17) | 35 |
| Foreign currency translation adjustments | 28 | (95) | 214 |
| Income taxes on foreign currency adjustments | (92) | (4) | (22) |
| Foreign currency translation adjustments, net of tax | (64) | (99) | 192 |
| Hedging activities | 2 | 2 | 3 |
| Income taxes on hedging activities | (1) | (1) | 2 |
| Hedging activities, net of tax | 1 | 1 | 5 |
| Other comprehensive income (loss), net of tax | (92) | (115) | 232 |
| Comprehensive income | 4,688 | 625 | 711 |
| Less: comprehensive income attributable to noncontrolling interests | (5) | (5) | (3) |
| Comprehensive Income Attributable to Phillips 66 | $4,683 | 620 | 708 |

*Plans for which Phillips 66 is not the primary obligor—primarily those administered by equity affiliates.
See Notes to Combined Financial Statements.

F-4

PSXCPT00000048

Preliminary Information Statement of Phillips 66                              Page 165 of 207

Table of Contents

| Combined Balance Sheet | | Phillips 66 |
|---|---|---|
| At December 31 | | Millions of Dollars |
| | 2011 | 2010 |
| **Assets** | | |
| Cash and cash equivalents | $          - | - |
| Accounts and notes receivable (net of allowance of $13 million in 2011 and $7 million in 2010) | 8,354 | 8,364 |
| Accounts and notes receivable—related parties | 1,671 | 1,849 |
| Inventories | 3,466 | 4,113 |
| Prepaid expenses and other current assets | 457 | 378 |
| Total Current Assets | 13,948 | 14,704 |
| Investments and long-term receivables | 10,306 | 9,918 |
| Loans and advances—related parties | 1 | 401 |
| Net properties, plants and equipment | 14,771 | 15,409 |
| Goodwill | 3,332 | 3,633 |
| Intangibles | 732 | 777 |
| Other assets | 121 | 113 |
| Total Assets | $ 43,211 | 44,955 |
| | | |
| **Liabilities** | | |
| Accounts payable | $ 10,007 | 9,814 |
| Accounts payable—related parties | 785 | 937 |
| Short-term debt | 30 | 29 |
| Accrued income and other taxes | 1,087 | 1,182 |
| Employee benefit obligations | 64 | 89 |
| Other accruals | 411 | 452 |
| Total Current Liabilities | 12,384 | 12,503 |
| Long-term debt | 361 | 388 |
| Asset retirement obligations and accrued environmental costs | 787 | 802 |
| Deferred income taxes | 5,803 | 4,817 |
| Employee benefit obligations | 117 | 111 |
| Other liabilities and deferred credits | 466 | 308 |
| Total Liabilities | 19,918 | 18,929 |
| | | |
| **Net Investment** | | |
| Accumulated other comprehensive income | 122 | 214 |
| Net parent company investment | 23,142 | 25,787 |
| Total | 23,264 | 26,001 |
| Noncontrolling interests | 29 | 25 |
| Total Net Investment | 23,293 | 26,026 |
| Total Liabilities and Net Investment | $ 43,211 | 44,955 |

*See Notes to Combined Financial Statements.*

F-5

PSXCPT00000049

Preliminary Information Statement of Phillips 66                          Page 166 of 207

Table of Contents

**Combined Statement of Cash Flows**                                                    Phillips 66

Years Ended December 31

|  | Millions of Dollars | | |
|---|---|---|---|
|  | 2011 | 2010 | 2009 |
| **Cash Flows From Operating Activities** | | | |
| Net income | $ 4,780 | 740 | 479 |
| Adjustments to reconcile net income to net cash provided by operating activities | | | |
| Depreciation and amortization | 908 | 880 | 879 |
| Impairments | 472 | 1,699 | 66 |
| Accretion on discounted liabilities | 21 | 22 | 24 |
| Deferred taxes | 931 | (33) | (84) |
| Undistributed equity earnings | (951) | (723) | (562) |
| Net gain on dispositions | (1,638) | (241) | (79) |
| Other | 167 | (53) | (174) |
| Working capital adjustments | | | |
| Decrease (increase) in accounts and notes receivable | (186) | (3,019) | (2,087) |
| Decrease (increase) in inventories | 616 | (344) | 237 |
| Decrease (increase) in prepaid expenses and other current assets | 28 | (2) | 183 |
| Increase (decrease) in accounts payable | 58 | 3,003 | 2,606 |
| Increase (decrease) in taxes and other accruals | (200) | 163 | (542) |
| Net Cash Provided by Operating Activities | 5,006 | 2,092 | 946 |
| **Cash Flows From Investing Activities** | | | |
| Capital expenditures and investments | (1,022) | (1,150) | (2,461) |
| Proceeds from asset dispositions | 2,627 | 662 | 757 |
| Long-term advances/loans—related parties | - | (200) | (350) |
| Collection of advances/loans—related parties | 550 | 20 | 1 |
| Other | 337 | 16 | 80 |
| Net Cash Provided by (Used in) Investing Activities | 2,492 | (652) | (1,973) |
| **Cash Flows From Financing Activities** | | | |
| Contributions from (distributions to) parent company | (7,471) | (1,411) | 1,056 |
| Repayment of debt | (26) | (26) | (25) |
| Other | (1) | (3) | (4) |
| Net Cash Provided by (Used in) Financing Activities | (7,498) | (1,440) | 1,027 |
| **Net Change in Cash and Cash Equivalents** | | | |
| Cash and cash equivalents at beginning of year | - | - | - |
| Cash and Cash Equivalents at End of Year | $ - | - | - |

*See Notes to Combined Financial Statements.*

F-6

PSXCPT00000050

Table of Contents

Combined Statement of Changes in Net Investment — Phillips 66

Millions of Dollars

| | Attributable to Phillips 66 | | | |
| | Accum. Other Comprehensive Income | Net Parent Company Investment | Noncontrolling Interests | Total |
|---|---|---|---|---|
| December 31, 2008 | $ 97 | 24,902 | 23 | 25,022 |
| Net income | - | 476 | 3 | 479 |
| Other comprehensive income | 232 | - | - | 232 |
| Net transfers from parent company | - | 1,210 | - | 1,210 |
| Distributions to noncontrolling interests and other | - | - | (3) | (3) |
| December 31, 2009 | 329 | 26,588 | 23 | 26,940 |
| Net income | - | 735 | 5 | 740 |
| Other comprehensive loss | (115) | - | - | (115) |
| Net transfers to parent company | - | (1,536) | - | (1,536) |
| Distributions to noncontrolling interests and other | - | - | (3) | (3) |
| December 31, 2010 | 214 | 25,787 | 25 | 26,026 |
| Net income | - | 4,775 | 5 | 4,780 |
| Other comprehensive loss | (92) | - | - | (92) |
| Net transfers to parent company | - | (7,420) | - | (7,420) |
| Distributions to noncontrolling interests and other | - | - | (1) | (1) |
| December 31, 2011 | $ 122 | 23,142 | 29 | 23,293 |

*See Notes to Combined Financial Statements.*

F-7

PSXCPT00000051

Preliminary Information Statement of Phillips 66                          Page 168 of 207

Table of Contents

Notes to Combined Financial Statements                                    Phillips 66

### Note 1—Separation and Basis of Presentation

**The Separation**

On July 14, 2011, ConocoPhillips announced approval by its Board of Directors to pursue the separation of its upstream and downstream businesses into two stand-alone, publicly traded corporations. This separation is expected to be completed in accordance with a separation and distribution agreement between ConocoPhillips and Phillips 66. ConocoPhillips intends to distribute, on a pro rata basis, all of the shares of Phillips 66 common stock to the ConocoPhillips stockholders as of the record date for the separation. Phillips 66 was incorporated in Delaware as a wholly owned subsidiary of ConocoPhillips in November 2011. The separation is subject to market conditions, customary regulatory approvals, the receipt of an affirmative Internal Revenue Service ruling with respect to the tax-free nature of the separation, and final approval by ConocoPhillips' Board of Directors.

**Basis of Presentation**

These combined financial statements were prepared in connection with the expected separation and are derived from the consolidated financial statements and accounting records of ConocoPhillips. These statements reflect the combined historical results of operations, financial position and cash flows of ConocoPhillips' refining, marketing and transportation operations; its natural gas gathering, processing, transmission and marketing operations, primarily conducted through its equity investment in DCP Midstream, LLC; its petrochemical operations, conducted through its equity investment in Chevron Phillips Chemical Company LLC (CPChem); its power generation operations; and an allocable portion of corporate costs. Although the legal transfer of these downstream businesses of ConocoPhillips into Phillips 66 has yet to take place, for ease of reference, these combined financial statements and cash flows are collectively referred to as those of Phillips 66. Unless otherwise stated or the context otherwise indicates, all references in these combined financial statements to "us," "our" or "we" mean the downstream businesses of ConocoPhillips, which are referred to as Phillips 66.

These financial statements are presented as if such businesses had been combined for all periods presented. All intercompany transactions and accounts within Phillips 66 have been eliminated. The assets and liabilities in the combined financial statements have been reflected on a historical cost basis, as immediately prior to the separation all of the assets and liabilities presented are wholly owned by ConocoPhillips and are being transferred within the ConocoPhillips consolidated group. The combined statement of income also includes expense allocations for certain corporate functions historically performed by ConocoPhillips and not allocated to its operating segments, including allocations of general corporate expenses related to executive oversight, accounting, treasury, tax, legal, procurement and information technology. These allocations are based primarily on specific identification of time and/or activities associated with Phillips 66, employee headcount or capital expenditures. Our management believes the assumptions underlying the combined financial statements, including the assumptions regarding allocating general corporate expenses from ConocoPhillips, are reasonable. Nevertheless, the combined financial statements may not include all of the actual expenses that would have been incurred had we been a stand-alone company during the periods presented and may not reflect our combined results of operations, financial position and cash flows had we been a stand-alone company during the periods presented. Actual costs that would have been incurred if we had been a stand-alone company would depend on multiple factors, including organizational structure and strategic decisions made in various areas, including information technology and infrastructure.

F-8

PSXCPT00000052

Preliminary Information Statement of Phillips 66                                    Page 169 of 207

Table of Contents

ConocoPhillips uses a centralized approach to the cash management and financing of its operations. Our cash is transferred to ConocoPhillips daily and ConocoPhillips funds our operating and investing activities as needed. Accordingly, the cash and cash equivalents held by ConocoPhillips at the corporate level were not allocated to us for any of the periods presented. We reflect transfers of cash to and from ConocoPhillips' cash management system as a component of "Net parent company investment" on our combined balance sheet. We have included debt incurred from our limited direct financing on our balance sheet, as this debt is specific to our business. We also have not included any interest expense for intercompany cash advances from ConocoPhillips, since historically ConocoPhillips has not allocated interest expense related to intercompany advances to any of its businesses.

Events and transactions subsequent to the balance sheet date have been evaluated through March 1, 2012, the date these combined financial statements were issued, for potential recognition or disclosure in the combined financial statements.

Note 2—Accounting Policies

■  **Combination Principles and Investments**—Our combined financial statements include the accounts of majority-owned, controlled subsidiaries and variable interest entities where we are the primary beneficiary. The equity method is used to account for investments in affiliates in which we have the ability to exert significant influence over the affiliates' operating and financial policies. When we do not have the ability to exert significant influence, the investment is either classified as available-for-sale if fair value is readily determinable, or the cost method is used if fair value is not readily determinable. Undivided interests in pipelines, natural gas plants and terminals are combined on a proportionate basis. Other securities and investments are generally carried at cost.

■  **Net Parent Company Investment**—In the combined balance sheet, net parent company investment represents ConocoPhillips' historical investment in us, our accumulated net earnings after taxes, and the net effect of transactions with, and allocations from, ConocoPhillips.

■  **Foreign Currency Translation**—Adjustments resulting from the process of translating foreign functional currency financial statements into U.S. dollars are included in accumulated other comprehensive income in net investment. Foreign currency transaction gains and losses are included in current earnings. Most of our foreign operations use their local currency as the functional currency.

■  **Use of Estimates**—The preparation of financial statements in conformity with accounting principles generally accepted in the United States requires management to make estimates and assumptions that affect the reported amounts of assets, liabilities, revenues and expenses, and the disclosures of contingent assets and liabilities. Actual results could differ from these estimates.

■  **Revenue Recognition**—Revenues associated with sales of crude oil, natural gas liquids, petroleum and chemical products, and other items are recognized when title passes to the customer, which is when the risk of ownership passes to the purchaser and physical delivery of goods occurs, either immediately or within a fixed delivery schedule that is reasonable and customary in the industry.

Revenues associated with transactions commonly called buy/sell contracts, in which the purchase and sale of inventory with the same counterparty are entered into "in contemplation" of one another, are combined and reported net (i.e., on the same income statement line).

■  **Shipping and Handling Costs**—We record shipping and handling costs in purchased crude oil and products. Freight costs billed to customers are recorded as a component of revenue.

F-9

PSXCPT00000053

Preliminary Information Statement of Phillips 66                                        Page 170 of 207

Table of Contents

- **Inventories**—We have several valuation methods for our various types of inventories and consistently use the following methods for each type of inventory. Crude oil and petroleum products inventories are valued at the lower of cost or market in the aggregate, primarily on the last-in, first-out (LIFO) basis. Any necessary lower-of-cost-or-market write-downs at year end are recorded as permanent adjustments to the LIFO cost basis. LIFO is used to better match current inventory costs with current revenues and to meet tax-conformity requirements. Costs include both direct and indirect expenditures incurred in bringing an item or product to its existing condition and location, but not unusual/nonrecurring costs or research and development costs. Materials and supplies inventories are valued using the weighted-average-cost method.

- **Fair Value Measurements**—We categorize assets and liabilities measured at fair value into one of three different levels depending on the observability of the inputs employed in the measurement. Level 1 inputs are quoted prices in active markets for identical assets or liabilities. Level 2 inputs are observable inputs other than quoted prices included within Level 1 for the asset or liability, either directly or indirectly through market-corroborated inputs. Level 3 inputs are unobservable inputs for the asset or liability reflecting significant modifications to observable related market data or our assumptions about pricing by market participants.

- **Derivative Instruments**—Derivative instruments are recorded on the balance sheet at fair value. If the right of offset exists and certain other criteria are met, derivative assets and liabilities with the same counterparty are netted on the balance sheet and the collateral payable or receivable is netted against derivative assets and derivative liabilities, respectively.

