**MATTHEW J. PLATKIN**
**ATTORNEY GENERAL OF NEW JERSEY**
R.J. Hughes Justice Complex
25 Market Street
P.O. Box 093
Trenton, New Jersey 08625-0093
*Attorney for Plaintiffs*

By:  Gwen Farley
     Deputy Attorney General
     Attorney ID No. 000081999
     Ph. (609) 376-2740
     Gwen.Farley@law.njoag.gov

**KELLEY DRYE & WARREN LLP**
Special Counsel to the Attorney General

By:  Geoffrey W. Castello, Esq.
     One Jefferson Road
     Parsippany, New Jersey 07054
     Tel.: (973) 503-5900
     GCastello@KelleyDrye.com

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION; THE COMMISSIONER OF THE NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION; and THE ADMINISTRATOR OF THE NEW JERSEY SPILL COMPENSATION FUND,<br><br>Plaintiffs,<br><br>v.<br><br>E.I. DU PONT DE NEMOURS AND COMPANY; THE CHEMOURS COMPANY; THE CHEMOURS COMPANY FC, LLC; CORTEVA, INC.; DUPONT DE NEMOURS, INC.; and "ABC CORPORATIONS" 1-10 (Names Fictitious).<br><br>Defendants. | Case No.: 2:19-cv-14758-RMB-JBC<br><br>Civil Action<br><br><br><br>**THIRD AMENDED COMPLAINT AND JURY TRIAL DEMAND** |

Plaintiffs, the New Jersey Department of Environmental Protection (the "Department" or "NJDEP"), the Commissioner of the New Jersey Department of Environmental Protection ("Commissioner"), and the Administrator of the New Jersey Spill Compensation Fund ("Administrator") (collectively "Plaintiffs" or "the State"), file this Third Amended Complaint against the above-named defendants (the "Defendants"), and allege as follows:

## STATEMENT OF THE CASE

1. Plaintiffs bring this civil action against E.I. du Pont de Nemours and Company ("Old DuPont"), The Chemours Company ("Chemours"), and The Chemours Company FC, LLC ("Chemours FC"), DuPont de Nemours Inc. ("New DuPont"), and Corteva, Inc. ("Corteva") pursuant to the Spill Compensation and Control Act, N.J.S.A. 58:10-23.11 to -23.24 ("Spill Act"); the Water Pollution Control Act, N.J.S.A. 58:10A-1 to -20 ("WPCA"); the Solid Waste Management Act, N.J.S.A. 13:1E-1, *et seq.* ("SWMA"); the Department's enabling statute, N.J.S.A. 13:1D-1, *et seq.*; the Uniform Fraudulent Transfer Act, Del. Code. tit. 6, §§ 1301 to 1312, N.J.S.A. 25:2-20 to 25:2-34; and the common law of New Jersey for cleanup and removal costs, damages, and other relief as a result of the discharge of hazardous substances and pollutants at and from the Pompton Lakes Works facility, located at 2000 Cannonball Road, in Pompton Lakes Borough and Wanaque Borough, Passaic County, New Jersey.

2. Old DuPont owned and operated Pompton Lakes Works as a manufacturing facility for almost a century, producing lead azide, aluminum and bronze shelled blasting caps, metal wires, and aluminum and copper shells at the site. The property currently encompasses approximately 600 acres and is also designated and known as Block 100, Lots 3, 6, 7, and 9 in Pompton Lakes Borough and Block 479, Lots 4, 4.1, and 5 in Wanaque Borough. In the past, Pompton Lakes Works occupied a larger area. Old DuPont owned and conducted operations in additional properties next to the current property boundaries, including an area Old DuPont

referred to as Haskell Works. In this Third Amended Complaint, the "PLW Facility" or "Facility" refer to the current property boundaries and all contiguous properties owned by Old DuPont.

3. Pompton Lake, the Ramapo River, the Wanaque River and Acid Brook are all on or adjacent to the property, which is also adjacent to the Ramapo Mountain State Forest, as well as residential communities.

4. Old DuPont used a number of areas of the Facility for the disposal of various wastes generated by its manufacturing operations. Old DuPont's historic operations and waste management practices have resulted in the discharge and release of scores of hazardous substances and pollutants, including volatile organic compounds ("VOCs"), such as trichloroethylene ("TCE"), perchloroethylene ("PCE"), and metals, such as lead and mercury, into the streams, rivers and lakes in the area of the Facility, as well as the groundwater, soils, sediments, wetlands, and other natural resources at and around the Facility. Specific natural resources harmed by such contamination include, but are not limited to: water, sediments and soils in Acid Brook and the surrounding flood plain leading to Pompton Lake, the Acid Brook Delta, Pompton Lake, soils at residential properties located along Acid Brook, water and sediments in and floodplain soils adjacent to the Wanaque, Ramapo, and Pompton Rivers, groundwater, air, and biota (*i.e.*, non-human living resources).

5. A plume of contaminated groundwater has migrated off-site under a residential area, where private wells were widely used for drinking water. This contamination has caused extensive vapor intrusion issues, affecting hundreds of homes.

6. Although Defendants have addressed some historic contamination, extensive contamination remains throughout the site, and that contamination continues to harm the natural

resources of the State. The Facility and areas to which hazardous substances and pollutants have migrated are collectively referred to as the "Site."

7. The Plaintiffs seek costs and damages including, but not limited to: the costs of restoring natural resources of the State to their pre-discharge condition; the costs of replacing natural resources; damages for the loss of use and value (including existence value) of natural resources; the costs of assessing natural resource injuries and damages; the unreimbursed costs of investigation, oversight, and remediation; the costs of restoring, repairing, or replacing natural resources destroyed or damaged by a discharge; any income lost from the time the natural resource was damaged to the time it is restored, repaired, or replaced; any reduction in value of the natural resource caused by the discharge by comparison to its value prior thereto; the economic benefits Old DuPont, Chemours, and Chemours FC accrued, including any savings realized from avoided capital or noncapital costs for their unpermitted discharges; punitive damages; litigation fees and costs; and pre-judgment interest.

8. In addition, the State asserts claims under the Uniform Fraudulent Transfer Act based on a web of transactions that Old DuPont orchestrated over the past decade, all designed to shield significant assets from the State and other creditors.

9. Old DuPont has known for decades that it faces unprecedented environmental and tort liabilities for per- and polyfluoroalkyl substances ("PFAS") that it released into the environment in numerous parts of the country in combination with its massive environmental liabilities unrelated to PFAS. For years, it has, at every step, sought to hinder the State of New Jersey, and many other states facing massive harm to the well-being of their citizens and their natural resources, from being able to recover on their eventual judgments by attempting to put assets outside of the reach of creditors.

10.     Old DuPont has sought to limit its PFAS and environmental liabilities by engaging in a series of complex restructuring transactions, including (i) the "spinoff" of its Titanium Technologies, Chemical Solutions, and Fluorochemical segments (the "Performance Chemicals Business") (which included Teflon and other products, the manufacture of which involved the use of perfluorooctanoic acid ("PFOA") and other PFAS) into defendant Chemours; (ii) a purported merger with The Dow Chemical Company; (iii) the transfer of Old DuPont's historic assets to other entities, including defendant New DuPont; and, ultimately, (iv) the spin-off of Old DuPont to a new parent company, Corteva. These transactions were all designed to shield billions of dollars in assets from the PFAS and environmental liabilities that DuPont tried to isolate in Chemours.

11.     Old DuPont also sought to hide critical details of these transactions by burying them in non-public schedules to agreements in an attempt to keep the State and other creditors in the dark. What is clear, however, is that Old DuPont shed more than $20 billion in tangible assets as a result of its restructuring efforts and attempted to put those assets outside of the State's reach. This is the exact type of scheme that the Uniform Fraudulent Transfer Act is designed to prevent.

## THE PARTIES

12.     The Department is a principal department within the Executive Branch of the State government. Under the leadership of the Commissioner, it is vested with the authority to conserve natural resources, protect the environment, prevent pollution, and protect the public health and safety. N.J.S.A. 13:1D-9; N.J.S.A. 58:10-23.11b; N.J.S.A. 58:10A-3.

13.     The State is the trustee, for the benefit of its citizens, of all natural resources within its jurisdiction. The Department is vested with the authority to protect this public trust and to seek compensation for any injury to the natural resources of this State. N.J.S.A. 58:10-23.11a. In addition, the State may act in its *parens patriae* capacity to protect the State's "quasi-sovereign" interests, including its interest in the health and well-being of its residents and the integrity of its

natural resources. The Department brings this case in its trustee, *parens patriae*, and regulatory (police power) capacities, as well as in its capacity as an owner of real property directly impacted by contamination originating from the Facility. The State asserts its fraudulent transfer claims in its capacity as a creditor of Chemours and Old DuPont.

14.     Plaintiff Commissioner is the Commissioner of the Department.  N.J.S.A. 58:10-23.11b; N.J.S.A. 58:10A-3; and N.J.S.A. 13:1B-2. In this capacity, the Commissioner is vested by law with various powers and authority, including those conferred by the Department's enabling legislation, N.J.S.A. 13:1D-1 to -19; N.J.S.A. 13:1B-3.

15.     Plaintiff Administrator is the Chief Executive Officer of the New Jersey Spill Compensation Fund (the "Spill Fund"). N.J.S.A. 58:10-23.11j. As Chief Executive Officer of the Spill Fund, Plaintiff Administrator is authorized to approve and pay any cleanup and removal costs the Department incurs, N.J.S.A. 58:10-23.11f(c) & (d), and to certify the amount of any claim to be paid from the Spill Fund, N.J.S.A. 58:10-23.11j(d).

16.     Defendant Old DuPont is a corporation duly organized under the laws of the State of Delaware, with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805.

17.     Defendant Chemours is a corporation organized and existing under the laws of the State of Delaware, with its main place of business located at 1007 Market Street, Wilmington, DE 19899. Chemours was a wholly owned subsidiary of Old DuPont until July 2015, when Old DuPont spun off Chemours as a separate public entity.

18.     In connection with the spin-off, Chemours assumed direct liability for Old DuPont's decades-long history of causing environmental pollution and widespread PFAS contamination in the State and elsewhere.

19. Defendant Chemours FC is a limited liability company duly organized under the laws of the State of Delaware, with its principal place of business located at 1007 Market Street, PO Box 2047, Wilmington, Delaware 19899. Chemours FC is a subsidiary of Chemours that was formed in April 2014. On July 1, 2015, Old DuPont transferred ownership of the PLW Facility to Chemours FC.

20. Defendant New DuPont, formerly known as DowDuPont Inc., is a corporation duly organized under the laws of the State of Delaware, with its principal place of business at 974 Centre Road, Wilmington, Delaware 19805.

21. Defendant Corteva is a corporation duly organized under the laws of the State of Delaware, with its principal place of business located at P.O. Box 80735, Chestnut Run Plaza 735, Wilmington, Delaware 19805.

22. Defendants "ABC Corporations" 1-10, these names being fictitious, are entities with identities that cannot be ascertained as of the filing of this Third Amended Complaint, certain of which are corporate successors to, predecessors of, or are otherwise related to, the identified Defendants in this matter, or which are otherwise liable for the causes of action set forth herein.

## AFFECTED NATURAL RESOURCES

23. The "natural resources" of this State are all land, fish, shellfish, wildlife, biota, air, water, and other such resources owned, managed, held in trust, or otherwise controlled by the State. N.J.S.A. 58:10-23.11b.

24. The natural resources of this State include the "waters of the State," which include the ocean and its estuaries, all springs, streams and bodies of surface water or groundwater, whether natural or artificial, within the boundaries of this State or subject to its jurisdiction. N.J.S.A. 58:10A-3(t).

25. New Jersey's habitats and ecosystems—forests, lakes, rivers, wetlands, agricultural lands, coastal estuaries, pinelands, and grasslands—are some of the most threatened in the nation. They are vulnerable to pollution, degradation, and destruction from the discharge of hazardous substances and pollutants.

26. Hazardous substances and pollutants have been found in the surface water, groundwater, soils, sediments, wetlands, air, and other natural resources at the Site.

27. These natural resources have intrinsic (*i.e.*, inherent existence) values. The current and future residents of New Jersey have a substantial interest in a clean environment.

## Surface Water

28. Surface waters are a critical ecological resource of New Jersey. New Jersey's surface water—which includes all water in the State's lakes, streams, and wetlands—is a primary source of drinking water in the State. Nearly half of New Jersey's population obtains its drinking water from surface-water sources, and approximately 850 million gallons of surface water per day is used for that purpose.

29. Surface water in New Jersey is also used for other commercial and industrial purposes, such as cooling water and electrical generation, boating, fishing, and transportation of goods and services.

30. The tourism and recreation industries, which are vital to the State's economy, are dependent on clean water and beaches.

31. Surface waters also provide commercial, recreational, aesthetic, and ecological value, including by supporting aquatic ecosystems, nearby communities, and the citizens of the State.

32. Surface water bodies located within, directly adjacent to, or downstream of the PLW Facility include Acid Brook and Acid Brook Delta, the Ramapo River, Pompton Lake, and

8

the Wanaque River. All of these water bodies have been contaminated by discharges of hazardous substances and pollutants at the PLW Facility.

33.     Approximately 1.5 miles downstream of the Facility, the Ramapo River converges with the Pompton River. The Pompton River then flows into the Passaic River and into Newark Bay. A study performed by Chemours' consultant found mercury contamination in the Pompton River.

34.     Water and sediments contained within each of these water bodies (including those bodies that are downriver and downwind of the Facility) provide other natural resource values, including biological and human uses.

