[Docket Nos. 746, 752]

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION, et al.,

Plaintiffs,

v.

E.I. DU PONT DE NEMOURS AND COMPANY, et al.,

Defendants.

Case Nos. 1:19-cv-14758-RMB-JBC
1:19-cv-14765-RMB-JBC
1:19-cv-14766-RMB-JBC
3:19-cv-14767-RMB-JBC

**OPINION**

**TABLE OF CONTENTS**

I. FACTUAL BACKGROUND ........ 6
A. The Chambers Works Site ........ 7
B. The Parlin Site ........ 8
C. The Repauno Site ........ 8
D. The Pompton Lakes Sites ........ 9
II. PROCEDURAL HISTORY ........ 10
A. The State Takes Legal Action Against the Settling Defendants ........ 10
B. The State Prosecutes the Industrial Sites Cases ........ 12
C. The Court Accelerates the Chambers Works Litigation and Appoints Judge Schneider as Special Master ........ 15
D. The State Settles with 3M and Proceeds to Trial with the DuPont Defendants ........ 15
E. The State Settles with the DuPont Defendants After Prosecuting Several "Mini-Trials" ........ 16

F. The State Publishes the Proposed JCOs for the Notice-and-Comment Period ..... 17
G. The State Files the Motion to Approve the Proposed JCOs for Judicial Approval ..... 18
H. The Court Conducts the First Fairness Hearing on January 7, 2026 ..... 20
I. The State Files the Supplemental Report and the Stipulations ..... 22
J. The Court Conducts the Second Fairness Hearing on June 24, 2026 ..... 24
III. THE PROPOSED JCOS ..... 25
A. The General Terms of the Proposed JCOs ..... 26
B. The Proposed 3M JCO ..... 30
C. The Proposed DuPont JCO ..... 31
D. Distribution of the Settlement Payments ..... 34
1. Natural Resource Damages ..... 34
2. Abatement Damages ..... 37
a. PFAS Abatement Fund ..... 37
i. PFAS Water Quality Projects ..... 39
ii. PFAS Abatement Projects ..... 42
b. The Qualified Settlement Fund ..... 43
3. Costs, Fees, and Punitive Damages ..... 45
IV. STANDARD OF REVIEW ..... 47
V. THE MOTION TO APPROVE JUDICIAL CONSENT ORDERS ..... 50
A. Procedural Fairness ..... 50
B. Substantive Fairness ..... 56
C. Reasonableness ..... 68
1. Efficacy ..... 69
2. Satisfactory Compensation ..... 77
3. The Risks of Litigation ..... 78
D. Statutory Consistency and Faithfulness ..... 79
E. The Public Interest and Objections ..... 82

1. The State Possessed the Authority to Settle the Claims Asserted in Its Sovereign, Quasi-sovereign, Parens Patriae, Public Trustee, and Regulatory Capacities ........ 82
a. *Parens Patriae* ........ 83
b. The Public Trust Doctrine ........ 87
c. The State's Environmental Regulatory Schema ........ 88
d. The Attorney General of New Jersey ........ 94
e. Objectors' Challenges ........ 97
2. The Proposed JCOs Do Not Impermissibly Usurp the Legislature's Appropriations Authority ........ 103
3. Paragraph 83 of the Proposed DuPont JCO Does Not Impermissibly Determine Its Preclusive Effect ........ 108
4. The Proposed DuPont JCO Does Not Unlawfully Bundle Natural Resource Damages and Abatement Damages or Grant the Commissioner Authority to Misspend Natural Resource Damages ........ 112
5. The Proposed 3M JCO Does Not Require a Natural Resource Damages Carveout for the Parlin Site ........ 115
6. The "Tax Reduction Rule" Does Not Prevent Judicial Approval of the Proposed JCOs ........ 116
7. The Settlement Distribution Plan and the Stipulations Do Not Require Re-publication and a New Public Comment Period ........ 120
8. The Qualified Settlement Fund ........ 123
VI. THE MOTION TO APPROVE ATTORNEYS' FEES ........ 125
A. Standard of Review ........ 125
B. The State's Fee Request is Reasonable ........ 127
VII. LAST WORDS ........ 130
VIII. CONCLUSION ........ 131

**RENÉE MARIE BUMB, Chief United States District Judge**:

In 1818, President James Madison addressed the Agriculture Society of Albermarle, Virginia, exalting the beauty of nature, the indispensability of its preservation, and the consequences of its ruination. *See* James Madison, *Address to the Agricultural Society of Albemarle, Virginia*, *in* 3 LETTERS AND OTHER WRITINGS OF JAMES MADISON 63, 76–77 (1884). For President Madison, the stakes could not have been higher, for the veritable "happiness of our [C]ountry" counts on the faithful guardianship of its "soil and climate." *See id.*

Against this historical backdrop, the Court turns to the legal question presented: whether the State of New Jersey's proposed Judicial Consent Orders ("JCOs") are fair, reasonable, consistent with applicable law, and in the public interest. Since 2019, Plaintiffs New Jersey Department of Environmental Protection ("Department" or "DEP"), its Commissioner, and the Administrator of the N.J. Spill Compensation Fund (collectively, "Settling Plaintiffs" or "State") waged extensive enforcement actions against the 3M Company ("3M") and EIDP, Inc. (f/k/a E. I. du Pont de Nemours and Company) ("EIDP" or "Old DuPont"), Corteva, Inc. ("Corteva"), DuPont de Nemours Inc. ("New DuPont"), DuPont Specialty Products USA, LLC ("DuPont Specialty Products"), The Chemours Company ("Chemours"), and The Chemours Company FC, LLC ("Chemours FC") (collectively, "DuPont Defendants") (together with 3M, "Settling Defendants"). The State brought these actions to redress the contamination by thousands of chemicals, pollutants, and hazardous substances, including per- and polyfluoroalkyl substances ("PFAS"), across

the waters and lands of New Jersey allegedly caused by Settling Defendants. The parties engaged in sustained and hard-fought litigation. What followed was a pitched legal battle lasting nearly six years.

By the summer of 2025, the Settling Plaintiffs and the Settling Defendants (collectively, "Settling Parties") finally compromised. According to the terms of their agreements—referred to herein as the Proposed 3M JCO and the Proposed DuPont JCO[1]—the Settling Defendants will pay the State up to $1.325 billion in Natural Resource Damages and Abatement Damages (collectively, "Settlement Payments") over the next 25 years to address the environmental damages allegedly caused by the Settling Defendants through their production, utilization, and discharge of contaminants. The DuPont Defendants will also be responsible for additional remediation commitments valued at approximately $1.2 billion, for an aggregate value of $2.5 billion.

The State has now filed a Motion to Approve Judicial Consent Orders as fair, reasonable, and in the best interests of the people of New Jersey. [Docket Nos. 746, 746-1 ("Motion to Approve Proposed JCOs").] The State has also filed a Motion to Approve Attorneys' Fees for approximately $195 million. [Docket No. 752, 752-1 ("Motion to Approve Attorneys' Fees").] At this time, only two New Jersey municipalities—Carneys Point Township ("Carneys Point") and the Borough of Sayreville ("Sayreville") (collectively, "Objectors")—oppose judicial approval of the

[1] The Proposed DuPont JCO can be found at Docket No. 746-6 and the Proposed 3M JCO at Docket No. 746-7.

Proposed JCOs and the award of attorneys' fees. After review of the extensive record before it, the Court will **GRANT** the two Motions for the reasons that follow.

## I. FACTUAL BACKGROUND

The environmental contamination underlying these cases traces back more than a century and encompasses numerous contaminants associated with decades of industrial activity at the facilities at issue. Although the Proposed DuPont JCO resolves claims involving all contaminants, both Proposed JCOs principally address PFAS, and the Proposed 3M JCO concerns PFAS exclusively. Accordingly, the Court focuses primarily on PFAS throughout this Opinion.[2] The consolidated case before the Court comprises four lawsuits that correspond to some of the most contaminated industrial facilities in New Jersey: the Chambers Works Site, 1:19-14766 ("Chambers Works Litigation"); the Pompton Lakes Works Site, 1:19-14758 ("Pompton Lakes Litigation"); the Repauno Works Site, 1:19-14765 ("Repauno Works Litigation"); and

[2] "[A]ccidentally discovered by an Old DuPont scientist in 1938," PFAS is an "entirely manmade" "family of chemical compounds containing fluorine and carbon atoms." [Docket No. 332 ¶¶ 107, 117.] Perfluorooctanoic acid ("PFOA")—one of "the most widely studied PFAS chemicals"—is "toxic at very low concentrations." [*Id.* ¶ 107.] The chemicals "cause extensive and persistent environmental contamination" and "present[] a serious threat to public health through drinking water." [*Id.* ¶¶ 108, 111.] Each can "migrate through the environment and into groundwater, resist natural degradation, and be difficult and costly to remove." [*Id.* ¶ 108.] The toxins insinuate themselves into the environment through manufacturing, product degradation, and the use of consumer and commercial products containing them. [*Id.* ¶ 112.]

the Parlin Site, 3:19-14767 ("Parlin Litigation") (collectively, "Industrial Sites Cases").[3]

### A. The Chambers Works Site

The Chambers Works Site spans approximately 1,455 acres of real property in Pennsville and Carneys Point Townships in Salem County, New Jersey. [Docket No. 332 ¶ 62.] EIDP operated the Site for over 120 years. [Docket No. 637-2 ¶ 3.] From 1892 to 1978, the Chambers Works Site produced smokeless gunpowder, nitrocellulose, and related products. [*Id.* ¶ 6.] The period from 1917 to the early 1980s witnessed the production of approximately 700 different dyes and the use of a laundry list of chemicals. [*Id.* ¶ 7.] For example, EIDP began aromatic chemical manufacturing operations at the Site, which involved the use of petroleum hydrocarbons, acids, solvents, inorganics, and aromatic hydrocarbons, in the 1940s. [*Id.* ¶ 8.] A decade later saw EIDP using PFOA as a polymerization aid in certain manufacturing processes at the Site. [*Id.* ¶ 9.] One such usage was the manufacture of elastomers, for which EIDP did not install a scrubber on any air emission point during the time it used PFOA at the Site. [*Id.* ¶ 12.] The use of PFOA continued at the Site until 2001 for the production of standard fluoroelastomers and until 2013 for the manufacture of perfluoroelastomers. [*Id.* ¶¶ 13–14.] At certain times between 1975 and 2001, 3M sold products containing PFOA to EIDP for use at the Site. [*Id.* ¶ 35.]

[3] Unless otherwise noted, citations to the docket refer to the Chambers Works Litigation.

### B. The Parlin Site

In 1904, Old DuPont purchased 350 acres in Middlesex County from the International Smokeless Powder Company and developed what is referred to now as the Parlin Site. [Parlin Litigation Docket No. 73 ¶ 61.] International had manufactured a nitrocellulose-based gun powder alternative called gun cotton at the Parlin Site in 1890—a practice Old DuPont continued until 1939. [*Id.* ¶ 65.] Beginning in or around 1975, Old DuPont began to manufacture polytetrafluoroethylene, which requires PFOA as a processing aid, and marketed it under the trade name "Teflon." Until 2002, Old DuPont purchased the PFOA it required for its manufacturing activities from 3M. [*Id.* ¶¶ 68, 124.] In or around that time, Old DuPont began producing PFOA as a raw material for its own use and for sale, after 3M ceased PFOA production. [*Id.* ¶ 74.] In 2009, a replacement product for PFOA was developed for the Parlin Site. [*Id.* ¶ 76.]

### C. The Repauno Site

The Repauno Site is located in Gloucester County, New Jersey. [Repauno Works Litigation Docket No. 58 ¶¶ 2, 65.] Since 1880, Old DuPont, Chemours, and Chemours FC utilized the Repauno Works Site for the manufacture, storage, and transport of industrial chemicals and high explosive products. [*Id.* ¶¶ 1–2.] Old DuPont's first research laboratory was located on the Site. [*Id.* ¶ 67.] During World War I, the Repauno Works Site produced explosives to support the demand for ammunition, which Old DuPont expanded for the demands of the Second World War.

[*Id.* ¶¶ 69, 71.] All explosives manufacturing ceased at the Site in 1954. [*Id.* ¶ 71.] Throughout the middle of the twentieth century, the Repauno Site discharged hazardous substances and pollutants, including trichloroethylene, nitrobenzene, aniline, diphenylamine, benzene, metals, and polychlorinated biphenyls. [*Id.* ¶¶ 2, 93.]

**D. The Pompton Lakes Sites**

Located in Passaic County, Old DuPont owned and operated the Pompton Lakes Works Site as a 600-acre explosives manufacturing facility for 92 years, from 1902 to 1994. [Pompton Lakes Litigation Docket No. 410 ¶¶ 72, 74.] For almost a century at the Site, Old DuPont produced lead azide (a propellant and explosive), shelled blasting caps, metal wire, both aluminum and copper shells, as well as other explosives. [*Id.* ¶ 2.] Old DuPont also used the Site as a waste disposal location for its manufacturing operations. [*Id.* ¶ 4.] The Western Manufacturing Area ("WMA") stopped producing explosive products in 1926 and hosts waste areas that contain pollutants. [*Id.* ¶¶ 87, 89.] The WMA includes the "shooting area", the old fuze works wire dump, tar deposit areas, and the burning area, among others. [*Id.* ¶ 89.] Testing revealed the presence of antimony, arsenic, cadmium, chromium, copper, lead, mercury, nickel, selenium, silver, thallium, and zinc in the WMA. [*Id.* ¶ 90.] The Eastern Manufacturing Area ("EMA") also contains waste disposal locations, but also contained manufacturing operations and storage areas allegedly leading to contamination. [*Id.* ¶¶ 92–93.] The EMA tested positive for many of the same

contaminates as the WMA but also included cyanide, cobalt, PCE, and bis (2-ethylhexyl) phthalate. [*Id.* ¶ 94.]

## II. PROCEDURAL HISTORY

### A. The State Takes Legal Action Against the Settling Defendants

In 2019, the State instituted legal action against the Settling Defendants and sought to "obtain recoveries to supplement funds already available to assist with the cleanup of PFAS [as well as other contaminants] across New Jersey and reduce residents' exposure to these chemicals." [*Id.*] Of note, on March 25, 2019, the State issued a Statewide PFAS Directive pursuant to the Spill Compensation and Control Act (the "Spill Act"), N.J. STAT. ANN. §§ 58:10-23.11–23.24. [*Id.* ¶ 7 & Ex. A.] The Directive "required" the Settling Defendants "to, among other things, participate in a process with the Department through which costs to investigate and clean up PFAS contamination across New Jersey, including in drinking water supplies and natural resources, would be estimated, and provide the necessary funding toward such costs." [Motion to Approve Proposed JCOs 8 (citing *id.* Ex. A).] In response, the Settling Defendants asserted numerous defenses.

In March 2019, the State—in its sovereign, quasi-sovereign, *parens patriae*, public trustee, and regulatory capacities—filed the aforementioned Industrial Sites Cases in the Superior Court of New Jersey "collectively seeking injunctive relief and damages for discharges over decades that caused a wide variety of contamination across the State, including from PFAS." [Motion to Approve Proposed JCOs 9.] The

Settling Defendants then removed[4] the Industrial Site Cases to this Court.[5] [Proposed DuPont JCO § I.S; Proposed 3M JCO § I.E.]

---

[4] The Settling Defendants removed the Industrial Cases to this Court pursuant to 28 U.S.C. § 1442(a), the federal officer removal statute, based on their manufacturing activities undertaken at the direction of the federal government. [Docket No. 1 § 2; Pompton Lakes Litigation Docket No. 1 § 2; Repauno Works Litigation Docket No. 1 § 2; Parlin Litigation Docket No. 1 § 2.] Although the Court's subject matter jurisdiction is not challenged, the Court has an independent obligation to assure itself that jurisdiction exists. *Zambelli Fireworks Mfg. Co. v. Wood*, 592 F.3d 412, 418 (3d Cir. 2010). It does here. The propriety of removal has been considered by two Judges of this Court who each rejected challenges to federal jurisdiction. The Court sees no basis to revisit those determinations. Moreover, the Court's jurisdiction is not limited to the particular contaminants or periods of industrial activity that supplied the federal officer nexus. The Court possesses supplemental jurisdiction over the related state law claims under 28 U.S.C. § 1367(a). Although some claims involve different contaminants and periods of activity—including PFAS contamination not alleged to have resulted from federally-directed conduct—they are sufficiently related to the claims within the Court's original jurisdiction. That the Settling Parties now seek to resolve those claims through the Proposed JCOs does not alter the jurisdictional analysis. To be sure, a settlement cannot create federal jurisdiction where none exists. However, because these actions were properly removed under § 1442(a) and the related state law claims fall within the Court's supplemental jursidiction, the Court possesses subject matter jurisdiction to consider whether to approve the Proposed JCOs.

[5] Shortly thereafter, the State filed another lawsuit in the Superior Court of New Jersey against the Settling Defendants and other manufacturers of PFAS-containing AFFF ("NJ Statewide AFFF Case"). [Reap Decl. ¶ 9.] That suit "sought relief related to PFAS contamination across New Jersey caused by the manufacture and sale of AFFF products, including at and around sites where AFFF was used throughout [the State]." [Motion to Approve Proposed JCOs 9.] The Settling Defendants removed that case as well to this Court, from where it was transferred to the multidistrict litigation *In re Aqueous Film-Forming Foams Prods. Liab. Litig.,* No. 18-2873 (D.S.C.) ("AFFF MDL"), in the United States District Court for the District of South Carolina. The State has initiated PFAS-focused litigation against other defendants too. In 2020, the State filed suit against Solvay Specialty Polymers USA, LLC, and Arkema Inc. for PFAS discharged from the West Deptford manufacturing plant. [Reap Decl. ¶ 10.] The State also sued the United States in January 2021 for its failure to address PFAS contamination released from federal facilities around New Jersey. [*Id.* ¶ 11.]

As amended, the State asserted claims against the Settling Defendants under: the Spill Act; the Water Pollution Control Act ("WPCA"), N.J. STAT. ANN. §§ 58:10A-1–20; the Solid Waste Management Act ("SWMA"), N.J. STAT. ANN. §§ 13-1E-1–230; the Industrial Site Recovery Act ("ISRA"), N.J. STAT. ANN. §§ 13:1K-6–13.1; the Brownfield and Contaminated Site Remediation Act ("BCSRA"), N.J. STAT. ANN. §§ 58:10B-1–31; the Air Pollution Control Act ("APCA"), N.J. STAT. ANN. §§ 26:2C-1–68; the New Jersey Safe Drinking Water Act ("NJSDWA"), N.J. STAT. ANN. §§ 58:12A-1 *et seq.*; the DEP's enabling statute, N.J. STAT. ANN. §§ 13:1D-1 *et seq.*; the Uniform Fraudulent Transfer Act, DEL. CODE ANN. tit. 6, §§ 1301–12, N.J. STAT. ANN. §§ 25:2-20–36; and New Jersey common law for public nuisance, trespass, negligence, gross negligence, willful or wanton misconduct, abnormally dangerous activity, and products liability. [Proposed DuPont JCO §§ I.N–R; Proposed 3M JCO §§ I.C–D.]

**B. The State Prosecutes the Industrial Sites Cases**

In June 2020, this Court consolidated the Industrial Site Cases for management and pretrial purposes. [Docket No. 40.] That ensuing fall the Settling Parties "commenced discovery across the four cases, which included over 500 requests for production and over 100 interrogatories on complex regulatory, scientific, and environmental topics." [Docket No. 746-2 ¶ 12 ("Reap Decl.").] This intensity also included "a series of motions to dismiss" that sought, among other things, dismissal of "the State's groundwater natural resources damages claims against the DuPont

Defendants, and the State's claims against 3M entirely." [Motion to Approve Proposed JCOs 10 (citations omitted).] The Court largely denied these motions.

These early days also saw corporate-restructuring maneuvers on the part of the DuPont Defendants. After it spun off Chemours in 2015, Old DuPont merged with the Dow Chemical Company ("Dow") in 2017. [Docket No. 752-3 ¶ 30 ("Castello Decl.").] "Following that merger, Old DuPont and Dow combined and reshuffled their assets, and announced new spinoffs to occur in the spring and summer of 2019, while the [Settling] [P]arties were litigating the State's environmental claims, and the fraud transfer claims arising from the 2015 Chemours spin." [*Id.*] This subsequent series of convoluted transactions resulted in New DuPont and Corteva, the latter of which became Old DuPont's corporate parent. [*Id.*] To assure success, the State had to "review[] and analyze[] publicly available materials to understand these transactions and their implications on the claims that the State asserted in these matters." [*Id.*] In the State's view, these fraudulent transfers were "designed to hinder, delay[,] or defraud creditors in" New Jersey. [*Id.* ¶ 34.]

The State inaugurated 2022 with a request for preliminary injunctive relief requiring some of the DuPont Defendants to establish a remediation funding source ("RFS") for the Chambers Works Site, "which became a significant focus of the litigation." [Reap Decl. ¶ 13.] Resolution of that motion required "seventeen days of expert depositions … in the summer and fall of 2022." [*Id.*] The year 2023 saw no respite. The State and some of the DuPont Defendants "began filing further briefing

in preparation for a hearing on the injunction, and at the same time continued to brief several significant discovery disputes." [*Id.*]

On March 27, 2023, the Court ordered the Settling Parties to mediation under the supervision of the Honorable Joel Schneider (Ret.). [Docket No. 268.] With Judge Schneider's "approval, the parties' negotiations encompassed claims against the [Settling] Defendants at the Industrial Sites as well as those set forth in the Statewide Directive and the NJ Statewide AFFF Case, and for remaining PFAS liability statewide to the maximum extent the State could resolve." [Reap Decl. ¶ 14.] Each party had much to consider, seeing that the Settling Defendants had reached "substantial settlements" with nationwide classes of water providers in the AFFF MDL in the spring and summer of 2023. [*Id.* ¶ 15.] 3M's and the DuPont Defendants' provision of up to $12.5 billion and $1.2 billion, respectively, to the water providers to treat PFAS in drinking water naturally "factor[ed] heavily into the" Settling Parties' negotiations. [*Id.*] These amounts "represented significant financial commitments to the [N]ation's, including New Jersey's, water providers in exchange for [the Settling Defendants'] release of drinking water claims, but at the same time placed strain on the[ir] finances." [Motion to Approve Proposed JCOs 12.]

Bearing this in mind, as well as other factors such as the prospect of protracted and costly litigation, the Settling Parties "participated in numerous meetings and information exchanges" for about a year or so after the State "prepared and issued [its] demands." [Reap Decl. ¶ 16.] "[D]ue to deep differences," the State and the DuPont Defendants remained at loggerheads, and "[n]egotiations stalled." [*Id.*]

### C. The Court Accelerates the Chambers Works Litigation and Appoints Judge Schneider as Special Master

Because of the "impasse" with the DuPont Defendants, the Court placed the Chambers Works Litigation on an accelerated track as of April 3, 2024. [Docket No. 286.] At the Settling Parties' stipulated behest and in accordance with Federal Rule of Civil Procedure 53, the Court appointed Judge Schneider as Special Master to perform non-dispositive case management and scheduling matters. [Docket No. 292.]

Under Judge Schneider's auspices, the adversarial process intensified. "[B]etween April 2024 and May 2025, the [Settling] [P]arties produced over one million documents, took over 100 fact and expert depositions, and briefed and argued numerous discovery disputes." [Reap Decl. ¶ 17.] The Settling Parties also "participated in more than 40 pre-trial conferences with" Judge Schneider and "two full-day pre-trial hearings" before this Court in April 2025. [*Id.* ¶ 18.] In late April 2025, the Court scheduled a series of seven "mini-trials" that would be variably tried by a jury and this Court. [Docket No. 613.] The first of these "mini-trials" was set to begin May 19, 2025. [*Id.*]

### D. The State Settles with 3M and Proceeds to Trial with the DuPont Defendants

The Settling Parties' engaged, but contested efforts bore fruit a week before trial with the State and 3M resolving their differences and finalizing their Proposed JCO. [Reap Decl. ¶ 19]; *see* [Docket No. 638.] Not so much with the DuPont Defendants, however. Negotiations having failed, the State "pressed forward … on its claims against" them. [Motion to Approve Proposed JCOs 13.] On May 19, 2025, the first

"mini-trial" began on the State's claims against EIDP under the Spill Act and BCSRA. That first "mini-trial" ended with EIDP and Chemours entering into a stipulation delineating the scope of their liability at the Chambers Works Site. [Docket No. 659.]

The Court then proceeded to the next "mini-trial" on EIDP's affirmative defense based on the 2005 Compensatory Restoration Administrative Consent Order ("CRACO"), which the Court rejected. The third and fourth "mini-trials" concerned, respectively, the State's claims under the WPCA and the DuPont Defendants' government contractor defense. By the end of the fourth "mini-trial" in mid-June 2025, the State and the DuPont Defendants "had completed 12 trial days that included testimony from 28 live witnesses and the admission of over 150 trial exhibits." [Reap Decl. ¶ 20.]

**E. The State Settles with the DuPont Defendants After Prosecuting Several "Mini-Trials"**

With the remaining "mini-trials" looming, especially that over the DuPont Defendants' alleged fraudulent transfer, the State and the DuPont Defendants "renewed their settlement discussions, with the benefit of key rulings from the trial." [*Id.* ¶ 21.] Following "multiple long days of in-person negotiation sessions," these Settling Parties "reached a settlement in principle" and "then set to the task of drafting a [Proposed] JCO to fully detail the terms of the settlement." [*Id.* ¶¶ 21–22.] On August 4, 2025, the State and the DuPont Defendants finalized their settlement. [*Id.* ¶ 22]; *see also* [Docket No. 724.] "[S]hortly after" the settlements were reached, the State "publicly announced the[m] … with a press release for each that included each

[P]roposed JCO." [Reap Decl. ¶ 23.] The State "further published dedicated websites for [each] [s]ettlement[], which included the press releases, frequently asked questions, PFAS information, the [Proposed] JCO and later, the Scheduling Order for briefing on th[e] Motion [to Approve Proposed JCOs]."[7] [*Id.*]

### F. The State Publishes the Proposed JCOs for the Notice-and-Comment Period

"Consistent with the Spill Act," the State published notices of the Proposed 3M JCO and the Proposed DuPont JCO in the *New Jersey Register* on July 21, 2025, and September 2, 2025, respectively. [*Id.* ¶ 24.] Each notice "announced that the Department sought public comments on the [Proposed JCOs] for a period of 60 days." [*Id.*] On the same days it published the notices in the *New Jersey Register*, the State posted copies of the notices to the DEP's dedicated website, emailed copies to each of the DEP's Political Subdivision contacts, and sent copies to numerous other interested parties in accordance with the notice provisions set out in the Proposed JCOs. [*Id.*] Also, as required under the Proposed JCOs, the Settling Defendants "arranged for notices to be published in print and electronic versions of widely-circulated New Jersey newspapers." [*Id.*]; *see* [Proposed 3M JCO ¶ 92(a); Proposed DuPont JCO ¶ 89(a).] And, pursuant to Paragraph 6 of the then-governing Scheduling Order, the State filed with the Court two status reports on the notice-and-comment periods. [Docket Nos. 729, 732, 735.]