  Recognition and classification of the gain or loss that results from recording and adjusting a derivative to fair value depends on the purpose for issuing or holding the derivative. Gains and losses from derivatives not accounted for as hedges are recognized immediately in earnings. For derivative instruments that are designated and qualify as a fair value hedge, the gains or losses from adjusting the derivative to its fair value will be immediately recognized in earnings and, to the extent the hedge is effective, offset the concurrent recognition of changes in the fair value of the hedged item. Gains or losses from derivative instruments that are designated and qualify as a cash flow hedge or hedge of a net investment in a foreign entity are recognized in other comprehensive income and appear on the balance sheet in accumulated other comprehensive income until the hedged transaction is recognized in earnings; however, to the extent the change in the value of the derivative exceeds the change in the anticipated cash flows of the hedged transaction, the excess gains or losses will be recognized immediately in earnings.

- **Capitalized Interest**—Interest from external borrowings is capitalized on major projects with an expected construction period of one year or longer. Capitalized interest is added to the cost of the underlying asset's properties, plant and equipment and is amortized over the useful life of the assets.

  Although parent company interest expense on general corporate debt is not allocated to us in these combined financial statements, our properties, plants and equipment balance does include capitalized interest from such debt if our projects met the criteria for interest capitalization.

- **Intangible Assets Other Than Goodwill**—Intangible assets with finite useful lives are amortized by the straight-line method over their useful lives. Intangible assets with indefinite useful lives are not amortized but are tested at least annually for impairment. Each reporting period, we evaluate the remaining useful lives of intangible assets not being amortized to determine whether events and circumstances continue to support indefinite useful lives. These indefinite-lived intangibles are

F-10

PSXCPT00000054

**Table of Contents**

considered impaired if the fair value of the intangible asset is lower than net book value. The fair value of intangible assets is determined based on quoted market prices in active markets, if available. If quoted market prices are not available, fair value of intangible assets is determined based upon the present values of expected future cash flows using discount rates believed to be consistent with those used by principal market participants, or upon estimated replacement cost, if expected future cash flows from the intangible asset are not determinable.

■ **Goodwill**—Goodwill resulting from a business combination is not amortized but is tested at least annually for impairment. If the fair value of a reporting unit is less than the recorded book value of the reporting unit's assets (including goodwill), less liabilities, then a hypothetical purchase price allocation is performed on the reporting unit's assets and liabilities using the fair value of the reporting unit as the purchase price in the calculation. If the amount of goodwill resulting from this hypothetical purchase price allocation is less than the recorded amount of goodwill, the recorded goodwill is written down to the new amount. For purposes of goodwill impairment calculations, Worldwide Refining and Marketing is our only reporting unit.

■ **Depreciation and Amortization**—Depreciation and amortization of properties, plants and equipment are determined by either the individual-unit-straight-line method or the group-straight-line method (for those individual units that are highly integrated with other units).

■ **Impairment of Properties, Plants and Equipment**—Properties, plants and equipment used in operations are assessed for impairment whenever changes in facts and circumstances indicate a possible significant deterioration in the future cash flows expected to be generated by an asset group and annually in the fourth quarter following updates to corporate planning assumptions. If, upon review, the sum of the undiscounted pretax cash flows is less than the carrying value of the asset group, the carrying value is written down to estimated fair value through additional amortization or depreciation provisions and reported as impairments in the periods in which the determination of the impairment is made. Individual assets are grouped for impairment purposes at the lowest level for which identifiable cash flows are largely independent of the cash flows of other groups of assets—generally at an entire complex level. Because there usually is a lack of quoted market prices for long-lived assets, the fair value of impaired assets is typically determined based on the present values of expected future cash flows using discount rates believed to be consistent with those used by principal market participants or based on a multiple of operating cash flow validated with historical market transactions of similar assets where possible. Long-lived assets committed by management for disposal within one year are accounted for at the lower of amortized cost or fair value, less cost to sell, with fair value determined using a binding negotiated price, if available, or present value of expected future cash flows as previously described.

The expected future cash flows used for impairment reviews and related fair value calculations are based on estimated future volumes, prices, costs, margins, and capital project decisions, considering all available evidence at the date of review.

■ **Impairment of Investments in Nonconsolidated Entities**—Investments in nonconsolidated entities are assessed for impairment whenever changes in the facts and circumstances indicate a loss in value has occurred and annually following updates to corporate planning assumptions. When such a condition is judgmentally determined to be other than temporary, the carrying value of the investment is written down to fair value. The fair value of the impaired investment is based on quoted market prices, if available, or upon the present value of expected future cash flows using discount rates believed to be consistent with those used by principal market participants, plus market analysis of comparable assets owned by the investee, if appropriate.

F-11

PSXCPT00000055

Preliminary Information Statement of Phillips 66                    Page 172 of 207

Table of Contents

- **Maintenance and Repairs**—Costs of maintenance and repairs, which are not significant improvements, are expensed when incurred. Major refinery maintenance turnarounds are expensed as incurred.

- **Advertising Costs**—Production costs of media advertising are deferred until the first public showing of the advertisement. Advances to secure advertising slots at specific sporting or other events are deferred until the event occurs. All other advertising costs are expensed as incurred, unless the cost has benefits that clearly extend beyond the interim period in which the expenditure is made, in which case the advertising cost is deferred and amortized ratably over the interim periods that clearly benefit from the expenditure.

- **Property Dispositions**—When complete units of depreciable property are sold, the asset cost and related accumulated depreciation are eliminated, with any gain or loss reflected in the "Net gain on dispositions" line of our combined statement of income. When less than complete units of depreciable property are disposed of or retired, the difference between asset cost and salvage value is charged or credited to accumulated depreciation.

- **Asset Retirement Obligations and Environmental Costs**—Fair value of legal obligations to retire and remove long-lived assets are recorded in the period in which the obligation is incurred. When the liability is initially recorded, we capitalize this cost by increasing the carrying amount of the related properties, plants and equipment. Over time the liability is increased for the change in its present value, and the capitalized cost in properties, plants and equipment is depreciated over the useful life of the related asset. For additional information, see Note 10—Asset Retirement Obligations and Accrued Environmental Costs.

  Environmental expenditures are expensed or capitalized, depending upon their future economic benefit. Expenditures relating to an existing condition caused by past operations, and those having no future economic benefit, are expensed. Liabilities for environmental expenditures are recorded on an undiscounted basis (unless acquired in a purchase business combination) when environmental assessments or cleanups are probable and the costs can be reasonably estimated. Recoveries of environmental remediation costs from other parties, such as state reimbursement funds, are recorded as assets when their receipt is probable and estimimable.

- **Guarantees**—Fair value of a guarantee is determined and recorded as a liability at the time the guarantee is given. The initial liability is subsequently reduced as we are released from exposure under the guarantee. We amortize the guarantee liability over the relevant time period, if one exists, based on the facts and circumstances surrounding each type of guarantee. In cases where the guarantee term is indefinite, we reverse the liability when we have information indicating the liability is essentially relieved or amortize it over an appropriate time period as the fair value of our guarantee exposure declines over time. We amortize the guarantee liability to the related income statement line item based on the nature of the guarantee. When it becomes probable we will have to perform on a guarantee, we accrue a separate liability if it is reasonably estimimable, based on the facts and circumstances at that time. We reverse the fair value liability only when there is no further exposure under the guarantee.

- **Stock-Based Compensation**—We recognize stock-based compensation expense over the shorter of: (1) the service period (i.e., the time required to earn the award); or (2) the period beginning at the start of the service period and ending when an employee first becomes eligible for retirement, but not less than six months, which is the minimum time required for an award to not be subject to forfeiture. We have elected to recognize expense on a straight-line basis over the service period for the entire award, whether the award was granted with ratable or cliff vesting.

F-12

PSXCPT00000056

Table of Contents

■  **Pension and Postretirement Plans**—Certain of our U.S. and U.K. employees participate in defined benefit pension plans and postretirement health and life insurance plans (Shared Plans) sponsored by ConocoPhillips, which include participants of other ConocoPhillips subsidiaries. We account for such Shared Plans as multiemployer benefit plans. Accordingly, we do not record an asset or liability to recognize the funded status of the Shared Plans. We recognize a liability only for any required contributions to the Shared Plans that are accrued and unpaid at the balance sheet date. The related pension and postretirement expenses are allocated to Phillips 66 based primarily on pensionable compensation of active participants.

Plans in Austria, Germany, and Ireland that are sponsored by entities included in Phillips 66 (Direct Plans) are accounted for as defined benefit pension plans. Accordingly, the funded and unfunded position of each Direct Plan is recorded in our combined balance sheet. Actuarial gains and losses that have not yet been recognized through income are recorded in accumulated other comprehensive income within net investment, net of taxes, until they are amortized as a component of net periodic benefit cost. The determination of benefit obligations and the recognition of expenses related to Direct Plans are dependent on various assumptions. The major assumptions primarily relate to discount rates, long-term expected rates of return on plan assets, and future compensation increases. Management develops each assumption using relevant company experience in conjunction with market-related data for each individual country in which such plans exist. For additional information, see Note 16—Employee Benefit Plans.

■  **Income Taxes**—Our taxable income is included in the U.S. federal income tax returns and in a number of state income tax returns of ConocoPhillips. In the accompanying combined financial statements, our provision for income taxes is computed as if we were a stand-alone tax-paying entity.

Deferred income taxes are computed using the liability method and are provided on all temporary differences between the financial reporting basis and the tax basis of our assets and liabilities, except for deferred taxes on income considered to be permanently reinvested in certain foreign subsidiaries and foreign corporate joint ventures. Allowable tax credits are applied as reductions of the provision for income taxes. Interest related to unrecognized tax benefits is reflected in interest expense, and penalties in operating expenses.

■  **Taxes Collected from Customers and Remitted to Governmental Authorities**—Excise taxes are reported gross within sales and other operating revenues and taxes other than income taxes, while other sales and value-added taxes are recorded net in taxes other than income taxes.

Note 3—Changes in Accounting Principles

**Comprehensive Income**
Effective December 31, 2011, we early adopted Financial Accounting Standards Board (FASB) Accounting Standards Update (ASU) No. 2011-05, "Presentation of Comprehensive Income." This ASU amends FASB Accounting Standards Codification (ASC) Topic 220, "Comprehensive Income," by requiring a more prominent presentation of the components of other comprehensive income. We elected the two-statement approach, presenting other comprehensive income in a separate statement immediately following the income statement. On December 23, 2011, the FASB issued ASU 2011-12, "Deferral of the Effective Date for Amendments to the Presentation of Reclassifications of Items Out of Accumulated Other Comprehensive Income in ASU No. 2011-05." ASU 2011-12 defers the ASU 2011-05 requirement to present items reclassified into net income from other comprehensive income. This deferral only impacted the presentation requirement on the combined income statement.

F-13

PSXCPT00000057

Table of Contents

Note 4—Inventories

Inventories at December 31 consisted of the following:

|  | Millions of Dollars | |
|---|---|---|
|  | 2011 | 2010 |
| Crude oil and petroleum products | $ 3,193 | 3,839 |
| Materials and supplies | 273 | 274 |
|  | $ 3,466 | 4,113 |

Inventories valued on the LIFO basis totaled $3,046 million and $3,724 million at December 31, 2011 and 2010, respectively. The estimated excess of current replacement cost over LIFO cost of inventories amounted to approximately $8,600 million and $7,000 million at December 31, 2011 and 2010, respectively.

For our Refining and Marketing (R&M) segment, certain reductions in inventory caused liquidations of LIFO inventory values. These liquidations increased net income by approximately $155 million and $30 million in 2011 and 2010, respectively, and decreased net income by approximately $65 million in 2009.

Note 5—Assets Held for Sale or Sold

During 2009, we sold U.S. marketing assets with a net properties, plants and equipment carrying value of $505 million and recognized before-tax gains of $26 million. We had other dispositions in 2009 with a net carrying value of $569 million that resulted in before-tax gains of $52 million, primarily our interest in certain R&M pipelines. Also during 2009, we classified additional marketing assets as held for sale. Accordingly, at December 31, 2009, we classified $323 million of noncurrent assets as held for sale and most of this amount was included in "Prepaid expenses and other current assets" on our combined balance sheet. We also classified $75 million of noncurrent deferred tax liabilities as current, based on their held for sale status. We sold these held-for-sale assets and others during 2010, resulting in before-tax gains totaling $241 million.

In August 2011, we sold our refinery in Wilhelmshaven, Germany, which had been operating as a terminal since the fourth quarter of 2009. The refinery was included in our R&M segment and at the time of disposition had a net carrying value of $211 million, which included $243 million of properties, plants and equipment. A $234 million before-tax loss was recognized from this disposition.

In October 2011, we sold Seaway Products Pipeline Company to DCP Midstream. The total carrying value of the asset, which was included in our R&M segment, was $84 million, consisting of $55 million of net properties, plants and equipment and $29 million of allocated goodwill. The sale resulted in a before-tax gain of $312 million, 50 percent of which was recognized in current period earnings, while the remaining 50 percent will be deferred and amortized as part of the basis difference of our investment in the equity affiliate.

In December 2011, we sold our ownership interests in Colonial Pipeline Company and Seaway Crude Pipeline Company. The total carrying value of these assets, which were included in our R&M segment, was $348 million, including $104 million of investment in equity affiliates and $244 million of allocated goodwill. A $1,661 million before-tax gain was recognized from these dispositions.

Gains and losses from asset sales are included in the "Net gain on dispositions" line in the combined income statement.