35.     Hazardous substances and pollutants from the Facility have adversely impacted surface waters both on and off the Facility.

### **Groundwater**

36.     Groundwater—that is, water that exists beneath the Earth's surface—is an extremely important natural resource for the people of New Jersey. More than half of New Jersey's population obtains drinking water from groundwater sources, and more than 900 million gallons of water per day are used for that purpose.

37.     Private wells, which provide access to groundwater, were widely used in the residential communities around the Facility. Wells were used for drinking water, watering lawns, and filling swimming pools, among other things.

38.     Not only does groundwater serve as a source of potable water, it also serves as an integral part of the State's ecosystem. Groundwater provides base flow to streams. It influences surface-water quality, wetland ecological conditions, and the health of the aquatic ecosystem.

39. Groundwater also provides cycling and nutrient movement within and among the State's bodies of water and wetlands, prevents saltwater intrusion, provides ground stabilization, prevents sinkholes, and helps to maintain critical water levels in freshwater wetlands.

40. Groundwater and the other natural resources of the State are unique resources that help sustain the State's economy.

41. Groundwater depths in the eastern part of the Facility range from approximately three to 26 feet below ground surface. Groundwater within the eastern area generally flows toward the south. Groundwater flows through the Acid Brook valley and then southeast from the southern area of the Facility, running beneath residential areas, before discharging into Pompton Lake.

42. In the western part of the Facility, groundwater depths range from approximately six to 19 feet below ground surface. Groundwater in the western area generally flows toward the south and the Wanaque River.

43. Hazardous substances and pollutants from the Facility have adversely impacted groundwater both on and off the Facility.

## Air

44. Air resources are vital to life. Pollution of air resources can injure human health and welfare, flora and fauna, and property and can unreasonably interfere with the enjoyment of life and property in areas affected by such pollution. Air deposition (*i.e.*, deposits of air contaminants on the earth's surface) can also be a source of contamination to other types of natural resources, including surface water, groundwater, sediments and soils, wetlands, forests, and biota.

45. Upon information and belief, air pollution from activities at the PLW have contaminated downwind natural resources, including but not limited to the Ramapo Mountain State Forest.

10

46. When subsurface air is contaminated with volatile organic compounds ("VOCs"), the subsurface air (*i.e.*, soil gas) can become a source of contaminated air to the structures above, causing vapor intrusion.

47. VOC contamination emanating from the PLW Facility has contaminated the subsurface air underlying hundreds of homes to the south-southeast of the PLW Facility, causing vapor intrusion in these homes. These homes have required the installation of vapor mitigation systems to address the indoor air pollution caused by the volatilization of VOCs from subsurface air into the homes.

### Sediments and Soils

48. New Jersey's land and aquatic resources are comprised of unique and complex ecosystems.

49. Sediments and soils are critical components of New Jersey's ecological resources.

50. Sediments and soils can sustain a wide diversity of plants and animals that are essential in a healthy ecosystem. They provide a living substrate for submerged and emergent flora and support diverse invertebrate species, wading birds, and fish and shellfish populations.

51. Sediments in the Acid Brook Delta and Pompton Lake have been contaminated with at least mercury, copper, and lead from discharges of hazardous substances and pollutants at the PLW Facility.

52. Hazardous substances and pollutants discharged at the PLW Facility have contaminated sediment and soils within the Facility and adjacent areas with barium, copper, lead, mercury, selenium, zinc, and organic contaminants such as perchloroethylene ("PCE") and polycyclic aromatic hydrocarbons ("PAHs"), among other contaminants.

53. Upon information and belief, sediments and soils that were downwind of the Facility's operations have also been contaminated through air deposition of hazardous substances and pollutants released from the PLW Facility.

54. Hazardous substances and pollutants discharged at or released from the Facility have adversely impacted sediments and soils both on and off the Facility.

**Wetlands**

55. Wetlands are a critical component of New Jersey's ecological resources, which include land and aquatic resources comprised of unique and complex ecosystems.

56. New Jersey has approximately 730,000 acres of fresh-water wetlands and 250,000 acres of coastal wetlands.

57. Wetlands can sustain a wide diversity of plants and animals that are essential in a healthy ecosystem.

58. Wetlands perform many additional functions, which include the improvement of water quality, sediment trapping, groundwater recharge, shoreline protections, and protecting land from flooding and erosion.

59. Ramapo State Forest, which borders the northeast and eastern portions of the Facility, contains deciduous wooded wetlands.

60. Hazardous substances and pollutants discharged at or released from the PLW Facility have adversely impacted wetlands both on and off the Facility, including wetlands associated with the Acid Brook, Acid Brook Delta, Pompton Lake, Ramapo River, Wanaque River, and Pompton River.

**Forests**

61. Forests are a critical component of New Jersey's ecological resources.

62. New Jersey's forests produce clean water and air, absorb runoff, provide recreation, and are home to thousands of species of wildlife.

63. The Ramapo Mountain State Forest contains deciduous forest and some deciduous wooded wetlands.

64. Upon information and belief, hazardous substances and pollutants discharged at, or released from, the PLW Facility have adversely impacted forests both on and off the Facility, including the Ramapo Mountain State Forest.

**Biota**

65. Biota, including the flora and fauna of the State, are critical ecological resources. New Jersey is home to more than 2,000 plant species, which include entire communities of rare flora that cannot be found anywhere else in the world. Approximately 15 percent of the native plant species in New Jersey, however, are now at risk of extinction, with a total of 331 vascular plant species listed as endangered and an additional 32 that have already been extirpated.

66. New Jersey wildlife includes approximately 900 species, including 90 mammal species, 79 reptile and amphibian species, more than 400 fish species, and approximately 325 species of birds. Approximately 1.5 million shorebirds and as many as 80,000 raptors make migratory stopovers in New Jersey each year.

67. At least 17 percent of New Jersey's native vertebrate species and 24 percent of its native invertebrate species are at risk of extinction. Several threatened and endangered raptor species have difficulty breeding because of the bioaccumulation of toxic compounds.

68. New Jersey's biodiversity provides a wealth of ecological, social, and economic goods and services that are an integral part of the ecological infrastructure for all cultural and economic activity in the State.

69. Contamination from the discharge of hazardous substances and pollutants is one of the major causes of biodiversity loss.

70. Natural resource injuries to biota in New Jersey negatively impact not only the individual species directly involved, but the capacity of the injured ecosystems to regenerate and sustain such life into the future.

71. Hazardous substances and pollutants discharged at or released from the PLW Facility have adversely impacted biota both on and off the Facility.

**<u>GENERAL ALLEGATIONS</u>**

72. Old DuPont owned and operated the PLW Facility as an explosives manufacturing facility for 92 years, from 1902 to 1994. The Facility is still commonly referred to as "DuPont Pompton Lakes Works" or "Chemours Pompton Lakes Works" site.

73. The Facility's address is 2000 Cannonball Road in Pompton Lakes. The Facility is located in Pompton Lakes Borough and Wanaque Borough, both in Passaic County.

74. The PLW Facility currently encompasses approximately 600 acres and is also designated and known as Block 100, Lots 3, 6, 7, and 9 in Pompton Lakes Borough and Block 479, Lots 4, 4.1, and 5 in Wanaque Borough.

75. Interstate 287 ("I-287") crosses the northern and western portions of the Facility, and the Ramapo State Forest borders the northeast and eastern portions. Areas known as Pompton Lakes, Twin Lake Valley, and Haskell surround the Facility on the southern and western edges, and support residential, industrial, and commercial uses.

76. Old DuPont manufactured explosives and explosive products at the PLW Facility for nearly a century. Manufactured products included mercury fulminate and lead azide blasting caps, aluminum and bronze shelled blasting caps, copper shells, metal wires, fuses, smokeless powder, and other explosives. During World War I, the Facility produced up to 1,500,000 blasting

14

caps per day. Old DuPont also operated a wire plating and drawing process, an aluminum and copper shell drawing process, and a metal cladding operation.

77. In the Haskell Works area of the Facility, Old DuPont manufactured nitrocellulose, ballistite, and smokeless powder.

78. Waste management practices at the Facility resulted in significant contamination of surface water, groundwater, soils, and sediments both on and off the Facility.

79. Old DuPont used a number of areas of the Facility for the disposal of various wastes generated by its explosives manufacturing operations, including lead salts, mercury compounds, explosive powders, chlorinated solvents, waste wire drawing solution, and detonated off-specification blasting caps.

80. Old DuPont made decisions regarding disposal practices, equipment selection, and equipment maintenance (or lack thereof) at the Facility.

81. Based upon information and belief, Old DuPont knew, or should have known, that its practices and operations at the Facility would likely contaminate the State's natural resources. Upon information and belief, these practices occurred with the knowledge of senior level corporate officers and managers within and throughout Old DuPont's corporate structure, such as environmental coordinators, department heads, vice presidents, presidents, and members of corporate boards of directors.

**Contamination by Area**

82. Old DuPont's operations at the Facility were historically divided into three areas: the Eastern Manufacturing Area, the Western Manufacturing Area, and the Northern Manufacturing Area. Western Manufacturing Area

83. The Western Manufacturing Area ("WMA") is located in the Wanaque River Valley. The WMA is located south of I-287 along the Wanaque River.

15

84. The Wanaque River Valley was formerly known as the Lake Inez Valley (the removal of the Lake Inez Dam in 1984 drained the lake), and it was alongside Lake Inez that Old DuPont's explosives manufacturing began in the area that would become part of the PLW Facility.

85. Old DuPont began explosive manufacturing at the WMA in 1902.

86. In 1926, Old DuPont consolidated its operations in the Eastern Manufacturing Area and ended its operations in the WMA.

87. Operational facilities in the WMA consisted of buildings for manufacturing; storage areas, where magazines for explosive materials and products were stored; and engineered tunnels for conducting cladding operations. In the WMA, these structures were located mainly along the banks and ridge slopes of the Wanaque River.

88. Manufacturing and waste disposal practices at the Facility led to spills and releases of hazardous substances and pollutants into WMA soils and groundwater, as well as to surface water and sediments in the Wanaque River and its floodplain.

89. Examples of waste areas in the WMA include the shooting ground (known as Area of Concern ("AOC") 107), the old fuze works wire dump (AOC 192), old fuze works dump (AOC 194), old fuze miscellaneous waste site (AOC 193), tar deposits area (AOC 198), and the burning area (AOC 199).

90. The following contaminants have been identified in natural resources in the WMA: antimony, arsenic, cadmium, chromium, copper, lead, mercury, nickel, selenium, silver, thallium, zinc, and PAHs.

*Eastern Manufacturing Area*

91. The Eastern Manufacturing Area ("EMA") was formerly referred to as the Acid Brook Valley. The EMA is located east of the Wanaque River, south of I-287, west of Ringwood State Park, and north of residential portions of Pompton Lakes Borough.

92.     Operational facilities in the EMA were located in the low-lying lands of the valley, consisting of manufacturing and experimental laboratory buildings; storage areas, where magazines for explosive materials and products were stored; and an engineered tunnel for conducting cladding operations.

93.     Waste management practices during the Facility's operation resulted in contamination of soil, groundwater, surface water, and sediment both on and off the Facility, including but not limited to the EMA, Acid Brook, Acid Brook Delta, Pompton Lake, and the Pompton Lake floodplain.

94.     The following contaminants have been identified in natural resources in the EMA: arsenic, antimony, barium, cadmium, chromium, cobalt, copper, lead, manganese, mercury, nickel, selenium, silver, thallium, cyanide, PCE, PAHs, and bis (2-ethylhexyl) phthalate.

95.     The following manufacturing and chemical storage areas in the EMA were sources of hazardous substances and pollutants:

   a.    Mercury fulminate plant, storage building and fume lines;

   b.    Experimental lead azide laboratory;

   c.    Black powder mill;

   d.    Cap test area;

   e.    Storage tanks for materials such as mercury fulminate, lead azide, and other chemicals used in manufacturing processes;

   f.    Gasoline underground storage tanks;

   g.    Powder dry-house impoundment;

   h.    Platforms for various manufacturing processes such as mercury fulminate killing; and

17

i.      Engineered tunnels for cladding operations.

96.    These locations were sources of contamination to surrounding and underlying sediments and soils, groundwater, and surface water resources.

97.    Detection of materials known to have been used as constituents in the historic manufacturing operations at EMA (for example, mercury and lead used to manufacture mercury fulminate and lead azide) confirm that these materials were released as a result of the Facility's operations. These detected materials include metals—such as lead, mercury, and copper, as well as chlorinated organic compounds—which have been detected in EMA soil and in groundwater in the immediate vicinity of the Facility's historic operations.

98.    In general, a multitude of waste products were disposed on-site. Wastes disposed of on-site included, but were not limited to, lead salts, mercury compounds, explosive powders, chlorinated solvents, waste wire drawing solutions, metal scrap, and detonated blasting caps. These wastes were handled in a variety of ways. Powder-contaminated material was burned on-site. Chemical wastes were disposed of in unlined waste lagoons, ponds, and waste storage tanks. Sludge was piled on unlined surfaces, next to lagoons and ponds. Scrap metal and other solid wastes were disposed of in dumps. Off-specification blasting caps were disposed of by detonation underwater in a lagoon known as the "Shooting Pond."

99.    Examples of former waste management areas at the Facility that are sources of hazardous substances and pollutants include: the lead recycling area, burning grounds and pits, unlined lagoons, burned wire and scrap metal dumps, the canister disposal area, and the Shooting Pond.