---

[7] Those interested can still access the two websites at https://dep.nj.gov/3m/ and https://dep.nj.gov/dupont/.

On September 19, 2025, and November 1, 2025, the respective comment period for the Proposed JCOs closed. [Reap Decl. ¶ 24.] In all, the State received 115 comments from "[P]olitical [S]ubdivisions, associations, [and] individuals:" 59 for the Proposed DuPont JCO and 56 for the Proposed 3M JCO.[8] [*Id.* ¶ 25.] The comments "raised numerous topics related to the" Proposed JCOs, which the State "carefully reviewed and considered" with the help of experienced counsel, but, notably, also by conferring "with many of the commenters to better understand their perspectives;" thus the State issued "detailed responses to all comments received." [*Id.* ¶ 26.]

**G. The State Files the Motion to Approve the Proposed JCOs for Judicial Approval**

After "hard-fought and years-long adversarial litigation …[and] … negotiation," to say the least, the State submitted at last the Proposed JCOs for this Court's approval on November 21, 2025. [Motion to Approve Proposed JCOs 2.] Naturally, the Settling Parties anticipated—and, to their credit, welcomed—dissent. Even before filing the pending Motion to Approve Proposed JCOs, the Settling Parties had conferred, consented to, and developed a streamlined briefing schedule for opposition entities. *See* [Docket Nos. 737–40.] This resulted in amici briefing from two trade associations dedicated to clean water in the State of New Jersey: The

[8] Reap's Declaration miscalculates the comments at 120. *Compare* [Reap Decl. ¶ 25], *with* [Motion to Approve Proposed JCOs, Exs. B ("Proposed DuPont JCO Response to Public Comments") & C ("Proposed 3M JCO Response to Public Comments").]

National Association of Clean Water Agencies[9] ( "NACWA") and Association of Environmental Authorities of New Jersey[10] ("AEA").[11] *See* [Docket Nos. 769, 771.] The NACWA and AEA's animating concern was the "polluter pays" principle, *i.e.*, that the Settling Defendants, not the public, should bear the cost of PFAS-related capital expenses and operational costs possibly compounded by the release of claims in the Proposed JCOs.[12] Although "agree[ing] with [the NACWA and AEA] that

---

[9] The NACWA "represents 360 clean water agencies nationwide, including 16 in the State of New Jersey." [Docket No. 769, at 2.] Clean water agencies are essential to modern life, for they "provide the vital public services of protecting human health and the environment by managing and treating billions of gallons of wastewater and stormwater, as well as the millions of tons of biosolids generated as a byproduct of the wastewater treatment process, every day." [*Id.* at 1.]

[10] The AEA "is a nonprofit membership organization representing publicly owned and operated water, wastewater, solid waste, and environmental infrastructure agencies throughout the [S]tate." [Docket No. 771, at 7 ("[The] AEA's membership provides one or more of these utility services to most of New Jersey's population.").] The "promot[ion of] effective, efficient, and environmentally sound management of "water, wastewater, and solid waste services in every county" is the AEA's purpose. [*Id.*] Morris County Municipal Utilities Authority, Rockaway Valley Regional Sewerage Authority, Somerset Raritan Valley Sewerage Authority, Hanover Sewerage Authority, Stony Brook Regional Sewerage Authority, Rahway Valley Sewerage Authority, and the Musconetcong Sewerage Authority joined the AEA as amici. Each is a member of the AEA and a public entity created under the laws of New Jersey charged with "protecting public health and the environment through proper wastewater management and regulatory compliance." [*Id.* at 7–8.] In the service thereof, each owns and operates either a Wastewater Treatment Plant, Treatment Works, or a Solid Waste Facility, as defined in the Proposed JCOs. [*Id.* at 8]; [Proposed 3M JCO ¶ 6 (definitions thereof); Proposed DuPont JCO ¶ 6 (same).]

[11] A third amicus brief was filed by The Society for Earth Law in support of Carneys Point's Motion to Intervene. [Pompton Lakes Litigation Docket No. 577.]

[12] In the case of the AEA members, the release of their own claims. *See generally* [Docket No. 771.]

addressing PFAS in wastewater is an important priority for New Jersey," the State responded that the Proposed JCOs accomplish just that, alongside other efforts taken by the DEP. [Docket No. 788, at 2.]

Mainly spurred into action by the proposed release of their legal claims and the monetary values contemplated by the Proposed JCOs, 9 New Jersey Counties moved to intervene to modify the Proposed JCOs: Cape May, Cumberland, Mercer, Middlesex, Monmouth, Morris, Salem, Somerset, and Union. [Docket Nos. 770, 783; Pompton Lakes Litigation Docket Nos. 568, 586.] Two New Jersey Municipalities—Carneys Point and Sayreville—also filed intervention applications.[13] [Docket Nos. 742, 742-2 ("Objectors DuPont Motion to Intervene"), 745, 745-2 ("Objectors 3M Motion to Intervene"), 749.] Once briefing was complete, the Court set the Motion to Approve Proposed JCOs for what would be the first of two fairness hearings on January 7, 2026 ("First Fairness Hearing").

**H. The Court Conducts the First Fairness Hearing on January 7, 2026**

The Court began the First Fairness Hearing by discretionarily granting the Political Subdivisions' Motions to Intervene for the "limited purpose" of "objecting and voicing their objections" to the Proposed JCOs. [Docket No. 807, at 11:18–19

[13] Carneys Point's interventionist activity stretches back to 2022. On October 17, 2022, Carneys Point filed its first Motion to Intervene, which it subsequently withdrew without prejudice a month later. [Docket Nos. 231, 244–45.] A year and a half later on June 21, 2024, Carneys Point filed a second Motion to Intervene. [Docket No. 313.] After review of the completed briefing and with the benefit of oral argument, Judge Schneider denied Carneys Point's request, finding the requirements for mandatory or permissive intervention set forth in Federal Rule of Civil Procedure 24(a) and (n) not satisfied. [Docket No. 396.]

("Tr. of First Fairness Hearing").] The Court reasoned that having their positions would "lead to a more fruitful … and productive analysis of whether or not the consent decree[s are] fair, reasonable, and equitable." [*Id.* at 11:14–16.] With that concluded, the Court heard thoughtful, extensive argument from Counsel representing the Settling Parties, the Counties, Objectors, the AEA, and former Commissioner of the DEP Shawn LaTourette. *See generally* [*id.*] The First Fairness Hearing addressed a profusion of legal and practical issues, including the methodology employed by the State in evaluating the settlement consideration, the anticipated distribution of settlement funds, the scope and authority of the State to release the claims of Political Subdivisional, safeguards intended to ensure that settlement proceeds remained dedicated to environmental purposes, and objections from intervenors and interested non-parties. *See generally* [*id.*]

At hearing's end, the Court concluded that although the existing record was substantial, several issues required additional factual development before the Court could discharge its independent obligation to determine whether the Proposed JCOs were fair, reasonable, and in the public interest. Rather than rule with a broad gavel or speculate regarding matters affecting billions of dollars in environmental recoveries, the Court directed the State to supplement the record by addressing three specific questions.[14]

---

[14] The Court's decision to require additional evidence should not be construed as reflecting skepticism regarding the Proposed JCOs. Instead, given the unprecedented scope of the Proposed JCOs and the substantial public interest implicated, the Court concluded that a more fully developed record would better facilitate meaningful

First, the Court requested that the State explain what analysis it had performed in determining that the consideration obtained through the Proposed JCOs reasonably reflected the costs to the public of investigating, remediating, and abating contamination, PFAS especially, attributable to the Settling Defendants. [*Id.* at 189:21–190:16.] Second, the Court requested additional information concerning the process by which settlement proceeds would be distributed for the benefit of Political Subdivisions. [*Id.* at 190:17–24.] Third, the Court requested that the State identify the measures intended to protect settlement proceeds from diversion and ensure that recovered funds remained dedicated to their intended environmental purposes. [*Id.* at 190:25–191:6.] Any opposition to the supplemental submissions was also permitted. [Docket Nos. 816, 819, 821, 824, 835, 837.] The Court further encouraged discussions between the State and opposition groups while the supplemental record was being developed. [*Id.* at 191:7–192:1.] The Court deferred ruling on the Motion to Approve the Proposed JCOs pending filing of the supplemental submissions and any resulting mediation efforts.

**I. The State Files the Supplemental Report and the Stipulations**

On June 1, 2026, the State responded by filing a Supplemental Report addressing the Court's concerns, supported by Declarations of Former DEP Commissioner Shawn LaTourette, DEP Chief Legal Advisor and Chief Law

---

judicial review and, if approval ultimately proved appropriate, would provide greater transparency concerning the basis for the Court's decision.

Enforcement Officer Kimberly Cahall, Deputy Attorney General Gwen Farley, and Robert E. Unsworth of Industrial Economics, Inc. ("IEc"). [Docket No. 827 ("Suppl. Rpt."), 827-1 ("LaTourette Decl."), 827-2 ("Cahall Decl."), 827-3 ("Farley Decl."), 827-4 ("Unsworth Decl.").] The Supplemental Report—particularly its Settlement Distribution Plan[15]—expanded the evidentiary record before the Court and provided substantially greater transparency concerning the practical implementation of the Proposed JCOs than existed at the time of the First Fairness Hearing.

Also, consistent with the Court's encouragement, the State engaged in "intensive mediation" with the opposition. [Docket No. 843, at 1.] Those negotiations proved productive. First, the State reached a comprehensive Stipulation with the AEA addressing concerns regarding future funding for New Jersey's Publicly Owned Treatment Works ("POTWs") and related infrastructure. [Docket No. 851 ("AEA Stipulation").] Following execution of that Stipulation, the AEA withdrew its objections to the Proposed JCOs. [Docket No. 829.] The State likewise reached a separate Stipulation with eighteen New Jersey Counties ("Participating Counties"), including all nine original intervenors.[16] [Docket No. 850 ("Participating Counties Stipulation") (together with the AEA Stipulation, "Stipulations").] Under that Stipulation, the Participating Counties agreed to withdraw their objections in

[15] The Settlement Distribution Plan is labeled as Addendum 1 to the Supplemental Report.

[16] The additional Counties are Bergen, Burlington, Camden, Gloucester, Hunterdon, Ocean, Passaic, Sussex, and Warren.

exchange for specified funding commitments and the creation of a Qualified Settlement Fund ("QSF") to administer distributions for County environmental projects under procedures set forth therein. *See* [*id.*]

Although these Stipulations significantly narrowed the issues remaining before the Court, the withdrawal of these objections did not obviate the need for a fairness analysis. Judicial approval cannot rest upon the absence of opposition alone; the Court must still conduct its independent analysis of the Proposed JCOs. Yet, the Stipulations are relevant for two reasons.

First, they demonstrate that the settlement process remained dynamic even after execution of the Proposed JCOs. Rather than defending every aspect of the Proposed JCOs as immutable, the State continued to engage with opposition groups and agreed to implementation measures designed to address practical concerns regarding future funding and administration. Second, the resulting Stipulations clarified and improved the overall framework through which the Settlement Payments will ultimately be administered. Those improvements form part of the record the Court will consider in evaluating the Proposed JCOs as they now exist—not merely as originally proposed.

**J. The Court Conducts the Second Fairness Hearing on June 24, 2026**

By the time of the second fairness hearing on June 24, 2026 ("Second Fairness Hearing"), only Carneys Point and Sayreville continued to oppose approval of the Proposed JCOs.[17] Their objections principally concern the State's authority to

[17] Sayreville joined Carneys Point's second round of objections. [Docket No. 832.]

compromise claims asserted in its various sovereign and quasi-sovereign capacities, the relationship between the Proposed JCOs and Carneys Point's litigation pending in another forum, the constitutional treatment of Natural Resource Damages, and the future administration of the Settlement Payments. *See* [Docket Nos. 831-1 ("Objectors Resp. to Suppl. Rpt."), 832, 839 ("State Reply in Support of Suppl. Rpt."), 845-1 ("Objectors Sur-reply to Suppl. Rpt.").] The Court heard argument and received testimony from the State regarding the Supplemental Report, as well as Objectors' challenges to the Proposed JCOs at the Second Fairness Hearing. *See generally* [Docket No. 852 ("Tr. of Second Fairness Hearing").]

The Court has carefully considered each of the objections, together with the extensive briefing, the testimony and argument presented during both Fairness Hearings, the Supplemental Report, and the two Stipulations. The Court therefore turns its attention first to the terms of the Proposed JCOs and then, to the standard of review under which the Court will review them.

## III. THE PROPOSED JCOS

Like any settlement, the Proposed JCOs are the result of compromise. The State characterizes the Proposed JCOs as "landmark settlements that resolve some of the most significant environmental litigation in New Jersey's history." [Motion to Approve Proposed JCOs 1.] Each Proposed JCO is a "final, complete, and exclusive agreement and understanding between" the Settling Parties to restore New Jersey's injured natural resources, abate and remediate ongoing environmental harm, and fund

projects to protect human health and the lands and the waters of New Jersey. [Proposed 3M JCO ¶ 96; Proposed DuPont JCO ¶ 93.]

Broadly speaking, the Settling Defendants—without admitting liability—have agreed to "exceptional monetary consideration and remediation commitments" valued at approximately $2.5 billion in exchange for "broad releases and covenants not to sue regarding PFAS-related claims." [Motion to Approve Proposed JCOs 16, 24.] Before turning to the terms of each Proposed JCO, to which each Settling Party is respectively bound, the Court will provide a general overview of the Proposed JCOs.

**A. General Terms of the Proposed JCOs**

Under the terms of the Proposed JCOs, the Settling Defendants are generally responsible for three types of monetary payments: Natural Resource Damages; Abatement Damages; and Costs, Fees, and Punitive Damages. Natural Resource Damages are those reserved for assessing and compensating the damage inflicted on the State's natural resources, including land, vegetation, biota, fish, shellfish, wildlife and habitats, all waters of the State, drinking water supplies, and the air. [Proposed 3M JCO ¶ 6 (defining "Natural Resource Damages" and "Natural Resources"); Proposed DuPont JCO ¶ 6 (same).]

Abatement Damages are a form of compensation that will be separately marked to improve and protect public health, safety, and the environment, such as: addressing these concerns and their impacts from the Industrial Sites' contamination and discharges; supporting water quality infrastructure projects, including projects to install, operate, and maintain water treatment in public and private wells sufficient to

meet applicable state standards; and a host of other environmental, consumer-protection, and related projects.[18] *See* [Proposed 3M JCO ¶ 50; Proposed DuPont JCO ¶ IV.6 (defining "Abatement Damages").]

Payments for Costs, Fees, and Punitive Damages are those for exactly that: costs, attorneys' fees, punitive damages, and penalties. [Proposed 3M JCO ¶ 44(c)(iv); Proposed DuPont JCO ¶ 7(c)(iii).] The Settling Defendants will variably pay each of these types of damages to the State over the next 25 years in accordance with a Settlement Payment Schedule. [Proposed 3M JCO, Ex. A ("3M Settlement Payment Schedule"); Proposed DuPont JCO, Ex. A ("DuPont Settlement Payment Schedule").]

The Settlement Payment Schedules are accompanied by Escrow Agreements—a standard settlement practice. The Agreements work as follows: Until the Proposed JCOs "become[] final and non-appealable," the Settling Defendants are required to wire their respective Settlement Payments to an Escrow Account. [Proposed 3M JCO ¶ 44(b); Proposed DuPont JCO ¶ 7(b).] Once deposited, the Settlement Payments "shall earn interest and may not be used by the State for any purpose." [Proposed 3M JCO ¶ 44(b); Proposed DuPont JCO ¶ 7(b).] If the Proposed JCOs "become[] final and non-appealable," the State will provide the Settling Defendants with wire transfer

[18] The Proposed JCOs use slightly distinct terminology here: Abatement Damages for the DuPont Defendants and PFAS Contamination Abatement Funding for 3M.

instructions at that time, the Escrow Agreements' purpose having been served.[19] [Proposed 3M JCO ¶ 44(a)–(b); Proposed DuPont JCO ¶ 7(a)–(b).]

In exchange for these billions of dollars, the Settling Defendants are "broad[ly], expansive[ly], and inclusive[ly]" released from PFAS-related claims.[20] [Proposed 3M JCO ¶ 54; Proposed DuPont JCO ¶ 49 (collectively, the "Releases").] This includes the claims—as that word is defined in the Proposed JCOs—of the State's "departments, agencies, authorities, divisions, boards, commissions, districts, instrumentalities of any kind, and attorneys, including the Attorney General and county prosecutors, and any Person claiming by or through any of the foregoing[;]" "all of the State's Political Subdivisions[21] and their departments, agencies, authorities, divisions, boards, commissions, districts, instrumentalities of any kind, and attorneys, and any Person claiming by or through any of the foregoing;" "any Person or entity

[19] If, however, the approval of the Proposed JCOs "is overturned, remanded, vacated, or modified on appeal such that the JCO[s] [are] void, … of no effect, or … deemed by the [Settling] Parties, exercising good faith, to be materially altered, the settlement funds placed into the Escrow Account[s] by the Settling Defendants shall be returned to the Settling Defendants within 30 Days, with any interest earned thereon." [Proposed 3M JCO ¶ 44(b); Proposed DuPont JCO ¶ 7(b).]

[20] Upon entry, the Proposed JCOs are to constitute judicially-approved settlements under the Spill Act and Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601 *et seq.*, thus providing contribution protections to Settling Defendants as well. *See* [Proposed 3M JCO § X; Proposed DuPont JCO § XIII.]

[21] Political Subdivisions are "any city, borough, town, township, village, county, or other political subdivision of the State, or any agency or instrumentality of one or more thereof." [Proposed 3M JCO § IV.5 (defining "Political Subdivision"); Proposed DuPont JCO § IV.6 (same).]

acting or purporting to act in a *parens patriae*, sovereign, quasi-sovereign, private attorney general, qui tam, taxpayer, or other capacity … seeking relief on behalf of or generally applicable to the general public in the State or the people of the State, as opposed to solely to private or individual relief for separate and distinct injuries;" and "any Person or entity on whose behalf any Releasor identified …[above] … brought or could have brought [claims], whether individually or in any corporate, personal, representative, or derivative capacity." [Proposed 3M JCO ¶ 6 (defining "Releasors"); Proposed DuPont JCO ¶ 6 (defining "Statewide PFAS Releasors").] The Attorney General of New Jersey maximally asserts the power to execute the Releases on behalf of and for the benefit of Political Subdivisions, citizens, and residents, consistent with the State's sovereign, quasi-sovereign, *parens patriae*, public trustee, and regulatory authorities. *See* [Proposed 3M JCO ¶ 9 & § VIII; Proposed DuPont JCO §§ I.EE & XI.]

Lastly, as noted, the Proposed JCOs do not constitute "finding(s) or admission(s) of liability" by the Settling Defendants, [Proposed 3M JCO § XI (alterations in original); Proposed DuPont JCO § XIV (alterations in original)], and, with a minor distinction,[22] this Court "retains jurisdiction over both the subject matter of th[e Proposed] JCO[s] and the Parties for the duration of the performance of the terms of th[e] [Proposed] JCO[s] for the purpose of enabling any Party to apply to the

[22] The Proposed DuPont JCO qualifies this Court's jurisdiction "to the dispute resolution requirements set forth in Paragraph 96" of that agreement. [Proposed DuPont JCO ¶ 101.]

Court at any time for such further order, direction, or relief as may be necessary or appropriate for the construction, interpretation, or modification of th[e] [Proposed] JCO[s], or to effectuate or enforce compliance with th[e Proposed] JCO[s'] terms." [Proposed 3M JCO ¶ 105; Proposed DuPont JCO ¶ 101.]

In total, the Settling Defendants will pay $1.275 to $1.325 billion to the State in Natural Resource Damages and Abatement Damages over the next 25 years: $400 to $450 million by 3M and $875 million by the DuPont Defendants. The Court turns next to the specifics of each Proposed JCO to see how exactly each Settling Defendant will dole out these sums.

**B. The Proposed 3M JCO**

Consistent with the 25-year 3M Settlement Repayment Schedule and "subject to adjustment based on Credit-Eligible Claims as set forth in Paragraph 45," 3M has agreed to pay the State up to $400 to $450 million in monetary payments.[23] [Proposed 3M JCO ¶ 44 & 3M Settlement Payment Schedule.] One hundred million dollars of which shall constitute an initial payment to the State within 30 days of the Proposed JCO's entry. [Proposed 3M JCO ¶ 44(a).] Of 3M's total monetary obligations, $140 million is for Natural Resource Damages, allocated as follows: $105 million for the Chambers Works Site; $17.5 million for AFFF; and $17.5 million for other sources of PFAS contamination. [*Id.* ¶ 44(c)(i).] An additional $170 million is stipulated for

[23] Pursuant to the Proposed JCO's Most Favored Nation provisions, the State could receive up to $500 million in the event 3M enters into a multistate settlement that uses a calculation that would have awarded the State more than it received under the agreement. *See* [Proposed 3M JCO ¶ 114.]

Abatement Damages as follows: $40 million for the Chambers Works Site; $65 million for AFFF; and $65 million for other sources of PFAS contamination. [*Id.* ¶ 44(c)(ii).] 3M is also required to pay an additional $50 to $100 million designated as a New Jersey Leadership Payment[24] to further supplement PFAS abatement funding. *See* [*id.* ¶ 44(e)]. Another $40 million is set aside for Costs, Fees, and Punitive Damages. [*Id.* ¶ 44(c)(iv).] And, despite not currently owning, operating, managing, or controlling any sites in the State, 3M has also agreed to complete PFAS investigations and satisfy any PFAS remediation obligations at its three former manufacturing sites at Belle Mead, Flemington, and Freehold. *See* [*id.* ¶ 48.]

**C. The Proposed DuPont JCO**

The DuPont Defendants will pay the State $875 million over the next quarter century, "subject to adjustment based on Credit-Eligible PFAS Claims as set forth in Paragraph 9" and consistent with the DuPont Settlement Payment Schedule. [Proposed DuPont JCO ¶ 7 & DuPont Settlement Payment Schedule.] Natural Resource Damages account for $225 million of this total, allocated as follows: $100 million for the Chambers Works Site; $75 million for the Pompton Lakes Works Site; $30 million for the Parlin Site; and $20 million for the Repauno Works Site. [Proposed

[24] This is defined as "a set of exceptional payments to the State to acknowledge and recognize New Jersey's unique role as a national leader in PFAS abatement and Remediation efforts and specifically as the first state in the country to conduct statewide occurrence studies of PFAS in Drinking Water Supplies, the first state in the country to establish a maximum contaminant level for any PFAS substance, and the first state in the country to enter into the type of comprehensive PFAS settlement memorialized in this JCO." [Proposed 3M JCO ¶ 44(e).]

DuPont JCO ¶ 7(c)(i).] The DuPont Defendants are additionally obligated to provide $525 million in Abatement Damages and $125 million in Costs, Fees, and Punitive Damages. [*Id.* ¶¶ 7(c)(ii)–(iii).]

In keeping with the DuPont Defendants' degree of participation in the alleged environmental degradation and the State's comprehensive remedial efforts, the Proposed DuPont JCO address not only PFAS, but also "any … hazardous substance as defined by the Spill Act," "hazardous substance designated under CERCLA," "hazardous waste as defined by the SWMA," "pollutant[s] as defined by the WPCA," and "any other substance alleged in the Industrial Sites Litigations to have been Discharged from an Industrial Site." [*Id.* ¶ 6 (defining "Contamination" and "Contaminant").] This is also reflected in the Proposed JCO's broad definition of remediation as "all necessary actions to investigate and cleanup or respond to any known, suspected, or threatened discharge." [*Id.* (emphasis added) (defining "Remediation" and "Remediate" in accordance with § 7:26E-1.8 of New Jersey's Administrative Code).]

The Proposed DuPont JCO further establishes RFSs[25] up to $1.2 billion in value to ensure that remediation funds are available in the event that those responsible for the remediation fail to do so, leaving the taxpayer on the hook for those costs. *See* [*id.* § VI.] Of particular note here are provisions establishing a panel of neutral Licensed

---

[25] RFSs, or remediation funding sources, are the methods of financing Site remediation and whose establishment is the responsibility of the person or entity performing said remediation. [Proposed DuPont JCO ¶ 6 (defining "Remediation Funding Source").]

Site Remediation Professionals ("LSRPs") to quickly resolve the Settling Parties' disputes over remediation cost estimates. *See* [*id.* ¶ 16.] In addition to the RFSs, within 60 days of the entry of the Proposed DuPont JCO, New DuPont and Corteva are required to "establish [and maintain] a Reserve Fund in the amount of $475,000,000 … for the purpose of providing further assurance that Remediation of the Industrial Sites will be completed[.]" [*Id.* ¶ 20.] The Reserve Fund may be "adjusted annually in proportion with the percentage decrease or increase in the annual aggregate amount of the RFSs, starting with the RFSs immediately following the Year One RFSs, required by the Department for the four Industrial Sites, but in no event shall the Reserve Fund exceed" the $475 million cap. [*Id.* ¶¶ 20(e)–(f).] The State may access the Reserve Fund in the event any of the DuPont Defendants primarily responsible for remediation at a specific Site fails to perform the remediation and the RFS funds are not available. *See* [*id.* ¶ 21.]