PSXCPT00000058

Preliminary Information Statement of Phillips 66                          Page 175 of 207

Table of Contents

Note 6—Investments, Loans and Long-Term Receivables

Components of investments, loans and long-term receivables at December 31 were:

|  | Millions of Dollars | |
|---|---|---|
|  | 2011 | 2010 |
| Equity investments | $ 10,233 | 9,454 |
| Loans and advances—related parties | 1 | 401 |
| Long-term receivables | 68 | 451 |
| Other investments | 5 | 13 |
|  | $ 10,307 | 10,319 |

**Equity Investments**

Affiliated companies in which we had a significant equity investment at December 31, 2011, included:

- WRB Refining LP—50 percent owned business venture with Cenovus Energy Inc.—owns the Wood River and Borger refineries, which process crude oil into refined products.
- DCP Midstream—50 percent owned joint venture with Spectra Energy—owns and operates gas plants, gathering systems, storage facilities and fractionation plants.
- CPChem—50 percent owned joint venture with Chevron Corporation—manufactures and markets petrochemicals and plastics.
- Malaysian Refining Company Sdn. Bdh. (MRC)—47 percent owned business venture with Petronas, the Malaysian state oil company—owns the Melaka, Malaysia refinery which processes crude oil into refined products.
- Rockies Express Pipeline LLC (REX)—25 percent owned joint venture with Kinder Morgan Energy Partners and Sempra Energy Corp.—owns and operates a natural gas pipeline system from the Rocky Mountains, Colorado to eastern Ohio.

Summarized 100 percent financial information for equity method investments in affiliated companies, combined, was as follows:

|  | Millions of Dollars | | |
|---|---|---|---|
|  | 2011 | 2010 | 2009 |
| Revenues | $ 59,044 | 45,123 | 40,418 |
| Income before income taxes | 6,083 | 3,659 | 2,241 |
| Net income | 5,742 | 3,390 | 1,984 |
| Current assets | 8,752 | 8,515 | 8,154 |
| Noncurrent assets | 34,329 | 33,923 | 32,242 |
| Current liabilities | 6,837 | 6,978 | 8,230 |
| Noncurrent liabilities | 10,279 | 11,957 | 9,717 |

Our share of income taxes incurred directly by the equity companies is included in equity in earnings of affiliates, and as such is not included in the provision for income taxes in our combined financial statements.

At December 31, 2011, net parent company investment included $2,540 million related to the undistributed earnings of affiliated companies. Dividends received from affiliates were $2,209 million, $1,110 million and $570 million in 2011, 2010 and 2009, respectively.

F-15

PSXCPT00000059

Table of Contents

**WRB**

In 2007, we entered into a business venture with Cenovus to create a 50/50 U.S. downstream limited partnership, WRB Refining LP. We use the equity method of accounting for this entity.

WRB's operating assets consist of the Wood River and Borger refineries, located in Roxana, Illinois, and Borger, Texas, respectively. As a result of our contribution of these two assets to WRB, a basis difference was created because the fair value of the contributed assets recorded by WRB exceeded their historical book value. The difference is primarily amortized and recognized as a benefit evenly over a period of 26 years, which was the estimated remaining useful life of the refineries' property, plant and equipment at the closing date. At December 31, 2011, the book value of our investment in WRB was $3,722 million, and the basis difference was $3,918 million. Equity earnings in 2011, 2010 and 2009 were increased by $185 million, $243 million and $209 million, respectively, due to amortization of the basis difference. We are the operator and managing partner of WRB. Cenovus is obligated to contribute $7.5 billion, plus accrued interest, to WRB over a 10-year period that began in 2007.

**DCP Midstream**

DCP Midstream owns and operates gas plants, gathering systems, storage facilities and fractionation plants. At December 31, 2011, the book value of our equity method investment in DCP Midstream was $927 million. DCP Midstream markets a portion of its natural gas liquids to us and CPChem under a supply agreement that continues at the current volume commitment with a primary term ending December 31, 2014. This purchase commitment is on an "if-produced, will-purchase" basis and so has no fixed production schedule, but has had, and is expected over the remaining term of the contract to have, a relatively stable purchase pattern. Natural gas liquids are purchased under this agreement at various published market index prices, less transportation and fractionation fees. In 2009, a DCP Midstream subsidiary converted subordinated units into common units, and as a result, we recognized a $135 million before-tax deferred gain in equity earnings.

**CPChem**

CPChem manufactures and markets petrochemicals and plastics. At December 31, 2011, the book value of our equity method investment in CPChem was $2,998 million. We have multiple supply and purchase agreements in place with CPChem, ranging in initial terms from one to 99 years, with extension options. These agreements cover sales and purchases of refined products, solvents, and petrochemical and natural gas liquids feedstocks, as well as fuel oils and gases. Delivery quantities vary by product, and are generally on an "if-produced, will-purchase" basis. All products are purchased and sold under specified pricing formulas based on various published pricing indices.

In anticipation of the separation, we reached agreement with Chevron Corporation regarding CPChem that provides for CPChem to: (i) prior to the separation, suspend all cash distributions to its owners and accumulate its excess cash; and (ii) after the separation, use the accumulated cash and its excess cash flow to retire its $1 billion of outstanding fixed-rate bonds on an accelerated basis. During this period of bond repayment, CPChem is not required to make any cash distributions to its owners.

**MRC**

MRC's operating asset is a refinery in Melaka, Malaysia. The refinery operates in merchant mode in which each co-venturer sells crude oil to MRC and purchases the resulting refined product yield. At December 31, 2011, the book value of our equity method investment in MRC was $1,043 million.

F-16

PSXCPT00000060

Table of Contents

**REX**

REX owns a natural gas pipeline that runs from northwestern Colorado to eastern Ohio, which became fully operational in November 2009. Long-term, binding firm commitments have been secured for virtually all of the pipeline's capacity through 2019. At December 31, 2011, the book value of our equity method investment in REX was $789 million.

**Loans and Long-term Receivables**

We enter into agreements with other parties to pursue business opportunities. Included in such activity are loans and long-term receivables to certain affiliated and non-affiliated companies. Loans are recorded when cash is transferred or seller financing is provided to the affiliated or non-affiliated company pursuant to a loan agreement. The loan balance will increase as interest is earned on the outstanding loan balance and will decrease as interest and principal payments are received. Interest is earned at the loan agreement's stated interest rate. Loans and long-term receivables are assessed for impairment when events indicate the loan balance may not be fully recovered.

WRB Refining LP fully repaid its outstanding loans from us with payments of $550 million in 2011.

In November 2011, a long-term loan to a non-affiliated company related to seller financing of U.S. retail marketing assets sold in 2009 was refinanced, resulting in a receipt of $365 million. The principal portion of this receipt was included in the "Other" line in the investing section of the combined statement of cash flows. As part of the refinancing, we provided loan guarantees in support of $191 million of the total refinancing.

**Other**

Merey Sweeny, L.P. (MSLP) owns a delayed coker and related facilities at the Sweeny Refinery. MSLP processes long residue, which is produced from heavy sour crude oil, for a processing fee. Fuel-grade petroleum coke is produced as a by-product and becomes the property of MSLP. Prior to August 28, 2009, MSLP was owned 50/50 by us and Petróleos de Venezuela S.A. (PDVSA). Under the agreements that govern the relationships between the partners, certain defaults by PDVSA with respect to supply of crude oil to the Sweeny Refinery gave us the right to acquire PDVSA's 50 percent ownership interest in MSLP, which we exercised on August 28, 2009. PDVSA has initiated arbitration with the International Chamber of Commerce challenging the exercise of the call right and claiming it was invalid. The arbitral tribunal is scheduled to hold hearings on the merits of the dispute in December 2012. We continue to use the equity method of accounting for our investment in MSLP.

F-17

PSXCPT00000061

Preliminary Information Statement of Phillips 66                                      Page 178 of 207

Table of Contents

Note 7—Properties, Plants and Equipment

Properties, plants and equipment (PP&E) are recorded at cost. In the R&M segment, investments in refining manufacturing facilities are generally depreciated on a straight-line basis over a 25-year life, and pipeline assets over a 45-year life. The company's investment in PP&E, with the associated accumulated depreciation and amortization (Accum. D&A), at December 31 was:

| | | Millions of Dollars | | | | |
| | | 2011 | | | 2010 | |
| | Gross PP&E | Accum. D&A | Net PP&E | Gross PP&E | Accum. D&A | Net PP&E |
|---|---|---|---|---|---|---|
| **R&M** | | | | | | |
| Refining | $19,400 | 6,651 | 12,749 | 20,884 | 7,554 | 13,330 |
| Transportation | 2,359 | 931 | 1,428 | 2,412 | 890 | 1,522 |
| Marketing and other | 1,319 | 745 | 574 | 1,257 | 713 | 544 |
| Total R&M | 23,078 | 8,327 | 14,751 | 24,553 | 9,157 | 15,396 |
| Midstream | 64 | 51 | 13 | 61 | 49 | 12 |
| Chemicals | - | - | - | - | - | - |
| Corporate and other | 14 | 7 | 7 | 2 | 1 | 1 |
| | $23,156 | 8,385 | 14,771 | 24,616 | 9,207 | 15,409 |

Note 8—Goodwill and Intangibles

Goodwill

Changes in the carrying amount of goodwill, which is entirely within the R&M segment, were as follows:

| | Millions of Dollars | |
| | 2011 | 2010 |
|---|---|---|
| Balance at January 1 | $3,633 | 3,638 |
| Goodwill allocated to assets sold | (273) | - |
| Tax and other adjustments | (28) | (5) |
| Balance at December 31 | $3,332 | 3,633 |

Intangible Assets

Information at December 31 on the carrying value of intangible assets follows:

| | Millions of Dollars | |
| | Gross Carrying Amount | |
| | 2011 | 2010 |
|---|---|---|
| **Indefinite-Lived Intangible Assets** | | |
| Trade names and trademarks | $ 494 | 494 |
| Refinery air and operating permits | 207 | 244 |
| | $ 701 | 738 |

F-18

PSXCPT00000062

Preliminary Information Statement of Phillips 66                                    Page 179 of 207

Table of Contents

At year-end 2011, our amortized intangible asset balance was $31 million, compared with $39 million at year-end 2010. Amortization expense was not material for 2011 and 2010, and is not expected to be material in future years.

**Note 9—Impairments**

During 2011, 2010 and 2009, we recognized the following before-tax impairment charges:

|  | Millions of Dollars | | |
|---|---|---|---|
|  | 2011 | 2010 | 2009 |
| R&M | | | |
| United States | $470 | 83 | 63 |
| International | 2 | 1,616 | 3 |
|  | $472 | 1,699 | 66 |

*2011*
In 2011, we recorded a $467 million impairment of our refinery and associated pipelines and terminals in Trainer, Pennsylvania. In September 2011, we announced plans to seek a buyer for the refinery and have idled the facility. If unable to sell the refinery, we expect to permanently close the plant by the end of the first quarter of 2012.

*2010*
In U.S. R&M, we recorded property impairments of $83 million, which included canceled projects, a power generation facility and planned asset dispositions. In International R&M, we recorded a $1,514 million impairment of our refinery in Wilhelmshaven, Germany, due to canceled plans for a project to upgrade the refinery, and a $98 million impairment as a result of our decision to end our participation in a new refinery project in Yanbu Industrial City, Saudi Arabia.

*2009*
In 2009, we recorded property impairments of $66 million, which were primarily associated with planned asset dispositions.

**Fair Value Remeasurements**
There were no material fair value impairments for the year ended December 31, 2011. The following table shows the values of assets, by major category, measured at fair value on a nonrecurring basis in periods subsequent to their initial recognition:

|  | Millions of Dollars | | | |
|---|---|---|---|---|
|  |  | Fair Value Measurements Using | | |
|  | Fair Value* | Level 1 Inputs | Level 3 Inputs | Before-Tax Loss |
| Year ended December 31, 2010 | | | | |
| Net properties, plants and equipment (held for use) | $    274 | - | 274 | 1,508 |
| Net properties, plants and equipment (held for sale) | 23 | 5 | 18 | 43 |

*Represents the fair value at the time of the impairment.*

F-19

http://www.sec.gov/Archives/edgar/data/1534701/000119312512091773/d250454dex991....     3/14/2012

PSXCPT00000063

Preliminary Information Statement of Phillips 66                        Page 180 of 207

Table of Contents

*2010*

During 2010, net properties, plants and equipment held for use with a carrying amount of $1,782 million were written down to a fair value of $274 million, resulting in a before-tax loss of $1,508 million. The fair values were determined by the use of internal discounted cash flow models using estimates of prices, costs and a discount rate believed to be consistent with those used by principal market participants and cash flow multiples for similar assets and alternative use.

Also during 2010, net properties, plants and equipment held for sale with a carrying amount of $64 million were written down to their fair value of $23 million less cost to sell of $2 million for a net $21 million, resulting in a before-tax loss of $43 million. The fair values were primarily determined by binding negotiated selling prices with third parties, with some adjusted for the fair value of certain liabilities retained.

## Note 10—Asset Retirement Obligations and Accrued Environmental Costs

Asset retirement obligations and accrued environmental costs at December 31 were:

|  | Millions of Dollars | |
|---|---|---|
|  | 2011 | 2010 |
| Asset retirement obligations | $   378 | 332 |
| Accrued environmental costs | 542 | 554 |
| Total asset retirement obligations and accrued environmental costs | 920 | 886 |
| Asset retirement obligations and accrued environmental costs due within one year* | (133) | (84) |
| Long-term asset retirement obligations and accrued environmental costs | $   787 | 802 |

*Classified as a current liability on the balance sheet, under the caption "Other accruals."

**Asset Retirement Obligations**

We record the fair value of a liability for an asset retirement obligation when it is incurred (typically when the asset is installed). When the liability is initially recorded, we capitalize the associated asset retirement cost by increasing the carrying amount of the related properties, plants and equipment. Over time, the liability increases for the change in its present value, while the capitalized cost depreciates over the useful life of the related asset.

We have asset removal obligations that we are required to perform under law or contract once an asset is permanently taken out of service. Most of these obligations are not expected to be paid until several years in the future and will be funded from general company resources at the time of removal. Our largest individual obligations involve asbestos abatement at refineries.