100.    The Shooting Pond was created by excavating into bedrock. Bedrock in this area is fractured and is a recharge area for aquifers in the valley, and repeated underwater explosions may

have further fractured the bedrock. For decades, Old DuPont detonated about 100 defective blasting caps in the pond every 10 minutes, five days a week.

101. Groundwater in the vicinity of the Shooting Pond is contaminated with various metals and VOCs, including lead, copper, selenium, 1,1,1-trichloroethane ("TCA"), trichloroethylene ("TCE"), and PCE. Contaminants most likely entered the groundwater as a result of percolation from the Shooting Pond and splash water generated during detonation.

102. Samples of the Shooting Pond water in 1979 and 1981 detected aniline (500 parts per billion ("ppb")), chlorinated hydrocarbons (149 ppb), arsenic (95 ppb), selenium (600 ppb), chromium (4,000 ppb), lead (8,000 ppb), and methylene chloride (127 ppb).

103. Similarly, waters of the State were contaminated when waste solvents, including TCE and PCE, were dumped with wastewater into four unlined lagoons on the edge of the Facility. Contaminants migrated from the unlined lagoons into the underlying groundwater.

104. In addition, wastewater containing lead nitrate was dumped into one of two unlined salt ponds prior to 1972; the other received wastewater containing sodium hydroxide, lead nitrate, and dinitro-o-cresol prior to 1976. The entire area was filled and paved over in 1978. Elevated levels of lead have been detected in groundwater in this area.

105. The scrap metal dump was another source of contamination. The dump received construction debris, burned iron wire, scrap metal, and old equipment prior to 1950. As a result, groundwater in the area became contaminated with lead and PCE.

106. The outdoor storage area also has been a source of contamination to the site soils. The storage area consisted of an asphalt pad with maximum capacity of 204 drums and five 20-cubic yard containers of solid waste—primarily lead-contaminated sand, gravel, and debris from the Shooting Pond area. There was no containment system, and stormwater runoff from the

19

outdoor storage area flowed over land to local surface depressions during operations, where it seeped into the soil.

*Northern Manufacturing Area*

107. The Northern Manufacturing Area ("NMA") is located north of I-287 along the Wanaque River.

108. Hazardous substances and pollutants discharged at or released from the Facility, including arsenic, lead, and mercury, have adversely impacted natural resources in the NMA.

*Incomplete Cleanup Efforts to Date*

109. The State has attempted for decades to get Old DuPont and, in recent years, Chemours to delineate the extent of contamination and remediate the contamination. To date, those efforts have not yielded adequate results.

110. On April 29, 1983, the Department issued a letter requiring Old DuPont to assess the impact of waste disposal areas on the groundwater at the Facility.

111. Old DuPont submitted a "Ground Water Assessment Report" to the Department on July 19, 1984. That report revealed extensive contamination of the groundwater at the Facility by hazardous substances and pollutants including lead, selenium, and VOCs, including PCE. The most severe contamination was found in the southern portion of the Facility near the four unlined waste lagoons.

112. After reviewing the 1984 report, NJDEP required Old DuPont to further investigate the extent of groundwater contamination in this part of the Facility.

113. Further investigation revealed that groundwater was contaminated with TCE, PCE, 1,1,1-TCA, 1,1-dichloroethylene, trans-1,2-dichloroethylene, lead, selenium, and mercury.

114. The investigation also found that a plume of contaminated groundwater had migrated off the Facility boundaries to the southeast, contaminating private and municipal wells.

115. In September 1988, Old DuPont and the State entered an Administrative Consent Order ("ACO") requiring Old DuPont to conduct a remedial investigation and feasibility study of remedial action alternatives addressing "all contamination at/or emanating from the Site."

116. The 1988 State ACO required site-wide corrective action and off-site corrective action, addressing solid wastes and contaminated groundwater.

117. On July 5, 1990, the Department issued to Old DuPont a portion of a permit for the operation of a Resource Conservation and Recovery Act ("RCRA") Treatment, Storage, and Disposal Facility. Under federal law, the State lacked authority to issue the provisions of the permit that pertained to the Hazardous and Solid Waste Amendments of 1984 ("HSWA"), because only the federal U.S. Environmental Protection Agency ("EPA") may issue such permit provisions. The permit would not become operational until both the RCRA and HSWA portions were issued. On August 24, 1992, the EPA (Region II) issued the HSWA portion of the RCRA permit. On that date, therefore, the RCRA permit became operational.

118. In 2005, the Department, the Administrator, and Old DuPont entered into a Compensatory Restoration Administrative Consent Order ("CRACO"). The CRACO is not a bar to the claims asserted in this Third Amended Complaint for reasons including, but not limited to, the following: Old DuPont has failed to comply with the CRACO, concealed the nature and extent of contamination at its facilities, has attempted to provide contaminated property to fulfill its obligations, and additional injuries have been incurred since the CRACO became effective (e.g., new discharges, injuries caused by the remedy).

119. Then in 2015, when Old DuPont transferred the PLW Facility to Chemours and Chemours FC, the Department, Old DuPont, Chemours, and Chemours FC entered into an Administrative Consent Order Amendment pursuant to the Industrial Site Recovery Act, N.J.S.A.

13:1K-6, *et seq*., and Spill Act, setting forth various funding, remedial, and permitting requirements.

120. Over the course of decades of investigations, over 200 solid waste management units and areas of concern have been identified at or in the vicinity of the PLW Facility.

121. On March 27, 2019, the Department issued a Directive and Notice to Insurers pursuant to the authority vested in the Commissioner by N.J.S.A. 13:1-D-1 et seq. and the Spill Act to Old DuPont, Chemours, and Chemours FC to notify them that the Department believes them to be responsible for the significant contamination of natural resources both on and off the Facility. The Directive instructed those Defendants to pay the Department $125,000 for the initial costs to prepare a Natural Resource Damage Assessment plan that addressed all potentially injured natural resources and provide the Department with access to all applicable documents that may be of assistance in developing the NRDA plan. Old DuPont, Chemours, and Chemours FC refused to comply with the Directive.

122. Today, 35 years after the original 1988 State ACO was signed, the Facility and surrounding natural resources remain heavily contaminated. The full nature and extent of the contamination, and the injuries caused by that contamination, remain unknown.

123. Although Defendants have addressed some historic contamination, extensive contamination remains throughout the Site, and that contamination continues to harm the natural resources of the State.

*Old DuPont's Three Step Fraudulent Scheme to Isolate Its Valuable Tangible Assets From Its PFAS Liabilities and Hinder Creditors*

124. Old DuPont, Chemours, and Chemours FC have very substantial liabilities due to their polluting activities. Although PFOA and PFAS contamination are not an issue at the PLW Facility, Old DuPont's and Chemours', and Chemours FC's liabilities for PFOA and other PFAS

contamination account for a very substantial portion of their environmental liabilities nationwide, and therefore affect their overall ability to satisfy their environmental liabilities for the PLW Facility.

125. These liabilities include remediation obligations, tort damages, natural resource damages, and, most importantly, likely massive and potentially crippling punitive damages arising from Old DuPont's intentional misconduct.

126. Old DuPont sought to insulate itself from billions of dollars of legacy pollution liabilities, especially those arising from PFOA and other PFAS contamination at chemical plants that it owned and operated throughout the country.

127. Upon information and belief, Old DuPont's potential cumulative liability related to PFOA and other PFAS is likely billions of dollars due to the persistence, mobility, bio-accumulative properties, and toxicity of these "forever" compounds, as well as Old DuPont's decades-long attempt to hide the dangers of PFAS from the public.

128. For more than five decades, Old DuPont manufactured, produced, or utilized PFOA and other PFAS at plants in New Jersey, West Virginia, and North Carolina. Throughout this time, Old DuPont was aware that PFOA was toxic, harmful to animals and humans, bio-accumulative, and bio-persistent in the environment. Old DuPont also knew that it had emitted and discharged PFOA in large quantities into the environment, and that tens of thousands of people had been exposed to PFOA, including through public and private drinking water supplies, which Old DuPont had contaminated. Thus, Old DuPont knew, or reasonably should have known, that it faced billions of dollars in liabilities arising from its use of PFOA.

129. For example, in 1999, members of the Tennant family, who owned property impacted by PFOA-contamination adjacent to Old DuPont's Washington Works plant in Parkersburg, West Virginia, sued Old DuPont in West Virginia federal court.

130. Old DuPont's in-house counsel was very concerned about Old DuPont's exposure related to PFOA. In November 2000, one of Old DuPont's in-house counsel handling PFOA issues wrote to his co-counsel: "We are going to spend millions to defend these lawsuits and have the additional threat of punitive damages hanging over our head. Getting out in front and acting responsibly can undercut and reduce the potential for punitives . . . Our story is not a good one, we continued to increase our emissions into the river in spite of internal commitments to reduce or eliminate the release of this chemical into the community and the environment because of our concern about the biopersistence of this chemical."

131. In 2005, after confidentially settling the *Tennant* case, Old DuPont agreed to pay $10.25 million to resolve eight counts brought by EPA alleging violations of the Toxic Substances Control Act and the Resource Conservation and Recovery Act. That was the largest civil administrative penalty that EPA had ever obtained under a federal environmental statute. Old DuPont also was required to commit an additional $6.25 million to supplemental environmental projects. *See* https://www.epa.gov/enforcement/reference-news-release-epa-settles-pfoa-case-against-dupont-largest-environmental.

132. Also, in 2005, Old DuPont agreed to settle a class action lawsuit, which had been filed on behalf of 70,000 residents of Ohio and West Virginia who had been exposed to PFOA that Old DuPont had discharged from Washington Works, for $343 million. Under the terms of the settlement, Old DuPont agreed to fund a panel of scientists (the "Science Panel") to determine if any diseases were linked to PFOA exposure, to filter local water for as long as PFOA

concentrations exceeded regulatory thresholds, and to set aside $235 million for ongoing medical monitoring of the affected community. The settlement also provided that any class members who developed the linked diseases would be entitled to sue for personal injury, and Old DuPont agreed not to contest the fact that exposure to PFOA could cause those diseases.

133. After eight years, the Science Panel found several human diseases with "probable links" to PFOA exposure, including: high cholesterol; ulcerative colitis; pregnancy-induced hypertension; thyroid disease; testicular cancer; and kidney cancer.

134. More than 3,500 personal injury claims were filed against Old DuPont in Ohio and West Virginia as part of the 2005 settlement. These claims were consolidated in the federal multidistrict litigation styled *In Re: E.I. du Pont de Nemours and Company C-8 Personal Injury Litigation* (MDL No. 2433) in the United States District Court for the Southern District of Ohio. Forty "bellwether" trials were scheduled to take place in 2015 and 2016.

135. Old DuPont knew that it faced substantial exposure at these trials, as well as liability related to PFOA and other PFAS contamination at other sites throughout the country and that its liability was likely billions of dollars.

136. In addition to its PFOA and other PFAS liabilities, Old DuPont was facing very substantial environmental liabilities for its historic manufacturing and research operations throughout the country, including liability for discharges at the PLW Facility.

137. In light of this significant exposure, upon information and belief, by 2013, Old DuPont's management began to consider restructuring the company in order to, among other things, avoid responsibility for the widespread environmental harm that Old DuPont's PFAS had caused and shield billions of dollars in assets from these substantial liabilities. Old DuPont referred to this initiative internally as "Project Beta."

138. Upon information and belief, Old DuPont contemplated various restructuring opportunities, including potential merger structures. In that connection, in or about 2013, Old DuPont and The Dow Chemical Company ("Old Dow") began discussions about a possible "merger of equals."

139. Upon information and belief, Old DuPont recognized that neither Old Dow, nor any other rational merger partner, would agree to a transaction that would result in exposing Old Dow, or any other merger partner, to the substantial PFAS and environmental liabilities that Old DuPont faced.

140. Accordingly, Old DuPont's management decided to pursue a corporate restructuring strategy specifically designed to isolate Old DuPont's massive legacy liabilities from its valuable tangible assets in order to shield those assets from creditors and entice Dow to pursue the proposed merger.

141. Old DuPont engaged in a three-part restructuring plan.

142. The first step in Old DuPont's plan was to transfer its Performance Chemicals Business (which included Teflon® and other products, the manufacture of which involved the use of PFOA and other PFAS) into its wholly owned subsidiary, Chemours. And then, in July 2015, Old DuPont "spun-off" Chemours as a separate public entity and saddled Chemours with Old DuPont's massive legacy liabilities (the "Chemours Spinoff").

143. Old DuPont knew that Chemours was undercapitalized and could not satisfy the massive liabilities that it caused Chemours to assume. Old DuPont also knew that the Chemours Spinoff alone would not isolate its own assets from its PFAS liabilities, and that DuPont still faced direct liability for its own conduct.

144. Accordingly, Old DuPont moved on to the next step of its plan, designed to further distance itself from the exposure it had created over its decades-long bad conduct with regard to the environment and PFAS.

145. The second step involved Old DuPont and Old Dow entering into an "Agreement and Plan of Merger" in December 2015, pursuant to which Old DuPont and Old Dow merged with subsidiaries of a newly formed holding company, DowDuPont, Inc. ("DowDuPont"), which was created for the sole purpose of effectuating the merger. Old DuPont and Old Dow became subsidiaries of DowDuPont.

146. Then, through a series of subsequent agreements, DowDuPont engaged in numerous business segment and product line "realignments" and "divestitures."

147. The net effect of these transactions was to transfer, either directly or indirectly, a substantial portion of Old DuPont's assets to DowDuPont.