The Proposed DuPont JCO makes it clear that remediation of the Sites must be completed. *See* [*id.* § VIII.] As Paragraph 30 states: "Remediation is required at each Industrial Site until each Site is fully and finally Remediated pursuant to applicable federal and State laws, regulations, and guidance and receives a sitewide Final Remediation Document for all environmental media from (i) the Department and (ii) as applicable, EPA." [*Id.* ¶ 30.] For this reason, an added protective layer requires EIDP to perform Site remediation in the event of default by the responsible remediator, even if the RFSs or Reserve Fund are exhausted. *See* [*id.* ¶¶ 32–34.]

Critically, the Proposed DuPont JCO resolves outstanding disputes arising from the CRACO referenced above between the DEP, the New Jersey Spill Compensation Fund ("Spill Fund"), and EIDP. *See* [*id.* § X.] Paramount here is an updated process for the conservation of easements and conveyances, *see* [*id.*], that "will secure the preservation of almost 1,400 acres of land, and transfer to the State approximately 73 acres of land near Ramapo Mountain State Forest," [Motion to Approve Proposed JCOs 21].

**D. Distribution of the Settlement Payments**

How are the people of New Jersey to know that the State will use the Settlement Payments for their intended purposes? The language of the Proposed JCOs, the Settlement Funds Distribution Plan, the two Stipulations, and, most notably, the Constitution of New Jersey provide them assurance.

**1. Natural Resource Damages**

The State's expenditure of the $365 million in Natural Resource Damages shall comport with the State's Constitution. In force since 2017, the Natural Resource Damages Constitutional Amendment mandates that "[t]here shall be credited annually to a special account in the General Fund an amount equivalent to the revenue annually derived from all settlements and judicial and administrative awards relating to natural resource damages collected by the State in connection with claims based on environmental contamination." N.J. CONST. art. VIII, § 2, ¶ 9. This amount "shall be appropriated from time to time by the Legislature for paying for costs incurred by the State to repair, restore, or replace damaged or lost natural resources of the State,

or permanently protect the natural resources of the State, or for paying the legal or other costs incurred by the State to pursue settlements and judicial and administrative awards relating to natural resource damages." *Id.* "The first priority for the use of" Natural Resource Damages "shall be in the immediate area in which the damage to the natural resources occurred in connection with the claim for which the moneys were recovered." *Id.*

The very terms of the Proposed JCOs ensure their constitutional fidelity, as each dictate that the disbursement of the $365 million in Natural Resource Damages over the next 25 years shall comply with the 2017 Constitutional Amendment. [Proposed 3M JCO ¶ 44(c)(i); Proposed DuPont JCO ¶ 7(c)(i).] The Proposed 3M JCO straightforwardly allocates Natural Resource Damages as such in each of the next 25 years. *See* [3M Settlement Payment Schedule.] The Proposed DuPont JCO operates a bit differently. "[E]xcept where otherwise indicated," the DuPont Settlement Payment Schedule sets yearly block payments, but does not specify the portion of each annual payment that is for Natural Resource Damages or Abatement Damages. *See* [DuPont Settlement Payment Schedule.] For example, the DuPont Defendants will pay the State $200 million in Year 1, of which $100 million is allocated for Costs, Fees, and Punitive Damages. [*Id.*]

So what of the remaining $100 million? That allocation decision is vested in the Commissioner of the DEP to ensure that the Natural Resource Damages or Abatement Damages are wisely spent in Year 1 depending on conditions. *See* [*id.* ("[E]xcept where otherwise indicated, all funds are to be allocated between Natural

Resource Damages and Abatement Damages by the Department").] So, too, for the remaining 24 years, and reasonably so. As the Court explained at the Second Fairness Hearing, this will be "a moving process." [Tr. of Second Fairness Hearing 149:22–23.] In one given year, Natural Resource Damages may be more appropriate in the Commissioner's informed opinion, Abatement Damages the following year perhaps. It is quite understandable that the State would not want to blindly and unalterably allocate Natural Resource Damages or Abatement Damages for 25 years out. A thoughtful year-by-year approach makes good use of the State's technical expertise and serves well the State's remedial purposes.[26]

This is not to say that the Commissioner's discretion is unfettered, as the Objectors argue. Nothing in the Proposed DuPont JCO or its Settlement Payment Schedule empowers the Commissioner to redeploy elsewhere designated Natural Resource Damages: "[O]nce those funds go to [Natural Resource Damages], they stay there." [Tr. of Second Fairness Hearing 147:16–17.] Nor in the Court's view does the Proposed JCO permit the Commissioner to subvert the Industrial Sites' Natural Resource Damages entitlements. There shall be $100 million for the Chambers Works Site, $75 million for the Pompton Lakes Works Site, $30 million for the Parlin Site, and $20 million for the Repauno Works Site. [Proposed DuPont JCO ¶ 7(c)(i).] It is a question of *when*, not *whether*, these amounts will be dedicated to the Constitutional Amendment account. The Settlement Funds Distribution Plan "confirms" as much.

[26] This should not be construed in any manner as casting doubt on the State's decision to allocate 3M's Settlement Payments with more specificity.

*See* [Settlement Funds Distribution Plan 5 & n.6 ("[Natural Resource Damages] … will not be re-allocated by the Department for abatement funding.").]

**2. Abatement Damages**

Apart from the Proposed JCOs' stated intent that the up-to $795 million[27] in Abatement Damages will be used for that purpose, *see* [Proposed 3M JCO ¶¶ 6 (defining "PFAS Contamination Abatement Funding" and "PFAS Contamination Abatement Project"), 44(c)(ii), 44(e), 51; Proposed DuPont JCO ¶¶ 6 (defining Abatement Damages), 7(c)(i)], the Settlement Funds Distribution Plan "sets forth the processes the State will use to distribute PFAS Abatement Funds, including pursuant to" the Stipulations the State has reached with the AEA and the Participating Counties, [Suppl. Rpt. 21]. This plan envisions "two primary means." [Settlement Funds Distribution Plan 2.]

**a. PFAS Abatement Fund**

First, the State intends to deposit the Abatement Damages "into a separate, non-lapsing fund to be known as the 'PFAS Abatement Fund.'" [*Id.*] This Fund will be "a special revenue fund outside of the General Fund" that will ensure that the Abatement Damages "will be used for dedicated purposes as required by the JCOs." [Cahall Decl. ¶ 22.] The Governor of New Jersey's Detailed Budget Recommendations for Fiscal Year 2027 explains further:

> Any funds received by the State of New Jersey of funds from … PFAS … abatement settlements are deposited into a separate, nonlapsing fund to be known as the PFAS Abatement Fund. All funds deposited into the

[27] This includes 3M's $50 to $100 million New Jersey Leadership Payment.

> PFAS Abatement Fund are appropriated solely for projects which are eligible abatement actions consistent with the terms of the settlement agreements, consent orders, or both, governing the use of such funds and may include administrative costs in amounts that are consistent with the terms of such settlement agreements, consent orders or both, subject to the approval of the Director of the Division of Budget and Accounting. The Commissioner of Environmental Protection shall select the projects which are eligible abatement actions consistent with the terms of the settlement agreements, consent orders, or both. Any grants awarded through new or existing grant programs shall be awarded on a competitive basis, using criteria determined by the Department of Environmental Protection.

OFFICE OF MGMT. & BUDGET, THE STATE OF NEW JERSEY: THE GOVERNOR'S BUDGET MESSAGE, DETAILED BUDGET RECOMMENDATIONS, FISCAL YEAR 2027, at 250.[28] Consistent with the Governor's intention, the DEP "is committed to ensuring transparency as to the receipt and use of funds in the PFAS Abatement Fund." [Cahall Decl. ¶ 24.] The Department shall do so by "regularly report[ing] on the availability and use of the funds in the PFAS Abatement Fund," and by "develop[ing] a PFAS Settlement Information Website that provides the public with information regarding the PFAS Abatement Funds, including eligible and approved projects; amount of funding available and expended; frequently asked questions; and additional resources." [*Id.* ¶ 25.] The DEP will also "publish annual funding reports on the PFAS Settlement Information Website that state the amount of funding that has been received by and disbursed from the Fund consistent with the JCOs." [*Id.* ¶ 26.]

[28] The Governor's complete Budget Message can be found at https://www.nj.gov/treasury/omb/publications/27budget/FY%202027%20Budget%20Detail%20%20Full.pdf.

### i. PFAS Water Quality Projects

The PFAS Abatement Funds "received through the [Proposed] JCOs over the 25-year payment schedules will be used primarily to supplement funding available to 'local government units'[29] … through the New Jersey Water Bank [("Water Bank")]." [Cahall Decl. ¶ 30]; [Settlement Funds Distribution Plan 2.] These projects—known as PFAS Water Quality Projects—shall provide "an additional source of funding for the … Water Bank to provide loans that include no-interest, low-interest, and/or principal forgiveness to finance water quality projects to address PFAS throughout the State …, including specific assistance for … POTWs …." [Settlement Funds Distribution Plan 2.]

The Water Bank "is a partnership between the Department and the New Jersey Infrastructure Bank ('I-Bank') to provide low-cost financing for the design, construction, and implementation of projects that help protect and improve water quality and ensure safe and adequate drinking water." [*Id.* at 3.] Crucially, the DEP "sets the priorities and funding packages for the Water Bank on a yearly basis in a manner that seeks to maximize the impact of available resources across the State." [Cahall Decl. ¶ 32.] Through this yearly process, the DEP "will allocate funds from the PFAS Abatement Fund as an additional capitalization source to the Clean Water State Revolving Fund ("CWSRF") and Drinking Water State Revolving Fund

[29] As defined in § 7:22-3.4 of New Jersey's Administrative Code.

("DWSRF")—two "well-established and successful funding mechanisms" administered by the Water Bank. [*Id.* ¶ 31]; [Settlement Funds Distribution Plan 3.]

The process will unfold as follows: the DEP "will accept applications to the Water Bank for funding for PFAS Water Quality Projects through www.h2loans.com." [Settlement Funds Distribution Plan 3.] "Each year," through what are known as proposed Intended Use Plans ("IUPs")[30] that are subject to at least one public hearing and one public comment period, the DEP "will specify the following for PFAS Water Quality Projects: (a) the projects that are eligible for funding; (b) the principal forgiveness share of funding; (c) the principal forgiveness cap per applicant; (d) the total amount of principal forgiveness funding that will be available in the next fiscal year; (e) the share of loan funding available from the Department interest free; and (f) the share of loan funding available through the I-Bank at its AAA market rate." [*Id.*] This yearly planning mechanism "incorporates stakeholder input and ensures transparency through a public reporting process regarding the use of funds deployed by the Water Bank."[31] [Suppl. Rpt. 22 (citation omitted).] Of course, "[t]he PFAS Water Quality Projects process will be governed by

---

[30] As the State explains, IUPs are yearly documents "that establish priorities and policies for the financial assistance offered through the Water Bank, describe the projects eligible for financing, and provide information on the funding packages available for the next fiscal year." [Suppl. Rpt. 22 (citations omitted).]

[31] To guide interested parties through this process, "[m]ultiple resources are available to applicants in New Jersey, including detailed guidance, technical assistance, and a dedicated website." [Suppl. Rpt. 23 (citation omitted).] The DEP also "maintains a publicly accessible Spending Dashboard that provides detailed information regarding eligible and approved projects." [*Id.* (citation omitted).]

the Water Bank's existing and future statutory and regulatory requirements."[32] [Cahall Decl. ¶ 34.]

Sensitive to the POTWs' concerns expressed at the First Fairness Hearing, the State "has agreed to provide a minimum of $150,000,000 from the PFAS Abatement Fund to the Water Bank to assist POTWs with the costs of infrastructure upgrades to abate PFAS" pursuant to the AEA Stipulation. [Settlement Funds Distribution Plan 4]; [AEA Stipulation ¶ 1.] Of that amount, $100 million "will be used to provide principal forgiveness in connection with financing made available through the Water Bank" and another $50 million "will support the provision of no-interest loans." [Settlement Funds Distribution Plan 4]; [AEA Stipulation ¶¶ 1(a)–(b).] More than that, the DEP is further "agreeing to reduce its origination fee associated with financing PFAS Water Quality projects for POTWs through the Water Bank from 2% to 1%." [Settlement Funds Distribution Plan 4]; [AEA Stipulation ¶ 2.] A mechanism whereby the POTWs—as "passive receivers" of PFAS—can obtain a release, covenant not to sue, and contribution protection for certain types of claims related to PFAS as a further benefit. [AEA Stipulation ¶ 3.]

[32] The Settlement Funds Distribution Plan does stipulate that "[p]ublic water systems that receive funds under the national Public Water System class settlements will need to use any such funds first to address unmet needs before seeking financial assistance from the [DWSRF] made available through the PFAS Abatement Fund." [Settlement Funds Distribution Plan 3 n.2.]

**ii. PFAS Abatement Projects**

The DEP also plans to disburse Abatement Damages to finance PFAS Abatement Projects. To do so, the Department will provide funding "via an application process that builds off" its existing Spill Fund Damage Claim Process through which Political Subdivisions and individual members may apply for financial assistance to help abate PFAS contamination. [Settlement Funds Distribution Plan 4.] As it stands, public entities and private individuals in New Jersey can file a claim against the Spill Fund for damages resulting from the discharge of hazardous substances. *See* N.J. STAT. ANN. §§ 58:10-23.11i *et seq.* The Environmental Claims Administration, the office within the DEP that administers the Spill Fund, "accepts and reviews damage claims on an ongoing basis through a standard application available on the Department's website." [Cahall Decl. ¶ 44.] In the past, the Spill Fund "has awarded damages relating to potable well treatment systems, public waterline installations, remediation of contaminated sites, and other real and personal property damages caused by discharges of hazardous substances." [*Id.* ¶ 45.]

But the Spill Fund "has limited resources." [*Id.* ¶ 46.] Funding for PFAS Abatement Projects will therefore "supplement monies available … to assist [P]olitical [S]ubdivisions and individuals with the costs of projects to abate PFAS." [Settlement Funds Distribution Plan 4.] A simple process is intended: "Applicants will be directed to file claims with the Spill Fund … and the Environmental Claims Administration will be authorized to provide supplementary funding for PFAS abatement through that process." [*Id.*] That process should, moreover, be accountable and transparent.

Applicants will be required "to document previously incurred costs and/or to provide detailed project costs for anticipated future projects … to ensure that funds are disbursed appropriately." [*Id.*] Transparency will be achieved by the PFAS Settlement Information Website and the DEP's detailed annual funding reports described above.[33] [*Id.*]

**b. The Qualified Settlement Fund**

Should the Court approve the Proposed JCOs, the State will also "direct the Settling Defendants to pay $90,000,000 of the PFAS Abatement Damages in annual installments over eight years into" the QSF.[34] [*Id.*] A product of negotiations between the State and the Participating Counties following the First Fairness Hearing, the QSF addresses the concerns of the 18 Participating Counties "by expressly providing a funding mechanism under the [Proposed] JCOs that includes specific procedures governing the funds that will be provided to each [C]ounty." [Cahall Decl. ¶ 38]; *see* [Participating Counties Stipulation.]

[33] Thirdly, the DEP will "invest a comparatively smaller amount of funding from the PFAS Abatement Fund in PFAS-related research to benefit remediation efforts across the State." [Settlement Funds Distribution Plan 4 n.4.] This "research will further expand knowledge regarding human-health impacts, multimedia occurrence, cost-effective drinking water and wastewater treatment and destruction methods, improved onsite remediation techniques, legacy landfill impacts, indoor air exposure pathways, and ecological screening levels." [*Id.*]

[34] Years 1 and 5 through 8 call for $10 million deposits, while years 2 to 4 will see a total of $40 million. [Participating Counties Stipulation ¶ 3.]

Organized under the laws of the State of South Dakota,[35] the QSF monies will "ensure[] funding will be earmarked for the purpose of assisting Participating Counties with investigating and remediating PFAS contamination at [C]ounty-owned and [-]operated fire training facilities and airports." [Cahall Decl. ¶ 37]; *see* [Participating Counties Stipulation ¶ 5; Settlement Funds Distribution Plan 4–5.] A corporate trustee and special master appointed by the Participating Counties (subject to reasonable consent by the State) will oversee the QSF and manage any issues arising from it among the Participating Counties. [Participating Counties Stipulation ¶¶ 1–2.] In brief, "[e]ach Participating County will receive initial allotments, followed by 'special needs' distributions in the event more significant contamination issues are uncovered in particular [C]ounties during the course of investigation and remediation." [Cahall Decl. ¶ 39.] Swift remediation is vital, hence the QSF's design to "encourage the Participating Counties to quickly initiate cleanup activities, through providing allotments on a 'use it or lose it basis' and allowing for remaining funds to revert to the State if they are unused." [*Id.* ¶ 40.]

The QSF further contemplates that the DEP and the Participating Counties "will enter into Administrative Consent Orders ('ACOs') to govern the remediation at [C]ounty-owned and [-]operated fire training facilities and airports where PFAS contamination is known or suspected." [Cahall Decl. ¶ 41.] The ACOs "will be

[35] When queried by the Court on this choice, Counsel for the Participating Counties explained that "only a few states" have QSFs with the "guardrails" sought here. [Tr. of Second Fairness Hearing 171:3–6.]

negotiated based on the particular circumstances present at each [C]ounty property and will provide contribution protection to each Participating County under CERCLA and the Spill Act as to PFAS contamination at the respective [C]ounty property." [*Id.*] For its part, the State will have the right under the QSF "to audit the Participating Counties' expenditures to ensure that the funds are expended for the abatement of PFAS and in conformance with the terms of the JCOs." [*Id.* ¶ 42.] Although the Stipulation only binds the State and the Participating Counties, the State "is committed to cooperating with the remaining non-Participating Counties and treating all New Jersey [C]ounties equitably." [Settlement Funds Distribution Plan 5 n.6.]

**3. Costs, Fees, and Punitive Damages**

Costs, Fees, and Punitive Damages are the third category of monetary payments. [Proposed 3M JCO ¶ 44(c)(iv); Proposed DuPont JCO ¶ 7(c)(iii).] These monies shall defray Special Counsel's request for $195,122,093 in attorneys' fees, of which 3M will pay $41,128,044 and the DuPont Defendants $153,994,049. [Docket No. 781, at 3 ("State Reply in Support of Motion for Attorneys' Fees").] Paragraph 44(c)(iv) of the Proposed 3M JCO provides $40 million "for all Claims for costs, …including attorneys' fees and costs[,] … to investigate and litigate Claims." [Proposed 3M JCO ¶ 44(c)(iv).] The 3M Settlement Payment Schedule allocates this $40 million for attorneys' fees in Year 1. [3M Settlement Payment Schedule.] 3M's $50 to $100 million New Jersey Leadership Payment will provide the remaining $1,128,044 in Years 2 to 4. [*Id.*] The Proposed 3M JCO permits "up to, but not more than, $30,000,000 of the New Jersey Leadership Payment for any purpose described

in" Paragraph 44(c)(iv). [Proposed 3M JCO ¶ 44(e)(vii).] That Paragraph includes "attorneys' fees." [*Id.* ¶ 44(c)(iv).]

The DuPont Defendants are responsible for $125 million "for all claims for costs, … including attorneys' fees and costs, … to investigate, prosecute, and resolve the Litigations." [Proposed DuPont JCO ¶ 7(c)(iii).] The DuPont Settlement Payment Schedule calls for $100 million of this amount to be allocated in Year 1 and a second $25 million tranche in Year 2. [DuPont Settlement Payment Schedule.] The balance of $28,994,049 will come from Natural Resource Damages or Abatement Damages. Paragraph 11 of the Proposed DuPont JCO states that "up to an additional $50,000,000" of Natural Resource Damages or Abatement Damages may be allocated "for costs, including attorneys' fees and costs, that do not constitute restitution or remediation."[36] [Proposed DuPont JCO ¶ 11.] With the terms of the Proposed JCOs at hand, the Court turns to the framework under which their approval depends.

---

[36] As laid out, Objectors' challenge to the State's fee application is overruled. Objectors "do not challenge the amount" requested, but claim instead that the State has "not explained where the money will come from to pay the fee request." [Docket No. 773, at 2 ("Objectors Resp. to Motion for Attorneys' Fees").] Objectors misapprehend the Proposed JCOs.

Initially, Objectors miscalculate the portion of Costs, Fees, and Punitive Damages from $165 million to $140 million. [*Id.* at 2–3.] Neither this source of funding nor 3M's New Jersey Leadership Payment is challenged by Objectors. *See* [Objectors Resp. to Motion for Attorneys' Fees.] Their objection arises from the DuPont Settlement Payment Schedule's alleged bundling of Natural Resource Damages and Abatement Damages. Addressed in further detail below, the DuPont Settlement Payment Schedule does not unlawfully empower the Commissioner to reassign funds. What the Schedule does is allocate $125 million for attorneys' fees in Years 1 and 2, while the Commissioner lawfully exercises his discretion in the first instance to distribute the block payments as Natural Resources Damages or Abatement Damages

## IV. STANDARD OF REVIEW

The Court begins where every judicial review of a proposed consent decree must begin: with recognition of the limited—but vital—role assigned to the Judiciary. The Proposed JCOs do not become effective merely because sophisticated parties have agreed to their terms. Rather, parties seek entry of judicial consent orders that, once approved, will carry the force of court orders. In this way, "consent decrees have contractual as well as judicial features." *Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 519 (1986) (citation and internal quotation marks omitted). This Court's role extends beyond that of a passive recorder of the Proposed JCOs to the arbiter of what is fair to the citizens of New Jersey.

Before approving them, the Court must independently determine that the Proposed JCOs satisfy the legal standard governing judicial approval. Although "the Spill Act does not mandate a specific settlement review standard," federal courts have consistently appl[ied] the same standard to these settlements that they apply to federal CERCLA settlements." *N.J. Dep't of Env't Prot. v. Exxon Mobil Corp.* ("*Exxon I*"), 183 A.3d 289, 304 (N.J. Super. Ct. Law Div. 2015) (collecting cases); *United States v.*

---

throughout the 25-year period. With that clarified, Objectors' challenge fails. They concede that the 2017 Natural Resources Damage Constitutional Amendment allows for the payment of fees from Natural Resource Damage. [Objectors Resp. to Motion for Attorneys' Fees 3.] And their concern over fees being paid from Abatement Damages misses the fact that Paragraph 11 of the Proposed DuPont JCO expressly allows for the fee if they "do not constitute restitution or remediation." [Proposed DuPont JCO ¶ 11]; *see id.* at 3–4 (arguing against fee allocation because "[t]he Abatement portion is dedicated under the tax deduction rule solely for … restoration and remediation.").] The rest of Objectors' miscellaneous objections are addressed and overruled below.

*Unimatic Mfg. Corp.*, No. 20-17284, 2021 WL 1811651, at *2 (D.N.J. May 6, 2021) ("When reviewing Spill Act settlements, federal courts apply the same standard of review applied to CERCLA settlements.") (collecting cases). That standard calls for the Proposed JCOs to be: (1) procedurally and substantively fair; (2) reasonable; (3) consistent with statutory objectives; and (4) in the public interest. *See Exxon I*, 183 A.3d at 304. A few saliencies inform the Court's review.

First, and most importantly, "it is the policy of the law to encourage settlements." *United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 84 (1st Cir. 1990) (citations omitted); *see DuHamell v. Renal Care Grp. E., Inc.*, 66 A.3d 736, 738 (N.J. Super. Ct. Law Div. 2013) (quoting *McDermott v. AmClyde*, 511 U.S. 202, 215 (1994)) ("Equally well-settled is the notion that 'public policy wisely encourages settlements.'"). It is no different in the State of New Jersey, where "[t]he settlement of litigation ranks high" in public policy. *Gere v. Louis*, 38 A.3d 591, 600 (N.J. 2012) (alteration in original) (citing *Jannarone v. W. T. Co.*, 168 A.2d 72, 74 (N.J. Super. Ct. App. Div. 1961)). For good reason, as the "parties to a dispute are in the best position to determine how to resolve a contested matter in a way which is least disadvantageous to everyone." *Impink ex rel. Baldi v. Reynes,* 935 A.2d 808, 814 (N.J. Super. Ct. App. Div. 2007) (quoting *Isetts v. Borough of Roseland,* 835 A.2d 330, 334 (N.J. Super. Ct. App. Div. 2003)); *see also Ehrheart v. Verizon Wireless*, 609 F.3d 590, 595 (3d Cir. 2010) (citing *D.R. by M.R. v. East Brunswick Bd. of Educ.*, 109 F.3d 896, 901 (3d Cir. 1997)) ("Settlement agreements are to be encouraged because they promote the amicable

resolution of disputes and lighten the increasing load of litigation faced by the federal courts.").

New Jersey's pro-settlement policy "has particular force where, as here, a government actor committed to the protection of the public interest has pulled the laboring oar in constructing the proposed settlement." *Cannons* , 899 F.2d at 84 (citing *F.T.C. v. Standard Fin. Mgmt. Corp.*, 830 F.2d 404, 408 (1st Cir. 1987); *S.E.C. v. Randolph*, 736 F.2d 525, 529 (9th Cir. 1984)). Taken together, "there is deference to the administrative agenc[y's] input during consent decree negotiations and the law's policy of encouraging settlement." *In re Tutu Water Wells CERCLA Litig.*, 326 F.3d 201, 207 (3d Cir. 2003). Truthfully, it is difficult to imagine another entity or individual but the State being capable of "laboring [the] oar" for the "least disadvantageous" settlement on behalf of its people. *Cannons*, 899 F.2d at 84. It comes as no surprise then that the State is "afforded deference for its decision to enter into" the Proposed JCOs. *Unimatic.*, 2021 WL 1811651, at *3 (citing *Exxon I*, 183 A.3d at 304). But this Court cannot mistake deference for a "mechanistic[] rubberstamp." *Exxon I*, 183 A.3d at 306 (quoting *Arizona ex rel. Woods v. Nucor Corp.*, 825 F. Supp. 1452, 1456 (D. Ariz. 1992)).