During 2011 and 2010, our overall asset retirement obligation changed as follows:

|  | Millions of Dollars | |
|---|---|---|
|  | 2011 | 2010 |
| Balance at January 1 | $   332 | 325 |
| Accretion of discount | 15 | 15 |
| New obligations | 3 | - |
| Changes in estimates of existing obligations | 52 | 25 |
| Spending on existing obligations | (20) | (20) |
| Property dispositions | (2) | (7) |
| Foreign currency translation | (2) | (6) |
| Balance at December 31 | $   378 | 332 |

F-20

PSXCPT00000064

Table of Contents

**Accrued Environmental Costs**

We had accrued environmental costs of $276 million and $290 million at December 31, 2011 and 2010, respectively, primarily related to cleanup at domestic refineries and underground storage tanks at U.S. service stations; $206 million and $188 million, respectively, of environmental costs associated with nonoperator sites; and $60 million and $76 million, respectively, where the company has been named a potentially responsible party under the Federal Comprehensive Environmental Response, Compensation and Liability Act, or similar state laws. Accrued environmental liabilities are expected to be paid over periods extending up to 30 years. Because a large portion of the accrued environmental costs were acquired in various business combinations, they are discounted obligations. Expected expenditures for acquired environmental obligations are discounted using a weighted-average 5 percent discount factor, resulting in an accrued balance for acquired environmental liabilities of $276 million at December 31, 2011. The expected future undiscounted payments related to the portion of the accrued environmental costs that have been discounted are: $22 million in 2012, $25 million in 2013, $16 million in 2014, $10 million in 2015, $13 million in 2016, and $263 million for all future years after 2016.

**Note 11—Debt**

Long-term debt at December 31 was:

|  | Millions of Dollars | |
|---|---|---|
|  | 2011 | 2010 |
| 7.68% Notes due 2012 | $ 7 | 15 |
| Industrial Development Bonds due 2012 through 2038 at 0.08%–5.75% at year-end 2011 and 0.33%– 5.75% at year-end 2010 | 234 | 234 |
| Note payable to Merey Sweeny, L.P. due 2020 at 7% (related party) | 134 | 144 |
| Other | 1 | 1 |
| Debt at face value | 376 | 394 |
| Capitalized leases | 14 | 22 |
| Net unamortized premiums and discounts | 1 | 1 |
| Total debt | 391 | 417 |
| Short-term debt | (30) | (29) |
| Long-term debt | $ 361 | 388 |

Maturities of long-term borrowings, inclusive of net unamortized premiums and discounts, in 2012 through 2016 are: $30 million, $13 million, $14 million, $15 million and $16 million, respectively.

**Note 12—Guarantees**

At December 31, 2011, we were liable for certain contingent obligations under various contractual arrangements as described below. We recognize a liability, at inception, for the fair value of our obligation as a guarantor for newly issued or modified guarantees. Unless the carrying amount of the liability is noted below, we have not recognized a liability either because the guarantees were issued prior to December 31, 2002, or because the fair value of the obligation is immaterial. In addition, unless otherwise stated we are not currently performing with any significance under the guarantee and expect future performance to be either immaterial or have only a remote chance of occurrence.

F-21

PSXCPT00000065

Table of Contents

**Guarantees of Joint Venture Debt**

At December 31, 2011, we had guarantees outstanding for our portion of certain joint venture debt obligations, which have terms of up to 14 years. The maximum potential amount of future payments under the guarantees is approximately $50 million. Payment would be required if a joint venture defaults on its debt obligations.

**Other Guarantees**

We have other guarantees with maximum future potential payment amounts totaling $190 million, which consist primarily of guarantees to fund the short-term cash liquidity deficits of certain joint ventures and guarantees of the lease payment obligations of a joint venture. These guarantees generally extend up to 13 years or life of the venture.

**Indemnifications**

Over the years, we have entered into various agreements to sell ownership interests in certain corporations, joint ventures and assets that gave rise to qualifying indemnifications. Agreements associated with these sales include indemnifications for taxes, environmental liabilities, permits and licenses, employee claims, real estate indemnity against tenant defaults, and litigation. The terms of these indemnifications vary greatly. The majority of these indemnifications are related to environmental issues, the term is generally indefinite, and the maximum amount of future payments is generally unlimited. The carrying amount recorded for these indemnifications at December 31, 2011, was $278 million. We amortize the indemnification liability over the relevant time period, if one exists, based on the facts and circumstances surrounding each type of indemnity. In cases where the indemnification term is indefinite, we will reverse the liability when we have information the liability is essentially relieved or amortize the liability over an appropriate time period as the fair value of our indemnification exposure declines. Although it is reasonably possible future payments may exceed amounts recorded, due to the nature of the indemnifications, it is not possible to make a reasonable estimate of the maximum potential amount of future payments. Included in the recorded carrying amount were $157 million of environmental accruals for known contamination that are included in asset retirement obligations and accrued environmental costs at December 31, 2011. For additional information about environmental liabilities, see Note 13—Contingencies and Commitments.

**Note 13—Contingencies and Commitments**

A number of lawsuits involving a variety of claims have been made against us that arise in the ordinary course of business. We also may be required to remove or mitigate the effects on the environment of the placement, storage, disposal or release of certain chemical, mineral and petroleum substances at various active and inactive sites. We regularly assess the need for accounting recognition or disclosure of these contingencies. In the case of all known contingencies (other than those related to income taxes), we accrue a liability when the loss is probable and the amount is reasonably estimable. If a range of amounts can be reasonably estimated and no amount within the range is a better estimate than any other amount, then the minimum of the range is accrued. We do not reduce these liabilities for potential insurance or third-party recoveries. If applicable, we accrue receivables for probable insurance or other third-party recoveries. In the case of income-tax-related contingencies, we use a cumulative probability-weighted loss accrual in cases where sustaining a tax position is less than certain. See Note 17—Income Taxes, for additional information about income-tax-related contingencies.

Based on currently available information, we believe it is remote that future costs related to known contingent liability exposures will exceed current accruals by an amount that would have a material adverse impact on our combined financial statements. As we learn new facts concerning contingencies, we reassess

F-22

PSXCPT00000066

Preliminary Information Statement of Phillips 66                    Page 183 of 207

Table of Contents

our position both with respect to accrued liabilities and other potential exposures. Estimates particularly sensitive to future changes include contingent liabilities recorded for environmental remediation, tax and legal matters. Estimated future environmental remediation costs are subject to change due to such factors as the uncertain magnitude of cleanup costs, the unknown time and extent of such remedial actions that may be required, and the determination of our liability in proportion to that of other responsible parties. Estimated future costs related to tax and legal matters are subject to change as events evolve and as additional information becomes available during the administrative and litigation processes.

Environmental
We are subject to international, federal, state and local environmental laws and regulations. When we prepare our combined financial statements, we record accruals for environmental liabilities based on management's best estimates, using all information that is available at the time. We measure estimates and base liabilities on currently available facts, existing technology, and presently enacted laws and regulations, taking into account stakeholder and business considerations. When measuring environmental liabilities, we also consider our prior experience in remediation of contaminated sites, other companies' cleanup experience, and data released by the U.S. Environmental Protection Agency (EPA) or other organizations. We consider unasserted claims in our determination of environmental liabilities, and we accrue them in the period they are both probable and reasonably estimable.

Although liability of those potentially responsible for environmental remediation costs is generally joint and several for federal sites and frequently so for state sites, we are usually only one of many companies cited at a particular site. Due to the joint and several liabilities, we could be responsible for all cleanup costs related to any site at which we have been designated as a potentially responsible party. We have been successful to date in sharing cleanup costs with other financially sound companies. Many of the sites at which we are potentially responsible are still under investigation by the EPA or the state agencies concerned. Prior to actual cleanup, those potentially responsible normally assess the site conditions, apportion responsibility and determine the appropriate remediation. In some instances, we may have no liability or may attain a settlement of liability. Where it appears that other potentially responsible parties may be financially unable to bear their proportional share, we consider this inability in estimating our potential liability, and we adjust our accruals accordingly. As a result of various acquisitions in the past, we assumed certain environmental obligations. Some of these environmental obligations are mitigated by indemnifications made by others for our benefit and some of the indemnifications are subject to dollar limits and time limits.

We are currently participating in environmental assessments and cleanups at numerous federal Superfund and comparable state sites. After an assessment of environmental exposures for cleanup and other costs, we make accruals on an undiscounted basis (except those acquired in a purchase business combination, which we record on a discounted basis) for planned investigation and remediation activities for sites where it is probable future costs will be incurred and these costs can be reasonably estimated. We have not reduced these accruals for possible insurance recoveries. In the future, we may be involved in additional environmental assessments, cleanups and proceedings. See Note 10— Asset Retirement Obligations and Accrued Environmental Costs, for a summary of our accrued environmental liabilities.

Legal Proceedings
Our legal organization applies its knowledge, experience and professional judgment to the specific characteristics of our cases, employing a litigation management process to manage and monitor the legal proceedings against us. Our process facilitates the early evaluation and quantification of potential exposures in individual cases. This process also enables us to track those cases that have been scheduled for trial and/or mediation. Based on professional judgment and experience in using these litigation management tools

F-23

PSXCPT00000067

Preliminary Information Statement of Phillips 66                              Page 184 of 207

Table of Contents

and available information about current developments in all our cases, our legal organization regularly assesses the adequacy of current accruals and determines if adjustment of existing accruals, or establishment of new accruals, are required.

**Other Contingencies**

We have contingent liabilities resulting from throughput agreements with pipeline and processing companies not associated with financing arrangements. Under these agreements, we may be required to provide any such company with additional funds through advances and penalties for fees related to throughput capacity not utilized. In addition, at December 31, 2011, we had performance obligations secured by letters of credit of $1,233 million (of which $40 million was issued under the provisions of our parent company's revolving credit facility, and the remainder was issued as direct bank letters of credit) related to various purchase commitments for materials, supplies, services and items of permanent investment incident to the ordinary conduct of business.

**Long-Term Throughput Agreements and Take-or-Pay Agreements**

We have certain throughput agreements and take-or-pay agreements in support of financing arrangements. The agreements typically provide for crude oil transportation to be used in the ordinary course of the company's business. The aggregate amounts of estimated payments under these various agreements are: 2012—$337 million; 2013—$336 million; 2014—$336 million; 2015—$336 million; 2016—$336 million; and 2017 and after—$4,699 million. Total payments under the agreements were $300 million in 2011, $96 million in 2010 and $2 million in 2009.

Note 14—Financial Instruments and Derivative Contracts

**Derivative Instruments**

We use financial and commodity-based derivative contracts to manage exposures to fluctuations in foreign currency exchange rates and commodity prices, or to capture market opportunities. Since we are not currently using cash-flow hedge accounting, all gains and losses, realized or unrealized, from derivative contracts have been recognized in the combined statement of income. Gains and losses from derivative contracts held for trading not directly related to our physical business, whether realized or unrealized, have been reported net in "Other income" in our combined statement of income.

Purchase and sales contracts with fixed minimum notional volumes for commodities that are readily convertible to cash (e.g., crude oil and gasoline) are recorded on the balance sheet as derivatives unless the contracts are eligible for and we elect the normal purchases and normal sales exception (i.e., contracts to purchase or sell quantities we expect to use or sell over a reasonable period in the normal course of business). We generally apply this normal purchases and normal sales exception to eligible crude oil, refined product, natural gas and power commodity purchase and sales contracts; however, we may elect not to apply this exception (e.g., when another derivative instrument will be used to mitigate the risk of the purchase or sales contract but hedge accounting will not be applied, in which case both the purchase or sales contract and the derivative contract mitigating the resulting risk will be recorded on the balance sheet at fair value).

We value our exchange-traded derivatives using closing prices provided by the exchange as of the balance sheet date, and these are classified as Level 1 in the fair value hierarchy. Where exchange-provided prices are adjusted, non-exchange quotes are used or when the instrument lacks sufficient liquidity, we generally classify those exchange-cleared contracts as Level 2. Over-the-counter (OTC) financial swaps and physical commodity forward purchase and sales contracts are generally valued using quotations provided by brokers

F-24

PSXCPT00000068

Table of Contents

and price index developers such as Platts and Oil Price Information Service. These quotes are corroborated with market data and are classified as Level 2. In certain less liquid markets or for longer-term contracts, forward prices are not as readily available. In these circumstances, OTC swaps and physical commodity purchase and sales contracts are valued using internally developed methodologies that consider historical relationships among various commodities that result in management's best estimate of fair value. These contracts are classified as Level 3. A contract that is initially classified as Level 3 due to absence or insufficient corroboration of broker quotes over a material portion of the contract will transfer to Level 2 when the portion of the trade having no quotes or insufficient corroboration becomes an insignificant portion of the contract. A contract would also transfer to Level 2 if we began using a corroborated broker quote that has become available. Conversely, if a corroborated broker quote ceases to be available or used by us, the contract would transfer from Level 2 to Level 3. There were no material transfers in or out of Level 1.

Financial OTC and physical commodity options are valued using industry-standard models that consider various assumptions, including quoted forward prices for commodities, time value, volatility factors, and contractual prices for the underlying instruments, as well as other relevant economic measures. The degree to which these inputs are observable in the forward markets determines whether the options are classified as Level 2 or 3.

We use a mid-market pricing convention (the mid-point between bid and ask prices). When appropriate, valuations are adjusted to reflect credit considerations, generally based on available market evidence.

The fair value hierarchy for our derivative assets and liabilities accounted for at fair value on a recurring basis was:

| | | | | | Millions of Dollars | | | |
| | December 31, 2011 | | | | December 31, 2010 | | | |
| | Level 1 | Level 2 | Level 3 | Total | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|---|---|---|---|
| Assets | | | | | | | | |
| Commodity derivatives | $ 389 | 270 | 6 | 665 | 685 | 520 | 7 | 1,212 |
| Liabilities | | | | | | | | |
| Commodity derivatives | 428 | 267 | 4 | 699 | 779 | 567 | 10 | 1,356 |
| Net assets (liabilities) | $ (39) | 3 | 2 | (34) | (94) | (47) | (3) | (144) |

The derivative values above are based on analysis of each contract as the fundamental unit of account; therefore, derivative assets and liabilities with the same counterparty are not reflected net where the legal right of setoff exists. Gains or losses from contracts in one level may be offset by gains or losses on contracts in another level or by changes in values of physical contracts or positions that are not reflected in the table above.

As reflected in the table above, Level 3 activity was not material.

**Commodity Derivative Contracts**—We operate in the worldwide crude oil, refined product, natural gas, natural gas liquids and electric power markets and are exposed to fluctuations in the prices for these commodities. These fluctuations can affect our revenues, as well as the cost of operating, investing and financing activities. Generally, our policy is to remain exposed to the market prices of commodities; however, we use futures, forwards, swaps and options in various markets to balance physical systems, meet customer needs, manage price exposures on specific transactions, and do a limited, immaterial amount of

F-25

PSXCPT00000069

Preliminary Information Statement of Phillips 66                    Page 186 of 207

Table of Contents

trading not directly related to our physical business. We also use the market knowledge gained from these activities to capture market opportunities such as moving physical commodities to more profitable locations, storing commodities to capture seasonal or time premiums, and blending commodities to capture quality upgrades. Derivatives may be used to optimize these activities which may move our risk profile away from market average prices.