148. The third step involved DowDuPont spinning off two, new publicly traded companies: (i) Corteva, which currently holds Old DuPont as a subsidiary, and (ii) Dow, Inc. ("New Dow") which currently holds Old Dow. DowDuPont was then renamed DuPont de Nemours, Inc. (*i.e.*, New DuPont).

149. As a result of these transactions, between December 2014 (pre-Chemours Spinoff) and December 2019 (post-Dow merger), the value of Old DuPont's tangible assets decreased by $20.85 billion, or approximately one-half.

150. New DuPont and New Dow now hold the vast majority of the tangible assets that Old DuPont formerly owned.

151. Many of the details about these transactions are hidden from the public in confidential schedules and exhibits to the various restructuring agreements. Upon information and

belief, Old DuPont, New DuPont, New Dow, and Corteva have intentionally buried these details in an attempt to hide from creditors, like the State, where Old DuPont's valuable assets went and the inadequate consideration that Old DuPont received in return.

152. The below graphic depicts the restructuring as it progressed through each of the three steps:



*The Three Steps in Detail*
*Step 1: The Chemours Spinoff*

153. In February 2014, Old DuPont formed Chemours as a wholly owned subsidiary. Chemours was originally incorporated on February 18, 2014 under the name "Performance Operations, LLC."

154. On or about April 15, 2014, the company was renamed "The Chemours Company, LLC," and on April 30, 2015, it was converted from a limited liability company to a corporation named "The Chemours Company."

155. Prior to July 1, 2015, Chemours was a wholly owned subsidiary of Old DuPont.

156. On July 1, 2015, Old DuPont completed the spinoff of its Performance Chemicals Business through the creation of Chemours, which became a separate, publicly traded entity.

157. At the time of the Chemours Spinoff, the Performance Chemicals Business consisted of Old DuPont's Titanium Technologies, Chemical Solutions, and Fluorochemicals segments.

158. The Performance Chemicals Business included the business units that had manufactured, used, and discharged PFOA into the environment.

159. Prior to the Chemours Spinoff, Chemours was a wholly owned subsidiary of Old DuPont, and its Board of Directors had three members, all of whom were Old DuPont employees.

160. On June 19, 2015, a fourth member of the Board was appointed, and upon information and belief, this fourth member had served as a member of Old DuPont's Board of Directors from 1998 to 2015.

161. On July 1, 2015, effective immediately prior to the Chemours Spinoff, the size of the Chemours Board of Directors was expanded to eight members. The three initial Old DuPont employees resigned from the Board, and seven new members were appointed to fill the vacancies.

162. To effectuate the Chemours Spinoff, Old DuPont and Chemours entered into the June 26, 2015 Separation Agreement (the "Chemours Separation Agreement").

163. Pursuant to the Chemours Separation Agreement, Old DuPont agreed to transfer to Chemours all businesses and assets related to the Performance Chemicals Business, including 37 active chemical plants. Upon information and belief, the PLW Facility was transferred to Chemours via the Chemours Separation Agreement and one or more schedules to that Agreement.

164. Old DuPont completed a significant internal prior to the Chemours Spinoff to ensure the transfer of all of its Performance Chemicals Business assets to Chemours.

165. At the same time, Chemours accepted a broad assumption of Old DuPont's massive liabilities relating to Old DuPont's Performance Chemicals Business, including those arising from its discharge of contaminants, such as PFOA and other PFAS, into the environment. The specific details regarding the nature and value of probable maximum loss, and anticipated timing of the liabilities that Chemours assumed are set forth in the non-public schedules and exhibits to the Chemours Separation Agreement.

166. Notwithstanding the billions of dollars in environmental and PFAS liabilities that Chemours would face, on July 1, 2015, Chemours transferred to Old DuPont approximately $3.4 billion as a cash dividend, along with a "distribution in kind" of promissory notes with an aggregate principal amount of $507 million.

167. Thus, in total, Chemours distributed approximately $3.9 billion to Old DuPont. Chemours funded these distributions by entering into approximately $3.995 billion of financing transactions, including senior secured term loans and senior unsecured notes, on May 12, 2015. Also, Chemours distributed approximately $3.0 billion in common stock to Old DuPont shareholders on July 1, 2015 (181 million shares at $16.51 per share price).

168. Accordingly, most of the valuable assets that Chemours may have had at the time of the Chemours Spinoff were unavailable to creditors with current or future environmental and PFAS claims, and Old DuPont stripped Chemours' value for itself and its shareholders. Old DuPont, however, only transferred $4.1 billion in net assets to Chemours.

169. The Chemours Separation Agreement also required Chemours to assume billions of dollars of Old DuPont's PFAS liabilities and includes an indemnification of Old DuPont in connection with these liabilities, which is uncapped and does not have a survival period.

170. Specifically, the Chemours Separation Agreement requires Chemours to indemnify Old DuPont against, and assume for itself, all "Chemours Liabilities," which are defined broadly to include, among other things, "any and all Liabilities relating . . . primarily to, arising primarily out of or resulting primarily from, the operation or conduct of the Chemours Business, as conduct at any time prior to, at or after the Effective Date . . . including . . any and all Chemours Assumed Environmental Liabilities . . . .," which includes Old DuPont's historic liabilities relating to and arising from its decades of emitting pollution, including PFOA and PFAS, into the environment from its dozens of facilities, including the PLW Facility.

171. Chemours must indemnify Old DuPont against, and assume for itself, the Chemours Liabilities regardless of: (i) when or where such liabilities arose, (ii) whether the facts upon which they are based occurred prior to, on, or subsequent to the effective date of the Chemours Spinoff, (iii) where or against whom such liabilities are asserted or determined, (iv) whether arising from or alleged to arise from negligence, gross negligence, recklessness, violation of law, fraud, or misrepresentation by any member of the Old DuPont group or the Chemours group; (v) the accuracy of the maximum probable loss values assigned to such liabilities; and (vi) which entity is named in any action associated with any liability.

172. The Chemours Separation Agreement also requires Chemours to indemnify Old DuPont from, and assume all, environmental liabilities that arose prior to the Chemours Spinoff if they were "primarily associated" with the Performance Chemicals Business.

173. In addition, Chemours agreed to use its best efforts to be fully substituted for Old DuPont with respect to "any order, decree, judgment, agreement or Action with respect to Chemours Assumed Environmental Liabilities . . . ."

174. Notably, Chemours sued Old DuPont in Delaware state court in 2019, alleging, among other things, that if (i) the full value of Old DuPont's PFAS and environmental liabilities were properly estimated, and (ii) the Court does not limit Chemours' liability that the Chemours Separation Agreement imposes, then Chemours would have been insolvent at the time it was spun off from Old DuPont. There was no meaningful, arms-length negotiation of the Chemours Separation Agreement and Old DuPont largely dictated its terms.

175. In its Delaware lawsuit, Chemours alleged that Old DuPont refused to allow any procedural protections for Chemours in the negotiations, and Old DuPont and its outside counsel prepared all the documents to effectuate the Chemours Spinoff. Indeed, during the period in which the terms of commercial agreements between Chemours and Old DuPont were negotiated, Chemours did not have an independent board of directors or management independent of Old DuPont.

176. Chemours' independent board, newly appointed on July 1, 2015, immediately prior to the Chemours Spinoff did not participate in the negotiations of the terms of the separation.

177. It is apparent that Old DuPont's goal with respect to the Chemours Spinoff was to segregate a large portion of Old DuPont's legacy environmental liabilities, including liabilities related to its PFAS chemicals and products, and, in so doing, shield Old DuPont.

178. Not surprisingly, given Old DuPont's extraction of nearly $4 billion from Chemours immediately prior to the Chemours Spinoff, Chemours was thinly capitalized and unable to satisfy the substantial liabilities that it assumed from Old DuPont. Indeed, Chemours disclosed in public SEC filings that its "significant indebtedness" arising from its separation from Old DuPont restricted its current and future operations.

179. Indeed, shortly after the Chemours Spinoff, market analysts described Chemours as "a bankruptcy waiting to happen" and a company "purposely designed for bankruptcy."

180. At the end of December 2014, Chemours reported it had total assets of $5.959 billion and total liabilities of $2.286 billion. At the end of 2015, following the Chemours Spinoff, Chemours reported that it had total assets of $6.298 billion and total liabilities of $6.168 billion, yielding a total net worth of $130 million.

181. Removing Chemours' Goodwill and Other Intangibles of $176 million, which were reported at that time, yields a tangible net worth of negative $46 million (that is, Chemours' liabilities were greater than its tangible assets).

182. For the year 2015, Chemours reported $454 million in "other accrued liabilities," which in turn included $11 million for accrued litigation and $68 million for environmental remediation. Chemours separately reported $553 million in "other liabilities," which included an additional $223 million for environmental remediation and $58 million for accrued litigation.

183. Chemours significantly underestimated its liabilities, including the liabilities that it had assumed from Old DuPont with respect to PFAS contamination, and which Old DuPont and Chemours knew or should have known would be billions of dollars in addition to other environmental liabilities for other contaminants discharged at DuPont and Chemours facilities.

184. For example, in 2017, Chemours and Old DuPont amended the Chemours Separation Agreement in connection with the settlement of the personal injury multi-district litigation brought by thousands of residents who had been exposed to PFOA from Old DuPont's Washington Works plant. Per the amendment, Chemours paid $320.35 million to the plaintiffs in the settlement on August 21, 2017, and Old DuPont paid an additional $320.35 million on September 1, 2017. For all future PFOA costs incurred from July 6, 2017 through July 6, 2022,

Chemours agreed to cover the first $25 million per 12-month period, Old DuPont agreed to cover the next $25 million per 12-month period, and Chemours agreed to cover any additional amounts. Chemours is a named defendant in many lawsuits relating to Old DuPont's historical use of PFAS and other contaminants.

185. Had the full extent of Old DuPont's legacy liabilities been taken into account, as they should have been, at the time of the Chemours Spinoff, Chemours would have had negative equity (that is, total liabilities that are greater than total assets), not only on a tangible basis, but also on a total equity basis; Chemours would have been rendered insolvent at that time.

*Step 2: The Old Dow/Old DuPont "Merger"*

186. After the Chemours Spinoff, Old DuPont took the untenable position that it was somehow no longer responsible for the widespread PFAS contamination that it had caused over several decades. Old DuPont publicly claimed that the PFAS liabilities associated with the Performance Chemicals Business that Old DuPont had transferred to Chemours rested solely with Chemours, and not with Old DuPont.

187. Of course, Old DuPont could not contractually discharge all of its historical liabilities through the Chemours Spinoff, and Old DuPont remained liable for the liabilities it had caused, and Chemours had assumed.

188. Old DuPont knew that it could not escape liability and would still face exposure for PFAS liabilities, including for potentially massive punitive damages. So Old DuPont moved to the next phase of its fraudulent scheme.

189. On December 11, 2015, less than six months after the Chemours Spinoff, Old DuPont and Old Dow announced that their respective boards had approved an agreement "under which the companies [would] combine in an all-stock merger of equals" and that the combined

company would be named DowDuPont, Inc. (the "Dow-DuPont Merger"). The companies disclosed that they intended to subsequently separate the combined companies' businesses into three publicly-traded companies through further spinoffs, each of which would occur 18 to 24 months following the closing of the merger.

190. To effectuate the transaction, Old DuPont and Old Dow entered into an Agreement and Plan of Merger (the "Dow-DuPont Merger Agreement") that provided for: (i) the formation of a new holding company – Diamond-Orion HoldCo, Inc., later named DowDuPont, and then renamed DuPont de Nemours, Inc., (*i.e.*, New DuPont), and (ii) the creation of two new merger subsidiaries into which Old Dow and Old DuPont each would merge. Thus, as a result of the Merger, and in accordance with the DowDuPont Merger Agreement, Old Dow and Old DuPont each became wholly owned subsidiaries of DowDuPont.

191. Although Old DuPont and Old Dow referred to the transaction as a "merger of equals," the two companies did not actually merge at all, because doing so would have infected Old Dow with all of Old DuPont's historical PFAS liabilities. Rather, Old DuPont and Old Dow became affiliated sister companies that were each owned by the newly formed DowDuPont.

192. The corporate organization following the "merger" is depicted under "Step 2" in the graphic at ¶ 149.

*Step 3: The Shuffling, Reorganization, and Transfer of Valuable Assets Away from Old DuPont and Separation of Corteva and New Dow*

193. Following the Dow-DuPont Merger, DowDuPont underwent a significant internal reorganization, and engaged in numerous business segment and product line "realignments" and "divestitures." The net effect of these transactions has been the transfer, either directly or indirectly, of a substantial portion of Old DuPont's assets out of the company.

194. While, again, the details of these transactions remained hidden from the State and other creditors, it is apparent that the transactions were intended to frustrate and hinder creditors with claims against Old DuPont, including with respect to its substantial environmental and PFAS liabilities. The significant internal reorganization instituted by DowDuPont was in preparation for the conglomerate being split into three separate, publicly-traded companies.

195. Old DuPont's assets, including its remaining business segments and product lines, were transferred either directly or indirectly to DowDuPont, which reshuffled the assets and combined them with the assets of Old Dow, and then reorganized the combined assets into three distinct divisions: (i) the "Agriculture Business," (ii) the "Specialty Products Business," and (iii) the "Materials Science Business."

196. While the precise composition of these divisions, including many details of the specific transactions, the transfer of business segments, and the divestiture of product lines during this time, are not publicly available, it is apparent that Old DuPont transferred a substantial portion of its valuable assets to DowDuPont for far less than the assets were worth.