The Court must still review the Proposed JCOs with a scrupulous judicial eye because "the true measure of the deference due depends on the persuasive power of the agency's proposal and rationale, given whatever practical considerations may impinge and the full panoply of the attendant circumstances." *United States v. Cornell-Dubilier Elecs., Inc.*, No. 12-5407, 2014 WL 4978635, at *3 (D.N.J. Oct. 3, 2014)

(quoting *Standard Fin. Mgmt.*, 830 F.2d at 408). A probing review nevertheless should "refrain from second-guessing the Executive Branch." *Cannons*, 899 F.2d at 84. Understanding that the DEP is expert on matters of the environment, the Court is not concerned with a settlement that it itself could have negotiated or "might have fashioned" or "considers ideal." *Id.* (citation omitted). These determinations lie beyond the proper scope of judicial review. A balance between independent review and institutional deference that appropriately reflects the distinct constitutional roles of the Judicial and Executive Branches is essential to the matter at hand.

In that role, this Court asks a rather more "limited," *United States v. Rohm & Haas Co.*, 721 F. Supp. 666, 685 (D.N.J. 1989)—but critically important—question: whether these Proposed JCOs, viewed as a whole and in light of the extensive record developed before the Court, represent fair, reasonable, lawful, and enforceable resolutions that further the objectives of New Jersey's environmental laws and serve the public interest, *see Cannons*, 899 F.2d at 84 (citation omitted). It is to that question the Court now turns, with the "[p]rotection of the public interest" in mind. *Exxon I*, 183 A.3d at 306 (quoting *United States v. Akzo Coatings of Am.*, 949 F.2d 1409, 1435 (6th Cir. 1991)).

## V. THE MOTION TO APPROVE JUDICIAL CONSENT ORDERS

### A. Procedural Fairness

The Court must first determine whether the Proposed JCOs are procedurally fair. "Procedural fairness requires that settlement negotiations take place at arm's

length." *Tutu Water Wells*, 326 F.3d at 207; *Unimatic*, 2021 WL 1811651, at *3 (citation omitted). "To measure procedural fairness, a court should ordinarily look to the negotiation process and attempt to gauge its candor, openness, and bargaining balance." *Cannons*, 899 F.2d at 86 (collecting cases); *see also Menasha Corp. v. U.S. Dep't of Just.*, 707 F.3d 846, 848 (7th Cir. 2013) (citations omitted). What must be ensured is "procedural integrity" guaranteed by negotiations conducted "forthrightly and in good faith," *Cannons Eng'g*, 899 F.2d at 86, as well as the "willingness … to thoroughly consider all oral and written comments made with regard to the proposed decree[s]," *Exxon I*, 183 A.3d at 309 (quoting *Akzo*, 949 F.2d at 1435).

The Court finds that the Proposed JCOs are procedurally fair for five reasons: (1) the Proposed JCOs were reached only after years of fully adversarial litigation; (2) the negotiations were conducted at arm's length by sophisticated parties represented by experienced counsel; (3) the negotiations occurred under the supervision of an experienced neutral mediator; (4) the public notice-and-comment processes were extensive and meaningful; and (5) this Court's own probatory review strengthened the integrity of the settlement process.

As the Court's recitation of the six-year procedural history reveals, this matter involved "highly sophisticated parties with sharply conflicting interests … full of adversarial vigor." *Exxon I*, 183 A.3d at 309 (citation omitted). The expertise, experience, and know-how of each Settling Party cannot be credibly questioned. The Settling Plaintiffs have "entered into hundreds of settlements involving remediation and natural resource damages under the Spill Act and [are] recognized as … national

leader[s] in addressing PFAS contamination." [Motion to Approve Proposed JCOs 30.] "On the other side," the Settling Defendants "are large companies with significant resources, deeply knowledgeable about PFAS and other environmental issues affecting their businesses, including the litigation and liabilities they face" [*Id.* at 31.]

It comes as no surprise then that the Settling Parties' respective understandings of the issues at hand came to halting blows. To defend their interests, "the parties had quality representation throughout their negotiations." *Garrison Southfield Park LLC v. Closed Loop Ref. & Recovery, Inc.*, No. 19-1041, 2022 WL 472436, at *2 (S.D. Ohio Feb. 16, 2022) (citation omitted). "[S]ome of the most experienced environmental attorneys from within the New Jersey Division of Law, with decades of experience, participated directly in and oversaw both the extensive litigation and the settlement negotiations at every step" on behalf of Settling Plaintiffs. [Motion to Approve Proposed JCOs 30–31 (citing Reap Decl. ¶¶ 32–34).] Their opposite number, no less "prominent" and "preeminent[,] .... have negotiated some of the largest PFAS-related settlements, including the nationwide water provider class action settlements." [*Id.*] In a phrase, "the parties were on equal footing." *Exxon I*, 183 A.3d at 309 (citing *Cannons*, 899 F.2d at 86).

Unsurprisingly, the Settling Parties "maintained diametrically opposed positions on a variety of issues over the course of more than six years of heated litigation." [Motion to Approve Proposed JCOs 29.] For years these litigants fortified their entrenched positions: propounding "over 500 requests for production and over 100 interrogatories on complex regulatory, scientific, and environmental topics" just

in the fall of 2020 alone. [Reap Decl. ¶ 12.] A series of motions were also filed before the Court. [*Id.*] In March 2023, the Court ordered the Settling Parties to mediation under the neutral and experienced supervision of Judge Schneider. [Docket No. 268.] Over the next year, the Settling Parties "participated in numerous meetings and information exchanges," which, alas, "stalled with the DuPont Defendants … due to deep differences." [Reap Decl. ¶ 16.]

Informed of this "impasse," [*id.*], the Court placed the Chambers Works Litigation on an accelerated track as of April 3, 2024, [Docket No. 286]. What followed was yet another frenetic year, with the Settling Parties "produc[ing] over one million documents, t[aking] over 100 fact and expert depositions, and brief[ing] and argu[ing] numerous discovery disputes, all under the guidance of" Judge Schneider, who now served as Special Master. [Reap Decl. ¶ 7.] April 2024 to May 2025 also saw the Settling Parties "participate[] in more than 40 pre-trial conferences with" Judge Schneider. [*Id.* ¶ 18.]

Then, on the eve of trial, paydirt. After "over two years of painstaking negotiations," the State and 3M settled their differences on May 12, 2025. [*Id.* ¶ 19.] But those "deep differences" prevented compromise with the DuPont Defendants. [*Id.* ¶ 16.] To "mini-trial" the adversaries went, dueling for "12 … days that included testimony from 28 live witnesses and the admission of over 150 trial exhibits," before breaking. [*Id.* ¶ 20.] "During that time, the State and the DuPont Defendants renewed their settlement discussions, with the benefit of key rulings from the trial." [*Id.* ¶ 21.] Through "multiple long days of in-person negotiation sessions," the State and the

DuPont Defendants eventually reached an agreement in principle and finalized the terms of their Proposed JCO on August 4, 2025. [*Id.* ¶ 21–22.]

In order to reach the Proposed JCOs, the Settling Parties "exchanged large amounts of data, technical information, and analyses," swapped "dozens of drafts reviewed by numerous lawyers and client representatives on all sides," and "receive[d] frank, open perspective about their positions" with the expertise of Judge Schneider. [*Id.* ¶ 35.] The ultimate result of these "arm's[-]length" negotiations? *Tutu Water Wells*, 326 F.3d at 207. "[L]andmark settlements that resolve some of the most significant environmental litigation in New Jersey's history," [Motion to Approve Proposed JCOs 1], spearheaded by Judge Schneider, *see* [Docket No. 751, at 11 (memorializing Proposed JCO as a "tribute to Judge Schneider's patience, leadership, and wise counsel")].

Pursuant to applicable law, the State also "provided numerous substantive responses to the Public Comments." *Exxon I*, 183 A.3d at 311. With the benefit of counsel and "many of the commenters to better understand their perspectives concerning the Settlements," the State "prepared detailed responses" to 115 total comments, "including [even] late-submitted" ones, over 52 comprehensive pages. [Reap Decl. ¶ 26]; *see* [Proposed DuPont JCO Response to Public Comments Received; Proposed 3M JCO Response to Public Comments Received]; *see also* [Reap Decl. ¶ 25 ("Although a number of comments were submitted after the deadlines, the Department nevertheless accepted them for consideration.").] This further supports a finding that the Proposed JCOs were entered into in good faith. *See, e.g.*, *Exxon I*, 183

A.3d at 310–11 (finding "nine-page introduction" and "twenty-two pages of substantive comments/responses" evidence of good faith).

Lastly, the Settling Parties—alongside interested non-parties and stakeholders—have conscientiously participated in the two Fairness Hearings before this Court. During the course of these two proceedings, nuanced debate predominated, fleshing out and giving life to what was already voluminous briefing on the objections to and considerations of the Proposed JCOs. *See* [Tr. of First Fairness Hearing; Tr. of Second Hearing.] Following the First Fairness Hearing, the Court determined that several issues warranted greater factual development before approval would be appropriate. Rather than deciding the Motion to Approve Proposed JCOs on an incomplete record, the Court directed the State to submit additional evidence concerning the methodology used to evaluate settlement consideration, the anticipated distribution of settlement proceeds, and the safeguards intended to preserve those proceeds for environmental purposes. [Tr. of First Hearing 189:21–191:6.] The Court also encouraged the State and the opposition groups to "work together" and resolve their differences through continued negotiations while those supplemental submissions were being prepared. [*Id.* at 191:17–22, 194:3–4.]

That decision proved consequential. By way of "intensive mediation," [Docket No. 843, at 1], the Supplemental Report expanded the factual basis for judicial review, while the additional negotiations resulted in the two Stipulations resolving the objections of the AEA and Participating Counties. *See* [AEA Stipulation; Participating Counties Stipulation.] These efforts demonstrate that the settlement process remained

responsive to legitimate concerns raised during public review. Instead of treating the Proposed JCOs as fixed and immutable, the State continued to engage with the interested parties, refined aspects of future implementation, and created additional mechanisms intended to benefit public entities responsible for addressing PFAS contamination.

In the Court's view, that process reflects the hallmarks of procedural fairness. It demonstrates openness to criticism, willingness to engage in continued negotiations, and recognition that judicial review may improve—not simply ratify—the Proposed JCOs presented for approval. Finally, the Court concludes that the procedural integrity of these settlements is enhanced—not diminished—by the Court's decision to postpone ruling until additional evidence could be developed. Considering the record as a whole, the Court finds overwhelming evidence that the Proposed JCOs are procedurally fair. The Court turns next to substantive fairness.

**B. Substantive Fairness**

"While the procedural fairness inquiry examines the process, the substantive fairness inquiry examines the output of that process." *Exxon I*, 183 A.3d at 311. What are the people of New Jersey receiving, in other words. "[C]orrective justice and accountability" dictate that "a party should bear the cost of the harm for which it is legally responsible." *Cannons*, 899 F.2d at 87 (citing *Developments in the Law: Toxic Waste Litigation*, 99 HARV. L. REV. 1458, 1477 (1986)). This is the core of substantive fairness. *See United States v. Kramer*, 19 F. Supp. 2d 273, 285 (D.N.J. 1998) (citation omitted).

"Substantive fairness requires that the terms of the" Proposed JCOs "are based on 'comparative fault' and apportion liability 'according to rational estimates of the harm each party has caused.'" *Tutu Water Wells*, 326 F.3d at 207 (quoting *United States v. Se. Pa. Transp. Auth.* ("*SEPTA*"), 235 F.3d 817, 823 (3d Cir. 2000)). Judicial imprimatur of the Proposed JCOs does not demand perfection because "no universally correct approach" exists. *Cannons*, 899 F.2d at 87. So long as the measure of comparative fault "is not 'arbitrary, capricious, and devoid of a rational basis,' the district court should uphold it." *SEPTA*, 235 F.3d at 824 (quoting *id.*); *Unimatic*, 2021 WL 1811651, at *3. To impose "some judicially[-]imposed platonic ideal" would disincentivize settlement, "[disr]espect … the litigants," and unduly expand the Court's "much more constrained role." *Rohm & Haas*, 721 F. Supp. at 685; *see Garrison Southfield Park*, 2022 WL 472436, at *3 (applying *pro tanto* rather than *pro rata* approach to substantive fairness).

After review, the Court finds each Proposed JCO substantively fair. From the jump, "the high level of procedural fairness" reflects "strong indicia of substantive fairness." *Exxon I*, 183 A.3d at 309; *see Cannons*, 899 F.2d at 87 n.4 (quoting *City of New York v. Exxon Corp.*, 697 F. Supp. 677, 693 (S.D.N.Y. 1988)) ("To the extent that the process was fair and full of 'adversarial vigor,' the results come before the court with a much greater assurance of substantive fairness.") (collecting cases). Even without these indicia, the Court would nevertheless find the Proposed JCOs substantively fair on their own merits.

Throughout this litigation, the State "strove to achieve settlement terms that would provide fair, reasonable, and adequate relief to the State and its citizens in exchange for the statewide scope of release the Settling Defendants sought." [Farley Decl. ¶ 9.] To accomplish these "imperative[s]," "the State's analyses considered whether the [Proposed JCOs] would provide sufficient funding to significantly further remediation and abatement of PFAS contamination that may be required by public entities statewide, protect human health and the environment, and ensure that New Jersey's taxpayers and ratepayers are not left with the costs of remediating contamination caused by the Settling Defendants." [*Id.*] This proved difficult because "the total cost to cleanup PFAS in all environmental media across New Jersey is not ascertainable without decades of remedial investigations across thousands of individual sites, waterways, natural areas, and environmental management systems." [Reap Decl. ¶ 39.] But "precise data is often unavailable, 'particularly in the early phases of environmental litigation.'" *Exxon I*, 183 A.3d at 312 (quoting *Cannons*, 899 F.2d at 88). Undeterred, the State persevered in its pursuit.

"The State, its counsel, and its consultants worked to develop a reasonable estimation of the costs to address PFAS contamination across the State." [Suppl. Rpt. 7 (citing Farley Decl. ¶ 9).] In doing so, the State "engaged numerous experts …, including highly sophisticated financial experts, economists, engineers, hydrogeologists, and environmental scientists, all of whom assisted the State in evaluating site-specific and statewide damages." [Farley Decl. ¶ 13.] Included too in this process were "dozens of meetings with Department staff from various programs,

including the Division of Water Quality, the Contaminated Site Remediation & Redevelopment program, the Office of Natural Resource Restoration, the Division of Solid and Hazardous Waste, and the Commissioner's Office." [*Id.* ¶ 16.]

The State and these "'expert consultants developed … confidential analyses and estimates of statewide damages for categories including but not limited to public water treatment costs, private well treatment costs, … POTWs … costs, remediation of public properties (including but not limited to airports and fire training academies), and natural resource damages and associated restoration costs." [*Id.* ¶ 14.] The State "also developed site-specific damage estimates for the four [I]ndustrial [S]ites that were the specific subjects of the four active litigations pending before this Court and sources of significant contamination." [*Id.* ¶ 15.]

Through this informed process, which also included use of Habitat Equivalency Analysis and Resource Equivalency Analysis—"standard methods often used for calculating compensatory restoration damages"—the State estimated Natural Resource Damages costs for the four Industrial Sites at approximately $840 million for all contamination, including PFAS contamination. [Reap Decl. ¶¶ 37–38.] Settling Defendants will pay about 43% of that amount—an amount and percentage unopposed and which the Court finds substantively fair. [Proposed 3M JCO ¶ 44(c)(i); Proposed DuPont JCO ¶ 7(c)(i).]

"Based on extensive analysis undertaken by the State's consultants, Department technical staff, and the State's counsel, the State reasonably estimated that … statewide public costs to abate PFAS in New Jersey are $5.5 billion." [Suppl. Rpt. 7 (citing

Farley Decl. ¶ 19).] The Court likewise finds this uncontested figure substantively fair for the foregoing reasons.

Following the First Fairness Hearing, the Court requested the State to explain a bit more how it considered potential PFAS abatement costs to POTWs and County-owned fire training academies and airports. [Tr. of First Fairness Hearing 189:21–190:16.] The State thoughtfully complied with the Supplemental Report, for which Mr. Robert Unsworth ("Unsworth"), a Senior Fellow at IEc, testified in great detail at the Second Fairness Hearing.[37] [Tr. of Second Fairness Hearing 64:20–94:16.] Admitted into the record—and since reviewed by the Court—as Exhibit Unsworth-1 was a doorstopper of a binder containing materials on which Unsworth relied upon for his estimates and testimony at the Second Fairness Hearing. [*Id.* at 94:22–95:17.] Also worth mentioning is the fact that Counsel for Objectors elected not to cross-examine Unsworth at that proceeding. [*Id.* at 95:23–25.]

In 2019, the State retained IEc, an economic consulting firm with a particular focus on and expertise in evaluating environmental damages, to prepare estimates of various costs and damages that may be incurred by public entities within New Jersey.

---

[37] Unsworth's expertise in the field is "obvious" and uncontested. [Tr. of Second Fairness Hearing 65:7.] He earned a Bachelor of Science in Forestry from the State University of New York at Syracuse and a Master of Forest Science from Yale University, the focus of the latter being environmental and natural resource economics. [Unsworth Decl. ¶ 1.] Since 1985, Unsworth has been employed at IEc, where he is currently a Senior Fellow after previously holding the titles of Principal, Director, Chief Operating Officer, and President. [*Id.*] "Over the past decade" alone, "[his] firm," IEc, "has worked with several states to assess the expected costs to governmental entities of addressing the presence of PFAS in the environment, including but not limited to drinking water and waste-water utilities." [*Id.* ¶ 3.]

[Unsworth Decl. ¶ 4; Farley Decl. ¶ 17.] To prepare the State for negotiations and settlement demands with the Settling Defendants, IEc "examined data and cost projections both nationally and across New Jersey to forecast the potential costs of PFAS abatement to Public Entities across the State, including costs to entities in the public sectors covered by … Objectors." [Unsworth Decl. ¶¶ 4–5.]

"[T]o forecast potential costs of adding PFAS treatment to the effluent streams from all … POTWs … in New Jersey," IEc considered "in detail" a prominent Minnesota study on the issue.[38] [*Id.* ¶ 6.] But, after "consider[ing] both the nature of th[ose] cost estimates as well as their applicability for purposes of forecasting future treatment costs to POTWs in" New Jersey, IEc "determined that the assumptions and goals behind the Minnesota study rendered it a poor proxy for likely future costs to address PFAS in wastewater and biosolids[.]" [*Id.* ¶¶ 6–7]; *see* [*id.* ¶ 8 (determining that Minnesota "study provide[d] cost estimates that [were] not realistically applied to POTWs in New Jersey").] In summary, the Minnesota study "did not factor any *upstream* PFAS source control into the estimates of costs POTWs could face, while that is a central strategy in New Jersey."[39] [Suppl. Rpt. 11 (emphasis added) (citing *id.* ¶¶ 7–13).]

---

[38] That study can be found in full at Docket No. 771-26 and is included in Unsworth-1.

[39] For a review of the assorted strategies and policies collectively referred to as "Identify, Reduce, and Eliminate" by the State to implement its "upstream" strategy, see the State's Supplemental Report at pages 9 to 10.

Using instead "New Jersey specific information," IEc calculated "future costs to public entities to address PFAS in New Jersey wastewater and biosolids from POTWs could be reasonably estimated as $1.5 billion." [Unsworth Decl. ¶¶ 11–12.] IEc arrived at this figure "by considering and analyzing the potential costs to analytically sample for PFAS in influent to POTWs as well as the expected added costs to these POTWs to dispose of biosolids generated throughout the State." [*Id.* ¶ 12.] This analysis revealed that the "inclusion of significant costs to filter or otherwise treat sewage effluent *at* POTWs for the presence of PFAS was not supported." [*Id.* ¶ 13 (emphasis added).] Seeing that neither "New Jersey nor Federal regulators have suggested that the methods costed in the Minnesota study will be required in New Jersey," IEc concluded "that the Minnesota study treatment cost estimates were inapplicable for purposes of forecasting costs in New Jersey." [*Id.*] Recognizing the DEP's "use of various tools anticipated to reduce PFAS loading to POTWs over time," IEc found "upstream PFAS reduction, elimination, and treatment … much more cost-effective ways to reduce PFAS management costs for POTWs." [*Id.* ¶ 11.]

IEc also studied and approximated "the potential long-term costs associated with the remediation of PFAS contaminated soils on publicly owned properties," specifically "airports[40] and fire training facilities where AFFF releases likely have

[40] Airports are defined as "'Part 139' airports." [Unsworth Decl. ¶ 15.] According to Unsworth, federal regulations "require the Federal Aviation Administration to issue operating certificates to airports that serve flights above defined passenger seat counts. [*Id.* ¶ 15 n.3.] "To obtain a certificate, an airport must agree to certain operational and safety standards and provide for firefighting and rescue equipment." [*Id.*] The State

occurred." [*Id.* ¶ 14.] Because many of these sites are just beginning investigations and initial remedial activities with respect to the prior use of AFFF and associated PFAS contamination, the State undertook a macro analysis of their remediation costs.[41] *See* [Suppl. Rpt. 12–13 (citing *id.* ¶¶ 14–20; Farley Decl. ¶ 14; Cahall Decl. ¶¶ 14–16).] Although IEc assumed that all airports would require remediation, the State "opted to only include two of the four airports in its costing analysis because two of the airports were owned by an interstate body (the Port Authority of New York and New Jersey) and [are] not a [S]ubdivision of the State." [Unsworth Decl. ¶ 16.] Based on the analogous "average available cost estimates of $19.9 million to treat soil through 'soil washing' at two Department of Defense Air Force Bases, IEc estimated a total cost of $39.8 million to address PFAS contamination at the two New Jersey airports." [*Id.* ¶ 17.] IEc analyzed next remediation costs for 22 County-owned fire training academies within the State. [*Id.* ¶ 18; Cahall Decl. ¶ 13.] After applying the same $19.9 million remediation cost estimate above, IEc costed remediation of the fire training academies at $438 million. [Unsworth Decl. ¶ 19.] IEc therefore projected

therefore deduced that "the designation of an airport as a Part 139 facility is an indication that AFFF was present at the facility." [*Id.*]

[41] In truth, "[g]iven the variability among AFFF sites throughout New Jersey with respect to the amount of AFFF used, the extent of any PFAS contamination, and the status of remedial investigation, definitive cost projections for PFAS abatement on a site-by-site basis are currently unavailable and could remain unknown for years." [Cahall Decl. ¶ 16.]

the total remediation cost of these County-owned properties at $477.8 million.[42] [*Id.* ¶ 20.] At his testimony's end, Unsworth expressed his "confiden[ce]" with this estimate. [Tr. of Second Fairness Hearing 94:13–16.]

Of the $5.5 billion total estimate for PFAS abatement, the State "allocated 50% of total statewide PFAS damages to manufacturers of PFAS and AFFF and 50% to other dischargers of PFAS located in New Jersey (e.g., the United States at federal facilities and various industrial users/dischargers other than DuPont)." [Farley Decl. ¶ 20.] In the State's view, this equal division serves the Spill Act and CERCLA's "primary focus … on parties that release *or* discharge hazardous substances, including certain PFAS." [Motion to Approve Proposed JCOs 45 (emphasis added).] It thus accommodates and represents the distinct theories of liabilities against other manufacturers and dischargers that the State possesses. *See* [Tr. of Second Fairness Hearing 50:24–58:13 ("The State …ha[s] a lot of other causes of action and sites and claims that can be addressed through other mechanisms.").]

Then, "[o]f the 50% of liability assigned to PFAS manufacturers and sellers, the State allocated a share of 75% to the Settling Defendants." [Farley Decl. ¶ 20.] The State's point of reference here was prior analyses undertaken "to assign responsibility

[42] If anything though, this is a generous estimate used by the State because it "assumes all County-owned airports and fire academies will require significant remediation," despite the expectation "that not all these facilities[] will require the same degree of remediation." [Unsworth Decl. ¶ 21.] The State also anticipates "that these costs will be reduced further based on contributions to fund investigations and cleanups from the Department of Defense, among other responsible parties such as additional AFFF manufacturers." [Suppl. Rpt. 14 (citing LaTourette Decl. ¶¶ 51, 91; Farley Decl. ¶ 20).]

for PFAS contamination to PFAS manufacturers, broadly, based on the market share of their products." [Motion to Approve Proposed JCOs 45.] In the AFFF MDL, for example, class counsel used "a PFAS products market share analysis to inform their allocation of responsibility for PFAS damages, attributing approximately 75% to 3M and DuPont collectively." [*Id.*] "[G]iven that New Jersey is a highly industrialized [S]tate," the Settling Plaintiffs thought this apportionment appropriate in this case as well. [*Id.* at 46]; *cf. Exxon I*, 183 A.3d at 316 (finding State's use of "comparable [Natural Resource Damages] settlements" as benchmark for settlement demands rational).

"As a result, for purposes of settlement, the State estimated that Settling Defendants were responsible for an overall share of 37.5% of the total estimated statewide PFAS damages, or approximately $2 billion." [Farley Decl. ¶ 20.] In the end, the Settling Defendants will pay up to $795 million of this amount, or approximately 40%. The Court would be remiss to view this number in isolation. Remember, the Settling Defendants are also going to contribute "more than $500 million to New Jersey public water systems under the separate nationwide class action settlements." [*Id.* ¶ 21.] That totals $1.295 billion "dedicated to PFAS related abatement in New Jersey by these Settling Defendants. [*Id.*] The Court finds that the percentages of responsibility ascribed to the Settling Defendants were reasoned through and given due consideration. Their substantive fairness is supported all the stronger for their lack of opposition.