The fair value of commodity derivative assets and liabilities and the line items where they appear on our combined balance sheet were:

|  | Millions of Dollars | |
| --- | --- | --- |
|  | 2011 | 2010 |
| **Assets** | | |
| Prepaid expenses and other current assets | $ 665 | 1,225 |
| Other assets | 5 | - |
| **Liabilities** | | |
| Other accruals | 703 | 1,369 |
| Other liabilities and deferred credits | 1 | - |

*Hedge accounting has not been used for any item in the table. The amounts shown are presented gross (i.e., without netting assets and liabilities with the same counterparty where the right of setoff exists).*

The gains (losses) from commodity derivatives incurred, and the line items where they appear on our combined statement of income were:

|  | Millions of Dollars | |
| --- | --- | --- |
|  | 2011 | 2010 |
| Sales and other operating revenues | $ (620) | (257) |
| Other income | 12 | (33) |
| Purchased crude oil and products | 162 | 151 |

*Hedge accounting has not been used for any item in the table.*

The table below summarizes our material net exposures resulting from outstanding commodity derivative contracts. These financial and physical derivative contracts are primarily used to manage price exposure on our underlying operations. The underlying exposures may be from non-derivative positions such as inventory volumes. Financial derivative contracts may also offset physical derivative contracts, such as forward sales contracts.

|  | Open Position Long / (Short) | |
| --- | --- | --- |
|  | 2011 | 2010 |
| **Commodity** | | |
| Crude oil, refined products and natural gas liquids (millions of barrels) | (13) | (16) |

**Credit Risk**
Financial instruments potentially exposed to concentrations of credit risk consist primarily of OTC derivative contracts and trade receivables.

F-26

PSXCPT00000070

Table of Contents

The credit risk from our OTC derivative contracts, such as forwards and swaps, derives from the counterparty to the transaction. Individual counterparty exposure is managed within predetermined credit limits and includes the use of cash-call margins when appropriate, thereby reducing the risk of significant nonperformance. We also use futures, swaps and option contracts that have a negligible credit risk because these trades are cleared with an exchange clearinghouse and subject to mandatory margin requirements until settled; however, we are exposed to the credit risk of those exchange brokers for the receivables arising from daily margin cash calls, as well as for cash deposited to meet initial margin requirements.

Our trade receivables result primarily from the sale of products from, or related to, our refinery operations and reflect a broad national and international customer base, which limits our exposure to concentrations of credit risk. The majority of these receivables have payment terms of 30 days or less. We continually monitor this exposure and the creditworthiness of the counterparties and recognize bad debt expense based on historical write-off experience or specific counterparty collectability. Generally, we do not require collateral to limit the exposure to loss; however, we will sometimes use letters of credit, prepayments, and master netting arrangements to mitigate credit risk with counterparties that both buy from and sell to us, as these agreements permit the amounts owed by us or owed to others to be offset against amounts due us.

Certain of our derivative instruments contain provisions that require us to post collateral if the derivative exposure exceeds a threshold amount. We have contracts with fixed threshold amounts and other contracts with variable threshold amounts that are contingent on our credit rating. The variable threshold amounts typically decline for lower credit ratings, while both the variable and fixed threshold amounts typically revert to zero if we fall below investment grade. Cash is the primary collateral in all contracts; however, many contracts also permit us to post letters of credit as collateral.

The aggregate fair value of all derivative instruments with such credit-risk-related contingent features that were in a liability position was not material at December 31, 2011.

**Fair Values of Financial Instruments**
We used the following methods and assumptions to estimate the fair value of financial instruments:

- Accounts and notes receivable: The carrying amount reported on the balance sheet approximates fair value.
- Debt: The carrying amount of our floating-rate debt approximates fair value. The fair value of the fixed-rate debt is estimated based on quoted market prices.
- Commodity swaps: Fair value is estimated based on forward market prices and approximates the exit price at period end. When forward market prices are not available, fair value is estimated using the forward prices of a similar commodity with adjustments for differences in quality or location.
- Futures: Fair values are based on quoted market prices obtained from the New York Mercantile Exchange, the IntercontinentalExchange Futures, or other traded exchanges.
- Forward-exchange contracts: Fair values are estimated by comparing the contract rate to the forward rates in effect at the end of the respective reporting periods, and approximate the exit price at those dates.

F-27

PSXCPT00000071

Preliminary Information Statement of Phillips 66                                    Page 188 of 207

Table of Contents

Our commodity derivative and financial instruments were:

| | Millions of Dollars | | | |
| | Carrying Amount | | Fair Value | |
| | 2011 | 2010 | 2011 | 2010 |
|---|---|---|---|---|
| Financial assets | | | | |
| Commodity derivatives | $    73 | 81 | 73 | 81 |
| Financial liabilities | | | | |
| Commodity derivatives | 52 | 73 | 52 | 73 |
| Total debt, excluding capital leases | 377 | 395 | 406 | 428 |

The amounts shown for derivatives in the preceding table are presented net (i.e., assets and liabilities with the same counterparty are netted where the right of setoff exists). In addition, the 2011 commodity derivative assets and liabilities appear net of $55 million of rights to reclaim cash collateral. The 2010 commodity derivative assets and liabilities appear net of $152 million of rights to reclaim cash collateral.

Note 15—Leases

The company leases ocean transport vessels, tugboats, barges, pipelines, railcars, service station land sites, computers, office buildings and other facilities and equipment. Certain leases include escalation clauses for adjusting rental payments to reflect changes in price indices, as well as renewal options and/or options to purchase the leased property for the fair market value at the end of the lease term. There are no significant restrictions imposed on us by the leasing agreements with regard to dividends, asset dispositions or borrowing ability. Leased assets under capital leases were not significant in any period presented.

At December 31, 2011, future minimum rental payments due under noncancelable leases were:

| | Millions of Dollars |
|---|---|
| 2012 | $      426 |
| 2013 | 318 |
| 2014 | 240 |
| 2015 | 206 |
| 2016 | 121 |
| Remaining years | 435 |
| Total | 1,746 |
| Less income from subleases | 105* |
| Net minimum operating lease payments | $   1,641 |

*Includes $64 million related to subleases to related parties.

F-28

PSXCPT00000072

Preliminary Information Statement of Phillips 66                                        Page 189 of 207

Table of Contents

Operating lease rental expense for the years ended December 31 was:

|  | Millions of Dollars | | |
|  | 2011 | 2010 | 2009 |
|---|---|---|---|
| Total rentals* | $ 581 | 658 | 762 |
| Less sublease rentals | 19 | 20 | 15 |
|  | $ 562 | 638 | 747 |

*Includes $5 million of contingent rentals in 2011, and $6 million in 2010 and 2009. Contingent rentals primarily are related to retail marketing assets and are based on volume of product sold.

Note 16—Employee Benefit Plans

Pension Plans
As described in Note 2—Accounting Policies, we have plans in Austria, Germany and Ireland sponsored by entities included in Phillips 66, which are accounted for as defined benefit pension plans. An analysis of the projected benefit obligations for these pension plans follows:

|  | Millions of Dollars | |
|  | 2011 | 2010 |
|---|---|---|
| Change in Benefit Obligation |  |  |
| Benefit obligation at January 1 | $ 230 | 218 |
| Service cost | 5 | 5 |
| Interest cost | 13 | 12 |
| Plan participant contributions | 1 | 1 |
| Actuarial loss | - | 11 |
| Benefits paid | (10) | (9) |
| Foreign currency exchange rate change | (2) | (8) |
| Benefit obligation at December 31* | $ 237 | 230 |
|  |  |  |
| *Accumulated benefit obligation portion of above at December 31: | $ 206 | 200 |
|  |  |  |
| Change in Fair Value of Plan Assets |  |  |
| Fair value of plan assets at January 1 | $ 119 | 109 |
| Actual return on plan assets | (3) | 9 |
| Company contributions | 12 | 11 |
| Plan participant contributions | 1 | 1 |
| Benefits paid | (10) | (9) |
| Foreign currency exchange rate change | 1 | (2) |
| Fair value of plan assets at December 31 | $ 120 | 119 |
|  |  |  |
| Funded Status | $ (117) | (111) |

F-29

PSXCPT00000073

Preliminary Information Statement of Phillips 66

Table of Contents

| | | Millions of Dollars | |
| | | 2011 | 2010 |
|---|---|---|---|
| Amounts Recognized in the Combined Balance Sheet at December 31 | | | |
| Noncurrent liabilities | $ | (117) | (111) |

| | | | |
|---|---|---|---|
| **Weighted-Average Assumptions Used to Determine Benefit Obligations at December 31** | | | |
| Discount rate | | 5.30% | 5.40 |
| Rate of compensation increase | | 2.60 | 2.60 |

| | | | |
|---|---|---|---|
| **Weighted-Average Assumptions Used to Determine Net Periodic Benefit Cost for Years ended December 31** | | | |
| Discount rate | | 5.40% | 5.60 |
| Expected return on plan assets | | 5.80 | 5.60 |
| Rate of compensation increase | | 2.60 | 2.70 |

The overall expected long-term rate of return is developed from the expected future return of each asset class, weighted by the expected allocation of pension assets to that asset class. We rely on a variety of independent market forecasts in developing the expected rate of return for each class of assets.

Included in accumulated other comprehensive income at December 31 were the following before-tax amounts that had not been recognized in net periodic benefit cost:

| | | Millions of Dollars | |
| | | 2011 | 2010 |
|---|---|---|---|
| Unrecognized net actuarial loss | $ | 36 | 31 |

Accumulated other comprehensive income at December 31, 2011, includes $4 million that is expected to be amortized into net periodic benefit cost during 2012.

For our tax-qualified pension plans with projected benefit obligations in excess of plan assets, the projected benefit obligation, the accumulated benefit obligation, and the fair value of plan assets were $237 million, $206 million, and $120 million, respectively, at December 31, 2011, and $230 million, $200 million, and $119 million, respectively, at December 31, 2010.

The components of net periodic benefit cost of all defined benefit plans are presented in the following table:

| | | Millions of Dollars | |
| | | 2011 | 2010 | 2009 |
|---|---|---|---|---|
| **Components of Net Periodic Benefit Cost** | | | | |
| Service cost | $ | 5 | 5 | 5 |
| Interest cost | | 13 | 12 | 12 |
| Expected return on plan assets | | (8) | (6) | (6) |
| Recognized net actuarial loss | | 3 | 2 | 3 |
| Net periodic benefit cost | $ | 13 | 13 | 14 |

For net actuarial gains and losses, we amortize 10 percent of the unamortized balance each year.

F-30

PSXCPT00000074

Table of Contents

Plan Assets—The investment strategy for managing pension plan assets is to seek a reasonable rate of return relative to an appropriate level of risk and provide adequate liquidity for benefit payments and portfolio management. We follow a policy of diversifying plan assets across asset classes, investment managers, and individual holdings. A portion of plan assets are concentrated in contracts or securities from a few key issuers: approximately 13 percent are invested with a single insurance company, approximately 11 percent are invested in Italian government bonds, and approximately 11 percent are invested in French government bonds. Asset classes that are considered appropriate include equities, fixed income, cash, real estate and insurance contracts. Plan fiduciaries may consider and add other asset classes to the investment program from time to time. The target allocations for plan assets are approximately 46 percent equity securities, 35 percent debt securities and 19 percent in all other types of investments.

The following is a description of the valuation methodologies used for the pension plan assets. There have been no changes in the methodologies used at December 31, 2011 and 2010.

- Fair values of investments in common/collective trusts are determined by the issuer of each fund based on the fair value of the underlying assets.
- Fair values of mutual funds are valued based on quoted market prices, which represent the net asset value of shares held.
- Cash is valued at cost, which approximates fair value.
- Fair values of insurance contracts are valued at the present value of the future benefit payments owed by the insurance company to the Plans' participants.
- Fair values of real estate investments are valued using real estate valuation techniques and other methods that include reference to third-party sources and sales comparables where available.

The fair values of our pension plan assets at December 31, by asset class were as follows:

| | | Millions of Dollars | | |
|---|---|---|---|---|
| | Level 1 | Level 2 | Level 3 | Total |
| **2011** | | | | |
| Equity Securities | | | | |
| Common/collective trusts | $ - | 56 | - | 56 |
| Debt Securities | | | | |
| Common/collective trusts | - | 42 | - | 42 |
| Cash | 2 | - | - | 2 |
| Insurance contracts | - | - | 15 | 15 |
| Real estate | - | - | 5 | 5 |
| Total | $ 2 | 98 | 20 | 120 |
| | | | | |
| **2010** | | | | |
| Equity Securities | | | | |
| Common/collective trusts | $ - | 61 | - | 61 |
| Debt Securities | | | | |
| Common/collective trusts | - | 39 | - | 39 |
| Insurance contracts | - | - | 16 | 16 |
| Real estate | - | - | 3 | 3 |
| Total | $ - | 100 | 19 | 119 |

As reflected in the table above, Level 3 activity was not material.

F-31

PSXCPT00000075

**Table of Contents**

Contributions to international plans are dependent upon local laws and tax regulations. In 2012, we expect to contribute approximately $13 million to our international qualified pension plans.

The following benefit payments, which reflect expected future service, as appropriate, are expected to be paid:

|  | Millions of Dollars |
|---|---|
| 2012 | $ 9 |
| 2013 | 10 |
| 2014 | 10 |
| 2015 | 11 |
| 2016 | 11 |
| 2017-2020 | 64 |

**Shared Pension and Postretirement Plans**

Certain U.S. and U.K. employees participate in defined benefit pension plans and certain U.S. employees participate in postretirement health and life insurance plans sponsored by ConocoPhillips, which include participants of other ConocoPhillips subsidiaries. We recorded expense of $199 million, $234 million, and $259 million for 2011, 2010, and 2009, respectively, for our allocation of U.S. pension costs. We recorded expense of $39 million, $47 million, and $37 million for 2011, 2010, and 2009, respectively, for our allocation of U.K. pension costs. We recorded expense of $19 million, $26 million, and $23 million for 2011, 2010, and 2009, respectively, for our allocation of U.S. postretirement costs. As of December 31, 2011 and 2010, there were no required contributions outstanding.