197. Once the assets of Old DuPont and Old Dow were combined and reorganized, DowDuPont incorporated two new companies to hold two of the three newly formed business lines: (i) Corteva, which became the parent holding company of Old DuPont, which in turn holds the Agriculture Business, and (ii) New Dow, which became the parent holding company of Old Dow, and which holds the Materials Science Business. DowDuPont retained the Specialty Products Business and prepared to spin off Corteva and New Dow into separate, publicly traded companies.

198.    The below graphic depicts the structure of DowDuPont after the internal reorganization and realignment (and notes the planned disposition of the new companies):



199.    The mechanics of the separations are governed by the April 1, 2019 Separation and Distribution Agreement among Corteva, New Dow, and DowDuPont (the "DowDuPont Separation Agreement").

200.    The agreement generally allocates the assets primarily related to the respective business divisions to Corteva (Agriculture Business), New Dow (Materials Science Business), and New DuPont (Specialty Products Business), respectively. New DuPont also retained several "non-core" business segments and product lines that once belonged to Old DuPont.

201.    Similarly, Corteva, New Dow, and New DuPont each retained the liabilities primarily related to the business divisions that they retained, *i.e.*, (i) Corteva retained and assumed the liabilities related to the Agriculture Business, (ii) New DuPont retained and assumed the

liabilities related to the Specialty Products Business, and (iii) New Dow retained and assumed the liabilities related to the Materials Science Business.

202. Corteva and New DuPont also assumed direct financial liability of Old DuPont that was not related to the Agriculture, Materials Science or Specialty Products Businesses, including, upon information and belief, the PFAS liabilities. These assumed PFAS liabilities are allocated on a pro rata basis between Corteva and New DuPont pursuant to the DowDuPont Separation Agreement, such that, after both companies have satisfied certain conditions, future liabilities are allocated 71% to New DuPont and 29% to Corteva.

203. This "allocation" applies to Old DuPont's legacy liabilities for PFAS contamination and its former Performance Chemicals Business, including the State of New Jersey's claims in this case.

204. While New DuPont and Corteva have buried the details in non-public schedules, upon information and belief, New DuPont and Corteva each assumed these liabilities under the DowDuPont Separation Agreement, along with other liabilities related to DuPont's discontinued and divested businesses. The State can therefore bring claims against New DuPont and Corteva directly for Old DuPont's contamination of the State's natural resources.

205. The separation of New Dow was completed on or about April 1, 2019, when DowDuPont distributed all of New Dow's common stock to DowDuPont stockholders as a pro rata dividend. New Dow now trades on the New York Stock Exchange ("NYSE") under Old Dow's stock ticker "DOW."

206. On or about May 2, 2019, DowDuPont consolidated the Agricultural Business line into Old DuPont, and then, on or about May 31, 2019, it "contributed" Old DuPont to Corteva.

The following day, on June 1, 2019, DowDuPont spun off Corteva as an independent public company.

207.    Corteva now holds 100% of the outstanding common stock of Old DuPont. Corteva now trades on the NYSE under the stock ticker "CTVA."

208.    The separation of Corteva was completed on or about June 1, 2019, when DowDuPont distributed all of Corteva's common stock to DowDuPont stockholders as a pro rata dividend.

209.    The corporate structures of New DuPont, New Dow, Old Dow, Corteva, and Old DuPont, respectively, following the separations are depicted in "Step 3" of the graphic at ¶ 149.

210.    Also, on or about June 1, 2019, DowDuPont changed its registered name to DuPont de Nemours, Inc. (*i.e.*, New DuPont).

211.    On or about January 1, 2023, Old DuPont changed its name to EIDP, Inc.

*The Effect of the Years-Long Scheme to Defraud the State and Other Creditors and Avoid Financial Responsibility for Legacy Liabilities*

212.    The net result of these transactions was to strip away valuable tangible assets from Old DuPont and transfer those assets to New DuPont and Corteva for far less than the assets are worth.

213.    Old DuPont estimated that the Dow-DuPont Merger created "goodwill" worth billions of dollars. When the Corteva separation was complete, a portion of this "goodwill" was assigned to Old DuPont in order to prop up its balance sheet. But, in reality, Old DuPont was left with substantially fewer tangible assets than it had prior to the restructuring.

214.    In addition, Old DuPont owes a debt to Corteva of approximately $4 billion. Recent SEC filings demonstrate the substantial deterioration of Old DuPont's finances and the drastic change in its financial condition before and after the above transactions.

215. For example, for the fiscal year ended 2014, prior to the Chemours Spinoff, Old DuPont reported $3.6 billion in net income and $3.7 billion in cash provided by operating activities. For the 2019 fiscal year, just months after the Corteva separation, however, Old DuPont reported a net loss of negative $1 billion and only $996 million in cash provided by operating activities. That is a decrease of 128% in net income and a decrease of 73% in annual operating cash flow.

216. Additionally, Old DuPont reported a significant decrease in Income from Continuing Operations Before Income Taxes (a/k/a Earnings Before Tax, or "EBT"). Old DuPont reported $4.9 billion in EBT for the period ending December 31, 2014. For the period ending December 31, 2019, Old DuPont reported EBT of negative $422 million.

217. The value of Old DuPont's tangible assets further underscores Old DuPont's precarious financial situation. For the fiscal year ended 2014, prior to the Chemours Spinoff, Old DuPont owned nearly $41 billion in tangible assets. For the fiscal year ended 2019, Old DuPont owned just under $21 billion in tangible assets.

218. That means in the five-year period over which the restructuring occurred, when Old DuPont knew that it faced billions of dollars in environmental and PFAS liabilities, Old DuPont transferred or divested approximately half of its tangible assets—totaling $20 billion.

219. As of September 2019, just after the Corteva spinoff, Old DuPont reported $43.251 billion in assets. But almost $21.835 billion of these assets were comprised of intangible assets, including "goodwill" from its successive restructuring activities.

220. At the same time, Old DuPont reported liabilities totaling $22.060 billion. Thus, when the Corteva spinoff was complete, Old DuPont's tangible net worth (excluding its intangible assets) was negative $644 million.

221. Old DuPont's financial condition has continued to deteriorate. By the fiscal year ended 2019, Old DuPont reported $42.397 billion in total assets, half of which (or $21.653 billion) are intangible assets. Old DuPont's reported liabilities for the same period totaled $21.869 billion.

222. Old DuPont's tangible net worth between September 30, 2019 and December 31, 2019 declined even further, ending fiscal year 2019 with tangible net worth of negative $1.125 billion.

223. In addition, the State cannot take comfort in the "allocation" of liabilities to New DuPont and Corteva. Neither of those Defendants has publicly conceded that they assumed Old DuPont's historical environmental and PFAS liabilities. And it is far from clear that either entity will be able to satisfy future judgments.

224. Indeed, New DuPont—to which 71% of PFAS liabilities are "allocated" under the DowDuPont Separation Agreement once certain conditions are satisfied—is in the process of divesting numerous business segments and product lines, including tangible assets that it received from Old DuPont, and for which Old DuPont has received less than reasonably equivalent value.

225. New DuPont has received or will receive significant proceeds on the sales of Old DuPont's former business segments and product lines.

226. In September 2019, New DuPont sold the Sustainable Solutions business for $28 million to Gyrus Capital.

227. In December 15, 2019, New DuPont agreed to sell the Nutrition and Biosciences business to International Flavors & Fragrances for $26.2 billion.

228. In March 2020, New DuPont completed the sale of Compound Semiconductor Solutions for $450 million to SK Siltron.

229. In addition, New DuPont has issued Notices of Intent to Sell relating to: six non-core segments (estimated by market analysts at approximately $4.5 billion), as well as the Transportation and Industrial Chemicals business, which had reported net sales revenue in 2019 of $4.95 billion and estimated annual operating earnings before interest, taxes, depreciation, and amortization of $1.3 billion.

230. Moreover, while New DuPont has received substantial proceeds on the sale of Old DuPont's former business segments, those proceeds are not available to creditors, such as the State, because New DuPont is distributing them to its shareholders through aggressive stock buyback programs. Between January 1, 2018 and September 30, 2023, New DuPont spent more than $13.5 billion to repurchase its own stock. Furthermore, in the first quarter of 2024, New DuPont's Board of Directors authorized the repurchase and retirement of up to an additional $1 billion of its common stock. New DuPont's business segment divestitures and stock buybacks have substantially diminished the value of its assets.

231. Old DuPont's parent holding company, Corteva—to which 29% of PFAS liabilities are "allocated" under the DowDuPont Separation Agreement once certain conditions are satisfied—holds as its primary tangible asset the intercompany debt owed to it by its wholly owned subsidiary, Old DuPont. But Old DuPont does not have sufficient tangible assets to satisfy this debt obligation.

### First Count

### Spill Act
### (As Against All Defendants)

232. Plaintiffs repeat each allegation of Paragraphs 1 through 231 above as though fully set forth in its entirety herein.

233. Each Defendant is a "person" within the meaning of N.J.S.A. 58:10-23.11b.

234. The unauthorized discharge of hazardous substances is prohibited. N.J.S.A. 58:10-23.11c.

235. Except as otherwise provided in N.J.S.A. 58:10-23.11g.12, which is not applicable here, any person who discharges a hazardous substance, or is in any way responsible for any hazardous substance, shall be liable, jointly and severally, without regard to fault, for all cleanup and removal costs no matter by whom incurred. N.J.S.A. 58:10-23.11g(c).

236. The Department and Administrator have incurred, and will continue to incur, costs and damages, including lost use and value, costs of restoration and replacement for natural resources of this State that have been, or may be, injured as a result of discharges at the PLW Facility, and assessment costs.

237. The costs and damages the Department and Administrator have incurred, and will incur, associated with discharges at the PLW Facility, are "cleanup and removal costs" within the meaning of N.J.S.A. 58:10-23.11b.

238. Old DuPont, Chemours, and Chemours FC, as dischargers of hazardous substances at the PLW Facility, are liable, jointly and severally, without regard to fault, for all cleanup and removal costs and direct and indirect damages, including lost use and value, costs of restoration and replacement, and assessment costs, the Department and Administrator have incurred, and will incur, to assess, mitigate, restore, or replace any natural resource of this State that has been, or may be, injured as a result of the discharge of hazardous substances at the PLW Facility. N.J.S.A. 58:10-23.11g(c)(1).

239. Old DuPont, Chemours, and Chemours FC, as owners of the PLW Facility at the time hazardous substances were discharged there, also are persons in any way responsible, and are liable, jointly and severally, without regard to fault, for all cleanup and removal costs and direct

and indirect damages, including lost use and value, costs of restoration and replacement, and assessment costs the Department and Administrator have incurred, and will incur, to assess, mitigate, restore, or replace any natural resource of this State that has been, or may be, injured as a result of the discharge of hazardous substances at the PLW Facility. N.J.S.A. 58:10-23.11g(c)(1).

240. Chemours and Chemours FC, as the knowing purchasers of contaminated property, the PLW Facility, at which hazardous substances were previously discharged, is also a person in any way responsible, and is liable, without regard to fault, for all cleanup and removal costs and direct and indirect damages, including lost use and value, costs of restoration and replacement, and assessment costs, that the Department and Administrator have incurred, and will incur, to assess, mitigate, restore or replace, any natural resource of this State that has been, or may be, injured as a result of the discharge of hazardous substances at the PLW Facility. N.J.S.A. 58:10-23.11g(c)(3).

241. Upon information and belief, New DuPont and Corteva have assumed Old DuPont's liabilities for its former Performance Chemicals Business, as well as its obligations pertaining to the remediation of hazardous substances at the Site. New DuPont and Corteva are therefore parties "in any way responsible" for the discharged hazardous substances at the Site pursuant to the Spill Act and are therefore liable, jointly and severally, without regard to fault, for all cleanup and removal costs and direct and indirect damages, including lost use and value, costs of restoration and replacement, and assessment costs the Department and Administrator have incurred, and will incur, to assess, mitigate, restore, or replace any natural resource of this State that has been, or may be, injured as a result of the discharge of hazardous substances at the Site. N.J.S.A. 58:10-23.11g(c)(1).

242. Pursuant to N.J.S.A. 58:10-23.11u(a)(1)(a) and N.J.S.A. 58:10-23.11u(b), the Department may bring an action in the Superior Court for, *inter alia*, injunctive relief, N.J.S.A.

58:10-23.11u(b)(1); for its unreimbursed investigation, cleanup and removal costs, including the reasonable costs of preparing and successfully litigating the action, N.J.S.A. 58:10-23.11u(b)(2); for natural resource restoration and replacement costs, N.J.S.A. 58:10-23.11u(b)(4); and for any other unreimbursed costs or damages the Department incurs under the Spill Act, N.J.S.A. 58:10-23.11u(b)(5).

243. Pursuant to N.J.S.A. 58:10-23.11g(a) and (b), the Old DuPont, Chemours, and Chemours FC are also liable for lost income due to damage to natural resources destroyed or damaged by a discharge.

244. As a direct or indirect result of such violations, Plaintiffs NJDEP and Administrator have incurred, are incurring, and will continue to incur substantial costs including costs relating to:

     a.    the investigation, cleanup, and removal of discharged hazardous substances;

     b.    the restoration of natural resources contaminated by discharges of hazardous substances at the Site; and

     c.    the compensation of the citizens of New Jersey for the lost interim value and benefits of natural resources contaminated by discharges of hazardous substances at the Site.

245. Upon information and belief, Corteva and New DuPont assumed Old DuPont's Spill Act liability.

246. The costs Plaintiffs NJDEP and the Administrator have incurred, and will incur, are "cleanup and removal costs" within the meaning of N.J.S.A. 58:10-23.11b.