This leads into the Court's next point: the Settlement Payments did not develop in a vacuum. "In developing its settlement demands and negotiating final settlement amounts and allocations, the State also considered significant litigation risks." [*Id.* ¶ 10.] In the first place, litigation "would be prolonged, costly, and the outcome of the State's claims would remain uncertain." [*Id.* ¶ 11.] While the Chambers Works Litigation "alone would have involved at least one more bench trial and later, a jury trial, there were still the three other Industrial Site Cases to be fully litigated and tried [before] this Court." [*Id.*] Couple this with "inevitable appeals, litigating and trying these four cases to completion," and final resolution "would have taken, at a minimum, many more years—on top of the more than six years it already took for the State to prepare for and bring the Chambers Works case to trial." [*Id.*] Relatedly, "it was apparent that the timeline for additional various New Jersey public entities to bring and litigate to resolution claims against the Settling Defendants was likely to be prolonged (in addition to having uncertain outcomes) and costly." [*Id.*]

A wait that may have been for naught. The State "faced the possibility of recovering nothing from 3M, given its primary responsibility with respect to PFAS contamination associated with Chambers Works was as a past product supplier rather than as a direct discharger." [*Id.* ¶ 10.] In addition to "considering the Settling Defendants' cashflow and assets, the State weighed the companies' potential nationwide and global liabilities and considered them in evaluating what the Settling Defendants could pay." [Reap Decl. ¶ 47]; *see* [Farley Decl. ¶ 12 ("The State also

analyzed the Settling Defendants' current and future ability to pay for the full extent of statewide damages attributable to them.").]

This process presented "the unavoidable reality" of the Settling Defendants' having to pay "substantial PFAS-related liabilities" here and abroad. [Motion to Approve Proposed JCOs 48.] As a matter of prudence, the State simply could not ignore the "substantial" AFFF MDL settlements that the Settling Defendants reached, obligating them to pay an aggregate of $13.7 billion to water providers to treat PFAS in drinking water—a fact very much on the minds of the Settling Defendants themselves. [Reap Decl. ¶ 15.] This is to say nothing of how the Settling Defendants' ability to pay could be reduced over time given other "mounting liabilities." [Farley Decl. ¶ 12.] "Understanding that the Settling Defendants were viewing their settlement authority through their ability to financially withstand" these past and future settlements, the State's "decision to accept a substantial compromise to assure very significant relief" was wise. [Motion to Approve Proposed JCOs 49.]

For the foregoing reasons, "there is sufficient evidence in the record to indicate that the [Proposed JCOs'] allocation of liability has a rational basis and is neither arbitrary nor capricious." *Cornell-Dubilier*, 2014 WL 4978635, at *7. Accounting for the Settling Defendants' liabilities and their concurrent ability to pay, the State underwent a meticulous, well-informed, and reliable process to arrive at the Settlement Payments. To find otherwise would impose "platonic[ally] ideal." *Rohm & Haas*, 721 F. Supp. at 685. It is for the State, not this Court, to "pull[] the laboring oar in constructing the" Proposed JCOs. *Cannons*, 899 F.2d at 84. On this score at least, the

State's odyssey is at an end: the Proposed JCOs are substantively fair to the people of New Jersey. But are they reasonable?

**C. Reasonableness**

"There are three facets to a consent decree's reasonableness." *Exxon I*, 183 A.3d at 319; *United States v. Wyeth Holdings LLC*, No. 15-7153, 2015 WL 7862724, at *2 (D.N.J. Dec. 3, 2015). "First, and most importantly, the court must examine 'the decree's likely efficaciousness as a vehicle for cleansing the environment.'" *Cornell-Dubilier*, 2014 WL 4978635, at *9 (quoting *Cannons*, 899 F.2d at 89–90). Second, the Proposed JCOs must "satisfactorily compensate[] the public for the actual (and anticipated) costs of remedial and response measures." *Exxon I*, 183 A.3d at 319 (quoting *Cannons*, 899 F.2d at 90). The third factor considers "the overall fairness of the decree in light of the relative strengths of the parties and foreseeable risk of loss." *Unimatic*, 2021 WL 1811651, at *3 (quoting *Cannons*, 899 F.2d at 90).

The Court's "reasonableness inquiry, like that of fairness, is a pragmatic one, not requiring precise calculation." *Kramer*, 19 F. Supp. 2d at 286–87 (quoting *United States v. Charter Int'l Oil Co.*, 83 F.3d 510, 521 (1st Cir. 1996)). "A settlement may be deemed unreasonable ... if it is based on a clear error of judgment, a serious mathematical error, or other indicia that the parties did not intelligently enter into the compromise." *United States v. Acton Corp.*, 733 F. Supp. 869, 872 (D.N.J. 1990) (citing *Rohm & Haas*, 721 F. Supp. at 686).

### 1. Efficacy

The Court is confident that the Proposed JCOs will effectuate their intended purpose: "cleansing the environment." *Cornell-Dubilier*, 2014 WL 4978635, at *9. Before turning to the Settlement Payments, the Proposed DuPont JCO establishes and secures over $1 billion in remediation funding, the intent of which is the complete remediation of the Industrial Sites. *See* [Proposed DuPont JCO § VIII & ¶ 30 ("Remediation is required at each Industrial Site until each Site is fully and finally Remediated pursuant to applicable federal and State laws, regulations, and guidance and receives a sitewide Final Remediation Document for all environmental media from (i) the Department and (ii) as applicable, EPA.").] A finding of reasonableness is therefore supported by the Proposed DuPont JCO "placing the risks of future uncertainties upon the" DuPont Defendants for this funding. *Kramer*, 19 F. Supp. 2d at 288–89.

This funding will be secured through the RFSs in the event that those responsible for the remediation fail to do so, which would result in the taxpayer shouldering those costs. *See* [Proposed DuPont JCO § VI.] Furthermore, the neutral LSRPs will oversee these remediation efforts to swiftly resolve disputes over cost estimates so that projects can proceed apace. *See* [*id.* ¶ 16.] Added to this contingency is the Reserve Fund. Within 60 days of the entry of the Proposed DuPont JCO, New DuPont and Corteva are required to "establish [and maintain] a Reserve Fund in the amount of $475,000,000 … for the purpose of providing further assurance that Remediation of the Industrial Sites will be completed[.]" [*Id.* ¶ 20.] A fund which the

State will be able to access if any of the DuPont Defendants primarily responsible for remediation at a specific Industrial Site fails to perform the remediation and the RFS funds are not available. *See* [*id.* ¶ 21.] Given the Reserve Fund's $475 million cap, [*id.* ¶¶ 20(e)–(f)], the Proposed DuPont JCO protectively requires EIDP to perform Industrial Site remediation in the event of default by the responsible remediator, even if the RFSs or Reserve Fund are exhausted, *see* [*id.* ¶¶ 32–34].

The Proposed DuPont JCO also remedies longstanding CRACO disputes between the State and the DuPont Defendants. *See* [*id.* § X.] By addressing and resolving these issues, the Settling Parties have constructed an updated mechanism for the conservation of easements and conveyances, *see* [*id.*], that "will secure the preservation of almost 1,400 acres of land, and transfer to the State approximately 73 acres of land near Ramapo Mountain State Forest," [Motion to Approve Proposed JCOs 21]. 3M has a part to play here as well. Despite not currently owning, operating, managing, or controlling any sites in the State, 3M has agreed to complete PFAS investigations and satisfy any PFAS remediation obligations at its three former manufacturing sites at Belle Mead, Flemington, and Freehold as part of its obligations. *See* [Proposed 3M JCO ¶ 48.]

As for the $1.275 to $1.325 billion in Settlement Payments, the Court finds that the State will spend them loyally. The very language of the Proposed JCOs assures that the $365 million in Natural Resource Damages shall be used in accordance with the Natural Resource Damages Constitutional Amendment. The Natural Resource Damages will be expended on assessing and compensating the damage inflicted on the

State's natural resources, including land, vegetation, biota, fish, shellfish, wildlife and habitats, all waters of the State, drinking water supplies, and the air. [Proposed 3M JCO ¶ 6 (defining "Natural Resource Damages" and "Natural Resources"); Proposed DuPont JCO ¶ 6 (same).]

The Proposed 3M JCO plainly allocates the $140 million in Natural Resource Damages as such in each of the next 25 years. *See* [3M Settlement Payment Schedule.] While the Proposed DuPont JCO reserves the allocation of its yearly block payments to the Commissioner, that allocative discretion is not unfettered. *See* [DuPont Settlement Payment Schedule.] Neither the Proposed DuPont JCO nor its Settlement Payment Schedule authorizes the Commissioner to unlawfully reassign Natural Resource Damages once so designated. As this Court observed, "[O]nce those funds go to [Natural Resource Damages], they stay there." [Tr. of Second Fairness Hearing 147:16–17.] The Commissioner's yearly decision-making processes actually ensures efficient distribution of Natural Resource Damages.

With the State's Supplemental Report in hand, as well as its Stipulations with the AEA and the Participating Counties, the Court is also assured about the use of Abatement Damages. First is the language. Abatement Damages shall be separately used to improve and protect public health, safety, and the environment, such as: addressing these concerns and their impacts from the Industrial Sites' contamination and discharges; supporting water quality infrastructure projects, including projects to install, operate, and maintain water treatment in public and private wells sufficient to meet applicable state standards; and a host of other environmental, consumer-

protection, and related projects. *See* [Proposed 3M JCO ¶ 50; Proposed DuPont JCO ¶ 6 (defining "Abatement Damages").] The Proposed JCOs' stated intent is to spend the up-to $795 million in Abatement Damages accordingly. *See* [Proposed 3M JCO ¶¶ 6 (defining "PFAS Contamination Abatement Funding" and "PFAS Contamination Abatement Project"), 44(c)(ii), 44(e), 51; Proposed DuPont JCO ¶¶ 6 (defining Abatement Damages), 7(c)(i).] Secondly, the Settlement Funds Distribution Plan articulates the "two primary means" by which Abatement Damages will be disbursed: the PFAS Abatement Fund and the QSF.[43] [Suppl. Rpt. 21]; *see* [Settlement Funds Distribution Plan.]

The PFAS Abatement Fund—a separate, non-lapsing fund—will be a special revenue fund outside of the General Fund that the Governor specifically included in her Detailed Budget Recommendations for Fiscal Year 2027. *See* [Settlement Funds Distribution Plan 2; Cahall Decl. ¶ 22; OFFICE OF MGMT. & BUDGET, THE STATE OF NEW JERSEY: THE GOVERNOR'S BUDGET MESSAGE, DETAILED BUDGET RECOMMENDATIONS, FISCAL YEAR 2027, at 250.] Faithful to the Governor's message, the State has vowed "transparency as to the receipt and use of funds in the PFAS Abatement Fund" by regularly reporting on the availability and use of the monies, creating the resource-rich PFAS Settlement Information Website, and publishing annual funding reports. [Cahall Decl. ¶¶ 24–26.]

[43] In addition to these projects, the State will expend "a comparatively smaller" amount of funding on pivotal PFAS-related research "to benefit remediation efforts across the State." [Settlement Funds Distribution Plan 4 n.4.]

The PFAS Abatement Fund will be used to supplementally finance PFAS Water Quality Projects and PFAS Abatement Projects. [Settlement Funds Distribution Plan 2–4.] The former shall provide "an additional source of funding for the … Water Bank to provide loans that include no-interest, low-interest, and/or principal forgiveness to finance water quality projects to address PFAS throughout the State …, including specific assistance for … POTWs …." [*Id.* at 2.] "[S]et[ting] the priorities and funding packages for the Water Bank on a yearly basis in a manner that seeks to maximize the impact of available resources across the State," the DEP will allocate funds from the PFAS Abatement Fund as an additional capitalization source to the CWSRF and DWTRF—two "well-established and successful funding mechanisms" administered by the Water Bank. [Cahall Decl. ¶¶ 31–32]; [Settlement Funds Distribution Plan 3.] An allocation that "will be governed by the Water Bank's existing and future statutory and regulatory requirements." [Cahall Decl. ¶ 34.]

This process will also value accountability and transparency. The DEP "will accept applications to the Water Bank for funding for PFAS Water Quality Projects through www.h2loans.com." [Settlement Funds Distribution Plan 3.] Each proceeding year will then see the DEP "specify the following for PFAS Water Quality Projects: (a) the projects that are eligible for funding; (b) the principal forgiveness share of funding; (c) the principal forgiveness cap per applicant; (d) the total amount of principal forgiveness funding that will be available in the next fiscal year; (e) the share of loan funding available from the [DEP] interest free; and (f) the share of loan funding available through the I-Bank at its AAA market rate." [*Id.*] The State will implement

this specification process through the IUPs, which are subject to at least one public hearing and one public comment period, thus "incorporat[ing] stakeholder input and ensur[ing] transparency through a public reporting process regarding the use of funds deployed by the Water Bank."[44] [Suppl. Rpt. 22 (citation omitted).]

In addition, pursuant to their Stipulation, the State "has agreed to provide a minimum of $150,000,000 from the PFAS Abatement Fund to the Water Bank to assist POTWs with the costs of infrastructure upgrades to abate PFAS." [Settlement Funds Distribution Plan 4]; [AEA Stipulation ¶ 1.] This plan calls for $100 million "to provide principal forgiveness in connection with financing made available through the Water Bank" and another $50 million for "the provision of no-interest loans." [Settlement Funds Distribution Plan 4]; [AEA Stipulation ¶¶ 1(a)–(b).] Into this bargain is also the 1% reduction in origination fees for financing PFAS Water Quality Projects. [Settlement Funds Distribution Plan 4]; [AEA Stipulation ¶ 2.]

The financing of PFAS Abatement Projects will also lead to environmental restoration and remediation. Currently, public entities and private individuals in New Jersey can file a claim against the Spill Fund for damages resulting from the discharge of hazardous substances. *See* N.J. STAT. ANN. § 58:10-23.11g. The problem is that the Spill Fund "has limited resources." [Cahall Decl. ¶ 46.] Cue PFAS Abatement Projects. Through the PFAS Abatement Fund, the State intends to provide additional

---

[44] Do not forget either the "[m]ultiple resources … available to applicants in New Jersey, including detailed guidance, technical assistance, and a dedicated website." [Suppl. Rpt. 23 (citations omitted).]

funding to the Spill Fund "via an application process that builds off" the DEP's existing Spill Fund Damage Claim Process through which Political Subdivisions and individual members may apply for financial assistance to help abate PFAS contamination." [Settlement Funds Distribution Plan 4.]

This too will be a simple process burnished by efficiency and probity. Applicants will "file claims with the Spill Fund … and the Environmental Claims Administration will be authorized to provide supplementary funding for PFAS abatement through that process." [*Id.*] But these applicants will be required "to document previously incurred costs and/or to provide detailed project costs for anticipated future projects … to ensure that funds are disbursed appropriately." [*Id.*] And the PFAS Settlement Information Website will secure transparency. [*Id.*]

The Participating Counties—representing most of New Jersey—likewise believe the Proposed JCOs are structured to achieve their intended aims. Following the First Fairness Hearing, the State and the Participating Counties agreed to the creation of the QSF, a $90 million fund annually financed by the Settling Defendants over eight years. *See* [Settlement Funds Distribution Plan 4–5; Participating Counties Stipulation.] The QSF addresses the Participating Counties' concerns "by expressly providing a funding mechanism under the JCOs" to "ensure[] funding will be earmarked for the purpose of assisting Participating Counties with investigating and remediating PFAS contamination at [C]ounty-owned and [-]operated fire training facilities and airports." [Cahall Decl. ¶¶ 37–38]; *see* [Participating Counties Stipulation ¶ 5; Settlement Funds Distribution Plan 4–5.]

Managed and overseen by a special master and corporate trustee, [Participating Counties Stip. ¶¶ 1–2)], "[e]ach Participating County will receive initial allotments, followed by 'special needs' distributions in the event more significant contamination issues are uncovered in particular [C]ounties during the course of investigation and remediation," [Cahall Decl. ¶ 39]. The point here is to "encourage the Participating Counties to quickly initiate cleanup activities, through providing allotments on a 'use it or lose it basis' and allowing for remaining funds to revert to the State if they are unused." [*Id.* ¶ 40.]

The ACOs are another interesting feature of the QSF. Essentially site-specific governing agreements, the ACOs "will be negotiated based on the particular circumstances present at each [C]ounty property and will provide contribution protection to each Participating County under CERCLA and the Spill Act as to PFAS contamination at the respective [C]ounty property." [*Id.* ¶ 41.] Once more, efficiency is integral, as the State will have the right under the QSF "to audit the Participating Counties' expenditures to ensure that the funds are expended for the abatement of PFAS and in conformance with the terms of the JCOs." [*Id.* ¶ 42.] Make no mistake either, the State envisions implementing this statewide, and is therefore "committed to cooperating with the remaining non-Participating Counties and treating all New Jersey [C]ounties equitably." [Settlement Funds Distribution Plan 5 n.6.]

The record above demonstrates that "the settlement proceeds will go toward the … [State's] continued efforts to clean up and remove hazardous substances," including PFAS, "throughout New Jersey." *Unimatic*, 2021 WL 1811651, at *4. So concluded,

the first factor weighs in favor of the Proposed JCOs' reasonableness. *See Cannons* , 899 F.2d at 89–90 (explaining that first factor is "basically a question of technical adequacy, primarily concerned with the *probable* effectiveness of proposed remedial responses.") (emphasis added).

**2. Satisfactory Compensation**

The Court also finds the compensation to the public satisfactory. The State's "historic" $2.5 billion recovery will consist of $1.275 to $1.325 billion in monetary payments and remediation efforts valued at over another $1 billion. [Motion to Approve Proposed JCOs 3]. An impressive windfall, especially given "that defendants will generally settle for substantially less—indeed, often for far less given the inherent problems of proof in these cases—than the asserted damages." *Exxon I*, 183 A.3d at 320. All the more so because "[t]he actual cost of remedial measures is frequently uncertain at the time a consent decree is proposed." *Cannons*, 899 F.2d at 90; *see* [Reap Decl. ¶ 39.] And furthermore because the State "cannot realistically be held to a standard of mathematical precision." *Cannons*, 899 F.2d at 90; *see Cornell-Dubilier*, 2014 WL 4978635, at *10 (citation and quotation marks omitted) ("Due to the imprecise nature of this evaluation, the court should normally defer to the agency's expertise so long as the figures relied upon derive in a sensible way from a plausible interpretation of the record.").

Monomania over "how close a settlement comes to meeting a scientifically defined ideal" is misplaced. *Cornell-Dubilier*, 2014 WL 4978635, at *10 (quoting *United States v. Charles George Trucking, Inc.*, 34 F.3d 1081, 1085 (1st Cir. 1994)). This Court's

"reasonableness inquiry, like that of fairness, is a pragmatic one," *Kramer*, 19 F. Supp. 2d at 286, and the State's "reduction [here] was not made arbitrarily, but in response to realistic and supportable litigation risks and uncertainties," *Cornell-Dubilier*, 2014 WL 4978635, at *10. "By way of compromise," the State "agreed to accept this sum … as appropriate to" release the claims of the Settling Defendants. *Kramer*, 19 F. Supp. 2d at 287. As discussed earlier, "[t]his compromise appropriately takes into account such factors as the estimated volume and nature of the hazardous substances contributed … by the [S]ettling [Defendants], … and the risks and expense of litigation necessary to pursue the case[s] against the[m] … through trial and judgment." *Id.* at 287. A "dispassionate assessment of [these] attendant circumstances" compels a finding of reasonableness. *Charles George Trucking*, 34 F.3d at 1085.

**3. The Risks of Litigation**

The third factor to consider in evaluating the reasonableness of the Proposed JCOs is "the relative strength of the parties' litigating positions" and "the complexity, expense and likely duration of the litigation." *Cornell-Dubilier*, 2014 WL 4978635, at *11 (citations omitted). One look at this case's procedural history bears this factor out. For years and years, the Settling Parties—represented by legal titans—"maintained diametrically opposed positions on a variety of issues." [Motion to Approve Proposed JCOs 29.] Squaring up "against sophisticated lawyers can be costly and could significantly delay" environmental efforts, *Wyeth Holdings*, 2015 WL 7862724, at *3; hence the State's concern over "significant," "costly," "prolonged," and "uncertain" litigation were it not for the Proposed JCOs, [Farley Decl. ¶¶ 10–11]. The very same

can be said for the Settling Defendants, who faced "nationwide and global liabilities" against them. [Reap Decl. ¶ 47]; *see* [Farley Decl. ¶ 12.]

What the State had to consider was "many more years" tacked onto the six already spent for an unguaranteed final resolution compared to the Proposed JCOs. *See* [Farley Decl. ¶ 10 (facing "possibility of recovering nothing from 3M."] Because "[t]he parties … gain immediate resolution and avoid the uncertainty, delay, and expense of litigation in reaching a mutually agreed upon settlement," the third factor similarly supports reasonableness. *Unimatic*, 2021 WL 1811651, at *4.

A pragmatic consideration of the factors compels the Court to find each Proposed JCO reasonable. It cannot be said that they are "based on a clear error of judgment, a serious mathematical error, or other indicia that the parties did not intelligently enter into the compromise." *Acton*, 733 F. Supp. at 872. To whether the Proposed JCOs are statutorily consistent and faithful the Court turns its gaze next.

**D. Statutory Consistency and Faithfulness**

The Legislature "had three broad goals in mind when it passed the [Spill] Act: (1) assure the prompt, effective cleanup of hazardous substances; (2) place the financial burden of cleanup on polluters; and (3) encourage early settlements." *Exxon I*, 183 A.3d at 328; *cf. Unimatic*, 2021 WL 1811651, at *4 (citation and quotation mark omitted) ("[T]he Spill Act ha[s] two primary objectives: to ensure the prompt and effective cleanup by responsible parties, while preserving both public finances and public health."). The Proposed JCOs further these objectives.

"First, the [Proposed JCOs] ensure[] the prompt cleanup of hazardous substances." *Exxon I*, 183 A.3d at 329. As discussed at length, the substantively fair Proposed JCOs are "likely efficacious[] as a vehicle for cleansing the environment." *Cornell-Dubilier*, 2014 WL 4978635, at *9 (citation and quotation marks omitted); *see also Cannons*, 899 F.2d at 90 (explaining that statutory faithfulness "necessarily involves matters implicating fairness and reasonableness" and that "[t]he three broad approval criteria were not meant to be mutually exclusive and cannot be viewed in majestic isolation"). From the required Site remediation and its contingent funding, *i.e.*, the RSFs and Reserve Fund, to the dedicated use of Natural Resource Damages and Abatement Damages, *i.e.*, the Natural Resource Damages Constitutional Amendment, PFAS Abatement Fund, and QSF, to other assorted measures*, i.e.*, the CRACO dispute resolution, LSRPs, and EIDP's remedial obligations, the Proposed JCOs dutifully carry out the task of healing the State of New Jersey from environmental contamination to the tune of billions of dollars here today and for decades to come.

For much the same reasons, the Court has exhaustively explained why the Proposed JCOs also further the "polluter pays" principle. In addition to those safeguards already built into them, the State addressed this very concern of the AEA and the Participating Counties with the two Stipulations. *See* [AEA Stipulation; Participating Counties Stipulation.] As the State avers and as the record substantiates, the State "considered whether the [Proposed JCOs] would provide sufficient funding to significantly further remediation and abatement of PFAS contamination that may

be required by public entities statewide, protect human health and the environment, and ensure that New Jersey's taxpayers and ratepayers are not left with the costs of remediating contamination caused by the Settling Defendants." [Farley Decl. ¶ 9.] Carefully weighing the risks of litigation against corrective justice and accountability, the State has struck a fine "polluter pays" balance. To put it pithily, the Proposed JCOs "mandate[] that the" environmental contamination of all contaminants, not just PFAS, "be cleaned up by th[ose] liable." *Wyeth Holdings*, 2015 WL 7862724, at *3.

"Finally, the Proposed [JCOs] further[] the Spill Act, and indeed general New Jersey policy of promoting settlement." *Exxon I*, 183 A.3d at 332; *see Gere*, 38 A.3d at 600; *DuHamell*, 66 A.3d at 738; *Reynes*, 935 A.2d at 814. "Settlements are a particularly effective way of furthering the Spill Act's goals because they lock in swift guaranteed compensation," and "[n]umerous courts have recognized that the immediate transfer of funds is a significant factor when considering fidelity to the statute and public interest." *Exxon I*, 183 A.3d at 332 (citation and quotation marks omitted) (collecting cases). "In fact, settlement has long been the tactic of choice for the DEP." *Id.* Another reason is that "the savings of governmental litigation resources of experienced counsel and staff may now instead be devoted to other pressing cases where litigation is necessary." *Kramer*, 19 F. Supp. 2d at 289. Given the complex "and potentially lengthy litigation, … 'the Court believes the public interest in the efficient and expeditious resolution of environmental cleanup claims strongly militates in favor of entering the [Proposed JCOs]." *Exxon I*, 183 A.3d at 332 (quoting *Litgo*

*N.J., Inc. v. Martin*, No. 06-2891, 2011 WL 5325655, at *3 (D.N.J. Nov. 2, 2011)). Lastly, the public interest.

### E. The Public Interest And Objections

To the Court, "[p]rotection of the public interest is the key consideration in assessing whether a decree is fair, reasonable and adequate." *Akzo*, 949 F.2d at 1435. This is why the Court granted amici status, held two Fairness Hearings, and permitted prolific briefing. For the reasons discussed in Section V in conjunction with those that follow, the Court finds that approval of the Proposed JCOs is in the public interest.

#### 1. The State Possessed the Authority to Settle the Claims Asserted in Its Sovereign, Quasi-sovereign, *Parens Patriae*, Public Trustee, and Regulatory Capacities

Objectors argue that the Proposed JCOs exceed the State's authority because they release claims belonging not only to the State, but also those of Political Subdivisions. [Objectors DuPont Motion to Intervene 26–31; Objectors 3M Motion to Intervene 14–22; Objectors Resp. to Suppl. Rpt. 34–48.] According to Objectors, the State does not have the authority to compromise subdivisional causes of action or to extinguish claims held independently by local governmental entities. On that basis, Objectors contend that the Proposed JCOs are unlawful and should not be approved. The Court disagrees.

The starting point is the nature of the claims asserted by the State itself. These actions were not brought solely as conventional civil actions seeking damages for proprietary injuries to State-owned property. Rather, the State—"acting through and

by the Attorney General"—brought an array of statutory and common law claims against the Settling Defendants in its sovereign, quasi-sovereign, *parens patriae*, public trustee, and regulatory capacities "to the maximum extent allowable by law, on behalf of and for the benefit of all the State's Political Subdivisions, citizens, and residents." [Proposed 3M JCO ¶ 9; Proposed DuPont JCO § I.EE.] Those capacities are subtly distinct, yet mutually reinforcing and complementary.