At December 31, 2011 and 2010, the shared defined benefit pension plans were approximately 70 percent and 72 percent funded, respectively. Contributions to the plans are made by ConocoPhillips and are at least sufficient to meet the minimum funding requirements of applicable laws and regulations but no more than the amount deductible for federal income tax purposes. The assets of the plans are held by major financial institutions and are well diversified and include investments in domestic equities, international equities, fixed income, private equity, real estate, and cash.

**Defined Contribution Plans**

Most U.S. employees are eligible to participate in the ConocoPhillips Savings Plan (CPSP). Employees can deposit up to 75 percent of their eligible pay up to the statutory limit ($16,500 in 2011) in the thrift feature of the CPSP to a choice of approximately 39 investment funds. ConocoPhillips matches contribution deposits, up to 1.25 percent of eligible pay. Contributions charged to expense for the CPSP and predecessor plans for Phillips 66 employees, excluding the stock savings feature (discussed below), were $13 million in 2011, 2010 and 2009.

The stock savings feature of the CPSP is a leveraged employee stock ownership plan. Employees may elect to participate in the stock savings feature by contributing 1 percent of eligible pay and receiving an allocation of ConocoPhillips shares of common stock proportionate to the amount of contribution. Total CPSP expense related to the participation of Phillips 66 employees in this stock savings feature was $38 million, $45 million and $44 million in 2011, 2010 and 2009, respectively, all of which was compensation expense.

F-32

PSXCPT00000076

Table of Contents

### Share-Based Compensation Plans

Until the completion of the separation of Phillips 66 from ConocoPhillips, Phillips 66 employees will continue to participate in the ConocoPhillips share-based compensation plans. Total share-based compensation expense directly allocated to Phillips 66 and the associated tax benefits for the years ended December 31, were as follows:

|  | Millions of Dollars | | |
|---|---|---|---|
|  | 2011 | 2010 | 2009 |
| Compensation cost | $  46 | 44 | 39 |
| Tax benefit | 18 | 17 | 15 |

ConocoPhillips share-based compensation programs generally provide accelerated vesting (i.e., a waiver of the remaining period of service required to earn an award) for awards held by employees at the time of their retirement. For share-based awards granted prior to ConocoPhillips' adoption of Statement of Financial Accounting Standards No. 123(R), codified into FASB ASC Topic 718, "Compensation—Stock Compensation," ConocoPhillips recognized expense over the time that an employee earned the award, even if the award could not be forfeited due to retirement eligibility. Expense recognition would only be accelerated if the employee actually retired. Share-based compensation expense for awards granted after ConocoPhillips adopted ASC 718 on January 1, 2006, is recognized over the shorter of: (1) the service period (i.e., the stated period of time required to earn the award); or (2) the period beginning at the start of the service period and ending when an employee first becomes eligible for retirement, but not less than six months, which is the minimum time required for an award to not be subject to forfeiture.

Some of ConocoPhillips' share-based awards vest ratably (i.e., portions of the award vest at different times) while some of the awards cliff vest (i.e., all of the award vests at the same time). For awards that vest ratably granted prior to ConocoPhillips' adoption of ASC 718, expense is recognized on a straight-line basis over the service period for each portion of the award vesting separately (i.e., as if the one award was actually multiple awards with different requisite service periods). For share-based awards granted after adoption of ASC 718, ConocoPhillips recognizes expense on a straight-line basis over the service period for the entire award, whether the award was granted with ratable or cliff vesting.

Basis of Presentation—The following sections on ConocoPhillips stock options, Stock Unit Program, and Performance Share Program disclose the activity of these awards granted to direct active employees of Phillips 66. Awards to indirect employees of Phillips 66 (e.g., awards to ConocoPhillips corporate staffs that provide services to Phillips 66) are excluded from the following disclosures, as the expense of those awards was either: (1) included in expense allocated to Phillips 66 for certain corporate functions historically performed by ConocoPhillips, through a multi-tiered allocation process in which the individual cost components may or may not be discretely identifiable; or (2) retained at corporate historically but have been allocated to Phillips 66 for the sole purpose of presenting these financial statements (for more information, see Note 1—Separation and Basis of Presentation).

The tables that appear in the following sections display the net change of awards held by employees transferring in and out of Phillips 66 during the year in the line "Transfers in/(out)." This line also includes reductions for awards held by Phillips 66 employees who retired or left the company during the year and ceased being direct active employees.

Stock Options—Stock options granted under the provisions of the 2009 Omnibus Stock and Performance Incentive Plan of ConocoPhillips (the Plan) and earlier plans permit purchases of ConocoPhillips common stock at exercise prices equivalent to the average market price of the stock on the date the options were granted. The options have terms of 10 years and generally vest ratably, with one-third of an option award

F-33

PSXCPT00000077

Table of Contents

vesting and becoming exercisable on each anniversary date following its date of grant. Options awarded to employees already eligible for retirement vest within six months of the grant date, but those options do not become exercisable until the end of the normal vesting period.

The following table summarizes the activity of ConocoPhillips stock options granted to direct active employees of Phillips 66 for the three years ended December 31, 2011:

| | Options | Weighted-Average Exercise Price | Weighted-Average Grant-Date Fair Value | Millions of Dollars Aggregate Intrinsic Value |
|---|---|---|---|---|
| Outstanding at December 31, 2008 | 4,652,169 | $ 34.11 | | |
| Granted | 644,200 | 45.47 | $ 11.18 | |
| Exercised | (220,792) | 22.04 | | $ 6 |
| Forfeited | - | - | | |
| Expired or canceled | - | - | | |
| Transfers in/(out) | (418,942) | 26.41 | | |
| Outstanding at December 31, 2009 | 4,656,635 | $ 36.95 | | |
| Granted | 491,200 | 48.39 | $ 11.70 | |
| Exercised | (676,930) | 27.16 | | $ 20 |
| Forfeited | - | - | | |
| Expired or canceled | - | - | | |
| Transfers in/(out) | (765,257) | 41.87 | | |
| Outstanding at December 31, 2010 | 3,705,648 | $ 39.23 | | |
| Granted | 359,500 | 70.13 | $ 16.70 | |
| Exercised | (756,200) | 30.55 | | $ 32 |
| Forfeited | - | - | | |
| Expired or canceled | (2,282) | 27.85 | | |
| Transfers in/(out) | (434,824) | 41.46 | | |
| Outstanding at December 31, 2011 | 2,871,842 | $ 45.07 | | |
| Vested at December 31, 2011 | 2,385,467 | $ 42.56 | | $ 74 |
| Exercisable at December 31, 2011 | 2,083,828 | $ 40.27 | | $ 69 |

The weighted-average remaining contractual term of vested options and exercisable options at December 31, 2011, was 3.97 years and 3.31 years, respectively.

During 2011, ConocoPhillips received $22 million in cash and realized a tax benefit of $8 million from the exercise of options held by direct active employees of Phillips 66. At December 31, 2011, the remaining unrecognized compensation expense from unvested options was $3 million, which will be recognized over a weighted-average period of 19 months, the longest period being 25 months.

F-34

PSXCPT00000078

Preliminary Information Statement of Phillips 66                           Page 195 of 207

Table of Contents

The significant assumptions used to calculate the fair market values of ConocoPhillips options granted over the past three years, as calculated using the Black-Scholes-Merton option-pricing model, were as follows:

| | 2011 | 2010 | 2009 |
|---|---|---|---|
| Assumptions used | | | |
| Risk-free interest rate | 3.10% | 3.23 | 2.90 |
| Dividend yield | 4.00% | 4.00 | 3.50 |
| Volatility factor | 33.40% | 33.80 | 32.90 |
| Expected life (years) | 6.87 | 6.65 | 6.53 |

The ranges in the assumptions used were as follows:

| | 2011 | | 2010 | | 2009 | |
|---|---|---|---|---|---|---|
| | High | Low | High | Low | High | Low |
| Ranges used | | | | | | |
| Risk-free interest rate | 3.10% | 3.10 | 3.23 | 3.23 | 2.90 | 2.90 |
| Dividend yield | 4.00 | 4.00 | 4.00 | 4.00 | 3.50 | 3.50 |
| Volatility factor | 33.40 | 33.40 | 33.80 | 33.80 | 32.90 | 32.90 |

Volatility was calculated using the most recent ConocoPhillips end-of-week closing stock prices spanning a period equal to the expected life of the options granted. The average of the time lapsed between grant dates and exercise dates of past grants is periodically calculated to estimate the expected life of new option grants.

Upon completion of the separation, the disposition of ConocoPhillips outstanding stock options held by Phillips 66 employees on the distribution date depends on whether the options are exercisable. Each holder of exercisable ConocoPhillips stock options will retain the options and also receive exercisable options of Phillips 66 entitling the holder to purchase the same number of shares of Phillips 66 common stock the holder would have been entitled to receive if he or she had exercised the ConocoPhillips stock options immediately prior to the distribution record date. The exercise prices of both the existing ConocoPhillips options and the new options in Phillips 66 will be adjusted using a formula designed generally to preserve the intrinsic value of the original ConocoPhillips stock options prior to the separation.

Unexercisable ConocoPhillips stock options held by Phillips 66 employees at the separation will be replaced by unexercisable stock options to purchase shares of Phillips 66, with the same terms and conditions as the options replaced, but the exercise price and the number of shares subject to the Phillips 66 options will be adjusted using a formula designed generally to preserve the intrinsic value of the original ConocoPhillips stock options prior to the separation.

**Stock Unit Program**—Stock units granted under the provisions of the Plan vest ratably, with one-third of the units vesting in 36 months, one-third vesting in 48 months, and the final third vesting 60 months from the date of grant. Upon vesting, the units are settled by issuing one share of ConocoPhillips common stock per unit. Units awarded to employees already eligible for retirement vest within six months of the grant date, but those units are not issued as shares until the end of the normal vesting period. Until issued as stock, most recipients of the units receive a quarterly cash payment of a dividend equivalent that is charged to expense. The grant date fair value of these units is deemed equal to the average ConocoPhillips common stock price on the date of grant. The grant date fair market value of units that do not receive a dividend equivalent while unvested is deemed equal to the average ConocoPhillips common stock price on the grant date, less the net present value of the dividends that will not be received.

F-35

PSXCPT00000079

Preliminary Information Statement of Phillips 66                    Page 196 of 207

Table of Contents

The following summarizes the activity of ConocoPhillips stock units granted to direct active employees of Phillips 66 for the three years ended December 31, 2011:

| | Stock Units | Weighted-Average Grant-Date Fair Value | Millions of Dollars Total Fair Value |
|---|---|---|---|
| Outstanding at December 31, 2008 | 1,481,090 | $ 60.26 | |
| Granted | 613,348 | 44.91 | |
| Forfeited | - | - | |
| Issued | (396,234) | | $ 18 |
| Transfers in/(out) | (120,246) | 59.07 | |
| Outstanding at December 31, 2009 | 1,577,958 | $ 58.22 | |
| Granted | 612,648 | 47.87 | |
| Forfeited | - | - | |
| Issued | (324,786) | | $ 16 |
| Transfers in/(out) | (82,945) | 59.09 | |
| Outstanding at December 31, 2010 | 1,782,875 | $ 55.21 | |
| Granted | 432,957 | 69.52 | |
| Forfeited | - | - | |
| Issued | (282,238) | | $ 20 |
| Transfers in/(out) | (124,111) | 55.34 | |
| Outstanding at December 31, 2011 | 1,809,483 | $ 56.11 | |
| Not Vested at December 31, 2011 | 1,266,093 | $ 56.34 | |

At December 31, 2011, the remaining unrecognized compensation cost from the unvested units held by direct active employees of Phillips 66 was $36 million, which will be recognized over a weighted-average period of 33 months, the longest period being 52 months.

Upon completion of the separation, ConocoPhillips stock units under this Plan held by Phillips 66 employees will be replaced by stock units of Phillips 66 with the same terms and conditions as the original stock units, but the number of Phillips 66 stock units will be adjusted using a formula generally designed to preserve the intrinsic value of the original stock units prior to the separation.

**Performance Share Program**—Under the Plan, ConocoPhillips also annually grants to senior management performance stock units (PSUs) that do not vest until either: (1) with respect to awards for periods beginning before 2009, the employee becomes eligible for retirement by reaching age 55 with five years of service; or (2) with respect to awards for periods beginning in 2009, five years after the grant date of the award (although recipients can elect to defer the lapsing of restrictions until retirement after reaching age 55 with five years of service). Accordingly, compensation expense is recognized for these awards beginning on the date of grant and ending on the date the PSUs are scheduled to vest. Since these awards are authorized three years prior to the grant date, compensation expense for employees eligible for retirement by or shortly after the grant date is recognized over the period beginning on the date of authorization and ending on the date of grant. These PSUs are settled by issuing one share of ConocoPhillips common stock per PSU. Until issued as stock, recipients of the PSUs receive a quarterly cash payment of a dividend equivalent that is charged to expense. In its current form, the first grant of PSUs under this program was in 2006.

F-36

PSXCPT00000080

Preliminary Information Statement of Phillips 66                    Page 197 of 207

Table of Contents

The following summarizes the activity for ConocoPhillips PSUs granted to direct active employees of Phillips 66 for the three years ended December 31, 2011:

| | Performance Share Stock Units | | Weighted-Average Grant-Date Fair Value | Millions of Dollars Total Fair Value | |
|---|---|---|---|---|---|
| Outstanding at December 31, 2008 | 475,682 | $ | 68.48 | | |
| Granted | 91,787 | | 45.47 | | |
| Forfeited | - | | | | |
| Issued | - | | | $ | - |
| Transfers in/(out) | (10,507) | | 64.47 | | |
| Outstanding at December 31, 2009 | 556,962 | $ | 64.77 | | |
| Granted | 40,706 | | 48.39 | | |
| Forfeited | - | | | | |
| Issued | - | | | $ | - |
| Transfers in/(out) | (132,195) | | 65.06 | | |
| Outstanding at December 31, 2010 | 465,473 | $ | 63.25 | | |
| Granted | 84,515 | | 70.13 | | |
| Forfeited | - | | | | |
| Issued | - | | | $ | - |
| Transfers in/(out) | (67,593) | | 63.69 | | |
| Outstanding at December 31, 2011 | 482,395 | | 64.39 | | |
| Not Vested at December 31, 2011 | 295,926 | $ | 64.42 | | |

At December 31, 2011, the remaining unrecognized compensation cost from unvested PSU awards held by direct active employees of Phillips 66 was $7 million, which will be recognized over a weighted-average period of 41 months, the longest period being 15 years.