247. Pursuant to N.J.S.A. 58:10-23.11q, the Administrator is authorized to bring an action in the Superior Court for any unreimbursed costs or damages paid from the Spill Fund.

248.    Old DuPont, Chemours, Chemours FC, New DuPont, and Corteva, as persons "who may be subject to liability for a discharge" under the Spill Act, repeatedly failed to "immediately notify the department" of discharges both "prior to and after the effective date of the [Spill A]ct." Defendants' "[f]ailure to so notify shall make persons liable to the penalty provisions of section 22 of this act."

249.    Pursuant to N.J.S.A. 58:10-23.11u.d, Old DuPont, Chemours, Chemours FC, New DuPont, and Corteva are liable as "person[s] who violate[] a provision of P.L.1976, c. 141 (C. 58:10-23.11 et seq.), . . . [and are therefore] subject to a civil penalty not to exceed $50,000.00 per day for each violation and each day's continuance of the violation shall constitute a separate violation."

### Prayer for Relief

**WHEREFORE**, the Department and Administrator request that this Court enter judgment against Defendants as follows:

a.    Ordering each Defendant to reimburse the Department and Administrator, jointly and severally, without regard to fault, for all cleanup and removal costs and direct and indirect damages they have incurred, including lost use and value, costs of restoration and replacement for any natural resource of this State injured as a result of the discharge of hazardous substances at the PLW Facility, with applicable interest, and assessment costs;

b.    Finding each Defendant liable, jointly and severally, without regard to fault, for all future cleanup and removal costs and direct and indirect damages, including lost use and value, costs of restoration and replacement for any natural resource of this State injured as a result of the discharge of hazardous

substances at the PLW Facility, with applicable interest, and assessment costs;

c. Compelling each Defendant, jointly and severally, without regard to fault, to perform any further cleanup of the Site in conformance with the Site Remediation Reform Act, N.J.S.A. 58:10C-1, et. seq., and all other applicable laws and regulations;

d. Compelling each Defendant, jointly and severally, without regard to fault, to fund the Department's performance of an assessment of any natural resource that has been, or may be, injured as a result of the discharge of hazardous substances at the PLW Facility, and compelling each Defendant to compensate the citizens of New Jersey for the costs of restoration and replacement, including lost use and value of any injured natural resource;

e. Ordering the Defendants to pay for all compensatory damages for the lost value (including lost use) of the State's natural resources at and around the Facility as a result of the contamination of such natural resources by hazardous substances;

f. Finding each Defendant liable, jointly and severally, without regard to fault, for lost income due to damage to natural resources destroyed or damaged by a discharge;

g. Awarding the Department and Administrator their costs and fees in this action pursuant to N.J.S.A. 58:10-23.11u(b)(2);

h. Awarding the Department and the Administrator penalties pursuant to N.J.S.A. 58:10-23.11e and N.J.S.A. 58:10-23.11u.d; and

i.     Awarding the Department and Administrator interest and such other relief as this Court deems appropriate.

**Second Count**

**Water Pollution Control Act**
**(As Against All Defendants)**

250.   Plaintiffs repeat each allegation of Paragraphs 1 through 249 above as though fully set forth in its entirety herein.

251.   Defendants are each a "person" within the meaning of N.J.S.A. 58:10A-3.

252.   Except as otherwise exempted pursuant to N.J.S.A. 58:10A-6(d) and (p), which are not applicable here, it is unlawful for any person to discharge any pollutant except to the extent the discharge conforms with a valid New Jersey Pollutant Discharge Elimination System permit issued by the Commissioner pursuant to the WPCA, or pursuant to a valid National Pollutant Discharge Elimination System permit issued pursuant to the federal Water Pollution Control Act, 33 U.S.C. §§ 1251 - 1387. N.J.S.A. 58:10A-6(a).

253.   The unauthorized discharge of pollutants is a violation of the WPCA for which any person who is the discharger is strictly liable, without regard to fault. N.J.S.A. 58:10A-6(a).

254.   The Department has incurred, and will continue to incur, costs as a result of the discharge of pollutants at the PLW Facility.

255.   The Department also has incurred, and will continue to incur, costs and damages, including the costs of investigation to establish a violation at the PLW Facility, costs in removing, correcting or terminating the adverse effects upon water quality or public health due to violations at the PLW Facility, and compensatory damages and any other actual damages for any natural resource of this State that has been, or may be, lost or destroyed as a result of the discharge of pollutants at the PLW Facility.

256. The costs and damages the Department has incurred, and will incur, for the PLW Facility are recoverable by the Commissioner within the meaning of N.J.S.A. 58:10A-10(c)(2)-(4).

257. Old DuPont discharged pollutants at the PLW Facility, which discharges were neither permitted pursuant to N.J.S.A. 58:10A-6(a), nor exempted pursuant to N.J.S.A. 58:10A-6(d) or N.J.S.A. 58:10A-6(p), and is liable, without regard to fault, for all costs and damages, including compensatory damages and any other actual damages for any natural resource of this State that has been, or may be, lost or destroyed as a result of the discharge of pollutants at the PLW Facility.

258. Chemours and Chemours FC discharged pollutants at the PLW Facility, which discharges were neither permitted pursuant to N.J.S.A.58:10A-6(a), nor exempted pursuant to N.J.S.A. 58:10A-6(d) or N.J.S.A. 58:10A-6(p), and is liable, without regard to fault, for all costs and damages, including compensatory damages and any other actual damages for any natural resource of this State that has been, or may be, lost or destroyed as a result of the discharge of pollutants at the PLW Facility.

259. Upon information and belief, Corteva and New DuPont assumed Old DuPont's WPCA liability.

260. Pursuant to N.J.S.A. 58:10A-10(c),the Commissioner may bring an action in the Superior Court for injunctive relief, N.J.S.A. 58:10A-10(c)(1); for the costs of any investigation, inspection, or monitoring survey which led to establishment of the violation, including the costs of preparing and litigating the case, N.J.S.A. 58:10A-10(c)(2); any cost incurred by the State in removing, correcting, or terminating the adverse effects upon water quality resulting from any unauthorized discharge of pollutants for which action under this subsection may have been

brought, N.J.S.A. 58:10A-10(c)(3); compensatory damages and any other actual damages for any natural resource of this State that has been, or may be, lost or destroyed as a result of the unauthorized discharge of pollutants, N.J.S.A. 58:10A-10(c)(4); and the actual amount of any economic benefits accruing to the violator from any violation, including savings realized from avoided capital or noncapital costs resulting from the violation, the return earned or that may be earned on the amount of avoided costs, any benefits accruing as a result of a competitive market advantage enjoyed by reason of the violation, or any other benefit resulting from the violation, N.J.S.A. 58:10A-10(c)(5).

261. Pursuant to N.J.S.A. 58:10A-10(e), Old DuPont, Chemours, and Chemours FC are liable for penalties due to violations of the WPCA.

262. Upon information and belief, Corteva and New DuPont assumed Old DuPont's WPCA liability.

### Prayer for Relief

**WHEREFORE**, the Commissioner requests that this Court enter judgment against Defendants as follows:

    a. Permanently enjoining Defendants, requiring them to remove, correct, or terminate the adverse effects on water quality resulting from any unauthorized discharge of pollutants at or from the PLW Facility;

    b. Ordering Defendants, without regard to fault, to pay for the costs for any investigation, inspection, or monitoring survey, leading to establishment of the violation, including the costs of preparing and litigating the case;

    c. Finding Defendants liable, without regard to fault, for all costs for removing, correcting, or terminating the adverse effects upon water quality resulting from any unauthorized discharge of pollutants at the PLW Facility;

d.  Finding Defendants liable, without regard to fault, for all compensatory damages and other actual damages for any natural resource of the State that has been, or may be, injured, lost, or destroyed as a result of the unauthorized discharge of pollutants at the PLW Facility;

e.  Finding Defendants liable, without regard to fault, for the amount of any economic benefits they have accrued, including any savings realized from avoided capital or noncapital costs, the return they have earned of the amount of avoided costs, and benefits each Defendant has enjoyed as a result of a competitive market advantage, or any other benefit they have received as a result of having violated the WPCA;

f.  Awarding the Commissioner his costs and fees in this action pursuant to N.J.S.A. 58:10A-49.1(c)(2);

g.  Awarding the Commissioner penalties pursuant to N.J.S.A. 58:10A-10(e); and

h.  Awarding the Commissioner interest and such other relief as the Court deems appropriate.

### Third Count

**Solid Waste Management Act**
**(As Against All Defendants)**

263.  Plaintiffs repeat each allegation of Paragraphs 1 through 262 above as though fully set forth in its entirety herein.

264.  Defendants are each a "person" within the meaning of N.J.S.A. 13:1E-3.

265.  The Solid Waste Management Act ("SWMA" or the "Act") defines "[s]olid waste" as, *inter alia*, "discarded materials resulting from industrial, commercial and agricultural

operations" and "all other waste materials." N.J.S.A. 13:1E-3. N.J.A.C. 7:26-1.6(b) defines "other waste material," in pertinent part, as "any solid, liquid, semi-solid or contained gaseous material, including, but not limited to spent material, sludge, by-product, discarded commercial chemical products, or scrap metal resulting from industrial, commercial, mining or agricultural operations, from community activities, or any other material which has served or can no longer serve its original intended use, which . . . [i]s discarded or intended to be discarded . . . [i]s applied to the land or placed on the land or contained in a product that is applied to or placed on the land in a manner constituting disposal." N.J.A.C. 7:26-1.6(b) provides that "a material is also a solid waste if it is 'disposed of' by being discharged, deposited, injected, dumped, spilled, leaked or placed into or on any land or water so that such material or any constituent thereof may enter the environment or be emitted into the air or discharged into ground or surface waters."

266. N.J.S.A. 13:1E-3 of the SWMA and N.J.A.C. 7:26-1.4 define "disposal" as "the storage, treatment, utilization, processing, resource recovery of, or the discharge, deposit, injection, dumping, spilling, leaking or placing of any solid or hazardous waste into or on any land or water, so that the solid or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including groundwaters."

267. Various constituents present in soils, groundwater and surface water in and around the Site are discarded materials and are "solid waste" as defined under N.J.S.A. 13:1E-3 and N.J.A.C. 7:26-1.6.

268. Upon information and belief, Old DuPont, Chemours, Chemours FC have engaged in the past disposal of solid waste in and around the Site in the form of various constituents without first having filed a completed application for and received approval of a solid waste facility ("SWF") permit for such activities, resulting in the widespread presence of such solid wastes in

soils, groundwater, and surface water in and around the Site, all in violation of N.J.A.C. 7:26-2.8(e).

269. Upon information and belief, Old DuPont, Chemours, and Chemours FC have engaged in the past disposal of solid waste in and/or around the Site in the form of hazardous constituents in excess of 0.148 cubic yards of solids and/or 30 gallons of liquids, at locations other than a permitted SWF, resulting in the widespread presence of such solid wastes in soils, groundwater and surface water in and around the Site, in violation of N.J.S.A. 13:1E-9.3.

270. Pursuant to N.J.S.A. 13:1E-9(b) and (d), when the Commissioner finds that a person has violated any provision of the SWMA or any regulations adopted pursuant to the SWMA, the Commissioner is authorized to bring a civil action in Superior Court seeking temporary or permanent injunctive and other relief, as well as assessment of the violator for the costs of any investigation leading to the establishment of the violation, costs incurred by the State in removing, correcting or terminating the adverse effects to water and air quality resulting from the violation, and assessment against the violator of compensatory damages for any loss or destruction of wildlife, fish or aquatic life, and for any other actual damages, all of which relief may be awarded in a summary manner.

271. Old DuPont, Chemours, and Chemours FC have violated the SWMA and are thus liable for civil penalties of up to $50,000.00 per day of the violation pursuant to N.J.S.A. 13:1E-9(f).

272. Upon information and belief, Corteva and New DuPont assumed Old DuPont's SWMA liability.

### Prayer for Relief

**WHEREFORE**, the Commissioner requests that this Court enter judgment against Defendants as follows:

a. Ordering Defendants to, jointly and severally, fully comply with the SWMA by, *inter alia*, removing all unlawfully disposed of solid waste from all locations in and around the Site at which the same have come to be located and for which Old DuPont and Chemours and Chemours FC did not obtain a SWF permit;

b. Ordering Defendants, jointly and severally, to reimburse the Commissioner for the reasonable costs of preparing and litigating his claim seeking the enforcement of Defendants obligations pursuant to the SWMA; and

c. Ordering Defendants, jointly and severally, to reimburse the Commissioner for the cost incurred by the Department in assessing, removing, correcting, or terminating the adverse effects upon water and air quality resulting from their violations of the SWMA;

d. Ordering Defendants, jointly and severally, to compensate the State of New Jersey for the loss or destruction of wildlife, fish or aquatic life, and other actual damages caused by their violations of the SWMA;

e. Finding Old DuPont, Chemours, Chemours FC, Specialty Products, Corteva, and New DuPont liable for penalties authorized pursuant to N.J.S.A. 13:1E-9(f), and

f. Awarding the Commissioner such other relief as this Court deems appropriate.

## Fourth Count

## Public Nuisance
### (As Against All Defendants)

273. Plaintiffs repeat each allegation of Paragraphs 1 through 272 above as though fully set forth in its entirety herein.

274. Groundwater, surface water, sediments, wetlands, soils, and biota are natural resources of the State held in trust by the State.