**a. *Parens Patriae***

A bit of history to celebrate the Republic's semiquincentennial. Although our Nation commemorates the Framers' split from Great Britain "to begin the world over again," not all was renounced. THOMAS PAINE, COMMON SENSE 50 (W. & T. Bradford 1776). One such holdover "from the English constitutional system," *Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 257 (1972), was the doctrine of *parens patriae*, meaning, literally, "parent of the country," *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 600 n.8 (1982) (quoting BLACK'S LAW DICTIONARY 1003 (5th ed. 1979)); *see also id.* at 600 (citations omitted) ("The *parens patriae* action has its roots in the common-law concept of the 'royal prerogative.'"). "As the system developed from its feudal beginnings, the King retained certain duties and powers, which were referred to as the 'royal prerogative.'" *Standard Oil*, 405 U.S. at 257 (citation omitted). This "royal prerogative" was traditionally understood as the royal sovereign's "power as guardian of persons under legal disabilities to act for themselves." *Id.* (citation omitted).

"In the United States, the 'royal prerogative' and the 'parens patriae' function of the King passed to the States." *Id.* at 257. A "common-law concept" that American courts recognized "[a]t a fairly early date." *Alfred L. Snapp & Son*, 458 U.S. at 600. But, unlike the royal prerogative's rather limited, substitutional authority to represent those unable to do so themselves, "[t]he nature of the *parens patriae* suit has been greatly expanded in the United States beyond that which existed in England." *Standard Oil*, 405 U.S. at 257; *see also id.* ("This common-law approach, however, has relatively little to do with the concept of *parens patriae* standing that has developed in American law."). As presently understood, the right of a State to sue as *parens patriae* also encompasses suits "to protect 'quasi-sovereign' interests, such as the health, comfort and welfare of its citizens and general economy of the state." *Pennsylvania ex rel Sheppard v. Nat'l Ass'n of Flood Insurers*, 520 F.2d 11, 21–22 (3d Cir. 1975) (citing *Standard Oil*, 405 U.S. 251), *overruled on other grounds*, 659 F.2d 306 (3d Cir. 1981); *see also Broselow v. Fisher*, 319 F.3d 605, 608 (3d Cir. 2003) (citation omitted) ("That theory allows a state to bring suit on its own behalf to protect the well-being of its residents."). Prophetic to the present case, this conceptual broadening "closely traced American industrialization—the state guardianship power reached air and water pollution just as those matters were issues of public importance in this era of rapid industrialization." Margaret S. Thomas, *Parens Patriae and the States' Historic Police Power*, 69 SMU L. REV. 759, 787–88 (2016) (citation omitted).

Indeed, "in a series of cases" in the early twentieth century the Supreme Court of the United States "establish[ed] the right of a State to sue as *parens patriae* to prevent or repair harm to its 'quasisovereign' interests'" in the environment.[45] *Standard Oil*, 405 U.S. at 258. Justice Oliver Wendell Holmes Jr. floridly explained that a quasi-sovereign interest is one "independent of and behind the titles of its citizens, in all the earth and air within its domain." *Tenn. Copper*, 206 U.S. at 237. In this capacity, the State "has the last word as to whether its mountains shall be stripped of their forests and its inhabitants shall breathe pure air." *Id.*; *see Missouri*, 180 U.S. at 241 ("But it must surely be conceded that, if the health and comfort of the inhabitants of a state are threatened, the state is the proper party to represent and defend them.").

---

[45] This skein of cases being:

> *Missouri v. Illinois*, 180 U.S. 208 (1901) (holding that Missouri was permitted to sue Illinois and a Chicago sanitation district on behalf of Missouri citizens to enjoin the discharge of sewage into the Mississippi River); *Kansas v. Colorado*, 206 U.S. 46 (1907) (holding that Kansas was permitted to sue as parens patriae to enjoin the diversion of water from an interstate stream); *Georgia v. Tennessee Copper Co.*, 206 U.S. 230 (1907) (holding that Georgia was entitled to sue to enjoin fumes from a copper plant across the state border from injuring land in five Georgia counties); *New York v. New Jersey*, 256 U.S. 296 (1921) (holding that New York could sue to enjoin the discharge of sewage into the New York harbor); *Pennsylvania v. West Virginia*, 262 U.S. 553 (1923) (holding that Pennsylvania might sue to enjoin restraints on the commercial flow of natural gas); and *North Dakota v. Minnesota*, 263 U.S. 365 (1923) (holding that Minnesota could sue to enjoin changes in drainage which increase the flow of water in an interstate stream).

*Standard Oil*, 405 U.S. at 258 (alteration in original).

In due course, the States of the Union began lawfully exercising their *parens patriae* authority to redress environmental "threats to public health, safety, and welfare," including: "damage to coastal or harbor waters and marine life, discharge of sewage into public waters, the diverting of water from an interstate stream, changes in drainage which increase the flow of water in an interstate stream, the threat of being forced to accept low level radioactive waste, refusal of medical clinics to provide sign language interpreters at medical examinations of deaf patients, schemes constituting common law fraud, and restraints on the commercial flow of natural gas." Allan Kanner, *The Public Trust Doctrine, Parens Patriae, and the Attorney General As the Guardian of the State's Natural Resources*, 16 DUKE ENVTL. L. & POL'Y F. 57, 109–110 (2005) (citations omitted) ("[T]here are no states in which the principle of *parens patriae* has been deemed not part of the state's law."). In accordance with this "inherent" and "supreme power," *Mormon Church v. United States*, 136 U.S. 1, 57 (1890), the State of New Jersey has proven no exception, *see, e.g.*, *Dep't of Env't Prot. v. Jersey Cent. Power & Light Co.*, 336 A.2d 750, 758–59 (N.J. Super. Ct. App. Div. 1975), *rev'd on other grounds*, 351 A.2d 337 (N.J. 1976) (recognizing State's "interest which gives it standing to sue under the [p]arens patriae doctrine" for monetary and equitable relief "from pollution in navigable waters which causes injury to fish").

As a matter of law or fact, there are no challenges to the State's right in this case "to take action to protect New Jersey's citizens from harm caused by environmental pollution" in its *parens patriae* capacity. *N.J. Dep't of Env't Prot. v. E.I. du Pont de Nemours & Co.*, No. 19-14766, 2021 WL 6144081, at *4 (D.N.J. Dec. 30, 2021) (citing *Howell*

*Twp. v. Waste Disposal, Inc.*, 504 A.2d 19, 24–25 (N.J. Super. Ct. App. Div. 1986)); *see also* Kanner, *The Public Trust Doctrine, Parens Patriae, and the Attorney General As the Guardian of the State's Natural Resources* 107 ("Governmental interests in natural resources have been recognized as 'quasi-sovereign' since the turn of the century.").

**b. The Public Trust Doctrine**

In a similar vintage, "[t]he public trust doctrine provides that the State of New Jersey holds the state's natural resources in trust for the benefit of its citizens." *E.I. du Pont de Nemours* , 2021 WL 6144081, at *4 (citing *Borough of Neptune City v. Borough of Avon-by-Sea*, 294 A.2d 47, 51–53 (N.J. 1974)). This "ancient" "common-law principle," "with roots tracing back through English law to Roman law, has been consistently recognized and applied by" New Jersey courts. *Moran v. N.J. Dep't of Env't Prot.*, No. A-0804-23, 2025 WL 2406093, at *1 (N.J. Super. Ct. App. Div. Aug. 20, 2025) (per curiam) (first quoting *Susko v. Borough of Belmar*, 206 A.3d 979, 983 (N.J. Super. Ct. App. Div. 2019); and then citing *Hackensack Riverkeeper, Inc. v. N.J. Dep't of Env't Prot.*, 128 A.3d 749, 755 (N.J. Super. Ct. App. Div. 2015)).

"[T]he first case to affirm and reformulate the public trust doctrine in New Jersey," *Arnold v. Mundy*, 6 N.J.L. 1, 53 (E. & A. 1821), explained that, "upon the Colonies' victory in the Revolutionary War, the English sovereign's rights to the tidal waters 'became vested in the people of New Jersey as the sovereign of the country, and are now in their hands.'" *Raleigh Ave. Beach Ass'n v. Atlantis Beach Club, Inc.*, 879 A.2d 112, 119 (N.J. 2005) (alterations in original) (quoting *Arnold*, 6 N.J.L. at 78); *see*

*Matthews v. Bay Head Imp. Ass'n*, 471 A.2d 355, 360–63 (N.J. 1984) (providing historical development of public trust doctrine). "[T]he land on which water ebbs and flows, including the land between the high and low water," then-Chief Justice Kirkpatrick reasoned, "belong[ed] not to the owners of the lands adjacent to the water, but to the State, 'to be held, protected, and regulated for the common use and benefit.'" *Raleigh Ave. Beach*, 879 A.2d at 119 (quoting *Arnold*, 6 N.J.L. at 49, 71). While *Arnold's* "[e]arly understanding" of the doctrine focused on "the 'natural water resources' of New Jersey 'for navigation[,] … commerce[,] ... and fishing … ,'" New Jersey courts have extended it "to recreational uses, including bathing, swimming and other shore activities." *Id.* (quoting *Borough of Neptune City*, 294 A.2d at 54).

Of equal gravity with its *parens patriae* responsibilities, the "State can no more abdicate its trust over property in which the whole people are interested ... than it can abdicate its police powers[.]" *Matthews*, 471 A.2d at 361–62 (quoting *Ill. Cent. R. Co. v. Illinois*, 146 U.S. 387, 453 (1892)); *see Illinois Cent.*, 146 U.S. at 453 ("So with trusts connected with public property, or property of a special character, like lands under navigable waters; they cannot be placed entirely beyond the direction and control of the state."). The State's comprehensive regulatory regime to safeguard the environment enshrines these principles, doctrines, and, ultimately, responsibilities.

**c. The State's Environmental Regulatory Schema**

In enacting the Spill Act, the Legislature declared "that the State is the trustee, for the benefit of its citizens, of all natural resources within its jurisdiction." N.J. STAT. ANN. § 58:10-23.11a. So, too, did the Legislature find when it enacted the Water

Supply Management Act: "[T]he water resources of the State are public assets of the State held in trust for its citizens and are essential to the health, safety, economic welfare, recreational and aesthetic enjoyment, and general welfare, of the people of New Jersey." *Id.* § 58:1A-2; *see id.* (finding "ownership of these assets is in the State as trustee of the people" and "water resources of the State and any water brought into the State must be planned for and managed as a common resource").

Over time, the Legislature has entrusted the DEP with broad authority to investigate environmental contamination, enforce New Jersey's environmental statutes, recover cleanup and removal costs, seek Natural Resource Damages, and otherwise protect the State's environmental resources. Take the DEP itself. Organized in 1970, the Legislature intended the DEP to "assume control of the functions of a variety of departments, divisions and councils which theretofore had operated separately." *Howell Twp.*, 504 A.2d at 23 (citing *Id.*13:1D–1 *et seq.*); *see Superior Air Prods. Co. v. NL Indus., Inc.*, 522 A.2d 1025, 1030 (N.J. Super. Ct. App. Div. 1987) (citation omitted) ("[The DEP's] genesis marked the reorganization of the former Department of Conservation and Economic Development by which the functions of that department as well as certain functions of other departments were consolidated in DEP.").

Tasked with "formulat[ing] comprehensive policies for the conservation of the natural resources of the State, the promotion of environmental protection and the prevention of pollution of the environment of the State," N.J. STAT. ANN. § 13:1D-9, the DEP is empowered to "[e]nforce the State air pollution, water pollution,

conservation, environmental protection, solid and hazardous waste management laws, rules and regulations," *Id.* § 13:1D-9n. "Unquestionably," the DEP is "clothed with primary responsibility to regulate activity affecting the environment in the state as well as exercising oversight powers in this area of concern." *Howell Twp.*, 504 A.2d at 23–24.

"From time to time the Legislature has addressed particular areas of environmental considerations resulting in the passage of piecemeal regulatory legislation." *Id.* at 24. Enacted the same year as the DEP's organization was the SWMA. There, the Legislature found, in part, that the "collection, disposal and utilization of solid waste is a matter of grave concern to all citizens and is an activity thoroughly affected with the public interest." N.J. STAT. ANN. § 13:1E-2. The Legislature thus "declare[d] that it is the policy of this State to …. [e]stablish a meaningful and responsible role for the State in the solution of solid waste problems." *Id.* § 13:1E-2(b)(6). That role fell on the DEP, to whom the Legislature "grant[ed] … the power … to regulate and supervise all solid waste collection," invested "[a]ll" of its "codes, rules and regulations … [with] … the force and effect of law," *id.*, and compelled the Commissioner to "institute an action or proceeding ... for injunctive and other relief," including the power to seek money damages, "[w]henever the [C]ommissioner finds that a person has violated" the SWMA, *id.* §§ 13:1E-9a–b, d.

Take next the Spill Act. "The Spill Act was adopted in 1976 to deal with potential contamination from off-shore oil spills and to stem the 'threat to the economy and environment of this State' posed by the 'discharge of petroleum products and other

hazardous substances.'" *Marsh v. N.J. Dep't of Env't Prot.*, 703 A.2d 927, 930 (N.J. 1997) (quoting *id.* § 58:10-23.11a). Interestingly, "[t]he passage of this environmental protection legislation was accompanied by a strong statement that the state intended to assert it[s] *parens patriae* role in protecting the citizens from the discharge of petroleum products and other hazardous substances as a threat to the public health, safety and welfare." *Howell Twp.*, 504 A.2d at 24–25 (citing N.J. STAT. ANN. § 58:10-23.11a); *see also* N.J. STAT. ANN. § 58:10-23.11a ("[T]he State is the trustee, for the benefit of its citizens, of all natural resources within its jurisdiction.").

Once more, "it was the DEP that was authorized to promulgate the rules and regulations which would control such activities and provided for compulsory payment for costs and damages by offenders." *Howell Twp.*, 504 A.2d at 25. To accomplish this vision, the Spill Act authorizes the DEP to "bring a civil action" for "the costs of any investigation cleanup or removal;" "the reasonable costs of preparing and successfully litigating an action under this subsection;" "the cost of restoring, repairing, or replacing real or personal property damaged or destroyed by a discharge;" "any income lost from the time the property is damaged to the time it is restored, repaired or replaced;" "any reduction in value of the property caused by the discharge by comparison with its value prior thereto;" "the cost of restoration and replacement, where practicable, of any natural resource damaged or destroyed by a discharge;" and "any other costs incurred by the department."[46] N.J .STAT. ANN. § 58:10-23.11u(b)(2).

[46] The Spill Act "deviated somewhat from the exclusivity of DEP authority because it specifically authorized the Department of the Public Advocate to act as counsel for

The Legislature adopted the WPCA the following year. Spurred on by finding "that pollution of the ground and surface waters of this State continues to endanger public health," the Legislature announced that "the policy of this State [is] to restore, enhance and maintain the chemical, physical, and biological integrity of its waters, to protect public health, to safeguard fish and aquatic life and scenic and ecological values, and to enhance the domestic, municipal, recreational, industrial and other uses of water." *Id.* § 58:10A-2. "Again it was the DEP that was empowered to exercise supervisory jurisdiction and to enact implementing codes, rules and regulations to prevent, control or abate water pollution throughout the state." *Howell Twp.*, 504 A.2d at 25 (citing *id.* §§ 58:10A–4, 5a). "To that end, no person could discharge any pollutant into such waters without complying with DEP requirements and securing a permit from DEP." *Id.* (citing N.J. STAT. ANN. § 58:10A–6). And, under the WPCA, the Commissioner is solely designated (and mandated) to issue an administrative order, institute a civil action for injunctive relief and compensatory damages, levy a civil administrative penalty, institute a civil action for a civil penalty, or request the Attorney General to institute a criminal proceeding if he finds the act violated.[47] *See* N.J. STAT. ANN. § 58:10A–10.

---

assertion of claims by a class of aggrieved persons and preserved other common law rights by 'any person.'" *Howell*, 504 A.2d at 25 (quoting N.J. STAT. ANN. § 58:10–23.11q).

[47] The Court could go on. Although the State did not assert claims under the Water Supply Management Act, here too the Commissioner is authorized to promulgate rules and regulations "to control, conserve and manage the water supply of the State and the diversions of that water supply to assure the citizens of the State an adequate

Next up, the Environmental Rights Amendment ("ERA"), which somewhat democratized environmental protection in the State. Enacted in 1974, that statute's passage acted upon the Legislature's determination "that the integrity of the State's environment is continually threatened by pollution, impairment and destruction, that every person has a substantial interest in minimizing this condition, and that it is therefore in the public interest to enable ready access to the courts for the remedy of such abuses." *Id.* § 2A:35A–2. Thus, the ERA "was passed primarily to insure access to the courts by *all* persons interested in abating or preventing environmental damage." *Howell Twp.*, 504 A.2d at 25 (emphasis in original) (citations omitted). Under the ERA, a Political Subdivision is a "Person." N.J. STAT. ANN. § 2A:35A–3. The ERA does so not by providing a substantive cause of action itself, but by "grant[ing] a private person standing to enforce an environmental protection statute." *Superior Air Prods.*, 522 A.2d at 1032; *see id.* § 2A:35A–4.

But what giveth does not necessarily taketh. "The primary prosecutorial responsibility for enforcing the [S]tate's environmental laws resides in the government, and the ERA anticipates private parties' standing only when the government has failed to properly act." *United States v. CDMG Realty Co.*, 875 F. Supp. 1077, 1086 (D.N.J. 1995), *vacated on other grounds*, 96 F.3d 706 (3d Cir. 1996); *see Superior Air Prods.*, 522 A.2d at 1032; *Mayor & Council of Borough of Rockaway v. Klockner & Klockner*, 811 F.

---

supply of water under a variety of conditions." N.J. STAT. ANN. § 58:1A–5. If violations are found on his or her watch, the Commissioner has several enforcement vehicles, including the commencement of a civil action seeking injunctive and monetary relief. *See id.* § 58:1A–16.

Supp. 1039, 1054 (D.N.J. 1993) (citations omitted) ("Thus, the primary goal of the ERA is to limit lawsuits by private litigants to those instances where the government has not acted."). Through their elected representatives the citizens of New Jersey "deliberately" structured the ERA to achieve democratized environmental protection, "but not to sacrifice the paramount right of the state to control such action through its delegated agency"—the DEP. *Howell Twp.*, 504 A.2d at 25. In the end, "it is clear that the [L]egislature has entrusted to the DEP primary and supervisory enforcement powers under the various environmental protection legislation." *Id.* at 26. Understandably, in the Court's view, because the Executive "must normally be free to determine what solution will best resolve a problem on a state or regional basis given its expertise and ability to view those problems and solutions broadly." *N.J. Dep't of Env't Prot. v. Exxon Mobil Corp.* ("*Exxon II*"), 181 A.3d 257, 270 (N.J. Super. Ct. App. Div. 2018).

**d. The Attorney General of New Jersey**

As is the case here, sometimes the "best" solution arrived at in the Executive's reasoned judgment is settlement: hence, the need for the Attorney General of New Jersey. The State's "Attorney General has long been vested with the responsibility of protecting the public interest and enforcing public duties by instituting appropriate civil actions in court." *Matter of D.C.*, 679 A.2d 634, 643 (N.J. 1996) (collecting cases). In line with the State's venerable *parens patriae* and public trust authority, "[t]he Attorney General has traditionally been recognized as the defender of the public interest" since the Founding. *Petition of Pub. Serv. Coordinated Transp.*, 74 A.2d 580, 586 (N.J. 1950).

"Under the common law of England, the Attorney-General was the chief law officer and adviser of the Crown upon whom devolved the management of its legal affairs and the prosecution of all suits, civil and criminal, in which the Crown had an interest; and these functions and responsibilities, in the absence of constitutional limitations, appertain to the office of Attorney-General in New Jersey, as a part of [its] common-law inheritance[.]" *Alexander v. N.J. Power & Light Co.*, 122 A.2d 339, 343 (N.J. 1956) (citing *Wilentz v. Hendrickson*, 33 A.2d 366, 374 (N.J. Ch. 1943) ("[T]he functions of our [A]ttorney [G]eneral are similar to those exercised by the representative of the crown at the time of the separation of the colonies.")).

For centuries, "[i]n equity, as at law, the Attorney-General has [had] the right … to intervene by suit for the protection of the property of the sovereign or the interests of the public, where such are directly involved." *Alexander*, 122 A.2d at 380 (collecting cases). A "settled" power which the Attorney General enjoys at "common law except as modified by constitutional or statutory regulation." *O'Regan v. Schermerhorn*, 50 A.2d 10, 15 (N.J. Sup. Ct. 1946); *see Wilentz* 33 A.2d 366 at 374 (citations omitted) ("It has also been determined that those functions [of the Attorney General], in the absence of constitutional limitations, are subject to increase, alteration or abridgment by legislative enactment."). The statutory framework behind the Attorney General "reaffirms th[is] common law authority … to attend to all legal matters in which the people of the state are interested." *O'Regan*, 50 A.2d at 16; *see* N.J. STAT. ANN. § 52:17A-4 ("The powers and duties of the Division of Law shall be the powers and

duties now or hereafter conferred upon or required of the Attorney General, either by the Constitution or by the common and statutory law of the State.").

As head of the Department of Law, [the Attorney General's] powers and duties include: "[e]xamin[ing] and decid[ing] all legal matters submitted to h[er] by the Governor or the Legislature and act[ing] for them in any matter in which they may be interested;" "exclusively attend[ing] to and control[ling] all litigation and controversies to which the State is a party or in which its rights and interests are involved[;]" "[a]ttend[ing] generally to all legal matters in which the State or any officer, department, board, body, commission or instrumentality of the State Government is a party or in which its rights or interests are involved;" and "[e]nforc[ing] the provisions of the Constitution and all other laws of the State, as well as perform all of the duties conferred and imposed by law upon the Attorney General." N.J. STAT. ANN. §§ 52:17A-4c, g–h.

"[A]ct[ing] in all [these] capacities to the maximum extent allowable by law, on behalf of and for the benefit of all the State's Political Subdivisions, citizens, and residents," the Attorney General has decided to release the claims of Political Subdivisions as part of the Proposed JCOs to vindicate the State's quasi-sovereign interest in PFAS abatement and remediation. [Proposed 3M JCO ¶ 9; Proposed DuPont JCO § I.EE.] A decision that "is hardly novel." [Motion to Approve Proposed JCOs 63.] "[A]s a party to a 1998 nationwide settlement against tobacco companies," the Attorney General "released past, present, and future claims against

those companies on behalf of the State and its [P]olitical [S]ubdivisions in exchange for injunctive and monetary relief." [*Id.* at 63–64.]

**e. Objectors' Challenges**

Against this history, tradition, and understanding, Objectors stand athwart. In their view, Political Subdivisions are free "to operate without sovereign interference" and the State is without authority to release the claims at issue on their behalf. [Objectors DuPont Motion to Intervene 26–31; Objectors 3M Motion to Intervene 14–22; Objectors Resp. to Supp. Rpt. 34–38.] Doubtlessly, Political Subdivisions "are separate legal entities with their own statutory powers and rights." [Objectors Resp. to Suppl. Rpt. 35.] The Constitution of the State of New Jersey secures to Political Subdivisions not only those powers "granted in express terms but also those of necessary or fair implication, or incident to the powers expressly conferred, or essential thereto, and not inconsistent with or prohibited by this Constitution or by law." N.J. CONST. art. 4, § 7, ¶ 11. What is more, "[t]he provisions of this Constitution and of any law concerning municipal corporations formed for local government, or concerning counties, shall be liberally construed in their favor." *Id.*

Be this as it may, Objectors have not persuaded the Court that under these circumstances Political Subdivisions can effectively veto "the paramount right of the [S]tate to" vindicate its diligently-pursued statewide interest in environmental amelioration for the benefit of all residents, citizens, *and* Political Subdivisions. *Howell Twp.*, 504 A.2d at 25. Without much elaboration, Objectors retort that "[t]he express terms and liberal interpretation of municipal enabling statutes like" N.J. STAT. ANN.

§§ 40A and 40:69A "do not empower the DEP to make local government release claims." [Objectors DuPont Motion to Intervene 27.] But this turns timeworn principles on their heads.

The State does not claim its authority from municipal enabling statutes, but rather from the panoply of common-law, constitutional, statutory, and regulatory authorities adumbrated above; so Objectors' insistence that the State can only release these claims pursuant to statutory authorization finds no legal support.[48] [Objectors Resp. to Suppl. Rpt. 34–38.] The passage of time has unfurled quite a different habit: "The State's common-law power to function as protector of the public interest is subject to either '*enlargement or abridgment*' by legislative authority." *Matter of D.C.*, 679 A.2d at 643 (emphasis added) (quoting *Alexander*, 122 A.2d at 343). It is not, as Objectors would have it, contingent upon it, and Objectors have not identified for the Court a necessary curtailment.[49] *See* [Objectors DuPont Motion to Intervene 26–31; Objectors 3M Motion to Intervene 14–22; Objectors Resp. to Supp. Rpt. 34–38.]

---

[48] Objectors mistakenly direct the Court to *City of Jersey City v. Roosevelt Stadium Marina, Inc.*, 509 A.2d 808 (N.J. Super. Ct. App. Div. 1986), and *In re Lead Paint Litig.*, 924 A.2d 484 (N.J. 2007), for support. [Objectors Resp. to Suppl. Rpt. 35.] While discussing the settlement authority of Political Subdivisions, these cases do not discuss, let alone support, the alleged statutory authorization needed by the State to release the claims of Political Subdivisions. *See generally Roosevelt Stadium Marina, Inc.*, 509 A.2d 808; *In re Lead Paint Litig.*, 924 A.2d 484.

[49] As amended in 2022, the State's Antitrust Statute reads as follows: "The Attorney General, on behalf of the State or any of its political subdivisions or public agencies, or the political subdivision or public agency at the direction of or with the permission of the Attorney General, may institute an action to recover the damages provided for by this section or by any comparable provisions of Federal law, together with reasonable attorneys' fees, filing fees and reasonable costs of suit." N.J. STAT. ANN.