Upon completion of the separation, each holder of ConocoPhillips PSUs under this Plan will retain those PSUs and receive PSUs of Phillips 66 in an amount equal to what the holder would have been entitled to receive if the ConocoPhillips PSUs had been settled with ConocoPhillips stock immediately prior to the distribution record date.

Note 17—Income Taxes

Our income taxes as presented are calculated on a standalone basis.

Income taxes charged to income were:

| | | Millions of Dollars | | |
|---|---|---|---|---|
| | | 2011 | 2010 | 2009 |
| Income Taxes | | | | |
| Federal | | | | |
| Current | $ | 733 | 335 | 373 |
| Deferred | | 746 | 484 | (73) |
| Foreign | | | | |
| Current | | 126 | 180 | 218 |
| Deferred | | (9) | (489) | (165) |
| State and local | | | | |
| Current | | 133 | 54 | 10 |
| Deferred | | 115 | 15 | 5 |
| | $ | 1,844 | 579 | 368 |

F-37

PSXCPT00000081

Preliminary Information Statement of Phillips 66                                                    Page 198 of 207

Table of Contents

Deferred income taxes reflect the net tax effect of temporary differences between the carrying amounts of assets and liabilities for financial reporting purposes and the amounts used for tax purposes. Major components of deferred tax liabilities and assets at December 31 were:

|  | Millions of Dollars | |
|---|---|---|
|  | 2011 | 2010 |
| **Deferred Tax Liabilities** | | |
| Properties, plants and equipment, and intangibles | $ 3,480 | 3,422 |
| Investment in joint ventures | 2,336 | 1,684 |
| Investments in foreign subsidiaries | 647 | 592 |
| Other | 112 | 130 |
| Total deferred tax liabilities | 6,575 | 5,828 |
| **Deferred Tax Assets** | | |
| Benefit plan accruals | 45 | 59 |
| Inventory | 70 | - |
| Asset retirement obligations and accrued environmental costs | 266 | 268 |
| Deferred state income tax | 233 | 195 |
| Other financial accruals and deferrals | 128 | 121 |
| Loss and credit carryforwards | 364 | 571 |
| Other | 5 | 1 |
| Total deferred tax assets | 1,111 | 1,215 |
| Less valuation allowance | (210) | (165) |
| Net deferred tax assets | 901 | 1,050 |
| Net deferred tax liabilities | $ 5,674 | 4,778 |

Current assets, long-term assets, current liabilities and long-term liabilities included deferred taxes of $171 million, $9 million, $51 million and $5,803 million, respectively, at December 31, 2011, and $131 million, $13 million, $105 million and $4,817 million, respectively, at December 31, 2010.

With the exception of certain separate company losses, we did not allocate tax attributes to Phillips 66 at the beginning of the earliest period presented. At the balance sheet dates presented in this footnote, we have credit and loss carryforwards in multiple taxing jurisdictions. These attributes generally have indefinite carryforward periods.

Valuation allowances have been established to reduce deferred tax assets to an amount that will, more likely than not, be realized. During 2011, valuation allowances increased a total of $45 million. This increase is primarily related to foreign loss carryforwards. Based on our historical taxable income, expectations for the future, and available tax-planning strategies, management expects remaining net deferred tax assets will be realized as offsets to reversing deferred tax liabilities and as offsets to the tax consequences of future taxable income.

At December 31, 2011 and 2010, income considered to be permanently reinvested in certain foreign subsidiaries and foreign corporate joint ventures totaled approximately $1,081 million and $904 million, respectively. Deferred income taxes have not been provided on this income, as we do not plan to initiate any action that would require the payment of income taxes. It is not practicable to estimate the amount of additional tax that might be payable on this foreign income if distributed.

F-38

PSXCPT00000082

Preliminary Information Statement of Phillips 66                    Page 199 of 207

Table of Contents

The following table shows a reconciliation of the beginning and ending unrecognized tax benefits for 2011, 2010 and 2009:

|  | Millions of Dollars | | |
|---|---|---|---|
|  | 2011 | 2010 | 2009 |
| Balance at January 1 | $166 | 178 | 171 |
| Additions based on tax positions related to the current year | 11 | 11 | 11 |
| Additions for tax positions of prior years | 27 | 88 | 8 |
| Reductions for tax positions of prior years | (32) | (46) | (2) |
| Settlements | (2) | (65) | (8) |
| Lapse of statute | (1) | – | (2) |
| Balance at December 31 | $169 | 166 | 178 |

Included in the balance of unrecognized tax benefits for 2011, 2010 and 2009 were $114 million, $122 million and $54 million, respectively, which, if recognized, would affect our effective tax rate.

At December 31, 2011, 2010 and 2009, accrued liabilities for interest and penalties totaled $9 million, $16 million and $39 million, respectively, net of accrued income taxes. Interest and penalties benefitted earnings by $7 million, $6 million and $4 million in 2011, 2010 and 2009, respectively.

We and ConocoPhillips file tax returns in the U.S. federal jurisdiction and in many foreign and state jurisdictions. Audits in major jurisdictions are generally complete as follows: United Kingdom (2008), Germany (2006) and United States (2006). Issues in dispute for audited years and audits for subsequent years are ongoing and in various stages of completion in the many jurisdictions in which we operate around the world. As a consequence, the balance in unrecognized tax benefits can be expected to fluctuate from period to period. It is reasonably possible such changes could be significant when compared with our total unrecognized tax benefits, but the amount of change is not estimable.

The amounts of U.S. and foreign income (loss) before income taxes, with a reconciliation of tax at the federal statutory rate with the provision for income taxes, were:

|  | Millions of Dollars | | | Percent of Pretax Income | | |
|---|---|---|---|---|---|---|
|  | 2011 | 2010 | 2009 | 2011 | 2010 | 2009 |
| Income (loss) before income taxes |  |  |  |  |  |  |
| United States | $ 6,172 | 2,283 | 433 | 93.2% | 173.1 | 51.1 |
| Foreign | 452 | (964) | 414 | 6.8 | (73.1) | 48.9 |
|  | $ 6,624 | 1,319 | 847 | 100.0% | 100.0 | 100.0 |
| Federal statutory income tax | $ 2,318 | 462 | 296 | 35.0% | 35.0 | 35.0 |
| Goodwill allocated to assets sold | 96 | 25 | 21 | 1.4 | 1.9 | 2.4 |
| Capital loss utilization | (619) | – | – | (9.3) | – | – |
| Tax on foreign operations | (61) | 72 | 43 | (0.9) | 5.5 | 5.0 |
| Federal manufacturing deduction | (53) | (15) | – | (0.8) | (1.1) | – |
| State income tax | 161 | 45 | 10 | 2.4 | 3.4 | 1.2 |
| Other | 2 | (10) | (2) | – | (0.8) | (0.2) |
|  | $ 1,844 | 579 | 368 | 27.8% | 43.9 | 43.4 |

F-39

PSXCPT00000083

Preliminary Information Statement of Phillips 66                    Page 200 of 207

Table of Contents

During 2011, we recognized a significant tax capital loss on disposition of the legal entity which ultimately held the Wilhelmshaven Refinery assets. The tax benefit of this loss was realized in 2011 because of other capital gains that occurred.

The change in the effective tax rates for 2011, as compared with 2010 and 2009, was primarily due to the effect of asset sales in 2011, which decreased the effective tax rate. In addition, the impairment of the Wilhelmshaven Refinery in 2010, and the payment of a dividend in 2009, both adversely affected effective tax rates in those years. Statutory tax rate changes did not have a significant impact on our income tax expense in 2011, 2010 or 2009.

With certain exceptions, we do not make cash tax payments directly to taxing jurisdictions; rather, our share of our parent's tax payments are reflected as changes in parent company investment. Direct cash tax payments for certain state income taxes and those made by dedicated foreign entities totaled $327 million, $239 million and $236 million for the years 2011, 2010 and 2009, respectively.

**Note 18—Accumulated Other Comprehensive Income (Loss)**

Accumulated other comprehensive income in the net investment section of the balance sheet included:

| | Millions of Dollars | | | |
|---|---|---|---|---|
| | Defined Benefit Plans | Foreign Currency Translation | Hedging | Accumulated Other Comprehensive Income (Loss) |
| December 31, 2008 | $   (134) | 241 | (10) | 97 |
| Other comprehensive income | 35 | 192 | 5 | 232 |
| December 31, 2009 | (99) | 433 | (5) | 329 |
| Other comprehensive income (loss) | (17) | (99) | 1 | (115) |
| December 31, 2010 | (116) | 334 | (4) | 214 |
| Other comprehensive income (loss) | (29) | (64) | 1 | (92) |
| December 31, 2011 | $   (145) | 270 | (3) | 122 |

F-40

PSXCPT00000084

Table of Contents

Note 19—Other Financial Information

| | | Millions of Dollars | |
| | 2011 | 2010 | 2009 |
|---|---|---|---|
| **Other Income** | | | |
| Interest income | $ 33 | 42 | 47 |
| Other, net | 12 | 47 | 41 |
| | $ 45 | 89 | 88 |
| Research and Development Expenditures—expensed | $ 74 | 56 | 36 |
| Advertising Expenses | $ 63 | 59 | 47 |
| Shipping and Handling Costs* | $ 12 | 11 | 10 |
| *Amounts included in operating expenses. | | | |
| **Foreign Currency Transaction (Gains) Losses—after-tax** | | | |
| R&M | $ (24) | 60 | (39) |
| Midstream | - | 1 | 1 |
| Chemicals | - | - | - |
| Corporate and Other | - | - | - |
| | $ (24) | 61 | (38) |

Note 20—Related Party Transactions

Significant transactions with related parties were:

| | | Millions of Dollars | |
| | 2011 | 2010 | 2009 |
|---|---|---|---|
| Operating revenues and other income (a) | $ 9,034 | 7,411 | 6,922 |
| Net gain on dispositions (b) | 156 | - | - |
| Purchases (c) | 34,558 | 26,754 | 21,888 |
| Operating expenses and selling, general and administrative expenses (d) | 361 | 401 | 356 |
| Net interest expense (e) | 10 | 10 | 11 |

(a)  We sold crude oil to MRC. Natural gas liquids, solvents and petrochemical feedstocks were sold to CPChem, gas oil and hydrogen feedstocks were sold to Excel Paralubes and refined products were sold primarily to CFJ Properties. Beginning in the third quarter of 2010, CFJ was no longer considered a related party due to the sale of our interest. Crude, blendstock and other intermediate products were sold to WRB. In addition, we charged several of our affiliates, including CPChem and MSLP, for the use of common facilities, such as steam generators, waste and water treaters and warehouse facilities.

(b)  In 2011, we sold the Seaway Products Pipeline to DCP Midstream for cash proceeds of $400 million, resulting in a before-tax gain of $156 million.

F-41

PSXCPT00000085

Preliminary Information Statement of Phillips 66                    Page 202 of 207

Table of Contents

(c)  We purchased refined products from WRB. We purchased natural gas and natural gas liquids from DCP Midstream and CPChem for use in our refinery processes and other feedstocks from various affiliates. We purchased refined products from MRC. We also paid fees to various pipeline equity companies for transporting finished refined products. In addition, we paid a price upgrade to MSLP for heavy crude processing. We purchased base oils and fuel products from Excel Paralubes for use in our refinery and specialty businesses.

(d)  We paid utility and processing fees to various affiliates. Additionally, we paid transportation fees to pipeline equity companies.

(e)  We incurred interest expense on a note payable to MSLP. See Note 6—Investments, Loans and Long-Term Receivables and Note 11—Debt, for additional information on loans with affiliated companies.

Also included in the table above are transactions with ConocoPhillips and its consolidated subsidiaries that are not part of Phillips 66. These transactions include crude oil purchased from ConocoPhillips as feedstock for our refineries and power sold to ConocoPhillips from our power generation facilities. For the years 2011, 2010 and 2009, sales to ConocoPhillips were $1,197 million, $991 million and $744 million, respectively, while purchases from ConocoPhillips were $15,798 million, $13,345 million and $11,336 million, respectively.

As discussed in Note 1—Separation and Basis of Presentation, the combined statement of income includes expense allocations for certain corporate functions historically performed by ConocoPhillips and not allocated to its operating segments, including allocations of general corporate expenses related to executive oversight, accounting, treasury, tax, legal, procurement and information technology. Net charges from ConocoPhillips for these services, reflected in selling, general and administrative expenses in the combined statement of income were $180 million, $176 million and $133 million for 2011, 2010 and 2009, respectively.

Net Parent Company Investment
The following is a reconciliation of the amounts presented as "Net transfers from (to) parent company" on the combined statement of changes in net investment and the amounts presented as "Contributions from (distributions to) parent company" on the combined statement of cash flows.

|  | Millions of Dollars | | |
|  | 2011 | 2010 | 2009 |
|---|---|---|---|
| Net transfers from (to) parent company per the combined statement of changes in net investment | $  (7,420) | (1,536) | 1,210 |
| Non-cash adjustments | | | |
| Foreign currency translation adjustments on net parent company investment | (18) | 136 | (101) |
| Net transfers of assets and liabilities with parent company | (33) | (11) | (53) |
| Contributions from (distributions to) parent company per the combined statement of cash flows | $  (7,471) | (1,411) | 1,056 |

F-42

PSXCPT00000086

Preliminary Information Statement of Phillips 66        Page 203 of 207

Table of Contents

Note 21—Segment Disclosures and Related Information

We have organized our reporting structure based on the grouping of similar products and services, resulting in three operating segments:

1)    R&M—This segment purchases, refines, markets and transports crude oil and petroleum products, mainly in the United States, Europe and Asia. At December 31, 2011, we owned or had an interest in 12 refineries in the United States, one in the United Kingdom, one in Ireland, one in Germany, and one in Malaysia. This segment also includes power generation operations. The R&M segment's U.S. and international operations are disclosed separately for reporting purposes.

2)    Midstream—This segment gathers, processes, transports and markets natural gas and fractionates and markets natural gas liquids, predominantly in the United States. The Midstream segment primarily consists of our 50 percent equity investment in DCP Midstream.