275. The use, enjoyment, and existence of uncontaminated natural resources is a right common to the general public.

276. The contamination of the groundwater, surface water, sediment, wetlands, soils, and biota at and around the PLW Facility constitutes a physical invasion of the State's natural resources, and upon information and belief, the State's real property in the vicinity of the Facility, and an unreasonable and substantial interference, both actual and potential, with (1) the exercise of the public's common right to these natural resources; (2) the State's special property and statutory status and obligations regarding the natural resources of the State; (3) the State's ability, through the Department, to protect, conserve and manage the natural resources of the State, which are by law precious and invaluable public resources held by the State in trust for the benefit of the public; and (4) the rights of the people of the State to enjoy their natural resources free from interference by pollution and contamination.

277. As the owner of the Ramapo Mountain State Forest in the vicinity of the PLW Facility, which, upon information and belief, has become contaminated by the PLW Facility, Plaintiff Department has suffered a special injury different from that common to the general public.

278. As long as these natural resources at and around the PLW Facility remain contaminated due to Old DuPont, Chemours, and Chemours FC's conduct, the public nuisance continues.

279. Until these natural resources are restored to their pre-injury quality, Old DuPont, Chemours, and Chemours FC are liable for the creation, and continued maintenance, of a public nuisance in contravention of the public's common right to clean natural resources.

280. Old DuPont, Chemours, and Chemours FC committed each of the above-described acts and omissions with actual malice or with a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions.

281. Upon information and belief, Corteva and New DuPont assumed Old DuPont's public nuisance liability.

## **Prayer for Relief**

**WHEREFORE**, Plaintiffs request that this Court enter judgment against Defendants as follows:

> a. Ordering Defendants to reimburse the Department and Administrator for their costs of abatement, without regard to fault, including but not limited to all costs to investigate, clean up, restore, treat, monitor, and otherwise respond to contamination of the State's natural resources so that such natural resources are restored to their original condition;
>
> b. Compelling Defendants to abate the nuisance by investigating, cleaning up, restoring, treating, monitoring, and otherwise responding to contamination in the State's natural resources so that such natural resources are restored to their original condition;

c. Compelling Defendants to pay special damages to the Plaintiffs, funding the Department's performance of any further assessment and compensatory restoration of any natural resource that has been, or may be, injured as a result of the discharge of hazardous substances and pollutants at the PLW Facility, and compelling each Defendant to compensate the citizens of New Jersey for the costs of restoration and replacement, including lost use and value of any injured natural resource;

d. Awarding Plaintiffs punitive damages in an amount to be determined by the Court;

e. Awarding Plaintiffs costs and fees in this action, including attorneys' fees, incurred in prosecuting this action, together with prejudgment interest, to the full extent permitted by law;

f. Awarding Plaintiffs such other relief as this Court deems proper.

## Fifth Count

**Trespass**
**(As Against All Defendants)**

282. Plaintiffs repeat each allegation of Paragraphs 1 through 281 above as though fully set forth in its entirety herein.

283. Groundwater, surface water, sediment, wetlands, soils, and biota are natural resources of the State held in trust by the State for the benefit of the public. Water resources are owned by the State for the benefit of its citizens.

284. The State brings this claim in both its public trustee and *parens patriae* capacities.

285. As the trustee over the State's natural resources, the State has a duty to protect and restore all natural resources of the State and protect the health and comfort of its inhabitants.

286. In its *parens patriae* capacity, the State may protect its "quasi-sovereign" interests, including the State's interest in the well-being of its populace, as well as the populace's interest in the integrity of the State's natural resources. Accordingly, the State is bringing this action for the invasion of a substantial number of its residents' possessory interests in the State's natural resources. Waters, sediments, and biota that have been affected by Defendants' contamination are mobile, moving to and inhabiting areas far from the immediate area of the initial contamination.

287. Additionally, the State is the owner of lands, including the Ramapo Mountain State Forest, in the vicinity of the PLW Facility.

288. The hazardous substances and pollutants in the groundwater, surface water, sediment, wetlands, soils, and biota at and around the PLW Facility, including, upon information and belief, on State-owned lands, constitute a physical invasion of property without permission or license.

289. Old DuPont, Chemours, and Chemours FC are liable for trespass, and continued trespass, because the hazardous substances and pollutants in the groundwater, surface water, sediment, wetlands, soils, and biota at and around the PLW Facility, as well as contamination previously removed from the PLW Facility, resulted from discharges of hazardous substances and pollutants at the Facility.

290. As long as the natural resources remain contaminated due to Old DuPont's and Chemours and Chemours FC's conduct, the trespass continues.

291. Old DuPont, Chemours, and Chemours FC committed each of the above-described acts and omissions with actual malice or with a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions.

292.  Upon information and belief, Corteva and New DuPont assumed Old DuPont's trespass liability.

**Prayer for Relief**

**WHEREFORE**, Plaintiffs request that this Court enter judgment against Defendants as follows:

a.  Finding Defendants liable, jointly and severally, for all costs to investigate, clean up, restore, treat, monitor, and otherwise respond to contamination of the State's natural resources so that such natural resources are restored to their original condition, and for all damages to compensate the citizens of New Jersey for the lost use and value of their natural resources during all times of injury caused by hazardous substances and pollutants, and for such orders as may be necessary to provide full relief to address risks to the State, including the costs of:

  i.  Past and future testing of natural resources likely to have been contaminated by hazardous substances or pollutants;

  ii.  Past and future treatment of all natural resources containing detectable levels of hazardous substances or pollutants restored to non-detectable levels; and

  iii.  Past and future monitoring of the State's natural resources to detect the presence of hazardous substances or pollutants, and restoration of such natural resources to their pre-discharge condition;

b.  Ordering Defendants to pay all costs related to the investigation, cleanup, restoration, treatment, and monitoring of contamination of the State's natural resources;

59

c. Ordering Defendants to pay all damages in an amount at least equal to the full cost of restoring the State's natural resources to their original condition prior to the contamination;

d. Ordering Defendants to pay all compensatory damages for the lost value (including lost use) of the State's natural resources as a result of the contamination of such natural resources;

e. Ordering Defendants to pay all other damages sustained by Plaintiffs in their public trustee, *parens patriae*, and regulatory capacities as a direct and proximate result of the Defendants' acts and omissions alleged herein;

f. Entering an order against the Defendants for all appropriate injunctive relief to abate or mitigate the contamination that Defendants caused;

g. Awarding Plaintiffs punitive damages in an amount to be determined by the Court;

h. Awarding Plaintiffs costs and fees in this action, including attorneys' fees, incurred in prosecuting this action, together with prejudgment interest, to the full extent permitted by law; and

i. Awarding Plaintiffs such other relief as this Court deems appropriate.

**Sixth Count**

**Negligence/Gross Negligence/Willful or Wanton Misconduct**
**(As Against All Defendants)**

293. Plaintiffs repeat each allegation of Paragraphs 1 through 292 above as though fully set forth in its entirety herein.

294. Old DuPont, Chemours, and Chemours FC had a duty to Plaintiffs to ensure that hazardous substances and pollutants were not discharged at the PLW Facility and did not injure groundwater, surface water, sediment, wetlands, soils, and biota at and around the site.

295. Old DuPont, Chemours, and Chemours FC breached these duties.

296. As a direct and proximate result of Old DuPont's, Chemours', and Chemours FC's discharges of hazardous substances and pollutants at the PLW Facility, groundwater, surface water, sediment, wetlands, soils, and biota at and around the site have been injured. Old DuPont, Chemours, and Chemours FC are jointly and severally liable for such injuries and the consequential damages.

297. As a further direct and proximate result of Old DuPont's, Chemours, and Chemours FC's discharge of hazardous substances and pollutants at the PLW Facility, the Department and Administrator have incurred, are incurring, and will continue to incur investigation, cleanup and removal, treatment, monitoring and restoration costs, and expenses for which Old DuPont and Chemours and Chemours FC are jointly and severally liable.

298. Old DuPont, Chemours, and Chemours FC committed each of the above-described acts and omissions with actual malice or with wanton, willful, or reckless disregard of their knowledge that Plaintiffs would foreseeably be harmed by those acts or omissions and with indifference to that consequence.

299. Upon information and belief, Corteva and New DuPont assumed Old DuPont's negligence liability.

## Prayer for Relief

**WHEREFORE**, Plaintiffs request that this Court enter judgment against Defendants as follows:

a. Finding Defendants liable, jointly and severally, for all costs to investigate, clean up, restore, treat, monitor, and otherwise respond to contamination of the State's natural resources so that such natural resources are restored to their original condition, and for all damages to compensate the citizens of New Jersey for the lost use and value of their natural resources during all times of injury caused by hazardous substances and pollutants, and for such orders as may be necessary to provide full relief to address risks to the State, including the costs of:

   i. Past and future testing of natural resources likely to have been contaminated by hazardous substances or pollutants;

   ii. Past and future treatment of all natural resources containing detectable levels of hazardous substances or pollutants restored to non-detectable levels; and

   iii. Past and future monitoring of the State's natural resources to detect the presence of hazardous substances or pollutants, and restoration of such natural resources to their pre-discharge condition;

b. Ordering Defendants to pay all costs related to the investigation, cleanup, restoration, treatment, and monitoring of contamination of the State's natural resources;

c. Ordering Defendants to pay all damages in an amount at least equal to the full cost of restoring the State's natural resources to their original condition prior to the contamination;

d. Ordering Defendants to pay all compensatory damages for the lost value (including lost use) of the State's natural resources as a result of the contamination of such natural resources;

e. Ordering Defendants to pay all other damages sustained by Plaintiffs in their public trustee, *parens patriae*, and regulatory capacities as a direct and proximate result of the Defendants' acts and omissions alleged herein;

f. Entering an order against the Defendants for all appropriate injunctive relief to abate or mitigate the contamination that Defendants caused;

g. Awarding Plaintiffs punitive damages in an amount to be determined by the Court;

h. Awarding Plaintiffs costs and fees in this action, including attorneys' fees, incurred in prosecuting this action, together with prejudgment interest, to the full extent permitted by law; and

i. Awarding Plaintiffs such other relief as this Court deems appropriate.

## Seventh Count

### Actual Fraudulent Transfer in Relation to Chemours Spinoff
### (As Against Old DuPont, Chemours, Corteva, and New DuPont)

300. Plaintiffs repeat each allegation of Paragraphs 1 through 299 above as though fully set forth in its entirety herein.

301. Plaintiffs are and were creditors of Chemours at all relevant times.

302. Through its participation in the Chemours Spinoff, as detailed above, Chemours transferred valuable assets to Old DuPont, including the $3.9 billion dividend (the "Chemours Transfers"), while simultaneously assuming significant liabilities pursuant to the Chemours Separation Agreement (the "Chemours Assumed Liabilities").

303. The Chemours Transfers and Chemours Assumed Liabilities were made for the benefit of Old DuPont.

304. At the time that the Chemours Transfers were made and the Chemours Assumed Liabilities were assumed, and until the Chemours Spinoff was complete, Old DuPont was in a position to, and in fact did, control and dominate Chemours.

305. Chemours made the Chemours Transfers and incurred the Chemours Assumed Liabilities with the actual intent to hinder, delay and defraud the creditors or future creditors of Chemours

306. Plaintiffs have been harmed as a result of the Chemours Transfers.

307. Under Del. Code. Tit. 6 Sec. 1301 to 1312 and N.J.S.A. 25:2-20 to 25:2-34, Plaintiffs are entitled to avoid the Chemours Transfers, recover property or value transferred to Old DuPont, enjoin Old DuPont, as transferee, from distributing, transferring, capitalizing, or otherwise disposing of any property or value that Chemours transferred to Old DuPont, and a constructive trust over such property or value for the benefit of Plaintiffs.

308. Upon information and belief, Corteva and New DuPont assumed Old DuPont's liabilities for actual fraudulent transfer.

### Prayer for Relief

**WHEREFORE**, Plaintiffs request that this Court enter judgment against Old DuPont, Chemours, Corteva, and New DuPont as follows:

    a.    Voiding the Chemours Transfers to the extent necessary to satisfy the Plaintiffs' claims;

    b.    Enjoining Old DuPont from disposing of any property or value that Chemours transferred to Old DuPont;

    c.    Imposing a constructive trust over the Chemours Transfers;

d.      Awarding Plaintiffs prejudgment interest and attorneys' fees and costs; and

e.      Awarding Plaintiffs such other relief as this Court deems appropriate.

<u>**Eighth Count**</u>

**Constructive Fraudulent Transfer in Relation to Chemours Spinoff
(As Against Old DuPont, Chemours, Corteva, and New DuPont)**

309.    Plaintiffs repeat each allegation of Paragraphs 1 through 308 above as though fully set forth in its entirety herein.

310.    Plaintiffs are and were creditors of Chemours at all relevant times.

311.    Chemours did not receive reasonably equivalent value from Old DuPont in exchange for the Chemours Transfers and Chemours Assumed Liabilities.

312.    Each of the Chemours Transfers and Chemours' assumption of the Chemours Assumed Liabilities was made to or for the benefit of Old DuPont.

313.    At the time that the Chemours Transfers were made and the Chemours Assumed Liabilities were assumed, and until the Chemours Spinoff was complete, Old DuPont was in a position to, and in fact did, control and dominate Chemours.

314.    Chemours made the Chemours Transfers and assumed the Chemours Assumed Liabilities when it was engaged or about to be engaged in a business for which its remaining assets were unreasonably small in relation to its business.

315.    Chemours was insolvent at the time or became insolvent as a result of the Chemours Transfers and its assumption of the Chemours Assumed Liabilities.