Their position that the Tobacco Master Settlement Agreement and its Model Statute—ratified by the Legislature—somehow alter this arrangement is unfounded, as nothing in that statutory text could be read to that effect. [Objectors Resp. to Suppl. Rpt. 35–36]; *see* N.J. STAT. ANN. §§ 52:4D *et seq.* In the words of the Supreme Court of New Jersey, "the constitutional mandate to favor [M]unicipalities in the construction of statutory grants of power constitutes no warrant to read into these statutes a power that is not there and not intended to be given." *Wagner v. Mayor & Mun. Council of City of Newark*, 132 A.2d 794, 800 (N.J. 1957) (citing *Magnolia Dev. Co., Inc. v. Coles*, 89 A.2d 664, 666–67 (N.J. 1952)). Wisdom so counsels, for Objectors are themselves "but creations of the State," *id.* at 798 (citations omitted), "represent[ing] only a part of the citizens," *New Jersey v. New York*, 345 U.S. 369, 373 (1953). The State, *sine qua non*, is acting here on behalf of "all its citizens." *New Jersey*, 345 U.S. at 372–73 (quoting *Kentucky v. Indiana*, 281 U.S. 163, 173 (1930)).

The circumstances before the Court do not lend support to an "omnipoten[t]" power of Political Subdivisions to deny the people of New Jersey the generational benefits of the Proposed JCOs to combat PFAS contamination. *Wagner*, 132 A.2d at 800. Nor does the Court find that the releases unlawfully deny Political Subdivisions their "statutory ERA right to take action against polluters."[50] [Objectors DuPont

---

§ 56:9–12b. The Court takes this amendment to simply recognize the State's authority to release subdivisional claims, not to stand for the proposition pressed for by Objectors.

[50] The same for that of private individuals, insofar as Objectors even have proper standing to raise such an objection on their behalf. The Releases exclude claims by

Motion to Intervene 28; Objectors 3M Motion to Intervene 16.] Recall that the Legislature, in enacting the ERA, placed "primary prosecutorial responsibility for enforcing the [S]tate's environmental laws" in the State and "anticipate[d] private parties' standing only when the government has failed to properly act." *CDMG Realty*, 875 F. Supp. at 1086. "Here, there is no such inaction; the State has acted, including vigorously prosecuting this case at trial, to reach these comprehensive" Proposed JCOs. [Docket No. 764, at 37–38.] For all the reasons outlined by the Judge Schneider in his cogent Opinion denying Carneys Point's first Motion to Intervene, the State has not "failed in its mission, neglected to take action essential to fulfill an obvious legislative purpose, or … has not given adequate and fair consideration to local or individual interests." *Howell Twp.*, 504 A.2d at 27; *see* [Docket No. 396.] Nor do Objectors truly contend otherwise.[51] *See* [Objectors DuPont Motion to Intervene 26–31; Objectors 3M Motion to Intervene 14–22; Objectors Resp. to Supp. Rpt. 34–38.] Far from "fail[ing] or neglect[ing] to act in the best interest of the citizenry or … arbitrarily, capriciously or unreasonably act[ing]," *Howell Twp.*, 504 A.2d at 27, the Proposed JCOs—and the efforts behind them—are a testament to the State "be[ing] free to determine what solution will best resolve a problem on a state or regional basis

---

"any Person" seeking "solely … private or individual relief for separate and distinct injuries." [Proposed 3M JCO § IV.5 (defining "Releasors"); Proposed DuPont JCO § IV.6 (defining "Statewide PFAS Releasors").]

[51] Objectors' contention that the DEP "is acting in bad faith and acting unlawfully" for agreeing to the Releases, and therefore is violating the ERA, is an unpersuasive tautology. [Objectors 3M Motion to Intervene 22.]

given its expertise and ability to view those problems and solutions broadly," *Exxon II*, 181 A.3d at 270.

This Court finds that "the structure of the sovereign state and the constitutional and statutory powers granted to the Attorney General dictate that the [Political Subdivisions] [are] ultimately subordinate to the [S]tate where, as here, the Attorney General acted to bind the [S]tate as a whole in a matter clearly of [S]tate interest." *In re Certified Question from U.S. Dist. Ct. for E. Dist. of Mich.*, 638 N.W.2d 409, 415 (Mich. 2002). This structure calls for the State to have "the last word" on protecting the people and Political Subdivisions from the harms of statewide PFAS contamination.[52] *Tenn. Copper*, 206 U.S. at 237.

Objectors should neither misinterpret or mistake the scope of this Court's ruling. The Court does not disagree that Municipalities may possess independent legal interests in appropriate circumstances. Municipalities own property, operate drinking water systems, maintain infrastructure, and may assert claims arising from injuries to

[52] Objectors also argue that the Releases violate the Constitution of New Jersey, which "prohibits a contract, such as th[ese] [Proposed] JCO[s], from 'depriving a party of any remedy' which existed when the contract was made." [Objectors 3M Motion to Intervene 15–16 (quoting N.J. CONST. Art. 4, § 7, cl. 3).] What the Constitution truly says is this: "The Legislature shall not pass any bill of attainder, ex post facto law, or law impairing the obligation of contracts, or depriving a party of any remedy for enforcing a contract which existed when the contract was made." N.J. CONST. Art. 4, § 7, cl. 3).] On its face, this clause has no apparent applicability to the issue confronting this Court, nor do Objectors meaningfully argue otherwise. *See* [Objectors 3M Motion to Intervene 15–16.] For this reason, Objectors' (unexplained) reliance on *N.J. Educ. Ass'n v. State*, 989 A.2d 282 (N.J. Super. Ct. App. Div. 2010), to assert that the Proposed JCOs are "unlawful because [they] set[] State policy by executive contract without legislative authority" is baseless. [Objectors DuPont Motion to Intervene 28.]

those proprietary interests. Nothing in this Opinion should be read to hold otherwise. But that observation does not answer the question presently before the Court. The issue is not whether Municipalities may possess claims independent of the State. Rather, the issue is whether the State lacked authority to settle the claims it asserted. The answer is no.

Whether a particular municipal cause of action ultimately falls within the scope of the Releases is a separate question that depends upon the language of the Releases, the nature of the municipal claim, and principles of applicable law. That issue is neither necessary nor appropriate to resolve in deciding whether the Proposed JCOs should be approved. Deciding that question would require the Court to issue what would effectively be an advisory opinion concerning claims pending in other courts—as Objectors have correctly argued against—and involving parties not before this Court. The Court declines to do so. The Court's approval of the Proposed JCOs therefore should not be misunderstood. By approving the Proposed JCOs, the Court holds only that the State possessed the authority to compromise the claims it asserted in its sovereign, quasi-sovereign, *parens patriae*, public trustee, and regulatory capacities and that doing so was consistent with the governing legal framework. The Court does *not* hold that every claim any Municipality might someday assert necessarily falls within the Releases. Nor does the Court determine that any particular municipal claim survives unaffected. Those questions remain for future courts should they arise in an actual controversy.

The State duly exercised its authority in initiating these actions, prosecuted them in capacities recognized under New Jersey law, engaged in years of adversarial litigation, negotiated at arm's length, and obtained substantial monetary and remedial consideration. The mere existence of overlapping governmental interests does not deprive the State of authority to resolve the claims it asserted. Nor does it render the Proposed JCOs unlawful. Accordingly, the Court concludes that Objectors have not demonstrated that the State exceeded its authority in entering the Proposed JCOs and releasing the claims of Political Subdivisions as worded. The objection to the contrary does not provide a basis for denying approval.

2. **The Proposed JCOs Do Not Impermissibly Usurp the Legislature's Appropriations Authority**

Objectors next contend that the Proposed JCOs cannot be approved because they allegedly conflict with Article VIII of the New Jersey Constitution governing the appropriation and expenditure of public monies. [Objectors Resp. to Suppl. Rpt. 11–25.] According to Objectors, Abatement Damages remain subject to future legislative appropriations, thereby rendering the Proposed JCOs constitutionally infirm because a future Legislature could redirect, reduce, or decline to appropriate those funds in the manner contemplated by the Proposed JCOs. [*Id.* at 13–25.] The Court concludes that this objection misconstrues both the nature of the Proposed JCOs and the Court's role in reviewing them.

At the outset, the Court agrees with the unremarkable proposition that no judicial order may authorize conduct prohibited by the New Jersey Constitution.

Were the Proposed JCOs to require expenditures that plainly violated the Constitution's appropriations provisions, judicial approval would be inappropriate. But that is not the circumstance presented here. The Proposed JCOs do not appropriate public funds. Nor do they enact legislation, establish annual budgets, or direct the Legislature to appropriate monies in any particular fiscal year. Instead, they resolve disputed litigation through negotiated obligations voluntarily assumed by the Settling Defendants and establish the purposes for which the resulting Settlement Payments are to be used. Whether and how future State officials administer those funds necessarily remains subject to applicable constitutional and statutory requirements governing the expenditure of public monies.[53]

In this way, Objectors' demand for enabling legislation or yearly reappropriation before entering the Proposed JCOs appears to conflate two distinct governmental functions: The authority of the Executive Branch to settle litigation on behalf of the State and the Legislative prerogative to appropriate public funds. The Court does not understand the Proposed JCOs to alter this constitutional allocation of powers by investing the Executive with independent appropriation authority to

[53] Objectors also make the claim that the Escrow Agreements amount to appropriative usurpation because they place the Settlement Payments in the Commissioner's "direct control." [Objectors Resp. to Suppl. Rpt. 14.] At the First Fairness Hearing, however, Counsel for Objectors appeared to concede the propriety of the Escrow Agreements. *See* [Tr. of First Fairness Hearing 131:4–135:20.] The Escrow Agreements do not "govern" the disbursement of the Settlement Payments, but are to "be used for the sole purpose of holding [S]ettlement [P]ayments in escrow pending potential appeals—a standard practice for settlements of this magnitude." [State Reply in Support of Suppl. Rpt. 19.]

circumvent the Legislature's constitutional role in the budget process. The Court's own role in reviewing the Proposed JCOs is not to determine whether the parties have secured every future legislative action that may bear upon their implementation. That distinction is critical.

The Court's task is to determine whether the Proposed JCOs are lawful and appropriate for judicial approval. It is not to speculate on the constitutionality of hypothetical future appropriations legislation that have not been enacted, nor to predict how future Executive or Legislative officials may exercise their constitutional responsibilities years from now—that would require speculation concerning future governmental conduct. Objectors' true concern is uncertainty over whether future Legislatures might fail to appropriate funds consistently or in a manner different with the purposes identified in the Proposed JCOs. Those concerns, while not frivolous, do not render the Proposed JCOs constitutionally-violative.

The State intends to disburse the Abatement Damages through the PFAS Abatement Fund, a separate, non-lapsing fund outside of the General Fund that the Governor specifically included in her Detailed Budget Recommendations for Fiscal Year 2027. *See* [Settlement Funds Distribution Plan 2; Cahall Decl. ¶ 22; OFFICE OF MGMT. & BUDGET, THE STATE OF NEW JERSEY: THE GOVERNOR'S BUDGET MESSAGE, DETAILED BUDGET RECOMMENDATIONS, FISCAL YEAR 2027, at 250.] Conceptually, the PFAS Abatement Fund thus mirrors, if imperfectly, the Volkswagen Environmental Mitigation Fund, which has been "included in the State's Annual

Appropriations Act" "[e]ach year" since its creation.[54] [Suppl. Rpt. 35–36.] Objectors' focus on the alleged "uncertainty" of yearly reappropriation is not a reason to disapprove the Proposed JCOs. [Objectors Resp. to Suppl. Rpt. 17.] Could not one be just as concerned with the "uncertainty" over whether a future Legislature repeals, alters, or disadvantageously modifies the enabling statute that Objectors insist upon? In Objectors' view, the Legislature "retains full discretion to appropriate different amounts, redirect funds for other purposes, or decline to appropriate PFAS settlement funds at all." [*Id.* at 18.] Indeed, Objectors themselves concede that even their advocated-for enabling legislation "is permanent *until repealed*." [Objectors Sur-reply to Suppl. Rpt. 1 (emphasis added).] It stands to reason that to precondition Executive settlement authority upon Legislative vagaries is misguided and unworkable.

Objectors are hoisted by their own petard. The Executive cannot—and never has—absolutely guarantee that the Abatement Damages will be duly spent: That truly would amount to an Executive cutpurse.[55] And if that is the case, why would judicial approval require it? It does not. Suspecting as much, Objectors shift course and direct

[54] For all the attention paid to the discrete differences between the Volkswagen Environmental Mitigation Fund and the PFAS Abatement Fund by Objectors, they miss the forest for the trees. Insofar as the Court understands it, the State references the Volkswagen Environmental Mitigation Fund to provide an idea of what it intends with the PFAS Abatement Fund.

[55] Objectors also argue that the State claims Legislative appropriation authority to manage decades of Abatement Damages. [Objectors Resp. to Suppl. Rpt. 11, 19, 22–25.] Any fair reading of the State's filings in this case reveals that to be false, and Objectors' argument that approving the Proposed JCOs compels such a finding by this Court is without merit. [Objectors Resp. to Suppl. Rpt. 22–25.]

the Court to moments when the Legislature did enact special funding legislation. [Objectors Resp. to Suppl. Rpt. 19–21.] Tellingly, none of this intimates that such legislation is required for judicial approval of the Proposed JCOs.

Equally important, the Proposed JCOs remain enforceable orders of this Court. Remember, consent decrees have attributes both of contracts and of judicial decrees. *Local No. 93*, 478 U.S. at 519. Unlike an ordinary settlement agreement, the Proposed JCOs do not merely memorialize the Settling Parties' expectations; they impose judicially enforceable obligations. With minor qualification,[56] this Court "retains jurisdiction over both the subject matter of [each] [Proposed] JCO and the Parties for the duration of the performance of the terms of [the] [Proposed] JCO[s] for the purpose of enabling any Party to apply to the Court at any time for such further order, direction, or relief as may be necessary or appropriate for the construction, interpretation, or modification of th[e] [Proposed] JCO[s], or to effectuate or enforce compliance with th[e] [Proposed] JCO[s'] terms." [Proposed 3M JCO ¶ 105; Proposed DuPont JCO ¶ 101.]

So, should disputes arise concerning compliance with the terms of the Proposed JCOs, the Settling Parties remain subject to this Court's continuing jurisdiction. As Counsel for the State put it, "[I]f a term of th[ese] [Proposed JCOs] is breached," the Settling Parties will "be back" before this Court for redress. [Tr. of Second Fairness

[56] The Proposed DuPont JCO qualifies this Court's jurisdiction "to the dispute resolution requirements set forth in Paragraph 96"of that agreement. [Proposed DuPont JCO ¶ 101.]

Hearing 202:24–203:1.] This includes the State doing so on behalf of Political Subdivisions—to presume otherwise is unnecessarily speculative and assumes bad faith on the State's part. True, this Court's continuing jurisdiction does not extend to supervising the State's annual appropriations process or adjudicating abstract constitutional disputes, but it provides an equitable mechanism within this Court's limited constitutional role for ensuring that the contractual obligations embodied in the Proposed JCOs are honored according to their terms. Accordingly, the Court concludes that the objections premised upon the New Jersey Constitution's appropriations provisions do not warrant denial of the Proposed JCOs.

**3. Paragraph 83 of the Proposed DuPont JCO Does Not Impermissibly Determine Its Preclusive Effect**

Objectors also argue that Paragraph 83 of the Proposed DuPont JCO impermissibly determines the preclusive effect of the Proposed JCO on Carneys Point's pending action in the Superior Court of New Jersey.[57] [Objectors Resp. to

---

[57] Paragraph 83 of the Proposed DuPont JCO reads as follows:

> The Parties intend, and this Court finds, that the Releases in the JCO resolve, release and bar Claims, including to the extent applicable by res judicata, brought by Carneys Point Township that seek to recover for the same or materially similar relief that Settling Plaintiffs are releasing in the JCO, and specifically including Carneys Point's Environmental Rights Act Claims and all Claims within the scope of the Released Claims with respect to the Chambers Works Site (or that would be within the scope of the Released Claims if asserted by Settling Plaintiffs). Based on this, upon entry of this JCO, Settling Plaintiffs and the Settling Defendants will seek an order promptly dismissing the following litigation currently pending in the New Jersey court: *Carneys Point Twp. v. E.I. du Pont de Nemours et al.*, Salem County Superior Court Docket No. SLM-L- 251-16, Appeal Docket No. A-002427-24. The Parties will reasonably

Suppl. Rpt. 4–11.] According to Objectors, Paragraph 83 effectively directs the Superior Court to dismiss Carneys Point's action by declaring that the claims asserted therein have been released through the Proposed JCO. [*Id.* at 7–10.] Objectors contend this Court is without jurisdiction to do so. [*Id.*]; *see* [Tr. of Second Fairness Hearing 37:24–38:4.]

But this Court could not have expressed its agreement with Objectors more clearly at the First Fairness Hearing. There, this Court acknowledged that it "cannot tell the [S]tate court what to do" with respect to Paragraph 83. [Tr. of First Fairness Hearing 38:21–22]; *see also* [*id.* at 48:5–6 ("[T]his Court is impotent to tell a state court how to rule" on Paragraph 83's preclusive effect.").] Counsel for the State agreed, clarifying that the State "do[es] not believe that [Paragraph 83] is telling the [S]tate court what to do[,]" and that the State will rather "go back before the [S]tate court and persuade the [S]tate court to do whatever it's going to do with that action." [*Id.* at 38:12–25]; *see* [*id.* at 40:21–41:15]; [Proposed DuPont JCO Response to Public Comments Received ¶ 47 (responding during notice-and-comment period that "the Department recognizes that the Superior Court would need to consider the effect of [Paragraph 83 and] the Proposed DuPont JCO, if approved, and enter its own order with respect to a motion to dismiss Carneys Point's pending litigation and whether it should continue.").]

---

cooperate to seek dismissal of, or otherwise address, any other Claims brought by Carneys Point Township that are resolved, released, and barred by this JCO.

Likewise, Carneys Point remains free to contend that the Releases do not apply or are otherwise unenforceable before the State court. Indeed, the State "has consistently maintained that the [S]tate court must make its own determination of the impact of the Proposed DuPont JCO in the case pending before it." [State Reply in Support of Suppl. Rpt. 3.] The DuPont Defendants, too, "concur" with this interpretation. [Tr. of Second Fairness Hearing 47:18–21.] Thus, it seemed that Counsel for Objectors' response that he would "take" the Court's offer to interpret Paragraph 83 as not directing the Superior Court to rule either way, factually or legally, resolved the issue. [*Id.* at 48:1–9.]

Apparently under the (erroneous) impression that this Court directed the Settling Parties to textually amend Paragraph 83, Objectors recapitulated this challenge in their second round of objections and at the Second Fairness Hearing.[58] [Objectors Resp. to Supp. Rpt. 4–11; Tr. of Second Fairness Hearing 11:12–16:21.] The Court reiterated that it would assuage Objectors' concerns and not make any factual or legal findings as to the preclusive effect of Paragraph 83 in its "final opinion and order" on the Proposed JCO.[59] [Tr. of Second Fairness Hearing 12:25–14:3, 16:2.] Objectors, in turn, were again "satisf[ied]." [*Id.* at 16:12–20.] And despite their

[58] To be sure, the language disputed here by Objectors is not a paragon of clarity. The Settling Parties certainly could have drafted Paragraph 83 in a manner more consistent with what this Court has repeatedly made clear.

[59] Objectors' portrayal at the Second Fairness Hearing of the Settling Parties' fixation on Carneys Point's State court action in Paragraph 83 elides one critical detail: "[I]t's the only state court action that they're aware of." [Tr. of Second Fairness Hearing 14:4–21.]

apprehensions to the contrary, this Court is confident that the Honorable Robert G. Malestein will understand this Opinion's "clear direction," and that any ensuing confusion is the Objectors' alone.[60]

Properly construed, Paragraph 83 of the Proposed DuPont JCO identifies Carneys Point's pending State court litigation because the Settling Parties believe certain claims asserted therein fall within the scope of the negotiated Releases. The Paragraph further contemplates that, following entry of the Proposed DuPont JCO, the Settling Parties may seek dismissal of that litigation based upon those Releases and other applicable preclusion principles. The language of the provision further recognizes that any preclusive effect exists only to the "extent applicable by res judicata." [Proposed DuPont JCO ¶ 83.] Whether the Releases ultimately bar all, some, or none of Carneys Point's pending claims remains a matter for determination by the Superior Court should the issue be presented there. This Court's approval of the Proposed DuPont JCO constitutes approval of the settlement between the Settling Parties. It does not constitute a judicial determination regarding the preclusive effect of that settlement upon claims pending elsewhere.

---

[60] As has already proved the case. In resurrecting this specific challenge, Objectors proposed an amendment that would require this Court to make a preclusive finding in *its* favor. *See* [Objectors Resp. to Suppl. Rpt. 11.] Just as the Court cannot determine that Carneys Point's claims have necessarily been extinguished, neither can it determine that those claims necessarily survive unaffected by the Releases. Either conclusion would require adjudication of issues not presently before the Court and would improperly intrude upon matters reserved to the Superior Court.

Accordingly, the Court construes Paragraph 83 as preserving the ability of the Settling Parties to assert whatever defenses they believe are available in the Superior Court while preserving the ability of Carneys Point to oppose those defenses. For these reasons, the Court concludes that Paragraph 83 of the Proposed DuPont JCO, even if not perfectly worded and requiring clarification, does not warrant its denial.

**4. The Proposed DuPont JCO Does Not Unlawfully Bundle Natural Resource Damages and Abatement Damages or Grant the Commissioner Authority to Misspend Natural Resource Damages**

Objectors complain that the DuPont Settlement Payment Schedule unlawfully "bundles" Natural Resource Damages and Abatement Damages "without differentiating how much goes to" each, and that even if it did, the Proposed JCO "also does not differentiate how much [of] the [Natural Resource Damages] amount being paid each year, if any, goes to the four Industrial Sites." [Objectors Resp. to Suppl. Rpt. 25.] As explained above, it is because the DuPont Settlement Payment Schedule does not have to.

"[E]xcept where otherwise indicated," Objectors are correct that the Dupont Settlement Payment Schedule sets yearly block payments, but does not specify the portion of each annual payment that is for Natural Resource Damages or Abatement Damages. *See* [DuPont Settlement Payment Schedule.] For example, the DuPont Defendants will pay the State $200 million in Year 1, of which $100 million is allocated for Costs, Fees, and Punitive Damages. [*Id.*] The Court explained above that the remaining $100 million allocation decision is reserved to the Commissioner to ensure

that Natural Resource Damages or Abatement Damages are effectively spent in Year 1 (and the following years) depending on conditions. *See* [*id.* ("[E]xcept where otherwise indicated, all funds are to be allocated between Natural Resource Damages and Abatement Damages by the Department").] An annual review of where and how much to spend Natural Resource Damages makes the most beneficial use of the DEP's expertise in "a moving process." [Tr. of Second Fairness Hearing 149:22–23.] As conditions change, so will disbursements. So it should be, for why else did the Legislature task the DEP with "formulat[ing] comprehensive policies for the conservation of the natural resources of the State, the promotion of environmental protection and the prevention of pollution of the environment of the State"? N.J. STAT. ANN. § 13:1D-9.

Objectors' depiction of the Commissioner "mov[ing] Natural Resource Damages to PFAS in whatever amounts DEP chooses" is incorrect. [Objectors Resp. to Suppl. Rpt. 26.] "[O]nce those funds go to [Natural Resource Damages], they stay there." [Tr. of Second Fairness Hearing 147:16–17.] Nothing in the Proposed DuPont JCO or its Settlement Payment Schedule alters that. In due course, the Chambers Works Site shall receive $100 million, the Pompton Lakes Works Site $75 million, the Parlin Site $30 million, and the Repauno Works Site $20 million. [Proposed DuPont JCO ¶ 7(c)(i).] *When* those monies are so dedicated is lawfully left to the Commissioner.

Objectors also take issue with the last sentence of Paragraph 7(c)(iv), which states the following: "Notwithstanding the foregoing, the Settling Plaintiffs retain the

discretion to apply additional portions of the Settlement Payments for the general purpose of, among other things, improving water quality and funding the treatment of drinking water across the State."[61] [Proposed DuPont JCO ¶ 7(c)(iv).] Context helps—in this case the preceding two sentences, which basically say, "that the State may use more than $16.5 million specifically covered for statewide PFAS claims to improve water quality and fund the treatment of drinking water." [Tr. of Second Fairness Hearing 146:10–13.] "There's no inherent intention or contradiction between the [Natural Resource Damages] provisions and that provision. The State can use $225 million for [Natural Resource Damages] and it can also use more than $16.5 million to fund the treatment of drinking water." [*Id.* at 146:13–17.]

As discussed, the very terms of the Proposed JCOs ensure their constitutional fidelity, as each dictates that the administration of the $365 million in Natural Resource Damages over the next 25 years shall comply with the 2017 National Resource Damages Constitutional Amendment. [Proposed 3M JCO ¶ 44(c)(i); Proposed DuPont JCO ¶ 7(c)(i).] The bottom line is this: Objectors "want to know when" they will receive their monies. [Tr. of Second Fairness Hearing 152:11.] A fair enough question, but one whose answer does not prevent approval of the Proposed JCOs. Objectors can take their monies "to the bank." [*Id.* at 157:20–21.] But those

[61] Objectors withdrew this objection with respect to Paragraph 11 of the Proposed DuPont JCO. *See* [Tr. of Second Fairness Hearing 162:10–11.]

deposits will occur when "the Commissioner … exercise[es] his best discretion … [in] … addressing the problem the State faces across the board." [*Id.* at 152:12–13.].[62]

#### 5. The Proposed 3M JCO Does Not Require a Natural Resource Damages Carveout for the Parlin Site

Objectors relatedly contend that the Proposed 3M JCO does not specifically allocate Natural Resource Damages for the Parlin Site, yet designates $105 million for the Chambers Works Site. [Objectors Resp. to Suppl. Rpt. 26; Objectors Reply to Suppl. Rpt. 14–15; 3M Settlement Payment Schedule] This is indeed true, but it does not defeat judicial approval. The State crafted the Proposed 3M JCO as it did because the Chambers Works Site "was unique in terms of 3M's extensive ties to that [S]ite." [Tr. of Second Fairness Hearing 208:4–5.] The record supports the State's position here and Objectors offer no evidence to the contrary. *See* [Docket No. 853 §§ V–VI (directing Court to record evidence of 3M's primary involvement with Chambers Works Site as opposed to other Sites, including the Parlin Site); Objectors Resp. to Suppl. Rpt. 26; Objectors Reply to Suppl. Rpt. 14–15.]