3)    Chemicals—This segment manufactures and markets petrochemicals and plastics on a worldwide basis. The Chemicals segment consists of our 50 percent equity investment in CPChem.

Corporate and Other includes general corporate overhead, interest expense and various other corporate activities.

Analysis of Results by Operating Segment

| | | Millions of Dollars | |
|---|---|---|---|
| | 2011 | 2010 | 2009 |
| **Sales and Other Operating Revenues** | | | |
| **R&M** | | | |
| United States | $ 127,219 | 94,690 | 73,976 |
| International | 61,093 | 45,280 | 34,472 |
| Intersegment eliminations—U.S. | (509) | (402) | (375) |
| R&M | 187,803 | 139,568 | 108,073 |
| **Midstream** | | | |
| Total sales | 8,770 | 7,383 | 4,915 |
| Intersegment eliminations | (499) | (407) | (307) |
| Midstream | 8,271 | 6,976 | 4,608 |
| Chemicals | 11 | 11 | 11 |
| Corporate and Other | 3 | 6 | - |
| Combined sales and other operating revenues | $ 196,088 | 146,561 | 112,692 |
| | | | |
| **Depreciation, Amortization and Impairments** | | | |
| **R&M** | | | |
| United States | $ 1,180 | 747 | 707 |
| International | 195 | 1,829 | 235 |
| Total R&M | 1,375 | 2,576 | 942 |
| Midstream | 2 | 2 | 2 |
| Chemicals | - | - | - |
| Corporate and Other | 3 | 1 | 1 |
| Combined depreciation, amortization and impairments | $ 1,380 | 2,579 | 945 |

F-43

PSXCPT00000087

Preliminary Information Statement of Phillips 66                    Page 204 of 207

Table of Contents

|  | | Millions of Dollars | |
|---|---|---|---|
|  | 2011 | 2010 | 2009 |
| **Equity in Earnings of Affiliates** | | | |
| R&M | | | |
| United States | $ 1,284 | 605 | 429 |
| International | 94 | 114 | 12 |
| Total R&M | 1,378 | 719 | 441 |
| Midstream | 490 | 362 | 353 |
| Chemicals | 975 | 684 | 298 |
| Corporate and Other | - | - | - |
| Combined equity in earnings of affiliates | $ 2,843 | 1,765 | 1,092 |
| | | | |
| **Income Taxes** | | | |
| R&M | | | |
| United States | $ 1,440 | 608 | (4) |
| International | 39 | (272) | 210 |
| Total R&M | 1,479 | 336 | 206 |
| Midstream | 210 | 142 | 170 |
| Chemicals | 252 | 194 | 67 |
| Corporate and Other | (97) | (93) | (75) |
| Combined income taxes | $ 1,844 | 579 | 368 |
| | | | |
| **Net Income Attributable to Phillips 66** | | | |
| R&M | | | |
| United States | $ 3,637 | 1,013 | (124) |
| International | 211 | (867) | 195 |
| Total R&M | 3,848 | 146 | 71 |
| Midstream | 403 | 262 | 317 |
| Chemicals | 716 | 486 | 228 |
| Corporate and Other | (192) | (159) | (140) |
| Combined net income attributable to Phillips 66 | $ 4,775 | 735 | 476 |

F-44

Preliminary Information Statement of Phillips 66

Page 205 of 207

Table of Contents

|  | | Millions of Dollars | |
|---|---|---|---|
|  | 2011 | 2010 | 2009 |
| **Investments In and Advances To Affiliates** | | | |
| R&M | | | |
|    United States | $ 4,167 | 4,135 | 3,810 |
|    International | 1,326 | 1,304 | 1,142 |
|      Total R&M | 5,493 | 5,439 | 4,952 |
| Midstream | 1,743 | 1,898 | 1,877 |
| Chemicals | 2,998 | 2,518 | 2,446 |
| Corporate and Other | - | - | - |
| Combined investments in and advances to affiliates | $ 10,234 | 9,855 | 9,275 |
| | | | |
| **Total Assets** | | | |
| R&M | | | |
|    United States | $ 25,056 | 26,123 | 24,746 |
|    International | 8,902 | 9,308 | 9,305 |
|    Goodwill | 3,332 | 3,633 | 3,638 |
|      Total R&M | 37,290 | 39,064 | 37,689 |
| Midstream | 2,900 | 3,128 | 2,694 |
| Chemicals | 2,999 | 2,732 | 2,451 |
| Corporate and Other | 22 | 31 | 46 |
| Combined total assets | $ 43,211 | 44,955 | 42,880 |
| | | | |
| **Capital Expenditures and Investments** | | | |
| R&M | | | |
|    United States | $ 751 | 798 | 1,294 |
|    International | 237 | 276 | 513 |
|      Total R&M | 988 | 1,074 | 1,807 |
| Midstream | 17 | 68 | 639 |
| Chemicals | - | - | - |
| Corporate and Other | 17 | 8 | 15 |
| Combined capital expenditures and investments | $ 1,022 | 1,150 | 2,461 |
| | | | |
| **Interest Income and Expense** | | | |
| Interest income | | | |
|    R&M | $ 33 | 42 | 47 |
| Interest and debt expense | | | |
|    Corporate | $ 17 | 1 | 1 |
| | | | |
| **Sales and Other Operating Revenues by Product Line** | | | |
| Refined products | $ 146,834 | 108,182 | 87,948 |
| Crude oil resales | 38,259 | 28,836 | 18,760 |
| Natural gas liquids | 10,024 | 8,468 | 5,483 |
| Other | 971 | 1,075 | 501 |
| Combined sales and other operating revenues by product line | $ 196,088 | 146,561 | 112,692 |

F-45

PSXCPT00000089

Preliminary Information Statement of Phillips 66                              Page 206 of 207

Table of Contents

Geographic Information

| | Millions of Dollars | | | | | |
| | Sales and Other Operating Revenues* | | | Long-Lived Assets** | | |
| | 2011 | 2010 | 2009 | 2011 | 2010 | 2009 |
|---|---|---|---|---|---|---|
| United States | $ 134,499 | 100,914 | 77,994 | 21,196 | 21,224 | 20,701 |
| United Kingdom | 26,976 | 20,125 | 14,169 | 1,927 | 1,929 | 2,029 |
| Germany | 10,647 | 9,070 | 9,950 | 547 | 849 | 2,660 |
| Other foreign countries | 23,966 | 16,452 | 10,579 | 1,335 | 1,262 | 1,123 |
| Worldwide combined | $ 196,088 | 146,561 | 112,692 | 25,005 | 25,264 | 26,513 |

*Sales and other operating revenues are attributable to countries based on the location of the operations generating the revenues.
**Defined as net properties, plants and equipment plus investments in and advances to affiliated companies.

F-46

PSXCPT00000090

Preliminary Information Statement of Phillips 66                              Page 207 of 207

Table of Contents

SCHEDULE II—VALUATION AND QUALIFYING ACCOUNTS (Combined)

| Description | Balance at January 1 | Charged to Expense | Other (a) | Deductions | Balance at December 31 |
|---|---|---|---|---|---|
| **Millions of Dollars** | | | | | |
| **2011** | | | | | |
| Deducted from asset accounts: | | | | | |
| Allowance for doubtful accounts and notes receivable | $ 7 | 7 | - | (1)(b) | 13 |
| Deferred tax asset valuation allowance | 165 | 54 | (9) | - | 210 |
| **2010** | | | | | |
| Deducted from asset accounts: | | | | | |
| Allowance for doubtful accounts and notes receivable | $ 16 | - | - | (9)(b) | 7 |
| Deferred tax asset valuation allowance | 41 | 131 | (2) | (5) | 165 |
| **2009** | | | | | |
| Deducted from asset accounts: | | | | | |
| Allowance for doubtful accounts and notes receivable | $ 20 | 49 | 1 | (54)(b) | 16 |
| Deferred tax asset valuation allowance | 36 | 3 | 2 | - | 41 |

(a)Represent acquisitions/dispositions/revisions and the effect of translating foreign financial statements.
(b)Amounts charged off less recoveries of amounts previously charged off.

F-47

PSXCPT00000091

*File —*
*Corp. Restructure*
*Matter*



## State of New Jersey
### DEPARTMENT OF ENVIRONMENTAL PROTECTION
### SITE REMEDIATION PROGRAM
Mail Code 401-06
P. O. Box 420
Trenton, New Jersey 08625-0420
Tel. #: 609-292-1250
Fax. #: 609-777-1914

CHRIS CHRISTIE
*Governor*

KIM GUADAGNO
*Lt. Governor*

BOB MARTIN
*Commissioner*

March 30, 2012

**RECEIVED**

APR 9 - 2012

**Linda G. Hester**

Linda Gordon Hester, Esq.
Senior Council
Downstream Legal Group
McLean 2112
600 North Dairy Ashford
Houston, TX  77079- 1175

Re:  Non-applicability of ISRA to the Restructuring of ConocoPhillips

Dear Ms. Hester:

Thank you for your letter dated March 19, 2012 seeking the agreement of the New Jersey Department of Environmental Protection that ISRA does not apply to the proposed restructuring of ConocoPhillips.  My staff and I have read your letter and agree with your interpretation of the exemptions the ISRA rules allow in subchapter 2 to the proposed restructuring of ConocoPhillips.  My agreement is based on what was presented to the Department in your letter and ultimately the determination of ISRA applicability resides with ConocoPhillips.

I must point out that footnote #4 on page 6 of your letter incorrectly interprets petroleum pipelines as not meeting the definition of Industrial Establishment as defined in the ISRA rules. You have correctly interpreted the guidance the NAICS manual provides regarding un-manned operations, however, the ISRA law supersedes the guidance provided in the NAICS manual in certain circumstances, pipelines being one such circumstance.   In 2003 the New Jersey Legislature directed the Department to develop a list of ISRA subject NAICS numbers that were "generally equivalent" to the universe of SIC numbers subject to the original law.  This mandate to convert from SIC to NAICS was established in PL 2003 c.157.  PL 2003 c.157 states "The department shall ensure that the categories of employers, entities, establishments, or facilities regulated pursuant to the rules and regulations adopted pursuant to section 1 of this act are consistent with those regulated prior to the effective date of this act."  In short, the Department was not allowed to regulate more or less of a universe than it had before the order to convert from SIC to NAICS coding.  Under the rules of the SIC manual, a petroleum pipeline is an ISRA subject Industrial Establishment with a SIC number of 4613.  SIC number 4613 converts to a NAICS number of 486910 which is correctly listed as an ISRA subject number in Appendix C of the ISRA rule.   Therefore after the restructuring, should the new entity that will control the

pipelines trigger any of the events in the ISRA rule that requires a notice to the Department, ISRA will apply to the pipelines and to any other facilities that also meet the definition of Industrial Establishment such as the refineries and tank farms mentioned in your letter.

Thank you for your cooperation in this matter.  Should you have any questions, feel free to contact Joshua Gradwohl of the Bureau of Case Assignment and Initial Notice at (609) 292-0408.

Sincerely,

David Sweeney
Assistant Commissioner

Case 1:19-cv-14758-RMB-JBC    Document 174-6    Filed 11/24/21    Page 110 of 110
PageID: 3755
Preliminary Information Statement of Phillips 66                              Page 1 of 207

EX-99.1 23 d250454dex991.htm PRELIMINARY INFORMATION STATEMENT OF PHILLIPS 66

<u>Table of Contents</u>

**Exhibit 99.1**
**(Subject to Completion, Dated March 1, 2012)**



[•], 2012

Dear ConocoPhillips Stockholder:

I am pleased to report that the previously announced repositioning of ConocoPhillips through the separation of ConocoPhillips' Phillips 66 subsidiary from our remaining businesses is expected to become effective on [•], 2012, on which date Phillips 66, a Delaware corporation, will become an independent public company and will hold, through its subsidiaries, the assets and liabilities associated with ConocoPhillips' Downstream business.

The separation will be completed by way of a pro rata distribution of all of the outstanding shares of Phillips 66 common stock to our stockholders of record as of 5:00 p.m. Eastern Time, on [•], 2012, the distribution record date. Each ConocoPhillips stockholder of record will receive one share of Phillips 66 common stock for every two shares of ConocoPhillips common stock held by such stockholder on the record date. The distribution of these shares will be made in book-entry form, which means that no physical share certificates will be issued. Following the distribution, stockholders may request that their shares of Phillips 66 common stock be transferred to a brokerage or other account at any time. No fractional shares of Phillips 66 common stock will be issued. The distribution agent will aggregate fractional shares into whole shares, sell the whole shares in the open market at prevailing prices and distribute the net cash from proceeds from the sales pro rata to each holder who would otherwise have been entitled to a fractional share in the distribution.

ConocoPhillips has sought a private letter ruling from the Internal Revenue Service to the effect that, among other things, the distribution of Phillips 66's common stock to ConocoPhillips stockholders, together with certain related transactions, will qualify as a transaction that is generally tax-free for U.S. federal income tax purposes. However, any cash that you receive in lieu of fractional shares generally will be taxable to you. It is a condition to completing the separation that ConocoPhillips receive the private letter ruling from the Internal Revenue Service, in form and substance satisfactory to ConocoPhillips, to the effect that the distribution of Phillips 66's common stock to ConocoPhillips stockholders, together with certain related transactions, will qualify as a transaction that is generally tax-free for U.S. federal income tax purposes, which condition may be waived by ConocoPhillips in its discretion. You should consult your own tax advisor as to the particular tax consequences of the distribution to you, including potential tax consequences under state, local and non-U.S. tax laws. The separation is also subject to other conditions, including necessary regulatory approvals.

The distribution does not require stockholder approval, nor do you need to take any action to receive your shares of Phillips 66 common stock. ConocoPhillips' common stock will continue to trade on the New York Stock Exchange under the ticker symbol "COP." Phillips 66 has applied to have its common stock authorized for listing on the New York Stock Exchange under the ticker symbol "PSX."

The enclosed information statement, which we are mailing to all ConocoPhillips stockholders, describes the separation in detail and contains important information about Phillips 66, including its historical combined financial statements. We urge you to read this information statement carefully.

We want to thank you for your continued support of ConocoPhillips.

Sincerely,

J. J. Mulva
*Chairman of the Board, President and*
*Chief Executive Officer*