316.    At the time that the Chemours Transfers were made and Chemours assumed the Chemours Assumed Liabilities, Old DuPont and Chemours intended Chemours to incur, or believed, or reasonably should have believed that Chemours would incur debts beyond its ability to pay as they became due.

317. Plaintiffs have been harmed as a result of the Chemours Transfers.

318. Under Del. Code. Tit. 6 Sec. 1301 to 1312 and N.J.S.A. 25:2-20 to 25:2-34, Plaintiffs are entitled to void the Chemours Transfers, recover property or value transferred to Old DuPont, enjoin Old DuPont, as transferee, from distributing, transferring, capitalizing, or otherwise disposing of any property or value that Chemours transferred to Old DuPont, and a constructive trust over such property or value for the benefit of Plaintiffs.

319. Upon information and belief, Corteva and New DuPont assumed Old DuPont's liabilities for actual fraudulent transfer.

## Prayer for Relief

**WHEREFORE**, Plaintiffs request that this Court enter judgment against Old DuPont, Chemours, Corteva, and New DuPont as follows:

a. Voiding the Chemours Transfers to the extent necessary to satisfy the Plaintiffs' claims;

b. Enjoining Old DuPont from disposing of any property or value that Chemours transferred to Old DuPont;

c. Imposing a constructive trust over the Chemours Transfers;

d. Awarding Plaintiffs prejudgment interest and attorneys' fees and costs; and

e. Awarding Plaintiffs such other relief as this Court deems appropriate.

## Ninth Count

**Actual Fraudulent Transfer In Relation to Dow-DuPont Merger and Subsequent Restructurings, Asset Transfers and Separations**
**(As Against Old DuPont, New DuPont, and Corteva)**

320. Plaintiffs repeat each allegation of Paragraphs 1 through 319 above as though fully set forth in its entirety herein.

321. Plaintiffs are and were creditors of Old DuPont at all relevant times.

322. Through its participation in the Dow-DuPont Merger, and through the separations of New DuPont, New Dow, and Corteva, Old DuPont sold or transferred, directly or indirectly, valuable assets and business lines to Corteva and New DuPont (the "Old DuPont Transfers").

323. The Old DuPont Transfers were made for the benefit of New DuPont or Corteva.

324. At the time that the Old DuPont Transfers were made, New DuPont was in a position to, and in fact did, control and dominate Old DuPont and Corteva.

325. Old DuPont, New DuPont, and Corteva acted with the actual intent to hinder, delay, and defraud creditors or future creditors.

326. Plaintiffs have been harmed as a result of the Old DuPont Transfers.

327. Old DuPont engaged in acts in furtherance of a scheme to transfer its assets out of the reach of parties such as the Plaintiffs that have been damaged as a result of the actions described in this Third Amended Complaint.

328. Under Del. Code. Tit. 6 Sec. 1301 to 1312 and N.J.S.A. 25:2-20 to 25:2-34, Plaintiffs are entitled to void the Old DuPont Transfers and to recover property or value transferred to New DuPont and Corteva, enjoin New DuPont and Corteva, as transferees, from distributing, transferring, capitalizing, or otherwise disposing of any property or value that Old DuPont transferred to them, and a constructive trust over such property or value for the benefit of Plaintiffs.

## Prayer For Relief

**WHEREFORE,** Plaintiffs request that this Court enter judgment against Old DuPont, New DuPont, and Corteva as follows:

    a. Voiding the Old DuPont Transfers to the extent necessary to satisfy the Plaintiffs' claims;

b.	Enjoining New DuPont and Corteva from disposing of any property or value that Old DuPont transferred to them;

c.	Imposing a constructive trust over the Old DuPont Transfers;

d.	Awarding Plaintiffs prejudgment interest and attorneys' fees and costs; and

e.	Awarding Plaintiffs such other relief as this Court deems appropriate.

### Tenth Count

**Constructive Fraudulent Transfer In Relation to Dow-DuPont Merger and Subsequent Restructurings, Asset Transfers and Separations
(As Against Old DuPont, New DuPont, and Corteva)**

329.	Plaintiffs repeat each allegation of Paragraphs 1 through 328 above as though fully set forth in its entirety herein.

330.	Plaintiffs are and were creditors of Old DuPont at all relevant times.

331.	Old DuPont did not receive reasonably equivalent value from New DuPont and Corteva in exchange for the Old DuPont Transfers.

332.	Each of the Old DuPont Transfers was made to or for the benefit of New DuPont or Corteva.

333.	At the time that the Old DuPont Transfers were made, New DuPont was in a position to, and in fact did, control and dominate Old DuPont and Corteva.

334.	Old DuPont made the Old DuPont Transfers when it was engaged or about to be engaged in a business for which its remaining assets were unreasonably small in relation to its business.

335.	Old DuPont was insolvent at the time or became insolvent as a result of the Old DuPont Transfers.

336. At the time that the Old DuPont Transfers were made, Old DuPont intended to incur, or believed, or reasonably should have believed that it would incur debts beyond its ability to pay as they became due.

337. Plaintiffs have been harmed as a result of the Old DuPont Transfers.

338. Under Del. Code. Tit. 6 Sec. 1301 to 1312 and N.J.S.A. 25:2-20 to 25:2-34, Plaintiffs are entitled to void the Old DuPont Transfers and to recover property or value transferred to New DuPont and Corteva, enjoin New DuPont and Corteva, as transferees, from distributing, transferring, capitalizing, or otherwise disposing of any property or value that Old DuPont transferred to them, and a constructive trust over such property or value for the benefit of Plaintiffs.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs request that this Court enter judgment against Old DuPont, New DuPont, and Corteva as follows:

a. Voiding the Old DuPont Transfers to the extent necessary to satisfy the Plaintiffs' claims;

b. Enjoining New DuPont and Corteva from disposing of any property or value that Old DuPont transferred to them;

c. Imposing a constructive trust over the Old DuPont Transfers;

d. Awarding Plaintiffs prejudgment interest and attorneys' fees and costs; and

e. Awarding Plaintiffs such other relief as this Court deems appropriate.

**Eleventh Count**

**(Abnormally Dangerous Activity – As Against All Defendants)**

339. Plaintiffs repeat each allegation of Paragraphs 1 through 338 above as though fully set forth in its entirety herein.

340. Old DuPont, Chemours, and Chemours FC, in the operation, maintenance and ownership of the Facility, generated, stored, and disposed of toxic wastes, hazardous chemicals and substances throughout the Facility. These activities occurred in the immediate vicinity of the State's natural resources, including groundwater, air, surface water, sediments and soils, wetlands, and biota, and caused the discharge and release of numerous known hazardous chemicals and substances into the natural resources of the State.

341. As a result of Old DuPont's, Chemours', and Chemours FC's use and disposal of toxic wastes, hazardous chemicals and substances at Pompton Lakes Works, the State's natural resources were contaminated by hazardous chemicals and substances.

342. Old DuPont, Chemours, and Chemours FC failed to safely and adequately treat, store, dispose of toxic wastes, hazardous chemicals and substances and failed to protect and prevent State natural resources from exposure to these hazardous chemicals and substances.

343. The manufacture of explosives products and the disposal, discharge, and emission of toxic wastes, hazardous chemicals and substances resulting from that manufacture constitute abnormally dangerous activities that introduce an unusual danger into the community. These activities presented a high degree of risk of harm to the State's natural resources. These activities presented a high likelihood that the harm they would cause would be great. Neither Plaintiffs nor the broader community were able to eliminate this risk by the exercise of reasonable care, particularly in light of Old DuPont's, Chemours', and Chemours FC's failure to provide an adequate warning about the dangers involved.

344. The use, disposal, discharge, and emission of toxic wastes, hazardous chemicals and substances is not a matter of common usage in the areas in which Old DuPont, Chemours, and

Chemours FC carried out these activities, and these activities were inappropriate to carry out in these locations.

345. At all relevant times, the risks of Old DuPont's, Chemours', and Chemours FC's abnormally dangerous activities outweighed the value to the community.

346. Old DuPont's, Chemours', and Chemours FC's acts and omissions in using, disposing, discharging, and emitting hazardous chemicals and substances in the areas in which they did proximately caused the contamination of the State's natural resources. Old DuPont, Chemours, and Chemours FC are thus strictly liable for the harm these ultra-hazardous activities caused.

347. Old DuPont, Chemours, and Chemours FC committed each of the above-described acts and omissions with actual malice or with a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions.

348. Upon information and belief, Corteva and New DuPont assumed Old DuPont's abnormally dangerous activity liability.

<u>**PRAYER FOR RELIEF**</u>

**WHEREFORE**, Plaintiffs request that this Court enter judgment against Old DuPont, Chemours, Chemours FC, Corteva, and New DuPont as follows:

   a. Finding Old DuPont, Chemours, Chemours FC, Corteva, and New DuPont liable, jointly and severally, for all costs to investigate, clean up and remove, restore, treat, monitor, and otherwise respond to contamination in the State's groundwater, surface waters, and other natural resources so that such natural resources are restored to their original condition, and for all damages to compensate the citizens of New Jersey for the lost use and value of their natural resources during all times

of injury caused by Defendants' operations, and for such orders as may be necessary to provide full relief to address risks to the State, including the costs of:

1) Past and future testing of groundwater, surface waters, and natural resources likely to have been contaminated by Defendants' operations;

2) Past and future treatment of all groundwater, surface waters, and other natural resources containing detectable levels of hazardous chemicals and substances until restored to pre-discharge condition; and

3) Past and future monitoring of the State's groundwater, surface waters, and other natural resources to detect the presence of hazardous chemicals and substances, and restoration of such natural resources to their pre-discharge condition;

b. Ordering Old DuPont, Chemours, Chemours FC, Corteva, and New DuPont to pay for all costs related to the investigation, cleanup, restoration, treatment, and monitoring of contamination of the State's groundwater, surface waters, and other natural resources caused by Facility operations.

c. Ordering Old DuPont, Chemours, Chemours FC, Corteva, and New DuPont to pay for all damages in an amount at least equal to the full cost of restoring the State's groundwater, surface waters, and other natural resources to their original condition prior to the contamination of such waters by Facility operations.

d. Ordering Old DuPont, Chemours, Chemours FC, Corteva, and New DuPont to pay for all compensatory damages for the lost value (including lost use) of the State's

groundwater, surface waters, and other natural resources as a result of the contamination of such natural resources with hazardous chemicals and substances from Facility operations.

e.   Ordering Old DuPont, Chemours, Chemours FC, Corteva, and New DuPont to pay for all other damages sustained by Plaintiffs as a direct and proximate result of their acts and omissions alleged herein, including remedial, administrative, oversight, and legal fees and expenses;

f.   Entering an order against Old DuPont, Chemours, Chemours FC, Corteva, and New DuPont for all appropriate injunctive relief to abate or mitigate the contamination that they caused;

g.   Awarding Plaintiffs punitive damages in an amount to be determined by this Court;

h.   Awarding Plaintiffs costs and fees in this action, including attorneys' fees, incurred in prosecuting this action, together with prejudgment interest, to the full extent permitted by law; and

i.   Awarding Plaintiffs such other relief as this Court deems appropriate.

## JURY DEMAND

Plaintiffs are entitled to a jury trial and hereby demand a trial by jury.

Dated:  August 26, 2024.

**MATTHEW J. PLATKIN**
**ATTORNEY GENERAL OF NEW JERSEY**
*Attorney for Plaintiffs*

By: */s/ Gwen Farley*

Gwen Farley
Deputy Attorney General
R.J. Hughes Justice Complex
25 Market Street
P.O. Box 093
Trenton, New Jersey 08625-0093
Ph. (609) 376-2740

**KELLEY DRYE & WARREN LLP**
Special Counsel to the Attorney General
By: /s/ Geoffrey W. Castello
Geoffrey W. Castello, Esq.
One Jefferson Road
Parsippany, New Jersey 07054
Tel.: (973) 503-5900
GCastello@KelleyDrye.com

*William J. Jackson, Esq.
*John D.S. Gilmour, Esq.
*Lana M. Rowenko, Esq.
*Jennifer C. Barks. Esq.
515 Post Oak Blvd. Suite 900
Houston, Texas 77027
Ph. (713) 355-5000

*David Zalman, Esq.
David M. Reap, Esq.
3 World Trade Center
175 Greenwich Street
New York, New York 10007
Tel.: (212) 808-7800
DReap@KelleyDrye.com

**LAW OFFICES OF JOHN K. DEMA, P.C.**
Special Counsel to the Attorney General

By: *John K. Dema, Esq.
    Scott E. Kauff, Esq.
    *John T. Dema, Esq.
    *Briana Dema, Esq.
    Alex Latanision, Esq.
    *Elizabeth B. Petersen, Esq.
1236 Strand Street, Suite 103
Christiansted, St. Croix
U.S. Virgin Islands 00820-5034
Ph. (340) 773-6142

**TAFT STETTINIUS & HOLLISTER LLP**
Special Counsel to the Attorney General

*Robert A. Bilott, Esq.
425 Walnut Street, Suite 1800
Cincinnati, OH 45202-3957

Telephone: (513) 381-2838
Facsimile: (513) 381-0205
bilott@taftlaw.com

*David J. Butler, Esq.
41 S. High Street
Suite 1800
Columbus, OH 43215-6106
Telephone: (614) 221-2838

**COHN LIFLAND PEARLMAN
HERRMANN & KNOPF LLP**
Special Counsel to the Attorney General

Leonard Z. Kaufmann, Esq.
A Member of the Firm
Park 80 West – Plaza One
250 Pehle Avenue, Suite 401
Saddle Brook, New Jersey 07663
Ph. (201) 845-9600

*\* admitted pro hac vice*