It must also be remembered that there are *two* Proposed JCOs that seek comprehensive statewide redress of PFAS-related harm. As noted above, the Parlin Site will receive $30 million in Natural Resource Damages through the Proposed DuPont JCO. [Proposed DuPont JCO ¶ 7(c)(i).] And possibly more, as the Proposed

---

[62] Objectors' underdeveloped ancillary reasons on this score—unreconcilable contradiction, constitutional implications, usurpation of legislative appropriations authority, improper delegation, public transparency and accountability, substantive fairness—is nothing more than an extrapolation of the overruled objection above. *See* [Objectors Resp. to Suppl. Rpt. 27–34.]

3M JCO marks $550,000 in Natural Resource Damages for "other sources." [Proposed 3M JCO ¶ 44(c)(i).] This objection does not defeat approval of the Proposed JCOs.

**6. The "Tax Reduction Rule" Does Not Prevent Judicial Approval of the Proposed JCOs**

Objectors argue that the State's intended statewide use of the $525 million in Abatement Damages violates the so-called "Tax Reduction Rule" found in 26 C.F.R. § 1.162-21(e)(4). [Objectors Resp. to Suppl. Rpt. 39–42.] Specifically, Objectors contest that because the Proposed DuPont JCO incorporates language intended to permit certain settlement payments to qualify as restitution or remediation for purposes of the federal tax regulations, the State is legally obligated to expend the PFAS Abatement Damages only on projects having a "direct nexus" to the Chambers Works Site. *See* [*id.*] Objectors maintain that the State's proposed use of portions of the PFAS Abatement Fund for statewide PFAS projects renders the Proposed JCO internally inconsistent and therefore unfair and unreasonable. *See* [*id.*] It further requests that the Court require the State to dedicate those funds exclusively to Chambers Works Siterelated projects and to disclose federal tax reporting forms generated under the settlement. [*Id.* at 41–42.]

Section 162(f) of the Internal Revenue Code generally disallows deductions for amounts paid to, or at the direction of, a governmental entity in relation to the violation of law, while preserving deductions for certain amounts properly characterized as restitution, remediation, or expenditures incurred to come into

compliance with law if the statutory and regulatory requirements are satisfied. *See* I.R.C. § 162(f); 26 C.F.R. § 1.162-21. Those regulations govern the federal income tax consequences of qualifying payments and establish the requirements that must be satisfied if a taxpayer seeks to claim a deduction. They do not purport to regulate the substantive scope of a State's environmental enforcement authority, prescribe how a State must allocate settlement proceeds among competing environmental priorities, or establish standards governing judicial approval of environmental consent decrees. *See* I.R.C. § 162(f); 26 C.F.R. § 1.162-21.

To the extent Carneys Point has standing to challenge the Settling Defendants' prospective tax filings,[63] this objection fails for several reasons. First, as the Settling Parties correctly observe, the requirement of a "direct nexus" to a "site" does not appear in § 1.162-21(e)(4), nor have Objectors provided a single legal authority for that proposition. *See* [Objectors DuPont Motion to Intervene 31–35; Objectors 3M Motion to Intervene 22–27; Objectors Resp. to Suppl. Rpt. 39–42; Objectors Sur-reply to Suppl. Rpt. 12.] Beyond its atextuality, however, lies the observation that whether the DuPont Defendants "may be able to deduct their settlement payment on their … federal tax returns is also not a reason to deny approval." *Exxon I*, 183 A.3d at 335.

---

[63] At the Second Fairness Hearing, Objectors made the argument that they would be harmed because compliance with the Tax Reduction Rule would require all the Abatement Damages "to be spent at and around" polluted sites within their jurisdictions, "which the State doesn't want to have to do." [Tr. of Second Fairness Hearing 191:10–16.]

The Settling Defendants' intention to claim deductions under § 162(f) is a federal tax question quite distinct from the question presently before the Court. This Court's responsibility is to determine whether the Proposed JCOs are fair, reasonable, consistent with New Jersey's environmental statutes, and in the public interest. The Court is not asked to determine whether the Settling Defendants ultimately will satisfy every requirement necessary to obtain a federal tax deduction, nor is the Court charged with issuing what would effectively amount to an advisory ruling concerning future administration of the Internal Revenue Code.

It is true that the Settling Parties drafted portions of the Proposed DuPont JCO with reference to the federal tax regulations and included provisions requiring the State to furnish documentation contemplated by those regulations. *See, e.g.*, [Proposed DuPont JCO ¶¶ 6, 7(c)(iii), 12.] Objectors therefore emphasize that the so-called Tax Deduction Rule "has actually been incorporated into all of the payment definitions" of the Proposed DuPont JCO and that Paragraph 102 "obligates the [State] to prepare, provide, and file all necessary documents that entitle the [Settling] Defendants to qualify for the tax deduction." [Objectors Resp. to Suppl. Rpt. 40.] But it is nevertheless not for the Court to "wade into the tax strategies of multi-national corporations and determine how much, if any, of settlement payments they are going to deduct from their" federal taxes. *Exxon I*, 183 A.3d at 335.

All the more so since the resolution of such a federal tax controversy is neither ripe nor necessary for approval. Objectors' position presupposes a series of future events that have not yet occurred. It assumes particular allocations of settlement

funds, assumes the Settling Defendants will seek deductions for those expenditures, assumes the Internal Revenue Service will evaluate those deductions in a particular manner, and assumes that any disagreement regarding the tax consequences would invalidate the underlying Proposed JCO. The Court declines to engage in that chain of speculation.

Whether particular expenditures ultimately satisfy the requirements of § 162(f) and its implementing regulations depends upon the facts and circumstances surrounding those expenditures and, ultimately, the application of federal tax law by the Internal Revenue Service and, if necessary, the federal courts exercising jurisdiction over tax disputes. Nothing in the regulations assigns that determination to a district court reviewing the fairness of an environmental settlement. *See* I.R.C. § 162(f); 26 C.F.R. § 1.162-21. Nor do the regulations suggest that an environmental consent decree becomes unlawful merely because a third party disputes whether certain future expenditures may qualify for favorable tax treatment. *See* I.R.C. § 162(f); 26 C.F.R. § 1.162-21.

It is unsurprising then that Objectors have not directed the Court to a single "federal or state court that has rejected a[n] [Abatement-Damages[64]] settlement because the settling defendant could deduct its payment." *Exxon I,* 183 A.3d at 304; *see* [Objectors DuPont Motion to Intervene 31–35; Objectors' 3M Motion to Intervene 22–27; Objectors Resp. to Suppl. Rpt. 39–42; Objectors Sur-reply to Suppl. Rpt. 12.]

[64] The *Exxon I* court reasoned so in the context of Natural Resource Damages, but that distinction is of no legal moment here.

To rule otherwise and sustain this objection "would set a draconian precedent whereby every settlement, [Natural Resource Damages] *or otherwise*, could be rejected. Such a result would be contrary to th[e] [S]tate's pro-settlement policy." *Exxon I*, 183 A.3d at 335 (emphasis added); *see Gere*, 38 A.3d at 600; *DuHamell*, 66 A.3d at 738; *Reynes,* 935 A.2d at 814. This objection does not defeat approval of the Proposed JCOs.

#### 7. The Settlement Distribution Plan and the Stipulations Do Not Require Re-publication and a New Public Comment Period

Without caselaw to support their position, Objectors claim that the Settlement Distribution Plan (of which the PFAS Abatement Fund is a constituent plan) and the Stipulations are "material[] change[s]" requiring re-publication and a new public comment period. *See* [Objectors Resp. to Suppl. Rpt. 42–44.] The Court disagrees with this view.

The Spill Act reads pertinently:

> At least 60 days prior to its agreement to any administrative or judicially approved settlement entered into pursuant to [the Spill Act], the Department shall publish in the New Jersey Register and on the [DEP's] website the name of the case, the names of the parties to the settlement, the location of the property on which the discharge occurred, and *a summary of the terms of the settlement*, *including the amount of any monetary payments made or to be made*.

N.J. STAT. ANN. § 58:10-23.11e2 (emphasis added). Objectors base their challenge on the emphasized portion of the language excerpted above. [Objectors Resp. to Suppl. Rpt. 43.] In the first instance, Objectors have not explained, either in their briefings or at the Second Fairness Hearing, from where this "material change" standard emanates

(if from anything at all). *See* [Objectors Resp. to Suppl. Rpt.; Objectors Sur-reply to Suppl. Rpt.; Tr. of Second Fairness Hearing.] Sure, one could argue that a "term" is no longer a "term," as contemplated by the Spill Act, but Objectors neither make that argument nor elucidate their position. On that ground alone, the "objection" is waived.

Moreover, other than the Objectors say-so, the Settlement Distribution Plan and the Stipulations hardly constitute "material" changes as they serve to put a finer point on some of the Proposed JCOs' provisions that were subject to public notice and comment, *i.e.*, the "summary of the terms of the settlement." N.J. STAT. ANN. § 58:10-23.11e2. These clarifications do not alter the aggregate Settlement Payments which the Settling Defendants are obligated to pay the State, *i.e.*, "the amount of any monetary payments made or to be made." *Id.* Objectors make no real effort to explain how the Settlement Distribution Plan and the Stipulations legally affect the Proposed JCOs such that re-publication would be mandated by law. *See* [Objectors Resp. to Suppl. Rpt.; Objectors Sur-reply to Suppl. Rpt.; Tr. of Second Fairness Hearing.] These deficiencies alone warrant overruling this objection.

In any event, having reviewed the terms, the Court finds that the essential bargain struck by the Settling Parties and reflected in the Proposed JCOs has remained the same throughout these proceedings: the Settling Defendants have agreed to "exceptional monetary consideration and remediation commitments" in exchange for "broad releases and covenants not to sue regarding PFAS-related claims." [Motion to

Approve Proposed JCOs 16, 24.] It is the Court's view that the Settlement Distribution Plan and the Stipulations are simply clarifications of the Proposed JCOs.

All this led the Court to question the nature of the objection. When pressed by the Court whether Objectors would argue for re-publication if the State offered Objectors more money or otherwise altered the terms of the Proposed JCOs in *their* favor, Counsel "candid[ly]" conceded that Objectors would not advocate for re-publication or a new comment period. [Tr. of Second Fairness Hearing 204:19–205:21.] This says to the Court that Objectors' challenge appears to be a tactical one, rather than a substantive one. This does not provide a basis to defeat judicial approval.[65]

[65] To the extent Objectors raise this "objection" with respect to the QSF, it is likewise overruled for these reasons. Relatedly, Objectors want to "see" the legal instruments creating the QSF. [Tr. of Second Fairness Hearing 163:12.] But the QSF is "not yet created legally." [*Id.* at 164:11.] For one reason: this Court has yet to approve the Proposed JCOs. "[T]here is no [QSF] until th[e] [Proposed] JCO[s] get[] approved." [*Id.* at 166:11–12.] Once approved, the State and the Participating Counties "will go to South Dakota" and "create the fund consistent with" the Stipulation. [*Id.* at 164:12–14.]

Objectors seem to have retreated from their original argument that the DEP violated the Spill Act for not publishing the Escrow Agreements. *Compare* [Objectors DuPont Motion to Intervene 11–13; Objectors 3M Motion to Intervene 6–8], *with* [Objectors Resp. to Suppl. Rpt.; Objectors Sur-reply to Suppl. Rpt.] For good reason, not the least of which was that objection's fundamental misunderstanding of what the Escrow Agreements do. As explained before, the Escrow Agreements do not "govern" the disbursement of the Settlement Payments, as Objectors believe. [Objectors DuPont Motion to Intervene 11]. Furthermore, the Court does not find that the State was required to publish the Escrow Agreements word-for-word to satisfy its notice-and-comment obligations. Even assuming that the Escrow Agreements are material terms, the State is only required to publish a "summary of the terms of" the Proposed JCOs. N.J. STAT. ANN. § 58:10-23.11e2. The Proposed JCOs adequately do just that with

**8. The Qualified Settlement Fund**

Finally, Objectors raised a concern about the QSF at the Second Fairness Hearing. Objectors' argument appears to be that the QSF improperly delegates legislative and executive authority over Abatement Damages to the QSF's special master, involves South Dakota courts usurping New Jersey jurisdiction, and entails anti-competitive bidding. [Tr. of Second Fairness Hearing 167:18–23, 168:21–24, 169:2–4, 172:7–10.] None of this is accurate. The record does not support that the South Dakota special master would wrest the powers of New Jersey government.

The QSF works as follows, using Monmouth County as an exemplar:

> Monmouth County, they need [Abatement Damages] the most. [The Participating Counties] all agree. [Or] [t]hey don't agree, [so] the special master says, you know what, I've analyzed all of this, Monmouth needs it, okay. So when the State's doling out the money, we're going to step to the side and let Monmouth go and get abatement money first. The State's going to say, 'Thank you very much for your cooperation, we agree with your assessment. Monmouth needs it the most.' Then they're going to call up three different bidders and they're going to decide who's going to do the work because it requires competitive bidding.

[*Id.* at 175:8–17.]

Thus, the QSF "has nothing to do with the PFAS fund" nor "anything to do with the DEP" as argued by Objectors. [*Id.* at 168:14, 173:19.] The QSF is really "a side agreement amongst the [C]ounties and how they have decided to work together to address their needs collectively." [*Id.* at 178:8–11.] It does not oblige, compel, or control the DEP in any manner: "The DEP is out of it. [It is] just waiting on the

---

respect to the Escrow Agreements. [Proposed 3M JCO ¶ 44(b); Proposed DuPont JCO ¶ 7(b).]

sidelines waiting to see what the [C]ounties are telling them." [*Id.* at 169:5–7]; *see* [Participating Counties Stipulation ¶ 4 ("[I]n no way is the State bound by the QSF or the laws of the State of South Dakota and that the State is not subject to the jurisdiction of the South Dakota Court.").]

If the State and the Participating Counties have "any dispute between them regarding the proper use or application of the Settlement Funds, the amount that could revert to the State (if any), and/or the terms of this Order or their construction, the laws of the State of New Jersey shall apply to all such disputes and New Jersey shall be the sole venue where any such dispute(s) could be heard." [Participating Counties Stipulation ¶ 4.] In short, the Participating Counties prudently agreed on a mechanism to resolve their internal disputes regarding the settlement monies without involving the State. This final objection is not a basis upon which to disapprove the Proposed JCOs.[66]

Finding each Proposed JCO fair, reasonable, statutorily faithful, and in the public interest, the Court will **GRANT** the State's Motion to Approve Judicial Consent Orders.

---

[66] In their Sur-reply, Objectors raise a list of "additional issues," most of which are addressed and overruled in the discussion above. [Objectors Sur-reply to Suppl. Rpt. 6–16 (alterations in original).] Because these issues were raised for the first time in the Sur-reply, the Court declines to consider them.

## VI. THE MOTION TO APPROVE ATTORNEYS' FEES

Pursuant to New Jersey Court Rule 1:21-7(c), Special Counsel[67] for the State seeks $195,122,093 in reasonable attorneys' fees based on a total net present value of the cash and non-cash recoveries, applying an 8% discount rate, of $1,492,822,709.23. [Motion to Approve Attorneys' Fees 35 & Castello Decl. ¶¶ 81, 86.] There is no challenge to the reasonableness of Special Counsel's request under the applicable legal framework. *See* [Objectors Resp. to Motion for Attorneys' Fees 2 ("The Settling Plaintiffs claim that the net present value of the settlements is $1,492,822,709.23, and that they are seeking a fee of $195,122,093. Carneys Point and Sayreville do not challenge the amount.").] For the reasons that follow, the Court finds the requested fee award reasonable under New Jersey Court Rule 1:21-7(c).

### A. Standard of Review

Special Counsel's Retention Agreement[68] with the Office of the Attorney General incorporates New Jersey Court Rule 1:21-7, which governs the fee that an attorney may charge a client when the attorney represents the client in a personal injury action based on a contingency fee agreement. [Castello Decl., Ex. B, at B-4 ("Retention Agreement").] That Rule sets forth the maximum contingency fee an

---

[67] This moniker denotes: Kelley Drye & Warren LLP ("Kelley Drye"), the Law Offices of John K. Dema, P.C. ("Dema Law"), Cohn Lifland Pearlman Herrman & Knopf LLP ("CLPH&K"), and Taft Stettinius & Hollister LLP ("Taft Law").

[68] For ease of analysis, attached to the Motion to Approve Attorneys' Fees is the Chambers Works Litigation Retention Agreement, which "is representative of all the applicable retention agreements." [Castello Decl. ¶ 8 n.4]

attorney may contract for in tort cases: 33 1/3 % on the first $750,000 recovered; 30% on the next $750,000 recovered; 25% on the next $750,000 recovered; 20% on the next $750,000 recovered; and on all amounts recovered in excess of the above by application for a reasonable fee. N.J. CT. R. 1:21-7(c). Accordingly, Special Counsel is applying to this Court for a "reasonable fee" in the amount of $195,122,093.[69]

"The amount of the fee to be awarded in excess of $3,000,000 is to be determined by the court in light of all the circumstances." *Williams v. First Student Inc.*, 758 F. Supp. 3d 342, 357–58 (D.N.J. 2024) (citing *King v. Cnty. of Gloucester*, 483 F. Supp. 2d 396, 398 (D.N.J. 2007)); *see* N.J. CT. R. 1:21-7(f). "In determining a reasonable fee, the Court is guided by eight factors as laid out in the New Jersey Rules of Professional Conduct:

> (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
>
> (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
>
> (3) the fee customarily charged in the locality for similar legal services;
>
> (4) the amount involved and the results obtained;
>
> (5) the time limitations imposed on the client or by the circumstances;
>
> (6) the nature and length of the professional relationship with the client;
>
> (7) the experience, reputation, and ability of the lawyer or lawyers performing the services;
>
> (8) whether the fee is fixed or contingent.

[69] For both settlements, the Retention Agreement uses a sliding scale nearly identical to that in New Jersey Court Rule 1:21-7(c) for the respective amounts less than $3 million that do not require court approval. *Compare* [Retention Agreement, at B-4], *with* N.J. CT. R. 1:21-7(c).

*Williams*, 758 F. Supp. 3d at 358 (quoting RPC 1.5(a)); *see Nikoo v. Cameron*, No. 18-11621, 2021 WL 672930, at *1–*2 (D.N.J. Feb. 22, 2021) (applying RPC 1.5(a) to determine a reasonable fee); N.J. CT. R. 1:21-7(e) ("In all cases contingent fees charged or collected must conform to RPC 1.5(a).").

"Two especially important factors courts consider in determining a reasonable fee are whether 'the case presented problems which required exceptional skills beyond that normally encountered in such cases or the case was unusually time consuming.'" *King*, 483 F. Supp. 2d at 399 (citing *Wurtzel v. Werres*, 493 A.2d 611, 614 (N.J. Super. Ct. App. Div. 1985)). Courts generally find that exceptional lawyering exists where either: (1) new law is established; (2) trial, appeal, and retrial are required; or (3) the case presented significant obstacles to counsel and success appeared unlikely. *See Williams*, 758 F. Supp. 3d at 358 (collecting cases). "Where the court finds either exceptional lawyering or that the case was unusually time consuming, 'it will generally award a fee approximately at or above 1/3 of the excess amounts recovered.'" *Id.* (quoting *Busche v. Nat'l R.R. Passenger Corp.*, No. 18-10322, 2020 WL 5988267, at *7 (D.N.J. Oct. 9, 2020)). Where these factors are not present, the excess fee will typically range from 20% to 25% of the excess amounts recovered. *Busche*, 2020 WL 5988267, at *7.

**B. The State's Fee Request is Reasonable**

The first factor supports approval: Special Counsel expended much "time and labor," tackled "the novelty and difficulty of the questions involved," and possessed "the skill requisite to perform the legal service properly." RPC 1.5(a)(1). The matters

handled by Special Counsel "involved some of the most complex and novel environmental litigation in the country and lasted nearly six years." [Castello Decl. ¶ 92.] The successful resolution thereof demanded "not only a knowledge and understanding of the relevant statutes, regulations, and caselaw, but also an understanding of the science and technical issues that support the relevant statutes." [*Id.* ¶ 94.] So much so that "Special Counsel's attorneys and paralegals provided nearly 150,000 hours in professional services investigating and litigating these matters." [*Id.* ¶ 93.] "This is far from a run of the mill case[;]" it included "complex" legal issues and "hard-fought" proceedings. *King*, 483 F. Supp. 2d at 399 (quotation marks omitted). Special Counsel's award should reflect as much.

Factors two, three, and four likewise recommend approval. While Special Counsel was not precluded from other legal employment altogether—the second factor's concern—these cases "consume[d] a substantial amount of time for the individual attorneys involved and, for certain attorneys, the vast majority of their time." [Castello Decl. ¶ 100.] Of particular note, the period leading up to the Spring 2025 "mini-trials" saw "dozens of attorneys" toiling "round-the-clock" on the State's behalf. [*Id.*] The third factor is also satisfied. The Court finds the 13% fee requested by Special Counsel at or below that customarily charged in New Jersey for similar legal services. *See* [*id.* ¶¶ 103–108 & Exs. C–H (collating state and federal court orders in New Jersey approving 20% fees in environmental cases).] In fact, "courts customarily award 20-25% in excess of $3,000,000 as a reasonable fee." *Williams*, 758 F. Supp. 3d at 364 (citing *Busche*, 2020 WL 5988267, at *5). The fourth factor—

amounts involved and results obtained—favors approval. For many of the reasons supporting this Court's finding of procedural and substantive fairness, Special Counsel obtained billions of dollars in monetary payments and remediation commitments from the well-defended Settling Defendants for statewide PFAS contamination in the face of significant litigation risks.

As for the fifth factor, the nature and complexity of these cases imposed time limitations on Special Counsel. "The majority of fact discovery, plus expert discovery, dispositive motion practice, and pre-trial and trial, were undertaken within extraordinarily compressed deadlines and case schedules given the complexity of these cases." [Castello Decl. ¶ 117.] Sixthly, "the nature and length of the professional relationship with the" State calls for awarding Special Counsel their fees. Special Counsel "have represented the State in environmental remediation and [Natural Resource Damages] litigation for" decades, "have established legal precedents favorable to the Department" in that time, "and helped negotiate some of the largest environmental settlements in the State's history, under the oversight of eleven Attorneys General and five Commissioners of the Department." [Castello Decl. ¶ 121.] Special Counsel have certainly "achieved tremendous success with the States over the years, and particularly in these cases." [Motion to Approve Attorneys' Fees 32.]

The seventh factor is "the experience, reputation, and ability of the lawyer or lawyers performing the services." RPC 1.5(a)(7). Kelley Drye "has an environmental practice that specializes in representing states and other government entities in large

contamination and [Natural Resource Damages] cases." [Castello Decl. ¶ 124.] CLPH&K, "one of the oldest law firms in New Jersey," "has repeatedly represented the State in environmental matters," while Dema Law "has been recognized as the first firm to serve as outside counsel to a sovereign government in [Natural Resource Damages] litigation," and "has represented four states and territories in complex environmental litigation." [*Id.* ¶¶ 125–26.] For its part, Taft Law "was the first law firm in the country to uncover and disclose the impact of PFAS globally and prosecute litigation related to PFAS." [*Id.* ¶ 127.] The firm's "attorneys led the first PFAS-related class action, mass tort, and multi-district litigations in the United States, including in New Jersey, and continue to represent a wide variety of plaintiffs across the country in PFAS litigation." [*Id.*] The eighth and final factor also supports approval. The contingent nature of Special Counsel's retention, especially "in novel areas of the law such as this, against well-funded, sophisticated, and motivated opponents," is inherently risky and deserving of the requested award. [*Id.* ¶ 130.]

For all of these reasons, the Court will **GRANT** the Motion to Approve Attorneys' Fees in the amount of $195,122,093. *Williams*, 758 F. Supp. 3d at 358.

## VII. LAST WORDS

Before bringing this Opinion to a close, the Court would be remiss if it did not acknowledge the extraordinary advocacy displayed throughout this litigation. This case presented novel legal questions, exceptionally complex issues, and matters of substantial public importance and consequences. It was vigorously contested at every

stage by highly capable counsel, whose professionalism and dedication materially assisted the Court in resolving the issues before it. Although the parties often disagreed on both the facts and the law, their advocacy greatly assisted the Court in fully developing a comprehensive record necessary to decide this matter. The Court commends all counsel for their efforts on behalf of their respective clients and, ultimately, the citizens of New Jersey.

## VIII. CONCLUSION

The very Nation that we all cherish and for whose perpetuation we labor is "founded on compromise and barter," EDMUND BURKE, SPEECH ON CONCILIATION WITH AMERICA (1775)—complicated, yes; toilsome, sure, but necessary, indeed. "[N]o settlement will ever perfectly award the State everything that it wants," *Exxon I*, 183 A.3d at 333. The North Star of this litigation is and always has been whether the Proposed JCOs protect the public interest. That goal lies suspended somewhere between what is attainable and what is just beyond the collective reach: in other words, what is fair and reasonable. The Proposed 3M JCO and the Proposed DuPont JCO strike that balance.

Borrowing President Madison's description of our Constitution, the Proposed JCOs are not "the offspring of a single brain," and "ought to be regarded as the work of many hands & many heads." Letter from James Madison to William Cogswell (Mar. 10, 1834), *in* 9 THE WRITINGS OF JAMES MADISON 307, 307 (Gaillard Hunt ed., 1910). For the foregoing reasons, the State's Motion to Approve Judicial Consent

Orders and Motion to Approve Attorneys' Fees are **GRANTED**. An accompanying Order shall issue.

**August 7, 2026**
Date

**/s/ Renée Marie Bumb**
RENÉE MARIE BUMB
Chief United States District Judge